# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CLEAN ENERGY CHOICE COALITION, NFP | ) |
| Plaintiff, | ) ) ) ) Case No. |
| v. | ) ) |
| VILLAGE OF OAK PARK, ILLINOIS, | ) ) ) |
| Defendant. | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Clean Energy Choice Coalition, NFP ("Plaintiff" or "the Coalition"), by its attorneys, for its Complaint for Declaratory and Injunctive relief, states as follows:

### INTRODUCTION

1. Plaintiff brings this Complaint for Declaratory and Injunctive Relief against the Village of Oak Park, Illinois ("Oak Park"), a municipal corporation existing under the laws of the State of Illinois and located in the County of Cook, to enjoin the enforcement of an ordinance requiring, with limited exceptions, that all new buildings in Oak Park be constructed so as to use only electricity as an energy source, effectively banning the use of natural gas ("the Ordinance").

2. The Ordinance is invalid and unenforceable because the federal Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201 *et seq.*, expressly preempts Oak Park's ban on the use of natural gas for covered products.

3. Plaintiff has suffered, and will continue to suffer, irreparable harm, including both business and financial harm, for which there is no adequate remedy at law unless Oak Park is enjoined from enforcing the Ordinance. Oak Park, on the other hand, has no legitimate interest in enforcing an invalid and preempted law. The Ordinance deprives consumers and businesses of the choice to use an affordable, reliable, and efficient source of energy in new buildings. Accordingly,

the balance of the equities and the public interest favor Plaintiff in seeking to enjoin enforcement of an invalid and preempted ordinance.

4. Other communities have sought or are seeking to adopt similar ordinances. For example, Evanston, Illinois, a municipality within the service area of various members of the Coalition, has enacted similar legislation.[1] This patchwork approach by local governments is precisely what EPCA's uniform national energy conservation standards are intended to prevent. Each of these harms will affect Plaintiff on an ongoing basis, as the Ordinance, and other similar ordinances, restrict the use of natural gas in more buildings and more communities.

5. Plaintiff supports efforts to reduce carbon emissions. But the reduction of carbon emissions is a matter of federal policy and regulation, and Oak Park must act in compliance with federal law. EPCA reflects Congress' decision that the nation's energy policy cannot be dictated by state and local governments; such a patchwork approach would be the antithesis of a national energy policy that is intended, among other things, to provide energy security, sufficiency of domestic supply, and uniform national regulations promoting conservation of energy.

6. Thousands of residential and business customers in Oak Park use natural gas as fuel for heating, cooking, and hot water, particularly in the coldest winter months. Oak Park's decision to prohibit the use of natural gas as fuel in virtually all new buildings is at odds with citizens' and businesses' need for reliable, resilient, and affordable energy. Prohibiting natural gas-powered cooking ranges, water heaters, furnaces, dryers, and other appliances or equipment is fundamentally inconsistent with the public interest and consumer choice—and violates federal law. While Plaintiff supports working to achieve reductions in carbon emissions, functionally banning

---

[1] *See, e.g.*, Jennifer Johnson, *Evanston Okays Illinois' First Ordinance Requiring Larger Buildings to Run on Renewable Energy*, Chicago Tribune (Mar. 24, 2025), https://www.chicagotribune.com/2025/03/24/evanston-oks-ordinance-requiring-some-buildings-to-run-on-renewable-energy/.

natural gas in Oak Park buildings will do little if anything to advance those goals. Oak Park's Ordinance is plainly preempted by EPCA. It should be invalidated.

## THE PARTIES

7. Plaintiff Clean Energy Choice Coalition, NFP is an Illinois non-profit organization seeking to guarantee that energy consumers in the Chicagoland area and, more broadly, the state of Illinois have access to a wide range of established and cutting-edge technologies and energy alternatives, with a focus on reducing greenhouse gas emissions and achieving decarbonization demands by safeguarding numerous pathways and energy options.

8. The Coalition has numerous members, which include, among many others, the National Association of Homebuilders ("NAHB"), NPL Construction Co. ("NPL"), and the International Union of Operating Engineers Local 150, AFL-CIO ("Local 150").

