**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CLEAN ENERGY CHOICE COALITION, NFP | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:25-cv-04353 |
| v. | ) | Hon. Franklin U. Valderrama |
| | ) | |
| VILLAGE OF OAK PARK, ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

ARGUMENT ........................................................................................................ 7

    A.   Oak Park's Ordinance Is Preempted. ................................................. 8

    B.   The Coalition is Entitled to Declaratory and Injunctive Relief. ....................................... 14

CONCLUSION ...................................................................................................... 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev.
Comm'n*,
410 F.3d 492 (9th Cir. 2005) ..................................................................................2, 3

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015)...................................................................................................14

*Ass'n of Contracting Plumbers, Inc. v. City of New York*,
No. 23-CV-11292 (RA), 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025)............................11, 12

*California v. Texas*,
593 U.S. 659 (2021)...................................................................................................14

*California Restaurant Association v. City of Berkeley*,
89 F.4th 1094 (9th Cir. 2024) ...............................................................1, 9, 10, 11, 12

*Common Cause Ind. v. Lawson*,
937 F.3d 944 (7th Cir. 2019) .......................................................................................6

*eBay Inc. v. MercExchange*,
L.L.C., 547 U.S. 388 (2006) .......................................................................................15

*Golden State Transit Corp. v. City of Los Angeles*,
493 U.S. 103 (1989)...................................................................................................14

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) ....................................................................................15

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018)...................................................................................................10

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007)...................................................................................................14

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)...............................................................................................8, 11

*Mulhern Gas Co., Inc. v. Mosley*,
No. 1:23-cv-1267, 2025 WL 2062194 (N.D.N.Y. July 23, 2025).........................................11

*Nat. Res. Def. Council v. Abraham*,
355 F.3d 179 (2d Cir. 2004)..........................................................................................2

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................................15

*Philip Morris USA Inc. v. Scott*,
    561 U.S. 1301 (2010) ......................................................................................15

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
    579 U.S. 115 (2016) ..........................................................................................8

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) .......................................................................15

*Ye v. GlobalTranz Enters., Inc.*,
    74 F.4th 453 (7th Cir. 2023) ............................................................................8

## Statutes and Regulations

28 U.S.C. § 2201 ...............................................................................................14

42 U.S.C. § 6291 ......................................................................................... *passim*

42 U.S.C. § 6297 ......................................................................................... *passim*

42 U.S.C. § 6316 .................................................................................3, 4, 8, 13

Oak Park Building Code, Vill. Code §§ 7-1-1, 7-1-2 ................................. *passim*

Oak Park Residential Code, Vill. Code §§ 7-6-1, 7-6-2 ............................ *passim*

Pub. L. No. 102-486, § 122, 106 Stat. 2776 (1992)...........................................3

Pub.L. No. 100–12, 101 Stat. 103 (1987) .........................................................3

Pub.L. No. 95–619, 92 Stat. 3206 (1978) .........................................................2

## Other Authorities

Fed. R. Civ. P. 56...............................................................................................7

H.R. Rep. 100-11 (1987).....................................................................................3

S. Rep. 100-6 (1987)...............................................................................3, 4, 5, 13

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (West 2012)..........................12

## INTRODUCTION

This case presents a straightforward legal question: Does the federal Energy Policy and Conservation Act ("EPCA"), which expressly preempts laws "concerning the … energy use" of consumer and industrial appliances, 42 U.S.C. §§ 6297(c), 6316(b)(2)(A), bar the Village of Oak Park ("Oak Park") from enforcing its Ordinance banning natural-gas appliances in new buildings?