9. By banning the use of natural-gas pipes in Oak Park, the Ordinance will negatively affect the Coalition's members, causing them monetary and business harm.

10. Plaintiff is an organization with standing to bring this action on behalf of its members. The Coalition has one or more members injured as a result of the Ordinance who would otherwise have standing to sue in their own right; the interests sought to be addressed through this action are germane to Plaintiff's organizational purpose; and neither the claims asserted nor the equitable relief requested require the participation of the individual members in this lawsuit. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

11. Defendant Village of Oak Park is an Illinois home-rule municipality located in Cook County, Illinois.

## JURISDICTION AND VENUE

12. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

13. Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(1) and 1391(b)(2), because Oak Park is located wholly within the Northern District of Illinois, and because the facts giving rise to the claims in this Complaint occurred in this District.

## FACTUAL BACKGROUND

### I. The Village of Oak Park Enacts the Ordinance

14. Oak Park has two separate building codes relevant here. Most buildings are subject to Oak Park's adoption of the 2021 International Building Code (the "Building Code"). Oak Park Vill. Code §§ 7-1-1, 7-1-2. Single- and dual-family homes, however, are generally governed by Oak Park's adoption of the 2021 International Residential Code (the "Residential Code"). *Id.* §§ 7-6-1, 7-6-2; *see* 2021 Int'l Bldg. Code § 101.2 (providing that "[d]etached one- and two-family dwellings and townhouses not more than three stories . . . and their accessory structures not more than three stories" may instead comply with the Residential Code).

15. In June 2023, Oak Park enacted the Ordinance, which provides that, as to all "new buildings," "[t]he source of energy for the building shall be all electric and the source of energy shall not be fossil fuels." Oak Park Vill. Code § 7-1-2 at P301.1; *id.* § 7-6-2 at X301.1 (same for "new residential buildings"). The Building Code defines "new building" as "[a] newly constructed structure with an existing or new foundation." *Id.* § 7-1-2 at P201.1. The Residential Code defines "new residential building" as "a new independent or attached residential structure on a newly created foundation." *Id.* § 7-6-2 at X201. Both the Residential Code and Building Code define "fossil fuels" to include natural gas. *Id.* (Residential Code); *id.* § 7-1-2 at P201.1 (Building Code).

16. Beyond its general prohibition on fossil fuels, the Ordinance specifically prescribes several requirements for appliances installed in new buildings. For example, it amends the

4

Building Code to require all cooktops to be "electric induction types" and all ovens to be "electric types," and it amends both Codes to require that "energy for any clothes dryer shall be provided by an electric heat pump." Oak Park Vill. Code § 7-1-2 at P301.1(6)–(8); *id.* § 7-6-2 at X301.1(6) (Residential Code). The Ordinance also prohibits "directly piped gas fire pits and gas cooking grills whose source of energy is fossil fuels" (though not fire pits or cooking grills powered by fossil fuels stored in tanks or canisters). *Id.* § 7-1-2 P301.1(10); *id.* § 7-6-2 at X301.1(8).

17. These requirements mean that consumers, businesses, and building professionals designing and constructing new buildings in Oak Park will no longer be able to opt for natural gas-powered appliances. Indeed, the Ordinance specifically mandates that building professionals and their customers *must* choose electric appliances over natural-gas appliances—even if a natural-gas appliance would better fit the customer's needs.

18. The Ordinance provides only limited exceptions: "Energy from fossil fuels may be provided by generators for emergency backup power and for commercial kitchens." Oak Park Vill. Code § 7-1-2 at P301.1(1); *id.* § 7-6-2 at X301.1(1) (Residential Code exempting only "generators for emergency backup power"). "Commercial kitchen" is defined as "[a] kitchen for food preparation intended to service commercial restaurants, institutional uses, cafeterias and other similar dining or food preparation facilities." *Id.* § 7-1-2 at P201.1.

19. The stated purpose of the Ordinance is "to reduce production of greenhouse gasses," Oak Park Vill. Code § 7-1-2 at P101.2; *id.* § 7-6-2 at X101.2, and "to provide minimum requirements for electrification for all new buildings," *id.* § 7-1-2 at P101.1; *see also id.* § 7-6-2 at X101.1 ("to provide minimum requirements for enhanced environmental features in all new residential buildings regulated by" the Residential Code).