The answer is yes. As the Ninth Circuit held in invalidating the City of Berkeley's similar natural gas ban in *California Restaurant Association v. City of Berkeley*, "a regulation on 'energy use' fairly encompasses an ordinance that effectively eliminates the 'use' of an energy source." 89 F.4th 1094, 1102 (9th Cir. 2024). EPCA's text and context confirm this commonsense conclusion. EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use," and defines "energy" to "mean[] electricity, or fossil fuels." 42 U.S.C. § 6291(3), (4). And EPCA specifically contemplates that its express-preemption provision will apply, among other things, to "building code requirements." *Id.* § 6297(f). "So putting these terms together, EPCA preempts regulations, including 'building code requirements,' that relate to 'the quantity of [natural gas] directly consumed by' certain consumer appliances at the place where those products are used." *Cal. Rest. Ass'n*, 89 F.4th at 1101-02. And "a building code that prohibits consumers from using natural gas-powered appliances in newly constructed buildings necessarily regulates the 'quantity of energy directly consumed by [the appliances] at point of use.'" *Id.* at 1102.

Because EPCA expressly preempts Oak Park's Ordinance, and because the parties do not dispute any fact material to this pure legal question, this Court should grant summary judgment and issue declaratory and injunctive relief barring Oak Park from enforcing its Ordinance.

## BACKGROUND

*The Energy Policy Conservation Act.* EPCA was originally enacted to establish a "comprehensive energy policy" to address "the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005); *see also Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 185 (2d Cir. 2004). As initially enacted in 1975, EPCA focused on appliance labeling, on the theory that consumers would choose more efficient appliances if they had access to accurate information: It "required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective." *Air Conditioning*, 410 F.3d at 499; *see also Abraham*, 355 F.3d at 185. Early on, EPCA permitted significant state involvement, allowing "state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard." *Air Conditioning*, 410 F.3d at 499.

Since the original version of EPCA in 1975, Congress amended EPCA several times, each time moving further away from a decentralized approach allowing significant state regulation towards a more centralized system consisting of preemptive federal rules. In 1978, Congress passed the National Energy Conservation and Policy Act, which amended EPCA to give the federal government broader authority over energy policy and "required the [Department of Energy] to prescribe minimum energy efficiency standards" for certain consumer and industrial appliances"—which the Department of Energy failed to do. *Id.*; *see also* Pub.L. No. 95–619, 92 Stat. 3206 (1978). The 1978 amendments also amended EPCA's preemption provisions, allowing state and local regulations "*only* if the Secretary [of Energy] found there was a significant state or

2

local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce." *Id.* at 499 (emphasis in original).

In 1987, Congress responded to the growing trend of divergent state standards created by the Department of Energy's waiver policy by again amending EPCA via the National Appliance Energy Conservation Act, Pub.L. No. 100–12, 101 Stat. 103 (1987). There, Congress added the express preemption provision at issue in this case, broadly preempting any state or local regulation "concerning the energy efficiency [or] energy use" of a consumer appliance subject to a federal energy conservation standard unless the regulation falls under one of the enumerated statutory exceptions, *including* an exception for "building code[s]." Pub. L. No. 100-12, § 7, 101 Stat. 103, 117-22; *see also* Energy Policy Act of 1992, Pub. L. No. 102-486, § 122, 106 Stat. 2776, 2816. The purpose of the 1987 amendments was "to *reduce the regulatory and economic burdens* on the appliance manufacturing industry through the establishment of *national energy conservation standards* for major residential appliances." S. Rep. No. 100-6 at 2 (emphases added). Congress created these preemptive national standards to address "the problem of a growing *patchwork of differing State regulations* which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." *Id.* at 4 (emphasis added; quoted in *Air Conditioning*, 410 F.3d at 500); *see also* H.R. Rep. No. 100-11, at 24 (1987).