20. The Ordinance went into effect on January 1, 2024.

5

21. All new buildings are required to conform to the Ordinance, and consumers and businesses are prohibited from selecting piped natural gas to power any appliances inside or outside of their building.

22. The Ordinance's requirements have created, are creating, and will continue to create significant negative consequences for Coalition members.

## II. Federal Law Expressly Preempts Local Regulations Concerning Energy Use of Covered Appliances

23. Born out of the oil crisis the United States faced in the early 1970s, EPCA, 42 U.S.C. §§ 6201–6422, establishes a "comprehensive energy policy" designed to address "the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005), *abrogated in other part by Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938 (2016); *see also Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 185 (2d Cir. 2004). EPCA regulates the energy efficiency and energy use of covered appliances and equipment.

24. Since the original version of EPCA in 1975, Congress has amended EPCA several times, progressively moving away from a laissez-faire approach to appliance efficiency, which relied on consumers to choose more efficient appliances, and toward binding federal standards. Each amendment to EPCA further emphasized the federal government's intent to regulate appliance energy use and energy efficiency standards itself and further limited state and local authority in this area.

25. In its original form, EPCA's provisions regarding consumer appliances focused on requiring labeling of appliances, reasoning that consumers would choose more efficient appliances if they had access to accurate information about efficiency. Thus, the statute "required

manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective." *Air Conditioning*, 410 F.3d at 499; *Nat. Res. Def. Council*, 355 F.3d at 185. The legislative history memorializes Congress's intent: "[I]t is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation." H. Rep. No. 94-340, at 95 (1975).

26. In that early form, EPCA permitted significant state involvement, allowing "state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard." *Air Conditioning*, 410 F.3d at 499.

27. In 1977, President Carter created the federal Department of Energy to coordinate a federal response to the nation's energy problems. The next year, Congress passed a range of statutes known as the National Energy Act, which gave the federal government broader authority over energy policy and sought to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy for sustained economic growth.

28. As part of that 1978 effort, Congress amended EPCA. Rather than relying exclusively on labeling, the new approach "required the [Department of Energy] to prescribe minimum energy efficiency standards" for certain consumer and industrial products. *Air Conditioning*, 410 F.3d at 499; *see also Nat. Res. Def. Council*, 355 F.3d at 186. The amendment also strengthened EPCA's preemption of state and local laws, allowing state and local regulations "*only* if the Secretary [of Energy] found there was a significant state or local interest to justify the

state's regulation and the regulation would not unduly burden interstate commerce." *Air Conditioning*, 410 F.3d at 499.

29. Despite these new requirements, the Department of Energy did not adopt federal minimum energy standards. Instead, it "initiated a general policy of granting petitions from States requesting waivers from preemption. As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." S. Rep. No. 100-6, at 4 (1987).

30. In 1987, Congress responded to the divergent state standards by again amending EPCA. Among other changes, Congress added the express preemption provision that overrides Oak Park's Ordinance: This provision broadly preempts any state or local regulation "concerning the energy efficiency, energy use, or water use of" a product subject to a federal energy conservation standard unless the regulation falls under one of the enumerated statutory exceptions. National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, § 7, 101 Stat. 103, 117-22 (codified at 42 U.S.C. § 6297); *see also* Energy Policy Act of 1992, Pub. L. No. 102-486, § 122, 106 Stat. 2776, 2816 (enacting express-preemption provision for covered commercial and industrial appliances, codified at 42 U.S.C. § 6316(b)).

31. Notably, one such statutory exception exempts from preemption "a State or local building code for new construction" so long as the building code complies with detailed federal requirements, including that the building code uses an "energy consumption or conservation objective [that] is specified in terms of an estimated total consumption of energy" and "does not require that the covered product have an energy efficiency exceeding the applicable [federal] energy conservation standard." 42 U.S.C. § 629(c)(3), (f)(3).

32. The purpose of the 1987 amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of *national* energy

conservation standards for major residential appliances." S. Rep. No. 100-6 at 2 (emphasis added). As Congress recognized, varying state standards created "the problem of a growing patchwork of differing state regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." *Id*. at 4 (alteration incorporated); *see also* H.R. Rep. No. 100-11, at 24 (1987) ("Section 7 is designed to protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements.").