***ECPA Preemption Provisions.*** Accordingly, in its current form as amended, EPCA broadly preempts state and local regulations "concerning the energy efficiency [or] energy use" of consumer and industrial appliances that are subject to federal energy standards under EPCA. 42 U.S.C. § 6297(c); 42 U.S.C. § 6316(b). The appliances subject to federal energy standards under EPCA span a broad range, including consumer products and industrial equipment that "to any significant extent, is distributed in commerce for personal use or consumption by individuals"—

3

including water heaters, furnaces, dishwashers, and stoves. 42 U.S.C. §§ 6291(1)–(2), 6292(a); *id.* § 6311(1)–(2)(A). EPCA's express preemption provision for consumer appliances states that once a federal energy standard becomes effective for a covered product, "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions. *Id.* § 6297(c). Three significant terms in this provision carry statutory definitions: "State regulation" is defined as "a law, regulation, or other requirement of a State or its political subdivisions." *Id.* § 6297(a)(2)(A). "Energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use." *Id.* § 6291(4). And "energy" is defined as "electricity, or fossil fuels." *Id.* § 6291(3). Accordingly, EPCA preempts state and local regulations concerning "the quantity of [fossil fuel] directly consumed by" covered consumer appliances (*e.g.*, water heaters, furnaces, dishwashers, and stoves) at the place where those appliances are used.[1]

EPCA's express preemption provisions apply broadly, subject to a handful of narrow, enumerated exceptions. For example, states can seek permission from the Department of Energy to establish their own standards, 42 U.S.C. § 6297(d), but "achieving the waiver is difficult." S. Rep. No. 100-6 at 2. Also, especially important here, EPCA exempts from preemption "certain building code requirements." 42 U.S.C. § 6297(f). To qualify, a building code rule must satisfy seven specified requirements, including that it "permit[] a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies

---

[1] Likewise, EPCA's preemption provision for industrial appliances preempts "any State or local regulation concerning the energy efficiency or energy use of a product" that is subject to an EPCA industrial-equipment standard. 42 U.S.C. § 6316(b)(2)(A). The industrial equipment standards define "energy" the same way as the consumer product standards, *id.* §§ 6311(7), 6291(3), and, like the consumer product standards, define "energy use" to mean "the quantity of energy directly consumed by an article of industrial equipment at the point of use." *Id.* § 6311(4). Thus, like EPCA's consumer product provisions, EPCA's industrial equipment provisions preempt regulations relating to the "quantity of [fossil fuel] directly consumed by" covered industrial equipment at the place where such industrial equipment is used.

4

meet the objective." *Id.* § 6297(f)(3)(A). Congress thus intended for this exception to apply only to "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." S. Rep. No. 100-6 at 10-11.

***Oak Park's Ordinance.*** In June 2023, Oak Park enacted the Ordinance at the center of this case. SOF, ¶ 5. The Ordinance supplements Oak Park's two preexisting building codes—the 2021 International Building Code (the "Building Code") and the 2021 International Residential Code (the "Residential Code")[2]—by providing that, as to all "new buildings," "[t]he source of energy for the building shall be all electric and *the source of energy shall not be fossil fuels*." Oak Park Vill. Code § 7-1-2 at P301.1 (emphasis added); *id.* § 7-6-2 at X301.1; SOF, ¶ 5.[3] The stated purpose of this prohibition is "to reduce production of greenhouse gasses," Oak Park Vill. Code § 7-1-2 at P101.2; *id.* § 7-6-2 at X101.2, and "to provide minimum requirements for electrification for all new buildings," *id.* § 7-1-2 at P101.1; *see also id.* § 7-6-2 at X101.1; SOF ¶ 6.

In addition to its general prohibition on fossil fuels, the Ordinance prescribes several requirements for appliances installed in new buildings. SOF, ¶ 7. For example, it amends the Building Code to require all cooktops to be "electric induction types" and all ovens to be "electric types," and it amends both Codes to require that "energy for any clothes dryer shall be provided by an electric heat pump." Oak Park Vill. Code § 7-1-2 at P301.1(6)–(8); *id.* § 7-6-2 at X301.1(6) (Residential Code); SOF, ¶ 7. The Ordinance also prohibits "directly piped exterior gas fire pits and gas cooking grills whose source of energy is fossil fuels" (though not those powered by fossil

---

[2] Most buildings in Oak Park are subject to the Building Code. Oak Park Vill. Code §§ 7-1-1, 7-1-2. Single- and dual-family homes, however, are governed by the "Residential Code." *Id.* §§ 7-6-1, 7-6-2; SOF ¶ 5 n.1.