33. Accordingly, as amended, EPCA broadly preempts state and local regulations concerning the energy use or energy efficiency of covered appliances. States can still seek permission under the amended statute to establish their own standards, but "achieving the waiver is difficult." S. Rep. No. 100-6 at 2. It requires showing an unusual and compelling local interest, and the waiver cannot be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators." *Id.*

34. Moreover, in adopting EPCA's "building code" exception to preemption, Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." *Id.* at 10-11. Thus, to avoid preemption, a state building code provision must, among other requirements, "establish 'credits' for various conservation measures, to provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the credits provided for such energy efficiency." *Id.* at 11.

35. In 1992, Congress again amended EPCA, expanding the statute's federal appliance program to include commercial and industrial appliances. *See* Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776.

### A. EPCA's Express Preemption Provisions

36. As noted, EPCA expressly preempts state regulations concerning the energy use or energy efficiency of covered appliances, subject to a few narrow exceptions. The statute sets out specific, detailed requirements that must be met to qualify for those exceptions. That structure reflects Congress's choice to preempt any state or local regulation of energy use or energy efficiency with respect to covered appliances, replacing it with detailed conditions that must be met for state or local laws in this area to avoid preemption.

37. EPCA regulates the energy efficiency and energy use of a variety of consumer and industrial appliances, which the statute calls "covered products." Its standards for "consumer product[s]"—defined to include a product that, "to any significant extent, is distributed in commerce for personal use or consumption by individuals"—cover a range of statutorily enumerated appliances, including water heaters, furnaces, dishwashers, and stoves. 42 U.S.C. §§ 6291(1)–(2), 6292(a). EPCA also imposes standards for "industrial equipment"—defined to include a product that, "to any significant extent, is distributed in commerce for industrial or commercial use"—and specifically extends those standards to furnaces and water heaters, among other appliances. *Id.* § 6311(1)–(2)(A). These definitions are not tied to who uses a particular product. For example, a product that qualifies as a "consumer product" is subject to federal regulation as a "consumer product" even if it is used in a commercial enterprise. *See id.* §§ 6291(2), 6929(a), 6311(2)(A)(iii).

38. EPCA's express preemption provision for consumer products states that "effective on the effective date of an energy conservation standard established in or prescribed under [42 U.S.C. § 6295] for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product

unless the regulation" falls within certain enumerated exceptions. 42 U.S.C. § 6297(c). "State regulation" is defined as "a law, regulation, or other requirement of a State or its political subdivisions." *Id.* § 6297(a)(2)(A).

39. "Energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use." 42 U.S.C. § 6291(4). "Energy" is defined as "electricity, or fossil fuels." *Id.* § 6291(3).

40. Putting these definitions together, EPCA preempts regulations relating to "the quantity of [fossil fuel] directly consumed by" covered consumer appliances (*e.g.*, water heaters, furnaces, dishwashers, and stoves) at the place where those appliances are used.

41. Similarly, EPCA's industrial equipment provisions expressly preempt "any State or local regulation concerning the energy efficiency or energy use of a product" that is subject to an EPCA industrial-equipment standard. 42 U.S.C. § 6316(b)(2)(A).

42. The industrial equipment standards define "energy" the same way as the consumer product standards, *id.* §§ 6311(7), 6291(3), and, like the consumer product standards, define "energy use" to mean "the quantity of energy directly consumed by an article of industrial equipment at the point of use." *Id.* § 6311(4).

43. Like EPCA's consumer product provisions, EPCA's industrial equipment provisions thus preempt regulations relating to the "quantity of [fossil fuel] directly consumed by" covered industrial equipment at the place where such industrial equipment is used.

**B.    Oak Park's Ordinance Is Preempted by EPCA**

44. Oak Park's Ordinance falls within the heart of EPCA's express preemption provisions. The Ordinance is a regulation concerning the energy use of appliances covered by EPCA because it entirely "eliminates the use of an energy source"—natural gas and other fossil

11

fuels. *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101-02 (9th Cir. 2024) (emphasis omitted). The Ordinance therefore is preempted by federal law.