[3] The Building Code defines "new building" as "[a] newly constructed structure with an existing or new foundation." *Id.* § 7-1-2 at P201.1. The Residential Code defines "new residential building" as "a new independent or attached residential structure on a newly created foundation." *Id.* § 7-6-2 at X201. Both the Residential Code and Building Code define "fossil fuels" to include natural gas. *Id.* (Residential Code); *id.* § 7-1-2 at P201.1 (Building Code).

fuels stored in tanks or canisters). *Id.* § 7-1-2 P301.1(10); *id.* § 7-6-2 at X301.1(8); SOF ¶ 7.

The Ordinance went into effect on January 1, 2024. SOF, ¶ 8. Since then, consumers, businesses, and building professionals designing and constructing new buildings in Oak Park are not able to opt for natural gas-powered appliances. *Id.*, ¶ 9. Indeed, the Ordinance specifically mandates that building professionals and their customers must choose electric appliances over natural-gas appliances—even if a natural-gas appliance would better fit the customer's needs. *Id.*, ¶ 10. In short, the Ordinance bans natural gas-powered appliances in new buildings *precisely because they use fossil fuels*.

**Harm to Coalition Members.** The Coalition is an Illinois non-profit organization seeking to guarantee that energy consumers in the Chicagoland area and, more broadly, the state of Illinois have access to a wide range of established and cutting-edge technologies and energy alternatives—including natural gas. SOF, ¶ 1. The Coalition has numerous members on whom the Ordinance has imposed, and continues to impose, significant negative consequences. *Id.*, ¶¶ 12-27. The Ordinance has led to increased costs, which in turn deny Coalition members potential new customers who would otherwise choose to use natural gas. *Id.*, ¶ 23. By preventing new buildings from using natural gas, the Ordinance has limited the size of the customer base of various Coalition members. *Id.*, ¶ 24. And as existing buildings are gradually replaced with new buildings that do not use natural gas, the Ordinance will continuously and permanently reduce Coalition members' existing customer base. ¶ 25. The Coalition brought this lawsuit to vindicate its members' interest in providing natural gas services and appliances to consumers—interests at the heart of the Coalition's purpose. *See, e.g., Common Cause Ind. v. Lawson*, 937 F.3d 944, 957 (7th Cir. 2019).

The Ordinance's effect on Coalition member International Union of Operating Engineers Local 150, AFL-CIO ("Local 150") exemplifies its harm. Local 150 is a labor organization

representing nearly 24,000 working men and women, primarily in northeastern Illinois, who operate heavy equipment in various industries, including utility installation and maintenance, road construction, building construction, and others. SOF, ¶¶ 13-14. Relevant here, Local 150 members are specially trained and perform work on natural-gas distribution and maintenance processes. *Id.*, ¶ 15. The Ordinance eliminates significant work opportunities for Local 150 members, directly resulting in job losses, wage reductions, and economic instability. *Id.*, ¶ 16. As a result of the Ordinance, numerous natural-gas projects in Oak Park have been canceled or curtailed, leading to a diminished market for Local 150's skilled heavy equipment operators. *Id.*, ¶ 17.

The Ordinance has imposed and continues to impose similar negative consequences on fellow Coalition members of the National Association of Homebuilders ("NAHB"). With more than 140,000 members, NAHB represents the largest network of craftsman homebuilders in the United States. *Id.*, ¶ 18. Each year, NAHB's members construct about 80% of the new homes built in the country. *Id.*, ¶ 19. The Ordinance has increased construction costs in Oak Park substantially—costs that are ultimately borne by NAHB homebuilders and homebuyers. *Id.*, ¶ 20.