46. The Ninth Circuit—the only federal court of appeals to have addressed the scope of preemption under § 6297(c)—recently held in *California Restaurant Association* that "[b]y its plain text and structure," § 6297(c)'s preemption provision "encompasses building codes that regulate natural gas use by covered products," including codes that "prevent[] such appliances from using natural gas." 89 F.4th at 1098. That case involved a Berkeley, California ordinance that, rather than "directly banning those appliances in new buildings," banned fuel gas piping in new construction, "rendering the gas appliances useless." *Id.*

46. The unanimous Ninth Circuit panel explained that "EPCA preempts regulations that relate to 'the quantity of [natural gas] directly consumed by' certain consumer appliances at the place where those products are used." *Id.* at 1101 (citation omitted). "[A] regulation that prohibits consumers from using appliances necessarily impacts the 'quantity of energy directly consumed by [the appliances] at point of use.'" *Id.*

47. Indeed, the Ninth Circuit emphasized that EPCA's express *exemption* from preemption for "*a State or local building code for new construction*" that satisfies EPCA's "various requirements …. demonstrates that EPCA's preemptive scope extends beyond direct or facial regulations of covered products to at least include building codes 'concerning the energy ... use' of such products." *Id.* (emphasis in original; quoting 42 U.S.C. § 6297(f)).

48. Accordingly, the Ninth Circuit held that Berkeley's ordinance was preempted by EPCA "because it prohibits the installation of necessary natural gas infrastructure on premises where covered natural gas appliances are used." *Id.* at 1102.

49. Oak Park's Ordinance goes even further than Berkeley's preempted ordinance. Rather than limiting its ban to natural gas piping, Oak Park's Ordinance *directly bans* covered natural-gas appliances. Under the Ordinance, new buildings cannot use natural gas as a "source of energy," and so natural-gas appliances cannot be installed. Oak Park Vill. Code § 7-1-2 at P301.1(1); *id.* § 7-6-2 at X301.1(1). It also mandates that, except in single- and dual-family homes, "all cooktops shall be electric induction types" and "all cooking ovens shall be electric types," and that in all buildings "[e]nergy for any clothes dryer shall be provided by an electric heat pump." *Id.* § 7-1-2 at P301.1(6)–(8); *id.* § 7-6-2 at X301.1(6). These flat-out prohibitions on covered natural-gas appliances plainly run afoul of EPCA. *See, e.g., Cal. Rest. Ass'n*, 89 F.4th at 1119 (Baker, J., concurring) (noting that "EPCA would unquestionably preempt a building code that prohibited the attachment of covered appliances to the owner's piping that receives gas at the utility's service delivery point").

    **C.**    **The Ordinance Does Not Qualify for Any of EPCA's Narrow Exceptions to Preemption**

50. On information and belief, neither Oak Park nor Illinois has applied for a waiver of preemption from the Secretary of Energy under § 6297(d). Nor could Oak Park lawfully obtain such a waiver. The Secretary is authorized to grant waivers of preemption only where the "regulation is needed to meet unusual and compelling State or local energy . . . interests." 42 U.S.C. § 6297(d)(1)(B); *see id.* § 6297(d)(1)(C)(i) (interests must be "substantially different in nature or magnitude than those prevailing in the United States generally"). And EPCA prohibits the Secretary from granting waivers that would "significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis," *id.* § 6297(d)(3), or where "the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes,

13

capacities, and volumes that are substantially the same as those generally available in the State at the time of the" waiver, *id.* § 6297(d)(4).

51. Nor does the Ordinance satisfy the narrow exception for building codes. 42 U.S.C. § 6297(f)(3). That exception requires a regulation to meet seven specific requirements that, taken together, are intended to allow only codes that use consumption objectives and give builders choice about how to increase overall efficiency, ensuring an evenhanded policy that does not force builders to choose one type of appliance over another. *See* S. Rep. 100-6 at 10-11 (1987).