Finally, Coalition member NPL Construction Co. provides natural gas and energy infrastructure construction solutions, such as installing and restoring natural gas mains, and that business has long included Oak Park. *Id.*, ¶ 21. By prohibiting natural gas in new construction, the Ordinance has curtailed demand for NPL's services in Oak Park, directly reducing NPL's revenue. *Id.*, ¶ 22. These are just three examples of Coalition members who suffer harm under the Ordinance—harms that will continue so long as the Ordinance remains in effect.

## ARGUMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A case that, as

here, concerns an "express preemption" provision presents a straightforward "task … of statutory construction," not a factual dispute. *Ye v. GlobalTranz Enters., Inc.*, 74 F.4th 453, 457 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 564 (2024).

### A. Oak Park's Ordinance Is Preempted.

The Supreme Court has instructed courts to approach express preemption questions, like other statutory interpretation questions, by "begin[ning] with the Act's text." *GlobalTranz*, 74 F.4th at 458; *see also, e.g., Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) ("The question, at bottom, is one of statutory intent, and we accordingly begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." (internal quotation marks and citations omitted)). And the "inquiry should end" with the text where, as here, "the statute's language is plain." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (cleaned up). In particular, the Supreme Court and Seventh Circuit have held that courts should "not invoke any presumption against pre-emption" in express preemption cases; they should "instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Id.* (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 594 (2011)); *accord GlobalTranz*, 74 F.4th at 465 (holding that applying "the presumption against preemption" in an express preemption case "stood in direct conflict with the Supreme Court's instruction" in *Franklin*).

Here, EPCA's text is conclusive: Oak Park's ban on natural-gas appliances is preempted. The operative statutory language expressly preempts any "*State regulation* concerning the . . . *energy use*" of gas appliances. 42 U.S.C. § 6297(c) (emphases added); *see also* 42 U.S.C. § 6316(b)(2)(A). And the statutory definitions of the key terms in this provision confirm that it applies to natural gas bans such as the Ordinance at issue here.

First, EPCA defines "State regulation" to include "a law, regulation, or other requirement of a State *or its political subdivisions*" 42 U.S.C. § 6297(a)(2)(A) (emphasis added). Second, it defines "energy" to mean "electricity, or fossil fuels." *Id.* § 6291(3). Third, it defines "energy use" to mean "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293." *Id.* § 6291(4). Accordingly, EPCA expressly preempts any regulation adopted by a state or political subdivision that "concern[s]" "the quantity of [fossil fuels] directly consumed by a consumer product at point of use." And that is plainly what the Ordinance does: *It prohibits any appliance that uses more than zero fossil fuels*—and "more than zero" is indisputably a "quantity." *See Cal. Rest. Ass'n*, 89 F.4th at 1102 (citing the Oxford English Dictionary Online (2022) to note that "'quantity' means 'a property or attribute that can be expressed in numerical terms'").

The Ninth Circuit reached this very same conclusion in *California Restaurant Association*—the only appellate decision to have addressed the scope of preemption under § 6297(c). That case involved a Berkeley, California ordinance that, rather than "directly banning those appliances in new buildings," banned fuel gas piping in new construction, "rendering the gas appliances useless." 89 F.4th at 1098. The unanimous Ninth Circuit panel concluded that "EPCA preempts regulations, including 'building code requirements,' § 6297(f), that relate to 'the quantity of [natural gas] directly consumed by' certain consumer appliances at the place where those products are used." The panel thus held Berkeley's ordinance preempted, explaining that "a regulation that prohibits consumers from using appliances necessarily impacts the 'quantity of energy directly consumed by [the appliances] at point of use.'" *Id.* at 1101 (citations omitted). In other words, the Berkeley ordinance was a regulation "concerning … energy use" because it entirely "eliminate[d] the 'use' of an energy source"—namely, natural gas and other fossil fuels.