52. The Ordinance fails several of those requirements. It does not "permit[] a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective," 42 U.S.C. § 6297(f)(3)(A). Rather, without regard to any general target—or even whether the result of applying the Ordinance makes a building use more or less energy—the Ordinance categorically bars builders from selecting any appliances that use natural gas. Nor does it provide credits "for installing covered products having energy efficiencies exceeding" federal standards "on a one-for-one equivalent energy use or equivalent cost basis." *Id.* § 6297(f)(3)(C). No matter how far they exceed federal standards, natural-gas appliances get no credit at all; they cannot be installed in new buildings *no matter what*. And the Ordinance does not "specif[y]" any "energy consumption or conservation objective," let alone do so "in terms of an estimated total consumption of energy" calculated in the manner prescribed by statute, *id.* § 6297(f)(3)(F).

53. Oak Park's Ordinance is also preempted by 42 U.S.C. § 6316(b), the separate express-preemption clause included in EPCA's industrial-appliance provisions. As noted, this provision preempts "any State or local regulation concerning the energy efficiency or energy use of a product" that is subject to EPCA standards. 42 U.S.C. § 6316(b). And like EPCA's consumer-

14

appliance provisions, this provision contains only limited exceptions (including, again, a narrow exception for "a State or local building code") to the default rule of preemption of state regulations concerning the energy use of industrial appliances. 42 U.S.C. § 6316(2)(B).

54. In particular, to avoid preemption for industrial appliances, a state regulation in a building code must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." *Id.* § 6316(2)(B)(i). Oak Park's Ordinance does not qualify for that exception because it bans virtually all natural-gas appliances, even when they meet the efficiency standards in ASHRAE/IES Standard 90.1.

### III. The Coalition Is Harmed by the Ordinance

55. As a result of the Ordinance, the Coalition's members are suffering ongoing and irreparable harm for which there is no adequate remedy at law.

56. The effect of the Ordinance is to increase costs and deny Coalition members potential new customers who could otherwise choose to use natural gas. The Ordinance has limited the size of various Coalition members' customer base by preventing new buildings from using natural gas. And as existing buildings are gradually replaced with new buildings that do not use natural gas, the Ordinance will continuously and permanently reduce Coalition members' existing customer base.

57. For example, Local 150 is a Coalition member and labor organization representing nearly 24,000 working men and women, primarily in northeastern Illinois. Local 150 was chartered on May 8, 1929, and its members operate heavy equipment in various industries, including utility installation and maintenance, road construction, building construction, and many others. Local 150 members receive specialized training on natural-gas distribution and maintenance processes

and perform this work regularly. The Ordinance eliminates significant work opportunities for Local 150 members, directly resulting in job losses, wage reductions, and economic instability. As a result of the Ordinance, numerous natural-gas projects have been canceled or significantly curtailed, leading to a diminished market for Local 150's skilled heavy equipment operators.

58. NAHB, another Coalition member, represents the largest network of craftsman homebuilders. NAHB represents more than 140,000 members, and each year its members construct about 80% of the new homes built in the United States, both single-family and multifamily. The Ordinance has increased construction costs substantially—costs that are ultimately borne by homebuilders and homebuyers.

59. Coalition member NPL Construction Co. provides natural gas and energy infrastructure construction solutions, such as installing and restoring natural gas mains, including in Oak Park. The Ordinance, by prohibiting natural gas in new construction, has curtailed demand for NPL's services.

60. All these harms will continue so long as the Ordinance remains in effect.

61. The Ordinance also undermines the public interest, as it deprives consumers and businesses of the ability to choose affordable, reliable, and efficient natural-gas service and natural-gas appliances.

62. Moreover, the Ordinance imposes higher costs on customers throughout Oak Park, both as to the cost for new builds and energy rates. And the public has an interest in not having invalid laws enforced and in having local governments comply with state and federal law.

63. Conversely, Oak Park has no legitimate interest in enforcing an invalid and preempted law.

# COUNT I

**Declaratory Judgment and Permanent Injunction Prohibiting Enforcement of the Ordinance Because It Is Preempted By The Energy Policy and Conservation Act, 42 U.S.C. §§ 6291 *et seq.*, As A Regulation Concerning The Energy Use Of Covered Products**

64. Plaintiff realleges, as if fully set forth herein, paragraphs 1 through 63 of this Complaint.

65. EPCA expressly preempts state and local regulations concerning the energy use of covered products, 42 U.S.C. § 6297(c), including "clothes dryers," water heaters, furnaces, and "[k]itchen ranges and ovens," *id.* § 6292(a)(4), (5), (8), (10).