*Id.* at 1102. And Berkeley's "total ban on natural gas [appliances] [wa]s not exempt from EPCA just because it lower[ed] the 'quantity of energy' consumed to 'zero.'" *Id.*

Notably, Oak Park's Ordinance targets natural gas use more directly than the Berkeley ordinance invalidated in *California Restaurant Association*. Berkeley's ordinance simply banned natural gas piping; Oak Park's Ordinance *directly bans natural-gas appliances*. Under the Ordinance, new buildings cannot use natural gas as a "source of energy," and so natural-gas appliances cannot be installed. Oak Park Vill. Code § 7-1-2 at P301.1(1); *id.* § 7-6-2 at X301.1(1). It also mandates that, except in single- and dual-family homes, "all cooktops shall be electric induction types" and "all cooking ovens shall be electric types," and that in all buildings "[e]nergy for any clothes dryer shall be provided by an electric heat pump." *Id.* § 7-1-2 at P301.1(6)–(8); *id.* § 7-6-2 at X301.1(6). These prohibitions on EPCA-authorized natural-gas appliances plainly run afoul of EPCA. *See, e.g.*, *Cal. Rest. Ass'n*, 89 F.4th at 1119 (Baker, J., concurring) (noting that "EPCA would unquestionably preempt a building code that prohibited the attachment of covered appliances to the owner's piping that receives gas at the utility's service delivery point").

Moreover, the preemption of Oak Park's Ordinance is further confirmed by Congress's decision to preempt any regulation "*concerning*" energy use of covered products. 42 U.S.C. § 6297(c) (emphasis added). As the Supreme Court has explained, "'[c]oncerning' means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Lamar, Archer & Cofrin, LLP v. Appling,* 584 U.S. 709, 717 (2018) (citation omitted). The use of such words "in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Id.* "Indeed, when asked to interpret statutory language including the phrase 'relating to'"—which, as noted, is one of the meanings of "concerning"—the Supreme Court "has *typically read the relevant text expansively*." *Id.* (emphasis added). The

10

Supreme Court has repeatedly taken this approach to "relating to" in the context of preemption specifically, holding that the "ordinary meaning of ['relating to'] is a broad one … and the words *thus express a broad pre-emptive purpose*." *Morales*, 504 U.S. at 383–84 (emphasis added). Oak Park's Ordinance plainly relates to the "energy use" (*i.e.*, "electricity or fossil fuel" use) of appliances: It prohibits all appliances that use fossil fuels. It is therefore preempted.

Against this straightforward interpretation of EPCA, two counterarguments have been advanced—by a dissent from the Ninth Circuit's denial of rehearing en banc, and by a district court decision rejecting preemption that is currently on appeal in the Second Circuit. *See Cal. Rest. Ass'n*, 89 F.4th at 1119 (Friedland, J., dissenting); *Ass'n of Contracting Plumbers, Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025).[4] Both of these arguments are meritless, for they are squarely foreclosed by EPCA's plain text.

*First*, there is the argument that EPCA preempts only regulations that act as energy conservation standards for products as they leave the factory floor, rather than banning the use of appliances in certain locations. *See Cal. Restaurant Ass'n*, 89 F. 4th at 1122 (J., Friedland, dissenting from denial of rehearing en banc); *Ass'n of Contract Plumbers*, 2025 WL 843619, at *6. This argument fails because EPCA's exemption for certain building codes confirms that preemption applies *even if the state or local rule does not regulate appliances directly*. 42 U.S.C. § 6297(f). As the Ninth Circuit panel observed, EPCA's exception for certain building codes provides that a "regulation . . . that is contained in *a State or local building code for new construction* concerning the energy efficiency or energy use of a covered product' is superseded by EPCA *unless* it complies with various requirements." 89 F.4th at 1101 (emphasis in original; quoting 42 U.S.C. § 6297(f)(1)–(3)). Because building codes by definition will not regulate