66. There are currently EPCA energy conservation standards in place for consumer products that are now subject to Oak Park's ordinance. *See, e.g.*, 10 C.F.R. §§ 430.32(d) (water heaters), 430.32(e) (furnaces and boilers), 430.32(h) (clothes dryers), 430.32(j)(1) (conventional cooking tops), 430.32(j)(2) (conventional ovens), and 430.32(k) (pool heaters).

67. There are likewise currently EPCA energy conservation standards in place for commercial and industrial products that are now subject to Oak Park's ordinance. *See, e.g.,* 10 C.F.R. § 431.91 (air conditioners and heat pumps); 10 C.F.R. § 431.101 (water heaters); 10 C.F.R. § 431.151 (commercial clothes washers).

68. The Ordinance is a regulation concerning the energy use of all natural-gas appliances, including appliances covered by EPCA, in newly constructed buildings. The Ordinance requires that "[t]he source of energy for the building shall be all electric and the source of energy shall not be fossil fuels." Oak Park Vill. Code § 7-1-2 at P301.1(1); *id.* § 7-6-2 at X301.1(1). For all but new single- and dual-family homes, the Ordinance requires that "[a]ll cooktops shall be electric induction types" and "[a]ll cooking ovens shall be electric types." *Id.* § 7-1-2 at P301.1(6)–(7). And for all new buildings, it requires that "[a]ll refrigerators, dishwashers, and clothes washers shall be Energy Star certified" and "[e]nergy for any clothes

17

dryer shall be provided by an electric heat pump." *Id.* at P301.1(5), (8); *id.* § 7-6-2 at X301.1(5)–(6).

69. By requiring that all products, including products covered by EPCA energy conservation standards, use *only* electric energy, and by requiring that *only* specific types of electric appliances be used, the Ordinance concerns the energy use and energy efficiency standards of covered products. The Ordinance is therefore expressly preempted by EPCA.

70. The Ordinance does not qualify for any of EPCA's exemptions from preemption.

71. An actual controversy exists between the parties regarding the issues set forth in this Complaint.

72. This Court is empowered, pursuant to 28 U.S.C. §§ 2201 and 2202, to declare the rights of Plaintiff under EPCA.

73. Plaintiff has suffered, and will continue to suffer, irreparable harm, including both business and financial harm, for which there is no adequate remedy at law unless Oak Park is enjoined from enforcing the Ordinance.

74. Oak Park has no legitimate interest in enforcing an invalid and preempted law. On the other hand, Oak Park's Ordinance deprives consumers and businesses of the choice to use an affordable, reliable, and efficient source of energy in new buildings. The balance of the equities and the public interest thus weighs decisively in favor of permanently enjoining enforcement of the Ordinance.

75. Accordingly, Plaintiff requests the Court declare the Ordinance invalid on its face as a violation of EPCA and enter a permanent injunction prohibiting the Ordinance from going into effect.

**PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiff respectfully requests that the Court:

76. Declare that the Ordinance is preempted by 42 U.S.C. § 6297(c);

77. Enter a permanent injunction enjoining Oak Park from enforcing the Ordinance; and

78. Award such other relief as the Court deems just and proper.

Dated: April 21, 2025

By: */s/ Christine E. Skoczylas*

Christine Skoczylas (#6293811)
Alexander Bandza (#6312301)
BARNES & THORNBURG LLP
One N. Wacker Drive
Suite 4400
Chicago, IL 60606
Tel: (312) 214-5613
Fax: (312) 759-5646
Christine.Skoczylas@btlaw.com
ABandza@btlaw.com

John Maley
Kian Hudson
BARNES & THORNBURG LLP
11 S. Meridian St
Indianapolis, IN 46204
Tel: (317) 231-7464
John.Maley@btlaw.com
Kian.Hudson@btlaw.com

*Attorneys for Clean Energy Choice Coalition, NFP*