---

[4] Another district court adopted the reasoning of *Ass'n of Contracting Plumbers* without further reasoning. *See Mulhern Gas Co., Inc. v. Mosley*, No. 1:23-cv-1267, 2025 WL 2062194 (N.D.N.Y. July 23, 2025).

appliances directly (or act as conservation standards for individual types of appliances), this exception "demonstrates that EPCA's preemptive scope extends *beyond direct or facial regulations of covered products* to at least include building codes 'concerning the energy ... use' of such products." *Id.* (emphasis added); *see also* 42 U.S.C. § 6297(f)(3) (providing that a building code that sets "an energy consumption or conservation objective for a building" as a whole is exempt from preemption *only if it satisfies all seven of the statutory requirements*).

*Second*, there is the argument that local rules that prohibit fossil fuels specifically do not concern "energy use" generally. *See, e.g.*, *Cal. Restaurant Ass'n*, 89 F. 4th at 1123-25 (Friedland, J., dissenting from denial of rehearing en banc); *Ass'n of Contract Plumbers*, 2025 WL 843619, at *6. The underlying notion seems to be that a ban on fossil-fuel powered appliances does not concern "the quantity of energy directly consumed by a consumer product at point of use." 42 U.S.C. § 6291(4) (defining "energy use"). And this argument fails because EPCA specifically defines "energy" to mean "electricity, *or fossil fuels*." *Id.* § 6291(3) (emphasis added). Accordingly, EPCA preempts any ordinance that concerns the quantity of electricity *or fossil fuels* consumed by a consumer product. *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* § 12 (West 2012) (noting that "A or B" means either A or B, or both). The Ordinance here falls squarely within this scope of preemption, for it expressly provides that "*the source of energy [for appliances] shall not be fossil fuels*." Oak Park Vill. Code § 7-1-2 at P301.1 (emphasis added).

In sum, Oak Park has enacted an Ordinance that allows appliances in new buildings *only if they use zero fossil fuels*. Because that rule "concern[s] the …energy use" of products regulated by EPCA, it runs afoul of EPCA's express preemption clause. 42 U.S.C. § 6297(c). And because the Ordinance is subject to EPCA's broad preemption provision, it can survive scrutiny only if it

qualifies for one of EPCA's narrow exceptions to preemption. It does not.[5] The Ordinance does not satisfy EPCA's narrow exception for certain building codes. *Id.* § 6297(f)(3). That exception requires a regulation to meet seven specific requirements that, taken together, are intended to allow only codes that use consumption objectives and give builders choice about how to increase overall efficiency, ensuring an evenhanded policy that does not force builders to choose one type of appliance over another. *See* S. Rep. 100-6 at 10-11 (1987).

The Ordinance fails several of those requirements. It does not "permit[] a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective," 42 U.S.C. § 6297(f)(3)(A). Rather, without regard to any general target, the Ordinance categorically bars builders from selecting *any* appliances that use natural gas. Nor does the Ordinance provide credits "for installing covered products having energy efficiencies exceeding" federal standards "on a one-for-one equivalent energy use or equivalent cost basis." *Id.* § 6297(f)(3)(C). No matter how far they exceed federal standards, natural-gas appliances get no credit at all; they cannot be installed in new buildings no matter what. And the Ordinance does not "specif[y]" any "energy consumption or conservation objective," let alone do so "in terms of an estimated total consumption of energy" calculated in the manner prescribed by statute. *Id.* § 6297(f)(3)(F).[6]

---

[5] The Secretary of Energy is authorized to grant waivers of preemption where the state or local authority demonstrates that the "regulation is needed to meet unusual and compelling State or local energy . . . interests." 42 U.S.C. § 6297(d)(1)(B); *see also id.* § 6297(d)(1)(C)(i)). Oak Park has not applied for a preemption waiver or attempted to make any such demonstration—nor could it do so. SOF, ¶ 11.

[6] The Ordinance also does not qualify for an exception under EPCA's industrial-appliance provisions. 42 U.S.C. § 6316(b). To avoid preemption for industrial appliances, a building code regulation must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." *Id.* § 6316(b)(2)(B)(i). But the Ordinance does not qualify because it bans nearly all natural-gas appliances, even those meeting ASHRAE/IES Standard 90.1.

**B.  The Coalition is Entitled to Declaratory and Injunctive Relief.**

EPCA preempts Oak Park's Ordinance, and this Court has the power to say so in a declaratory judgment. *See* 28 U.S.C. § 2201(a). A court may grant a declaratory judgment when there is "a case of actual controversy within its jurisdiction," *id.*, that satisfies "Article III's case-or-controversy requirement," *California v. Texas*, 593 U.S. 659, 672 (2021). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (cleaned up). The Coalition meets these basic requirements. There is a substantial, ongoing controversy between the parties: Oak Park has banned the use of gas appliances, while the Coalition asserts its members' right under federal law to be free from this preempted parochial regulation, and to end the continued harm its members suffer as a result.

The Court likewise can issue an injunction preventing Oak Park from enforcing the Ordinance. Federal courts "may issue an injunction" against state officials "upon finding the [challenged] state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). As the Supreme Court noted in *Shaw v. Delta Air Lines, Inc.*—a case similarly brought against public officials challenging a state law as preempted—"[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights," including in preemption cases. 463 U.S. 85, 96 n.14 (1983); *see also, e.g., Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 119 (1989) (Kennedy, J., dissenting).

To be entitled to permanent injunctive relief, the Coalition must show (1) an irreparable injury where (2) monetary damages are inadequate to compensate for the injury and (3) equitable relief is warranted given the balance of hardships between the parties, and (4) the public interested

14

is not disserved by a permanent injunction. *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006). Plaintiffs satisfy each of those elements. *First,* the Ordinance irreparably harms the Coalition. As a result of the Ordinance, Coalition members have suffered and will continue to suffer serious harms, including lost customers, sales, and revenue, and increased expenses, SOF ¶ 26—all which cannot be recouped, and which make Coalition members' financial suffering an irreparable harm. *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (economic losses may be considered irreparable "[i]f expenditures cannot be recouped"). *Second*, there is no adequate remedy at law for the Coalition's harms. Without an injunction, Coalition members will be denied the right to conduct their lives and businesses unburdened by the prospect of the enforcement of a preempted law. Money damages would do little to remedy that harm. SOF, ¶ 27.

The *third* and *fourth* factors, the balance of harms and the public interest—merge where, as here, the government is the defendant. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Coalition and its members are suffering substantial harm. Oak Park, by contrast, will suffer no harm at all, for Oak Park has no legitimate interest in enforcing an unlawful regulation. *See, e.g., Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). By the same token, there is a "substantial public interest" in ensuring that federal law is followed and that unlawful action is ended. And as many courts have held, requiring compliance with a law that is unlawful is "always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). And EPCA embodies a strong public interest in a uniform national energy policy, specifically one that encourages a diverse domestic supply of energy and protects consumer choice—all of which the Ordinance undermines.

In sum, both declaratory and injunctive relief are merited.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment should be granted.

15

Dated: August 27, 2025

Respectfully submitted,

**CLEAN ENERGY CHOICE
COALITION, NFP**

By: /s/ *Christine E. Skoczylas* _____

Christine E. Skoczylas (#6293811)
Alexander J. Bandza (#6312301)
BARNES & THORNBURG LLP
One North Wacker Drive, Suite 4400
Chicago, IL 60606
(312) 537-1313
christine.skoczylas@btlaw.com
abandza@btlaw.com

Kian James Hudson
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
(317) 229-3111
kian.hudson@btlaw.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on August 27, 2025, the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

*/s/ Christine E. Skoczylas*