# EXHIBIT E

# CHAPTER 7

# BUILDINGS

Contractor Registration    0

Building Code    1

Existing Building Code    2

Electric Code    3

Mechanical Code    4

Fire Code    5

Residential Code    6

Signs    7

Fees    8

Historic Preservation    9

Vacant Buildings    10

Fuel Gas Code    11

Plumbing Code    12

Property Maintenance Code    13

Energy And Water Benchmarking    14

Pool Code    15

## ARTICLE 0

## CONTRACTOR REGISTRATION

SECTION:

**7-0-1: Contractor Registration**

## 7-0-1: CONTRACTOR REGISTRATION:

Contractors who seek to perform work in the Village for which a Village permit is required or contractors performing lawn maintenance/landscaping work as defined by article 8-41 of this Code shall be required to register with the Village according to this code. No permit will be issued for work to be performed by a contractor until the contractor has registered in accordance with this code and paid a registration fee of fifty dollars ($50.00).

   A.   Registration: Registration shall be submitted electronically to the Village and shall include the following information:

     1.   The contractor's full name, business name, full address of the business, business telephone and federal employer identification number (FEIN);

     2.   Whether the business is a sole proprietorship, partnership, or corporation and if a corporation, the name of the registered agent;

     3.   If the contractor is a corporation, annual certification from the Illinois secretary of state that the corporation is in good standing in the state of Illinois as either a domestic or foreign corporation and has not been dissolved;

     4.   If the contractor is required to be licensed by the state of Illinois, a copy of the current license with the license number; and

     5.   An original certificate of insurance or policy declaration documenting that the contractor carries general liability insurance with a minimum of one million dollars ($1,000,000.00) per occurrence, bodily injury insurance with a minimum of five hundred thousand dollars ($500,000.00) per occurrence, property damage insurance with a minimum of one hundred thousand dollars ($100,000.00), and workers' compensation insurance at the statutory minimum amounts.

       a.   Sole proprietorships and partnerships with no employees are exempt from the worker's compensation insurance requirement.

b.   Contractors who are engaged to perform work in the public right of way shall be required to name the Village of Oak Park as an additional insured on their policies of insurance and to provide proof of that insurance to the Village.

c.   Contractors who are required to maintain insurance as part of their state licensure shall be required to provide proof of insurance only in forms and amounts required by state law.

B.   Reciprocity: Any contractor who is required to register with the state of Illinois, may, in lieu of the registration required by subsection 7-0-1A of this section, provide the Village with its state registration and license.

C.   Registration Expiration And Renewal: A contractor's registration issued pursuant to this section shall be valid for one year from the date of issuance. Upon expiration, a contractor may renew its registration from the date of issuance pursuant to the procedures set forth in subsection 7-0-1A of this section.

D.   Reporting Changes In Registration: Contractors who experience a change in the business structure, name, or location; changes in ownership of the registered contractor; or changes in the license listed on the registration application shall reapply for registration and pay the applicable fifty dollar ($50.00) fee. The new registration will be valid for a one year period.

E.   Business Location: Should a contractor operate a business governed by this section within the Village's boundaries, a business license shall also be required.

F.   All contractors performing lawn maintenance/landscaping work are subject to the equipment restrictions contained in section 8-41-4 of this Code. Lawn maintenance/landscaping contractors shall not be subject to the registration fee until the year 2025 and thereafter, but shall be required to register with the Village. (Ord. 2014-0-52, 8-4-2014; amd. Ord. 23-19, 3-13-2023)

---

## ARTICLE 1

## BUILDING CODE

---

SECTION:

**7-1-1: Adoption**

**7-1-2: Amendments**

## 7-1-1: ADOPTION:

A.   The 2021 international building code ("IBC"), as published by the International Code Council, is hereby adopted by the Village by reference and is made a part hereof as if fully set forth in this section with the additions, insertions, deletions and changes set forth in section 7-1-2 of this article. To the extent that the provisions of the IBC are inconsistent with any codes previously adopted by the Village by reference, the provisions of the IBC shall govern unless specifically set forth in this code. In the event of a conflict between any provisions of the IBC and any provision of the Oak Park Village Code, the provisions of the Oak Park Village Code shall govern.

B.   There shall be three (3) copies of the IBC kept on file for public inspection in the office of the Chief Building Official. (Ord. 2014-0-58, 10-6-2014, eff. 1-1-2015; amd. Ord. 20-081, 9-21-2020; Ord. 23-47, 6-20-2023; Ord. 23-48, 6-20-2023)

## 7-1-2: AMENDMENTS:

The international building code, 2021 edition, as adopted pursuant to section 7-1-1 of this article is hereby amended by adding the underlined language and deleting the overstricken language as follows:

**101.1 Title.** These regulations, as amended and adopted by the Village, shall be known as the building code of the Village of Oak Park, hereinafter referred to as "this code."

**Section 101.2.1 Appendices.** Provisions in the appendices shall not apply unless specifically adopted. The following appendices are adopted as part of this code:

1.   Appendix A - Employee Qualifications;

2.   Appendix E - Supplementary Accessibility Requirements;

3.   Appendix F - Rodent-Proofing;

4.   Appendix I - Patio Covers;

5.   Appendix J – Grading; and

6.   Appendix P – Electrification Requirements for All New Buildings.

**101.4 Referenced Codes.** The other codes specified in Sections 101.4.1 through 101.4.7, as amended and adopted by the Village, and referenced elsewhere in this code shall be considered part of the requirements of this code to the prescribed extent of each such reference.

**101.4.1 Gas.** The provisions of the 2021 International Fuel Gas Code, as amended and adopted by the Village, shall apply to the installation of gas piping from the point of delivery, gas appliances and related accessories as covered in this code. These requirements apply to gas piping systems extending from the point of delivery to the inlet connections of appliances and the installation and operation of residential and commercial gas appliances and related accessories.

**101.4.2 Mechanical.** The provisions of the 2021 International Mechanical Code, as amended and adopted by the Village, shall apply to the installation, alterations, repairs and replacement of mechanical systems, including equipment, appliances, fixtures, fittings and/or appurtenances, including ventilating, heating, cooling, air-conditioning and refrigeration systems, incinerators, and other energy systems.

**101.4.3 Plumbing.** The provisions of the ~~International Plumbing Code~~ current edition of the State of Illinois Plumbing Code, pursuant to section 7-12-1 of the Village Code, shall apply to the installation, alteration, repair and replacement of plumbing systems, including equipment, appliances, fixtures, fittings and appurtenances, and where connected to a water or sewerage sewer system. and all aspects of a medical gas system. The provisions of the international private sewage disposal code shall apply to private sewage disposal system. In addition, the provisions of chapter 11 of the 2018 2021 edition of the International Plumbing Code shall be applicable to the installation, alteration, repair and replacement of storm drainage systems.

**101.4.4 Property Maintenance.** The provisions of the International Property Maintenance Code, as amended and adopted by the Village, shall apply to existing structures and premises; equipment and facilities; safety hazards, responsibilities of owners, operators and occupants; and occupancy of existing premises and structures.

**101.4.5 Fire Prevention.** The provisions of the 2021 International Fire Code, as amended and adopted by the Village, shall apply to matters affecting or relating to structures, processes and premises from the hazard of fire and explosion arising from the storage, handling or use of structures, materials or devices; from conditions hazardous to life, property or public welfare in the occupancy of structures or premises; and from the construction, extension, repair, alteration or removal of fire suppression and alarm systems or fire hazards in the structure or on the premises from occupancy or operation.

**101.4.6 Energy.** The provisions of the International Energy Conservation Code, as amended and adopted by the Village, shall apply to all matters governing the design and construction of buildings for energy efficiency.

**101.4.7 Existing Buildings.** The provisions of the International Existing Building Code, 2021 edition, as amended and adopted by the Village, shall be applicable to the repair, alteration, change of occupancy, addition and relocation of all existing buildings, regardless of occupancy, subject to the criteria set forth within that code.

**101.4.8 Electrical.** The provisions of the National Electric Code, NFPA 70, 2020 edition, as amended and adopted by the Village shall apply to all matters governing the design, installation, alteration, repair and replacement of electrical components, equipment and systems installed in buildings and structures covered by this code.

**101.4.9 Swimming Pools and Spas.** The provisions of the International Swimming Pool and Spa Code, 2021 edition, as amended and adopted by the Village, shall be applicable to the design, construction and alterations of private and public swimming pools and spas.

**101.5 Effective Date.** This code and all codes adopted by reference herein shall be effective pursuant to the applicable adopting ordinance, provided however, that:

a.   For any construction project where a permit has been issued prior to the effective date of this code and the Chief Building Official has determined that the permittee has pursued the work in good faith and where the work has not been abandoned within 90 days after the effective date of this code, the code in effect at the time of issuance of the permit shall be applicable.

b.   For any construction project for which an application for a permit has been filed with the Village prior to the effective date of this code and the permit has not been issued, and for a project where a permit has been issued and the permittee has not substantially changed their position in reliance on the permit, the Chief Building Official has discretion to apply either the code in effect at the time of the permit application or this code.

## PART 2 - ADMINISTRATION AND ENFORCEMENT

## SECTION 103 - DEPARTMENT OF BUILDING SAFETY

**103.1 Creation of Enforcement Agency.** The Permitting and Development Division of the Development Services Department ~~is hereby created~~ and the official in charge thereof shall be known as the ~~building official~~ Chief Building Official. The function of the ~~agency~~ Division shall be the implementation, administration and enforcement of the provisions of this code.

## SECTION 104 - DUTIES AND POWERS OF BUILDING OFFICIAL

**104.1.1 Building Official.** All references to the "building official" or "code official" shall mean the Chief Building Official.

**104.3.1 Failure to Comply.** Failure to comply with any notice or order issued by the Chief Building Official for the enforcement of this code shall be considered a violation of this code's requirements for regulation of construction.

**104.8 Liability** is deleted in its entirety and replaced with the following language:

Any building official, member of the board of appeals or any other employee or appointed official charged with the enforcement of this code, while acting in the course and scope of his employment, appointment, or official duties and responsibilities for the Village and under color of law shall be entitled to full protection pursuant to the local governmental and governmental employees tort immunity act, 745 ILCS 10/1 et seq., as well as the full protections of any other statutory or common law defenses, and shall not be held personally liable and is relieved from personal liability for any damage, loss or costs, including attorneys' fees, accruing to persons or property as a result of any act or omission in the discharge of official duties or appointment. The Village will indemnify and defend any officer, member or employee from any suit instituted against him or her alleging an act or omission performed or not performed by that officer, member or employee in the lawful discharge of his or her duties under the provisions of this code, until final determination of the proceedings, provided that the officer, member or employee gives the Village Attorney notice, within 21 days of the service of summons and complaint of any such lawsuit or proceeding.

**104.12 Requirements Not Covered by Code.** The Chief Building Official shall have discretion to impose additional requirements not specifically set forth in this code necessary for the strength, stability or proper operation of an existing or proposed installation; the construction, repair, alteration, change of occupancy or addition to buildings and structures; and the relocation of all existing buildings, in the interests of public safety, health and general welfare.

## SECTION 105 - PERMITS

**105.1 Required.** Any owner or owner's authorized agent who intends to construct, enlarge, alter, repair, move, demolish or change the occupancy of a building or structure, or to erect, install, enlarge, alter, repair, remove, convert or replace any electrical, gas, mechanical or plumbing system, the installation of which is regulated by this code, add insulation to an attic, or to cause any such work to be performed, shall first make application to the building official and obtain the required permit.

With the exception of work items set forth in section 105.2, any work performed without a required permit is illegal and constitutes an unlawful act and shall be subject to administrative penalties under this code and/or penalties in accordance with the applicable provisions of the Oak Park Village Code.

a.    No building permit or demolition permit shall be issued and no alteration authorized by the Permit Processing Division affecting any site, building, structure or improvement designated as set forth below until such time as the corresponding requirement or requirements set forth below for each such designated site, building, structure or improvement shall first have been satisfied:

1.    In the case of the construction on, and/or the alteration, relocation, demolition or removal of an eligible historic landmark, the building or demolition permit shall be issued or the alteration authorized upon the denial of designation of historic landmark status by the Village Board; provided, however, that if the site, building, structure or improvement which has been denied landmark status is located within a designated historic district, then the issuance of a building or demolition permit shall also be contingent upon satisfying the requirements set forth herein for property located within a designated historic district; or

2.    In the case of a demolition or removal of: a) an eligible or designated historic landmark; b) any site, building, structure or improvement within a designated historic district; or c) a site, building, structure or improvement located in a designated historic district or listed in the national register of historic places, which is wholly or partially financed by the Village or by one or more federal, state or Village funding sources which are dispersed through or administered by the Village, the demolition permit shall be issued upon the authorization of such a permit by formal resolution of the Village Board as being necessary to protect the public health, safety or welfare; or

3.    In the case of: a) the construction on, and/or the alteration, relocation, demolition or removal of an eligible or designated historic landmark; b) the alteration, demolition or removal of a site, building, structure or improvement located in a designated historic district or listed in the national register of historic places which is wholly or partially financed by the Village or by one or more federal, state or Village funding sources which are dispersed through or administered by the Village; or c) the removal or demolition of any building, structure or improvement located within a designated historic district for which demolition has not been authorized under subsection 7-9-9A2 of the Oak Park Village Code, as amended, the building or demolition permit shall be issued or the alteration shall be authorized upon the issuance of a certificate of appropriateness in accordance with section 7-9-13 of the Oak Park Village Code, as amended, or a certificate of economic hardship in accordance with section 7-9-14 of the Oak Park Village Code, as amended.

b.    No building permit for construction shall be issued by the Permit Processing Division affecting any non-landmark property or structure within a designated historic district unless a certificate of advisory review is issued in accordance with section 7-9-16 of the Oak Park Village Code, as amended.

**105.1.1.1 Scope of Annual Permit.** The scope of work permitted under an annual permit shall not include the construction, alteration, movement or enlargement of a building or structure, alterations or renovations that involve structural modifications or changes to established paths of egress or fire-resistant wall or horizontal assemblies, or change of use or occupancy.

**105.1.3 Application for Permit Filed After Work Has Commenced.** In addition to the fees and penalties imposed by section 109 of this code, and by the Oak Park Village Code, any person who commences work before obtaining a permit, where a permit is required, shall submit a signed and sworn statement, on a form acceptable to the building official, which provides the following information. Where the following information is contained in a document, that document may be provided as an attachment to the sworn statement:

1.    Complete description of the scope of work.

2.    Date(s) of construction.

3.    Contract for construction services. In lieu of the submittal of a contract for construction services, the building official is authorized to estimate the cost of construction using industry standard construction cost sources.

4.    Name(s) of all contractors, sub-contractors and other persons that received payment or material consideration in exchange for performing such work without permit(s).

5.    Dated and notarized signature of the owner or owner's agent.

6.    All construction documents that would be required for properly obtained permit(s) including, but not limited to, architectural drawings, engineering calculations and plat of survey.

7.    Certification of work from a third-party testing service as deemed necessary by the building official to ensure that work performed is in accordance with this code.

8.    Any other relevant documentation as required by the building official.

**105.1.4 Permit Applicant.** Application for permit shall be made by the owner, owner's agent, a duly licensed and/or registered contractor, lessee of the space(s) to be occupied who has written approval from the owner, or other responsible party.

**105.1.5 Demolitions and Moved Structures.** In order to demolish or move any free-standing principal structure, coach house, garage or other accessory structure, the responsible party must obtain a demolition permit issued by the Cook County Department of Environmental Control, a demolition permit issued by the Village, and for structures located within a designated historic district, a certificate of appropriateness as may be required by chapter 7 article 9 of the Village Code, as amended.

**105.1.6 Previous Approvals.** This code shall not require changes in the construction documents, construction or designated occupancy of a structure for which a lawful permit has been heretofore issued or otherwise lawfully authorized, and the construction of which has been pursued in good faith within 90 days after the date of effective date of this code and has not been abandoned.

**105.2 Work Exempt from Permit.** A permit shall not be required for the work items set forth below. Exemptions from permit requirements of this code shall not be deemed to grant authorization for any work to be done in any manner in violation of the provisions of this code or any other laws or ordinances of this jurisdiction, the Village. A certificate of advisory review is required, and a certificate of appropriateness may be required, for any work items performed on an eligible or designated historic landmark or any building, structure or improvement located within a designated historic district, listed in the National Register of Historic Places or determined to be eligible to be listed in the National Register of Historic Places by the State Historic Preservation Officer.

Permits shall not be required for the following:

Building:

1.   One-story detached accessory structures used as tool and storage sheds, playhouses and similar uses provided the floor area does not exceed 120 is less than 70 square feet (11 m$^2$).

2.   Fences not over 7 feet (1829 mm) high. Retaining walls with an unbalanced soil load of one foot or less in height.

3.   Oil derricks. Interior painting, papering, tiling, carpeting or other floor surface treatments, countertops and similar finish work with the condition that no electrical, mechanical, plumbing or structural work is associated with these activities.

4.   Retaining walls that are not over 4 feet (1219 mm) in height measured from the bottom of the footing to the top of the wall, unless supporting a surcharge or impounding class I, II or IIIA liquids. Exterior painting.

5.   Water tanks supported directly on grade if the capacity does not exceed 5,000 gallons (18925 L) and the ratio of height to diameter or width does not exceed 2:1. Masonry tuckpointing, involving replacement of less than 20 masonry units.

6.   Sidewalks and driveways not more than 30 inches (762 mm) above adjacent grade, and not over any basement or story below and are not part of an accessible route. Pressure washing of building exteriors.

7.   Painting, papering, tiling, carpeting, cabinets, counter tops and similar finish work. Resealing caulked joints in a building envelope.

8.   Temporary motion picture, television and theater stage sets and scenery. Replacement of cracked or missing glazing in existing window sashes.

9.   Prefabricated swimming pools accessory to a group R-3 occupancy that are less than 24 inches (610 mm) deep, do not exceed 5,000 gallons (18925 L) and are installed entirely above ground. Installation of residential storm windows and doors.

10.   Shade cloth structures constructed for nursery or agricultural purposes, not including service systems. Repair or replacement of deteriorated wood siding to match existing siding in a single or cumulative area not to exceed 100 square feet.

11.   Swings and other playground equipment accessory to detached one- and two-family dwellings. Repair of cracks or replacement of missing sections of existing stucco to match existing stucco in a single or cumulative area not to exceed 100 square feet where the existing lath remains in place.

12.   Window awnings supported by an exterior wall that do not project more than 54 inches (1372 mm) from the exterior wall and do not require additional support of groups R-3 and U occupancies. Repair or replacement of existing fencing in a single or cumulative area not exceeding 100 square feet.

13.   Nonfixed and movable fixtures, cases, racks, counters and partitions not over 5 feet 9 inches (1753 mm) in height. Minor residential household repair projects which do not require electrical, mechanical, plumbing or structural work.

14.   Sealcoating of existing driveways.

15.   Sealcoating of existing parking lots with less than 5 parking stalls and not requiring accessible stalls.

16.   Waterproofing of perimeter basement walls with spray-on membrane material or epoxy injection of cracks.

17.   Repair of pavement cracks not involving removal and replacement of existing paved materials.

18.   Repair of leaking roof flashings involving less than 10 linear feet of flashing.

19.   Repair of leaking roof membrane involving less than 100 square feet of roof covering materials.

20.   Replacing wood treads and risers on stairs of residential buildings not more than four dwelling units in size.

21.   Replacing handrails on stairs of residential buildings not more than four dwelling units in size.

22.   Erection of temporary tents and membrane structures in size exempted from permits under section 2403.2 of the International Fire Code as amended and adopted by the Village.

23.  Temporary motion picture, television and theater stage sets and scenery.

24.  Prefabricated temporary swimming pools, accessory to a group R-3 occupancy, that are less than 18 inches deep, do not exceed 2,500 gallons when filled to the highest level that water can reach before it spills out, and are installed entirely above ground.

25.  Non-fixed and movable non-electrified fixtures, cases, racks, counters and office partitions.

26.  Installation, maintenance and removal of trees, shrubbery or landscape plantings on private property.

Electrical:

1.  Repairs and maintenance: Minor repair work, including the replacement of lamps or the connection of approved portable electrical equipment to approved permanently installed receptacles.

2.  Radio and television transmitting stations: The provisions of this code shall not apply to electrical equipment used for radio and television transmissions, but do apply to equipment installation, installation of electrical equipment and wiring for a power supply and the cabling and installation of towers and antennas.

3.  Temporary testing systems: A permit shall not be required for the installation of any temporary system required for the testing or servicing of electrical equipment or apparatus.

4.  Replacement of plug-and-cord connected residential kitchen and laundry appliances.

Gas:

1.  Portable heating appliances.

2.  Replacement of any minor part component of an appliance or equipment that does not alter approval of equipment or make such <u>appliance</u> or equipment unsafe.

3.  Replacement of portable residential kitchen and laundry appliances.

Mechanical:

1.  Portable heating appliance.

2.  Portable ventilation equipment <u>not connected to permanent building duct system.</u>

3.  Portable cooling unit <u>equipment not connected to permanent building duct system.</u>

4.  Steam, hot or chilled water piping within any heating or cooling equipment regulated by this code.

5.  The replacement of any part that does not alter its approval of or make unsafe.

6.  Portable evaporative ~~cooler~~ <u>cooling equipment not connected to permanent building duct system.</u>

7.  Self-contained, <u>plug-in</u> refrigeration systems containing 10 pounds (5 kg) or less of refrigerant, or that are and actuated by motors of 1 horsepower (746 W) or less.

8.  Portable fuel cell appliances that are not connected to a fixed piping system and are not connected to a power grid.

Plumbing:

1.  The stopping of leaks in drains, water, soil, waste or vent pipe, provided, however, that if any concealed trap, drain pipe, water, soil, waste or vent pipe becomes defective and it becomes necessary to remove and replace the same with new material, such work shall be considered as new work and a permit shall be obtained and inspection made as ~~provided in~~ <u>required</u> by this code.

2.  The clearing of stoppages or the repairing of leaks in pipes, valves or fixtures and the removal and reinstallation of water closets, provided such repairs do not involve or require the replacement or rearrangement of valves, pipes, ~~or~~ fixtures <u>or an electrical connection</u>.

3.  The removal and replacement of residential fixtures that do not require the replacement or rearrangement of valves, pipes, fixtures, or an electrical connection.

4.  The removal and replacement of residential portable sump pump or ejector pumps.

Emergency Work:

Emergency work that commences after regular Village business hours to maintain electric, plumbing, sewerage, heating, air conditioning, or other essential utility service shall not require a permit prior to the work being commenced subject to the following: (1) the work is performed in conformance with this code; (2) a permit is obtained the next regular work day; and (3) the work is inspected and approved within 48 hours of permit issuance.

**105.3.1 Action on Application.** The building official shall examine or cause to be examined applications for permits and amendments thereto within a reasonable time after filing. <u>Based on a project's use group, complexity of the scope of work or location of a property within a designated historic district, the application shall be subject to a formal plan review which must be approved prior to the issuance of a permit.</u> If the application <u>for plan review</u> or the construction documents <u>are incomplete or</u> do not conform to the requirements of <u>this code or</u> pertinent laws, the building official shall reject such application or submittal documents in writing, stating the reasons therefor. <u>Upon completion and/or correction of the permit application and/or submittal documents, revised submittal documents shall be resubmitted to the building official for further review.</u> If the building official shall be satisfied that the proposed work

conforms to the requirements of this code and laws and ordinances applicable thereto, the building official shall issue a permit therefore as soon as possible.

**105.3.1.1 Application Forms.** The application for a permit shall be submitted on a form supplied by the Permit Processing Division. The building official is authorized to establish supplemental submittal requirements for each permit type in addition to those established in this code.

**105.5 Expiration.** Every permit shall become invalid unless the work on the site authorized by such permit is commenced within 180 days after its issuance, or if the work authorized on the site by such permit is suspended or abandoned for a period of 180 days after the time the work is commenced. The building official is authorized to grant, in writing, ~~one or more~~ up to two extensions of time, for periods not more than 180 days each. The extension shall be requested in writing the justifiable cause be demonstrated.

Unless noted otherwise upon a permit placard, every initial permit issued shall become invalid upon the occurrence of any one of the following conditions:

1. The work is not completed within one year of the date of issuance of the permit;

2. The work on the site authorized by such permit is not commenced within 90 days after the date of issuance of the permit; or

3. The period of time between validated inspections exceeds 90 days. The building official is authorized to grant, in writing, one or more extensions of time, for periods not more than 90 days each. The extension shall be requested in writing and justifiable cause demonstrated.

**105.5.1 Extensions.** A responsible party holding an unexpired permit shall have the right to apply for an extension of time within which the party shall complete the applicable work when the work is unable to be completed within the time requirements set forth in section 105.5. The building official is authorized to grant, in writing, one or more extensions of time for additional periods for not more than 90 days. The extension of time shall be requested in writing and justifiable cause demonstrated. Extensions of time are subject to administrative fees in accordance with section 109 of this code.

**105.6 Suspension or Revocation.** The building official is authorized to suspend or revoke a permit issued under the provisions of this code wherever:

1. The permit is found to be issued in error or on the basis of incorrect, inaccurate or incomplete information.

2. The permit is found to be issued in violation of any ordinance or regulation of any of the provisions of this code.

3. The work being performed is found to be in violation of any Village ordinance, law or regulation or any of the provisions of this code.

4. The scope of work being performed is found to exceed the work authorized by the permit.

5. Conditions and limitations set forth in the permit have been violated.

6. The permit placard was not posted in accordance with section 105.7 of this code.

7. The permit is used for a location or establishment other than that for which it was issued.

8. The permit is used for a condition or activity other than that listed in the permit.

9. The permit is used for a different person or firm than the name for which it was issued.

10. The permittee failed, refused or neglected to comply with an order or notice duly served in accordance with the provisions of this code within the time provided therein.

**105.6.1 Reinstatement of Permit.** Upon the expiration of a permit or the suspension, revocation or invalidation of a permit, a renewal or extension may be granted contingent on the responsible party's showing of good cause and the payment of administrative fees in accordance with Section 109 of this code. A permit that has been suspended or revoked for more than 30 calendar days shall be considered invalid and cannot be renewed.

## SECTION 107 - SUBMITTAL DOCUMENTS

**107.1 General.** Submittal documents consisting of construction documents, statement of special inspections, geotechnical report and other data shall be submitted ~~in two or more sets, or~~ in a digital format with each permit application. The construction documents shall be prepared by a registered design professional.

**Exception:** The building official is authorized to waive the submission of construction documents and other data not required to be prepared by a registered design professional if it is found that the nature of the work applied for is such that review of construction documents is not necessary to obtain compliance with this code.

**107.2.9** Permit submittal documents shall include the following:

1. Structural, architectural, mechanical, plumbing, fire protection and electrical drawings;

2. Plat of survey;

3. Structural calculations and/or drawings signed and sealed by an Illinois licensed structural engineer or Illinois licensed architect;

4. Cut sheets for proposed manufactured floor systems with applicable span chart to verify code compliance unless engineering calculations for the design of the manufactured floor systems or open web wood truss joists have been submitted. Engineering

calculations must be submitted for any manufactured floor systems or open web wood truss joists supporting loads other than uniformly distributed loads;

5. A statement with the permit application listing the materials and work requiring special inspections, describing the inspections to be performed and listing the individuals, approved agencies and/or firms required to conduct the inspections;

6. Window cut sheets for opening sizes specified for bedroom windows to determine if windows meet egress requirements;

7. Detailed layouts, schedules and manufacturer's data sheets for kitchen and any food processing equipment;

8. ComCheck for commercial and mixed commercial and residential buildings;

9. ResCheck for one and two-family residential buildings;

10. Specified fire-resistant assemblies listed rating descriptions; and

11. Village of Oak Park "Water Service Upgrade Worksheet."

**Exception:** The building official is authorized to waive the submission of construction document drawings and other data not required to be prepared by a registered design professional if it is found that the nature of the work is such that the review of construction documents is not necessary for compliance with this code.

**107.2.2 Fire Protection System Shop Drawings.** Shop drawings for any fire protection system shall be submitted to indicate conformance to this code and the construction documents and shall be approved prior to the start of system installation. Shop drawings shall contain all information as required by the referenced installation standards in chapter 9 of this code.

**107.2.2.1 Shop Drawings.** Shop drawings for a fire protection system shall be submitted and approved prior to the start of system installation. The shop drawings shall serve as a guide for the fabrication and installation of a fire sprinkler system. The shop drawings shall either be prepared by a licensed design professional or a National Institute for Certification in Engineering Technologies ("NICET") level 3 or 4 certified technician. If the shop drawings are prepared by a licensed design professional, they shall bear an original signature and seal of the design professional on each page. If the shop drawings are prepared by a NICET certified technician, the drawings shall have the preparer's name, signature and NICET certification number on each page. The drawings shall at a minimum contain the following:

1. Scaled plans prepared in accordance with NFPA 13 indicating the size and location of risers, cross mains, branch lines, sprinkler heads, and piping as required for the installation of the fire protection system;

2. Technical data sheets of all system components and hardware; and

3. Supplemental hydraulic calculations prepared in accordance with the approved technical submission and NFPA 13.

The system layout documents shall bear a certification from the design professional of record that the system shop drawings are in conformance with the requirements established for the project.

### SECTION 109 - FEES

**109.2 Schedule of Permit Fees.** ~~On buildings, structures, electrical, gas, mechanical and plumbing systems or alterations requiring a permit, a fee for each permit shall be paid as required, in accordance with the schedule as established by the applicable governing authority.~~ A fee for each permit shall be paid as required for all work governed by the Oak Park Village Code or an adopted code in accordance with the applicable Village fee schedule. It shall be a violation of this code to perform work without a permit where a permit is required.

### SECTION 111 - CERTIFICATE OF OCCUPANCY

**111.1.1 Certificates of Occupancy Required.** The following work requires a certificate of occupancy to be issued prior to the occupancy of any area:

1. New construction, including building additions;

2. Commercial build-outs for new tenancy;

3. Interior alterations of more than 50% of a given commercial lease space;

4. Interior alterations of any size that affect means of egress, exit signage, emergency lighting or other life-safety features;

5. Change of occupancy classification;

6. Change of use;

7. Moved structures; and

8. Other project types as deemed necessary by the Chief Building Official.

### SECTION 113 - BOARD OF APPEALS

**113.1 General.** In order to hear and decide appeals of orders, decisions or determinations made by the building official relative to the application and interpretation of this code, or the building official's designee, there shall be and is hereby created a board of appeals which shall be the Village's Building Code Advisory Commission. ~~The board of appeals shall be appointed by the applicable governing authority and shall hold office at its pleasure.~~ The board shall adopt rules of procedure for conducting its business and shall render all decisions and findings in writing to the appellant with a duplicate copy to the building official.

**113.4 Administration Appeals.** ~~The building official shall take immediate action in accordance with the decision of the board.~~ Any person directly affected by a decision of the building official or the building official's designee or a notice or order issued under this code shall have the right to appeal to the board of appeals, provided that a written application for appeal is filed within twenty (20) calendar days after the day the decision, notice or order was served.

**113.5 Board Decision.** The board of appeals shall modify or reverse the decision of the building official or the building official's designee or a notice or order issued under this code upon a concurring vote of a majority of the total number of appointed board members. The board of appeals shall have the discretion to allow a variance from the provisions of the code if, after having received a written report, certified by a licensed architect or engineer, the board of appeals determines that strict compliance with the code is impractical from an engineering, architectural or structural standpoint, that the spirit and intent of the code has been met and life safety has not been materially compromised as a result of the variance. The decision of the board of appeals shall be in writing and shall be furnished to the appellant and to the building official.

**113.6 Administration.** The building official shall take immediate action in accordance with the decision of the board of appeals. Appeals of decisions of the building official or a notice or order issued under this code (other than those of immediate threat to life safety) shall stay the enforcement of the decision, notice or order until the appeal is heard by the board of appeals and a decision is rendered.

### SECTION 116 - UNSAFE STRUCTURES AND EQUIPMENT

**116.5 Restoration or abatement.** Where the structure or equipment determined to be unsafe by the building official ~~shall be~~ is permitted to be restored to a safe condition, the owner, the owner's authorized agent, operator or occupant of a structure, premises or equipment deemed unsafe by the building official shall abate or cause to be abated or corrected such unsafe conditions by repair, rehabilitation, demolition or other approved corrective action. To the extent that repairs, alterations or additions are made or a change of occupancy occurs during the restoration of the structure, such repairs, alterations, additions or change of occupancy shall comply with the requirements of the International Existing Building Code as amended and adopted by the Village of Oak Park.

### CHAPTER 2

### DEFINITIONS

### SECTION 202 – DEFINITIONS. Section 202 is amended to add the following:

**Responsible Party:** Except as may otherwise be specified herein, the owner or the owner's designated agent shall be considered a responsible party for ensuring compliance with this code. In addition, any other person or entity that may be reasonably considered to have a role or responsibility in the creation, continuation, or correction of any violation of this code shall be considered a responsible party or additional responsible party for such violation.

### CHAPTER 9

### FIRE PROTECTION SYSTEMS

### SECTION 907 - FIRE ALARM AND DETECTION SYSTEMS

**907.2.1 Group A.** A manual fire alarm system that activates the occupant notification system in accordance with section 907.5 shall be installed in group A occupancies having an occupant load of ~~300~~ 100 or more ~~or where the Group A occupant load is more than 100 persons above or below the lowest level of exit discharge~~. Group A occupancies not separated from one another in accordance with Section 707.3.10 shall be considered as a single occupancy for the purposes of applying this section. Portions of group E occupancies occupied for assembly purposes shall be provided with a fire alarm system as required for the group E occupancy.

### SECTION 913 - FIRE PUMPS

**913.2.2 Construction of Fire Pump Rooms.** Fire pumps, where required by the edition of the International Fire Code as amended and adopted by the Village of Oak Park shall be located in an enclosure designed for protection of the equipment from weather or mechanical damage. The fire pump room shall have each of the following features.

1. Lighting and power. The room shall be adequately lighted to facilitate operation and maintenance of the equipment. At least one 110-volt duplex convenience outlet with ground-fault protection as regulated by the national electric code as amended and adopted by the Village of Oak Park shall be provided in a safe location within the enclosure.

2. Drainage. At least one floor sink complying with the state of Illinois plumbing code shall be provided. The floor sink shall be capable of draining waste water drained from the sprinkler system inspection port or main sprinkler piping system drain without accumulation on the floor. The floor sink shall be installed a minimum of 36 inches from any panel or piece of equipment.

3. Access. The room shall be in an accessible location as approved by the fire department with a minimum 36-inch wide door leading directly to the building exterior unless otherwise approved by the fire department.

4. There shall be a minimum 3-foot-wide access path with minimum 7-foot-high clear headroom through the fire pump room to all equipment. There shall be a minimum 36-inch wide by 36-inch deep by 84-inch high service clearance in front of each piece of equipment or panel in the fire pump room.

5. Separation. Other than piping, conduits, ducts and/or equipment directly serving the fire pump or the fire pump room, no other building components or systems shall be installed in or pass through the fire pump room.

### CHAPTER 10

### MEANS OF EGRESS

### SECTION 1013 - EXIT SIGNS

**1013.5 Internally Illuminated Exit Signs.** Electrically powered, self-luminous and photoluminescent exit signs shall be listed and labeled in accordance with UL 924 and shall be installed in accordance with the manufacturer's instructions and ~~chapter 27~~ the edition of the National Electric Code as amended and adopted by the Village of Oak Park. Exit signs shall be illuminated at all times.

### SECTION 1006 - NUMBER OF EXITS AND EXIT ACCESS DOORWAYS

**1006.3 Egress from Stories or Occupied Roofs.** The means of egress system serving any story or occupied roof shall be provided with the number of separate and distinct exits based on the aggregate occupant load served in accordance with this section. For purpose of means of egress only, roofs that are intended for private or public use occupied space shall have two separate means of egress. For purpose of this section only, exterior spiral stairways constructed in accordance with this code may be provided as a second means of egress from an occupied roof area.

Exceptions:

1. Buildings provided throughout with automatic sprinkler protection.

2. Buildings with parapets or roof edges no higher than 30 feet above the level of Fire Department access.

3. Buildings with windows or other exterior wall openings leading directly to the occupied roof area which have a sill height no higher than 30 feet above the level of Fire Department access.

### CHAPTER 14

### EXTERIOR WALLS

### SECTION 1407 - EXTERIOR INSULATION AND FINISH SYSTEMS (EIFS)

**1408.5.1 Height Above Grade.** EIFS other than ultra-high impact systems shall not be installed closer than 8 feet to finished exterior grade. High impact EIFS systems shall be provided with high impact glass fiber reinforcing mesh tested in accordance with ASTM E2486 for high impact resistance (90-150 inch-lbs. and minimum 15 oz/yd$^2$) in combination with standard mesh.

### CHAPTER 15

### ROOF ASSEMBLIES AND ROOFTOP STRUCTURES

### SECTION 1503 - WEATHER PROTECTION

**1503.6 Roof Drainage.** Design and installation of roof drainage systems shall comply with section 1803 of this code and chapter 11 of the International Plumbing Code appended to this code and re-titled as chapter 36 Storm Drainage.

**1503.7 Minimum Slope.** The minimum slope of a roof surface toward gutters, scuppers, roof drains or other water collectors shall be 1/4-inch per foot or the roof shall be designed in accordance with this code.

SECTION 1507 - REQUIREMENTS FOR ROOF COVERINGS

**Section 1507.13** Sprayed Polyurethane Foam Roofing is deleted in their entirety.

### CHAPTER 16

### STRUCTURAL DESIGN

### SECTION 1607 - LIVE LOADS

**1607.3.1 Balconies, Decks, Porches And Stairways.** In addition to the minimum uniformly distributed unit loads required by table 1607.1 of this code, all exterior balconies, decks, porches and stairways shall be designed to resist a lateral live load not less than 10 pounds per square foot applied either perpendicularly and parallel to the main building exterior wall on all horizontal occupied surfaces including, but not limited to built-in seating areas, stairs and walking surfaces. Structures need not be designed for the simultaneous application of lateral loads perpendicular and parallel to the main building exterior wall.

### CHAPTER 17

### STRUCTURAL TESTS AND SPECIAL INSPECTIONS

### SECTION 1705 – REQUIRED SPECIAL INSPECTIONS AND TESTS

**1705.18 Fire-resistant penetrations and joints.** In high-rise buildings, residential structures greater than three stories above grade, in buildings assigned to Risk Category III or IV, or in fire areas containing Group R occupancies with an occupant load greater than 250, special inspections for through-penetrations, membrane penetration firestops, fire-resistant joint systems and perimeter fire containment systems that are tested and listed in accordance with Sections 714.4.1.2, 714.5.1.2, 715.3.1 and 715.4 shall be in accordance with Section 1705.18.1 or 1705.18.2.

### CHAPTER 18

### SOILS AND FOUNDATIONS

### SECTION 1809 - SHALLOW FOUNDATIONS

**1809.5 Frost Protection.** Except where otherwise protected from frost, foundations and other permanent supports of buildings and structures shall be protected from frost by one or more of the following methods:

1. Extending below the frost line of the locality;

2. Constructing in accordance with ASCE 32; or

3. Erecting on solid rock.

**Exception** 1: Free-standing buildings meeting all the following conditions shall not be required to be ~~frost~~ protected:

1. Assigned to ~~occupancy~~ risk category I, in accordance with section 1604.5; or

2. ~~Area of~~ Total building area measured at the outside perimeter area is 600 square feet (56 m$^2$) or less for light-frame construction or 400 square feet (37 m$^2$) or less for other than light-frame construction; and

3. Building not higher than 1-story and have height ~~of~~ not higher than 10 feet (3048 mm) ~~or less; and~~

**Exception 2:** Free-standing buildings not higher than 1-story meeting any the following conditions shall not be required to be frost protected:

1. Building with attic space clear headroom less than 80 inches in height. Higher clear headroom is permitted where the total floor area of the attic space with clear headroom greater than 80 inches occurs over an area less than 70 square feet;

2. Building envelope is not constructed with brittle materials such as masonry, stucco, EIFS or similar materials;

3. Any overall exterior wall line dimension does not exceed 24 feet; and

4. Where an "accessory building" or an "accessory structure" as defined in the zoning ordinance of the Village of Oak Park is not connected to a plumbing sewer line.

**CHAPTER 27**

**ELECTRICAL**

**SECTION 2701 - GENERAL**

**2701.1 Scope.** ~~The provisions of this chapter and NFPA 70 shall govern the design, construction, erection and installation of the electrical components, appliances, equipment and systems used in buildings and structures covered by this code. The International Fire Code, the International Property Maintenance Code and NFPA 70 shall govern the use and maintenance of electrical components, appliances, equipment and systems. The International Existing Building Code and NFPA 70 shall govern the alteration, repair, relocation, replacement and addition of electrical components, appliances, or equipment and systems.~~ Electrical components, equipment and systems shall be designed and constructed in accordance with the provisions of the edition of the National Electrical Code as amended and adopted by the Village of Oak Park.

**CHAPTER 29**

**PLUMBING SYSTEMS**

**SECTION 2901 - GENERAL**

**2901.1 Scope.** The provisions of this chapter ~~and the international plumbing code~~ the state of Illinois Plumbing Code shall govern the design, construction, erection and installation of plumbing components, appliances, equipment and systems used in buildings and structures covered by this code. ~~Toilet and bathing rooms shall be constructed in accordance with Section 1210. Private sewage disposal systems shall conform to the International Private Sewage Disposal Code. The International Fire Code, the International Property Maintenance Code and the International Plumbing Code shall govern the use and maintenance of plumbing components, appliances, equipment and systems. The International Existing Building Code and the International Plumbing Code shall govern the alteration, repair, relocation, replacement and addition of plumbing components, appliances, equipment and systems.~~

**SECTION 2903 – INSTALLATION OF FIXTURES**

**2903 Installation of Fixtures** is deleted in its entirety.

**CHAPTER 30**

**ELEVATORS AND CONVEYING SYSTEMS**

**3002.4 Elevator Car to Accommodate Ambulance Stretcher.** Where elevators are provided in buildings four or more stories above, or four or more stories below, grade plane, not fewer than one elevator shall be provided for fire department emergency access to all floors. The elevator car shall be of such a size and arrangement to accommodate an ambulance stretcher 24 inches by 84 inches (610 mm by 2134 mm) with not less than 5-inch (127 mm) radius corners, in the horizontal, open position and shall be identified by the international symbol for emergency medical services (star of life). The symbol shall be not less than 3 inches (76mm) in height and shall be placed inside on both sides of the hoist-way door frame. The interior cab dimensions of such ambulance stretcher accommodating elevator shall be a minimum of 60 inches by 85 inches, clear inside of walls and handrails. The elevator shall be equipped with backup power per Section 3003 of this code.

**CHAPTER 33**

**SAFEGUARDS DURING CONSTRUCTION**

## SECTION 3301 - GENERAL

**Section 3301.2 Storage and Placement.** Construction equipment and materials shall be stored and placed so as not to endanger the public, the workers or adjoining property for the duration of the construction project <u>and as follows</u>:

1. Mobile construction offices shall not be located closer than 10 feet to any property line not adjoining the public right-of-way.

2. Site stored materials shall be kept under tarps or other approved coverings and shall be located not closer than 10 feet to any property line.

3. Fuel supply tanks shall be maintained a minimum of 10 feet from any structure or combustible material. Fuel tanks shall be enclosed with chain link fencing or barricades to prevent mechanical damage to the tanks.

4. Temporary heating units shall be maintained a minimum of 10 feet from any combustible material or structure. The local fire department shall be notified a minimum of 24 hours in advance of the use of any temporary heating units.

**3301.3 Construction Work Sites and Execution of Work.** All construction work shall be performed in accordance with this code and other pertinent laws and ordinances. For purposes of this section, the term "construction" shall mean the erection of new buildings or structures or the, remodeling, alteration, renovation or repair of existing structures.

**3301.3.1 Responsibility.** It shall be the duty of every person or entity that performs work regulated by this code, including but not limited to construction, installation or repair of a building, structure or equipment, to comply with the provisions of this code.

**3301.3.2 Items to Be Made Available on Site.** The following items shall be maintained at the work site and made available to the building official or his or her designee upon request during all work hours:

1. Copy of permit(s) or placard authorizing the commencement of construction for the authorized scope of work;

2. Approved set of construction documents; and

3. A copy of all inspection reports issued by Village inspectors.

**3301.3.3 Cleaning.** Construction sites and sites for the storage of construction materials and/or equipment shall be kept clean and maintained. Debris and trash from the site shall be removed or contained daily and when otherwise requested by the building official or his or her designee. Debris shall not be allowed to accumulate on the public right-of-way.

**3301.3.3.1 Responsible Party for Disposal of Construction Debris.** Property owners and/or the prime contractor in charge of the construction site shall furnish non-combustible leak-proof containers for construction debris, garbage, trash and litter, and shall be the responsible parties for the disposal of same by private waste haulers.

**3301.3.3.2 Containment of Debris, Garbage, Trash and Litter.** All debris, garbage, trash and litter shall be picked up from the ground of the construction site and adjoining areas if scattered during the course of the day. All debris, garbage, trash and litter shall be placed in approved containers as set forth in section 3301.3.3.1 of this code.

**3301.3.3.2.1 Dumpsters.** The use of dumpsters or other containers for collection of construction debris, garbage, trash and/or litter shall require a permit if such dumpster or container is placed within the public right-of-way. A barricade with flashing light shall be erected at each end and on the street side of any dumpster or container placed in the public right-of-way.

**3301.3.3.3 Air-Borne Dust and Particulate Matter.** Air-borne dust and particulate matter shall be controlled such that adjoining properties within 500 feet of the construction site are not affected by air-borne dust and particulate matter.

**3301.3.3.4 Public Right-Of-Way.** The public right-of-way shall be maintained in a broom swept condition at all times. Excavation and backfill materials shall not be allowed to accumulate on the public right-of-way.

**3301.3.4 Security.** Construction sites shall be maintained secure at all times from entry by unauthorized persons and from all trespassers. Construction gates shall be locked at all times workers are not on site.

**3301.3.5 Signage.** The contractor shall securely attach his sign to the construction fence in a location visible from the public right-of-way. The sign shall be a maximum of 18 inches high by 24 inches long. The sign shall include the following:

1. Name and address of the project;

2. Name of the general contractor; and

3. The contractor's contact information in case of an emergency.

**3301.3.6 Unauthorized Use of Construction Site.** Construction sites or sites used for storage of construction materials and/or equipment shall only be used for the activities approved by a permit(s) issued by the Village, and for the duration of permit(s) or license(s) issued.

**Exception:** Premises where additions, remodeling or renovations are being performed, and on which existing buildings or structures are currently occupied, in use, or have been determined to contain no imminent hazards associated with a use while construction is on-going, may be used for their originally approved building code classifications so long as safety hazards do not impact the safe use of the building during construction.

**3301.3.7 Damages and Hazards to Adjacent Properties and Neighborhoods.** Construction sites shall be used in a manner so as not to cause damage or hazards to adjacent public or private properties, residential neighborhoods or business districts. The contractor of record shall be responsible for the construction site and shall ensure that damage and hazards do not exist on adjacent

public or private properties within proximity of the construction site. The building official is authorized to issue a stop-work order for a project until any damage or hazard to an adjacent property are corrected or abated.

**3301.3.8. Construction Work Hours.** Construction work hours shall be maintained in accordance with the Oak Park Village Code.

**3301.3.9 Construction Staging and Material Storage Areas.** Areas used for construction staging and/or material storage shall not be permitted to encumber the public right-of-way without prior written permission by the building official. Unless staging and storage on adjacent properties is agreed to by the owner(s) of such properties, staging and storage of materials shall be on the property on which work is being executed. Additional permits may be required for staging and storage of materials on properties other than which work is being executed.

**3301.3.10 Job-Site Safety.** Construction sites shall be maintained in a safe working condition, and workers and visitors to the site shall practice safety measures for construction sites in accordance with applicable law.

**3301.3.11 Vacating of Structure.** When, during construction there is imminent danger or failure of collapse of a building or structure or any part thereof which endangers life safety, or when, during construction of any building or structure or part of same has fallen and life safety is endangered by the occupancy, use, or continued construction of the building or structure, the building official is hereby authorized and empowered to order and require the occupants to vacate the building or structure forthwith.

**3301.3.12 Temporary Safeguards And Emergency Repairs.** Upon the building official's finding of any unsafe condition capable of posing imminent danger to its condition or the life safety of persons on site, the building official shall have the authority to order temporary safeguards and emergency repairs to render the building or structure temporarily safe until permanent repairs can be facilitated. For purposes of this section, upon the disregard to any notice issued by the building official to provide temporary safeguards and emergency repairs to render a building or structure temporarily safe, the building official shall have the authority to employ the necessary labor and materials to perform the required work as expeditiously as possible with all costs to be reimbursed by the contractor or other responsible party.

**301.3.13 Right of Condemnation Before Completion.** The building official shall have the authority to condemn a building or structure under construction before its completion where the building or structure is found to be unsafe and endangers the life, health and safety of adjacent property occupants or the general public.

**3301.3.14 Abatement or Removal.** The building official shall have the authority to order abatement and/or removal of any unsafe building, structure or condition thereon.

## SECTION 3305 - SANITARY

**3305.1 Facilities Required.** Sanitary facilities shall be provided during construction, remodeling, renovation or demolition activities in accordance with ~~the international plumbing code~~ applicable law. Sanitary facilities shall be serviced and cleaned on a weekly basis at a minimum.

~~1.   Sanitary facilities shall not be located closer than 10 feet to any property line;~~

~~2.   Sanitary facilities shall not be installed in any residential front yard; and~~

## SECTION 3306 - PROTECTION OF PEDESTRIANS

**TABLE 3306.1 PROTECTION OF PEDESTRIANS** is modified to include the following:

**TABLE 3306.1**

**HEIGHT OF CONSTRUCTION**

More than 8 feet

**DISTANCE FROM CONSTRUCTION TO LOT LINE**

Less than 10 feet

**TYPE OF PROTECTION REQUIRED**

System of scaffolding and netting shall be provided to fully encompass all work areas at a level higher than the top of the barrier or covered walkway

**3306.9 Adjacent to Excavations.** Every excavation, including trenches, on a site located 5 feet (1524 mm) or less from the street lot line shall be enclosed with a barrier not less than 6 feet (1829 mm) high. Where located more than 5 feet (1524 mm) from the street lot line, a barrier shall be erected when required by the building official shall be fully enclosed with a minimum 4 feet high chain link fence or barrier, or by other measures to ensure public safety, when workers are not present on site. ~~Barriers~~ The enclosure shall be of adequate strength to resist wind pressure as specified in chapter 16.

**3306.10 Adjacent to Construction.** All construction sites shall be fully enclosed with an 8 feet high barrier of chain link fence with closed selvages on top and full-height opaque fabric during all phases of the work unless approved in writing by the building official. Chain link fencing shall have full-height posts driven into or staked to the ground at 8 feet on center maximum along the length of the construction fence. The fence shall be of adequate strength to resist wind pressure as specified in chapter 16 of this code. Sandbagging of fence posts shall not be permitted without the prior approval of the building official. Minimum 6 feet wide lockable double-leaf gates shall be provided at every 50 feet on center or fraction thereof along the length of the fence facing the public right-of-way for emergency access. Fencing may be omitted, upon approval of the building official, where adjacent buildings or fences provide protection from entry into the construction site. All construction fences shall have a permanent sign, in accordance with Section 3301.3.5 of this code. The use of barbed wire, razor wire or similar fencing materials are not permitted.

Exceptions:

1.   Fence height shall be a minimum 6 feet in height on properties within residential zoning districts established by the Zoning Ordinance of the Village of Oak Park.

2.   Lockable double-leaf gates are not required on properties within residential zoning districts established by the Zoning Ordinance of the Village of Oak Park.

3.   Opaque fabric fence covering shall not be required for projects governed by the edition of the International Residential Code adopted and amended by the Village.

### SECTION 3313 - TREE PROTECTION

**3313.1 Where Required.** Parkway trees and their root zones are required to be protected during construction in the following instances:

1.   Where excavation of the parkway occurs within the drip zone of any tree located within the parkway;

2.   Where powered wheel or track vehicles or equipment cross the parkway in areas other than on a driveway;

3.   Where construction operations have the potential to affect the health and/or safety of a parkway tree as determined by the building official or the building official's designee; or

4.   Where a dumpster is located within 10 feet of a parkway tree.

**3313.2 Protection Required.** Prior to the start of any construction, tree and root zone protection, root pruning and/or barriers shall be installed in accordance with the tree protection specifications for construction and the right-of-way restoration standards of the Village, and shall be maintained in place for the duration of the work.

**3315.3 Damage to Trees.** Any damage to Village trees or landscaped areas shall be restored in accordance with the standards, specifications, codes and regulations for construction and right-of-way restoration of the Village.

### APPENDIX P

### ELECTRIFICATION REQUIREMENTS FOR ALL NEW BUILDINGS

### SECTION P101

### ADMINISTRATION

**P101.1 Purpose.** The purpose of this appendix is to provide minimum requirements for electrification for all new buildings.

**P101.2 Objectives.** The objectives of this appendix are to reduce production of greenhouse gasses.

### SECTION P201

### DEFINITIONS

**P201.1 Definitions.** The following words and terms shall for the purpose of this appendix have the meaning set forth below.

**COMMERCIAL KITCHEN.** A kitchen for food preparation intended to service commercial restaurants, institutional uses, cafeterias and other similar dining or food preparation facilities.

**FOSSIL FUELS:** Fossil fuels are made from decomposing plants and animals and contain carbon and include coal, crude oil and natural gas.

**NEW BUILDING:** A newly constructed structure with an existing or new foundation.

### SECTION P301

### ELECTRIFICATION REQUIREMENTS

**P301.1 Electrification for New Buildings.** New buildings shall be designed and constructed as follows:

1.   The source of energy for the building shall be all electric and the source of energy shall not be fossil fuels. Energy from fossil fuels may be provided by generators for emergency backup power and for commercial kitchens.

2.   All heating and air conditioning shall be provided by cold climate air source or ground source heat pumps.

3.   A building shall contain an energy recovery ventilation system.

4.   A report shall be provided to the building official that verifies all systems related to heating, ventilation, and conditioning systems, lighting controls and service hot water systems comply with this code prior to final occupancy.

5.   All refrigerators, dishwashers, and clothes washers shall be Energy Star certified.

6.   All cooktops shall be electric induction types.

7.   All cooking ovens shall be electric types.

8.   Energy for any clothes dryer shall be provided by an electric heat pump.

9.   A minimum of one Level 2 electric vehicle charging station at each onsite parking area shall be installed for every 5 parking spaces. One charging station may serve an adjacent pair of spaces. Electrical vehicle charging stations in Group R-3 and R-4 occupancies are not required.

10.   Directly piped exterior gas fire pits and gas cooking grills whose source of energy are fossil fuels are prohibited.

(Ord. 2014-0-58, 10-6-2014, eff. 1-1-2015; amd. Ord. 20-081, 9-21-2020; Ord. 23-47, 6-20-2023; Ord. 23-48, 6-20-2023)

---

# ARTICLE 2

# EXISTING BUILDING CODE

---

SECTION:

**7-2-1: Adoption**

**7-2-2: Amendments**

## 7-2-1: ADOPTION:

   A.   The 2018 international existing building code (IEBC), as published by the International Code Council, is hereby adopted by the Village by reference and is made a part hereof as if fully set forth in this section with the additions, insertions, deletions and changes set forth in section 7-2-2 of this article. To the extent that the provisions of the IEBC are inconsistent with any codes previously adopted by the Village by reference, the provisions of the IEBC edition shall govern unless specifically set forth in this code. In the event of a conflict between any provisions of the IEBC and any provision of the Oak Park Village Code, the provisions of the Oak Park Village Code shall govern.

   B.   There shall be three (3) copies of the IEBC kept on file for public inspection in the office of the Village Clerk. (Ord. 2014-0-59, 10-6-2014, eff. 1-1-2015; amd. Ord. 20-066, 9-21-2020)

## 7-2-2: AMENDMENTS:

The 2018 international existing building code ("IEBC"), as adopted pursuant to section 7-2-1 of this article, is hereby amended by adding the underlined language and deleting the overstricken language as follows:

### CHAPTER 1

### SCOPE AND ADMINISTRATION

### PART 1 - SCOPE AND APPLICATION

### SECTION 101 - GENERAL

   **Section 101.1 Title.** These regulations, as amended and adopted by the Village of Oak Park, shall be known as the existing building code of the Village of Oak Park, hereinafter referred to as "this code."

   **Section 101.2.1 Appendices.** Adopted as part of this code are:

   1.   Appendix A - Guidelines for The Seismic Retrofit of Existing Buildings, including chapters A1 through A5

   2.   Appendix B - Supplementary Accessibility Requirements for Existing Buildings and Facilities; and

   3.   Resource A - Guidelines on Fire Ratings of Archaic Materials and Assemblies.

   **CHAPTER 1, PART 2 - ADMINISTRATION AND ENFORCEMENT** is deleted in its entirety.

   Administration and enforcement of this code shall be governed by applicable provisions of chapter 1 of the international building code, as amended and adopted by the Village.

### PROVISIONS FOR ALL COMPLIANCE METHODS

### SECTION 305 - ACCESSIBILITY FOR EXISTING BUILDINGS

   **Section 305.8.2 Elevators.** Altered elements of existing elevators shall comply with ~~ASME A17.1 and ICC A117.1~~ the current provisions of the state of Illinois safety codes and standards for conveyances. Such elements shall also be altered in elevators programmed to respond to the same hall call control as the altered elevator.

   **Section 305.8.3 Platform Lifts.** Platform (wheelchair) lifts complying with ~~ICC A117.1 and installed in accordance with ASME A18.1~~ the current provisions of the state of Illinois safety codes and standards for conveyances shall be permitted as a component of an accessible route.

### CHAPTER 4

### REPAIRS

### SECTION 408 PLUMBING is deleted in its entirety.

### CHAPTER 8

## ALTERATIONS - LEVEL 2

## SECTION 805 MEANS OF EGRESS

### 805.2 General

3.  In R-3 buildings, stairs to basement or attic may remain or be remodeled in their current configuration.

## SECTION 806 STRUCTURAL

### 806.2 Existing Structural elements carrying gravity loads

3.  In R-3 buildings, where an attic is converted to use as habitable space, attic floor structure in good condition which spans no greater than twelve feet with at least 2x6 joists @ 16" OC may remain as is.

## SECTION 807 ELECTRICAL

807.3.8 In dwelling units where interior wall coverings as defined in the international residential code as amended and adopted by the Village (e.g., plaster or gypsum board) are removed from a wall or floor/ceiling assembly, the wiring methods, receptacle spacing, household smoke detectors, and carbon monoxide detectors shall be brought into conformance on both sides of the wall or floor/ceiling assembly that is opened. Where legal existing non-conforming wiring methods are routed to/from concealed walls or floor/ceiling assemblies, the existing wiring shall transition to a method in conformance with this code as soon as practical as approved by the building official.

807.3.9 In dwelling units where cabinets in kitchens are removed or additional cabinets are installed the minimum number of small appliance branch circuits and receptacles, and receptacle spacing shall be brought into conformance with the adopted electrical code.

807.3.10 At least one 20-ampere branch circuit shall be provided in all remodeled dwelling unit bathrooms where one or more of the following conditions exist:

(1)  Where the floor area of the bathroom is reconfigured in size.

(2)  Where the bathroom wall covering as defined in the international residential code as amended and adopted by the Village (e.g., plaster or gypsum board) is removed and replaced in the area of required electrical devices.

Exception: The above requirements may be waived by the building official where the nature of the existing construction does not practically allow for conformance with this code.

## SECTION 809 PLUMBING

Replace paragraph 809.1 with the following:

**Section 809.1 Increase in Number of Plumbing Fixtures.** Where the number of plumbing fixtures is increased by more than 7 water supply fixture units (WSFU) above the existing number, provide one of the following:

(1)  If minimum constant water pressure is tested less than 8 psi or the minimum recommended by the fixture manufacturer, provide a booster pump to increase the pressure in accordance with the current edition of the state of Illinois plumbing code.

(2)  Increase the water supply pipe diameter from the street main and the water meter size to comply with the requirements of the current edition of the state of Illinois plumbing code for the number of WSFUs.

**Section 809.2** Provide an RPZ (reduced pressure zone backflow preventer) device on the potable water supply in an existing commercial or mixed commercial and residential building, where a minimum of 25% of lineal feet of existing hot and cold-water piping is to be increased and/or replaced.

Exception: If there is no existing floor drain within ten feet from the water meter, a testable double check valve may be provided in lieu of an RPZ.

## CHAPTER 10

## CHANGE OF OCCUPANCY

## SECTION 1002 - SPECIAL USE AND OCCUPANCY

**Section 1002.1 Compliance with the building code** shall be modified to add the following:

12.  Bed and breakfast establishments.

## SECTION 1009 - PLUMBING

**Section 1009.1 Increased Demand.** Where the occupancy of an existing building or part of an existing building is changed such that the new occupancy is subject to increased or different plumbing fixture requirements, or to increased water supply requirements in accordance with the ~~international plumbing code~~ current edition of the state of Illinois plumbing code, the new occupancy shall comply with the intent of the respective provisions of the current edition of the state of Illinois plumbing code.

**Section 1009.2 Food-Handling Occupancies.** If the new occupancy is a food-handling establishment, all existing sanitary waste lines above the food or drink preparation or storage areas shall be panned or otherwise protected to prevent leaking pipes or condensation on pipes from contaminating food or drink. New drainage lines shall not be installed above such areas ~~and shall be protected in accordance with the international plumbing code~~.

**Section 1009.3 Interceptor Required.** If the new occupancy will produce grease or oil-laden wastes, interceptors shall be provided as required ~~in the international plumbing code~~ by the current edition of the state of Illinois plumbing code.

**Section 1009.5 Group I-2.** If the occupancy group is changed to Group I-2, the plumbing system shall comply with the applicable requirements of the current edition of the state of Illinois plumbing code.

**Section 1010.6 Correction Of Health Or Safety Hazards.** Regardless of the age of the building, where a health or safety hazard exists because of an existing plumbing installation or lack thereof, the owner or other responsible party shall install additional plumbing or make such corrections as may be necessary to abate the hazard or violation in accordance with the current edition of the state of Illinois plumbing code.

## CHAPTER 11

## ADDITIONS

Add the following new Section:

## SECTION 1108

## PLUMBING

### 1108.1

809.2 Provide an RPZ (Reduced Pressure Zone backflow preventer) device on the potable water supply when an existing commercial or mixed commercial and residential building is added to with the addition exceeding 500 gross square feet in total area.

Exception: If there is no existing floor drain within ten feet from the water meter, a testable double check valve may be provided in lieu of an RPZ.0

## CHAPTER 12

## HISTORIC BUILDINGS

**SECTION 1207 EXTERIOR GUARDS AND HANDRAILS** is added as follows:

## SECTION 1207 - EXTERIOR GUARDS AND HANDRAILS

**Section 1207.1 Guards Required.** New guards or replacement guards shall be installed in accordance with section R312 of the international residential code as amended and adopted by the Village or section 1014 of the international building code as amended and adopted by the Village, as applicable.

**Exception:** Where a building is located within a designated Oak Park or National Register historic district, or is a National Historic Landmark, or is listed in the National Register of Historic Buildings, or is determined eligible to be listed in the National Register of Historic Buildings by the State Historic Preservation Officer, or listed individually as an Oak Park Landmark, or such building has significant historical and/or aesthetic characteristics similar to those which qualified that district as a historic district pursuant to the Village Code, the height of guards for porches, balconies or raised floors that are visible from the street shall be permitted to be installed to a height lower than that required by section R312 of the international residential code as amended and adopted by the Village or section 1015 of the international building code as amended and adopted by the Village, as applicable, under the following conditions:

1. Existing guards which are removed to facilitate refinishing shall be permitted to be reinstalled to the same height, but no lower than the documented height of the existing guards without being required to meet the structural loading conditions required under section R301.5 of the international residential code as amended and adopted by the Village or section 1607.8 of the international building code as amended and adopted by the Village, as applicable;

2. Existing guards which are repaired and retain a minimum of 50 percent of original materials shall be reinstalled no lower than the documented height of the existing guards without being required to meet the structural loading conditions required under section R301.5 of the International residential code as amended and adopted by the Village of Oak Park or section 1607.8 of the international building code as amended and adopted by the Village, as applicable;

3. Existing guards which are repaired in excess of 50 percent of the original material, or are totally replaced, shall be allowed to be installed to the same height as the existing guard provided that the guard meets the structural loading conditions of section R301.5 of the international residential code as amended and adopted by the Village of Oak Park or section 1607.8 of the international building code as amended and adopted by the Village, as applicable; and

4. Existing guards which are totally replaced or new guards which are installed to recreate a documented historic condition, shall be allowed to be installed to the same height as the previously existing guard(s) provided that the guard meets the structural loading conditions of section R301.5 of the international residential code as amended and adopted by the Village or section 1607.8 of the international building code as amended and adopted by the Village, as applicable.

**Section 1207.2 Handrails Required.** New handrails or replacement handrails shall be installed in accordance with section R311.7.8 or R311.8.3 of the international residential code as amended and adopted by the Village, or section 1014 of the international building code as amended and adopted by the Village of Oak Park, as applicable.

**Exception:** Where a building is located within a designated Oak Park or National Register historic district, or is a National Historic Landmark, or is listed in the National Register of Historic Buildings, or is determined eligible to be listed in the National Register of Historic Buildings by the State Historic Preservation Officer, or listed individually as an Oak Park Landmark, or such building has significant historical and/or aesthetic characteristics similar to those which qualified that district as a historic district pursuant to the

Village Code , the height of handrails for stairs that are visible from the street shall be permitted to be installed to a height lower than that required by section R311.7.8 or R311.8.3 of the international residential code as amended and adopted by the Village or section 1014 of the international building code as amended and adopted by the Village, as applicable under the following conditions:

1. Existing handrails which are removed to facilitate refinishing shall be permitted to be reinstalled to the same height, but no lower than existing without being required to meet the structural loading conditions required under section R301.5 of the International Residential Code international residential code as amended and adopted by the Village or section 1607.8 of the international building code as amended and adopted by the Village, as applicable;

2. Existing handrails which are replaced shall be allowed to be installed to the same height as the existing handrail provided that the guard meets the structural loading conditions of section R301.5 of the international residential code as amended and adopted by the Village or section 1607.8 of the international building code as amended and adopted by the Village, as applicable;

3. Where an existing stair is replaced with construction of materials, dimensions and aesthetic features documented to match existing, the handrail may be omitted where there is documentation that a handrail did not originally exist; and

4. New handrails which are installed to recreate a documented historic condition, shall be allowed to be installed to the same height and in the same shape and configuration as the previously existing handrail(s) provided that the handrail meets the structural loading conditions of section R301.5 of the international residential as amended and adopted by the Village or section 1607.8 of the international building code, as amended and adopted by the Village, as applicable.

## CHAPTER 14

## RELOCATED OR MOVED BUILDINGS

## SECTION 1402 REQUIREMENTS

**Section 1402.7.1 Inspection and approval of Moved Structures.** After being set upon an approved foundation, a structure which is moved from one lot to another shall be inspected by an Illinois Licensed structural engineer or Illinois Licensed Architect hired by the owner or other responsible party at no cost to the Village to ensure the structural integrity of the structure in its new location. Any deficiencies noted by the engineer or architect shall be corrected in accordance with requirements for new construction provisions of this code prior to re-occupying the structure. If the building is moved from another jurisdiction, the structure shall be inspected by the Village for conformance with the provisions of this code and other pertinent ordinances for new construction. The moved structure shall not be occupied until a certificate of occupancy is issued for the new location.

## APPENDIX J

## EXISTING BUILDINGS AND STRUCTURES

## SECTION AJ102 - COMPLIANCE

**Section AJ102.10 Conversion into habitable space.** When any area not previously approved or utilized as habitable space is converted into and/or utilized as habitable space, regardless of the amount of construction work done in this area, it shall be considered as reconstruction and shall be subject to the requirements of this Appendix and the provisions of section R310 of this code.

**Section AJ102.11 Conversion into a sleeping room.** When any area not previously approved or utilized as a sleeping room is converted into and/or utilized as a sleeping room, regardless of the amount of construction work that was or was not done in this conversion or change of utilization, it shall be subject to all requirements for new construction of a sleeping room as found in this code.

(Ord. 2014-0-59, 10-6-2014, eff. 1-1-2015; amd. Ord. 20-066, 9-21-2020)

---

## ARTICLE 3

## ELECTRIC CODE

---

SECTION:

**7-3-1: Adoption**

**7-3-2: Amendments**

**7-3-1: ADOPTION:**

A.  The 2021 International Energy Conservation Code, as published by the International Code Council, is hereby adopted by the Village by reference and is made a part hereof as if fully set forth in this section with the additions, insertions, deletions and changes set forth in section 7-13-2 of this article. To the extent that the provisions of the IMC are inconsistent with any codes previously adopted by the Village by reference, the provisions of the 2021 IECC shall govern unless specifically set forth in this code. In the event of a conflict between any provisions of the IMC and any provision of the Oak Park Village Code, the provisions of the Oak Park Village Code shall govern.

B.  There shall be three (3) copies of the NEC kept on file for public inspection in the office of the Chief Building Official. (Ord. 2014-0-60, 10-6-2014, eff. 1-1-2015; amd. Ord. 20-082, 9-21-2020; Ord. 23-49, 6-20-2023; Ord. 23-55, 6-20-2023)

## 7-3-2: AMENDMENTS:

The 2021 National Electric Code, as adopted pursuant to section 7-3-1 of this article is hereby amended by adding the underlined language and deleting the overstricken language as follows:

### ARTICLE 110

**Requirements for Electrical Installations**

**Section 110.26 Spaces About Electrical Equipment.**

Add the following sentence to Section 110.26: The working space and access shall be entirely on the legal property which the equipment serves or public right-of-way.

### ARTICLE 210

**Branch Circuits**

Add the following sentence to Section 210.50 (G):

Provide minimum of one receptacle outlet on the outside of each garage and not more than 1.7 m (5 ½ ft) above grade.

### ARTICLE 230

**Services**

**Section 230.43 Wiring Methods For 1000 Volts, Nominal, Or Less.** Service-entrance conductors shall be installed in accordance with the applicable requirements of this code covering the type of wiring method used and shall be limited to the following methods:

1. Type IGS cable

2. Rigid metal conduit

3. Intermediate metal conduit

4. Electrical metallic tubing

5. Electrical nonmetallic tubing (ENT)

6. Service-entrance cables

7. Wireways

8. Busways

9. Auxiliary gutters

10. Rigid PVC nonmetallic conduit

11. Cable bus

12. Type MC cable

13. Mineral insulated, metal-sheathed cable

14. Flexible metal conduit not over 1.8 m (6 ft) long or liquid tight flexible metal conduit not over 1.8 m (6 ft) long between raceways, or between raceway and service equipment, with equipment bonding jumper routed with the flexible metal conduit according to the provisions of 250.102(A), (B), (C), and (E)

15. Liquid tight flexible nonmetallic conduit

16. High Density Polyethylene conduit (HDPE)

17. Nonmetallic underground conduit with conductors (NUCC)

18. Reinforced thermosetting resin conduit (RTRC)

### ARTICLE 250

**Grounding and Bonding**

**Section 250.118 Types of Equipment Grounding Conductors** is modified to list items (2), (3), and (4) to read as follows:

(2) Rigid metal conduit installed above ground.

(3) Intermediate metal conduit installed above ground.

(4) Electrical metallic tubing installed above ground.

### ARTICLE 314

**Outlet, Device, Pull, and Junction Boxes;**

**Conduit Bodies; Fittings; and Handhole Enclosures**

Add the following new paragraph to 314.27:

(C)   Where a lighting outlet installed in the ceiling of a dwelling unit is located such that the location makes it feasible to attach a ceiling fan to the outlet box, the outlet box shall be listed for sole support of a ceiling suspended (paddle) fan, regardless of the initial intentions of use for the outlet box.

(Ord. 2014-0-60, 10-6-2014, eff. 1-1-2015; amd. Ord. 20-082, 9-21-2020; Ord. 23-55, 6-20-2023)

---

# ARTICLE 4

# MECHANICAL CODE

---

SECTION:

**7-4-1: Adoption**

**7-4-2: Amendments**

## 7-4-1: ADOPTION:

A.   The 2021 international mechanical code (IMC) as published by the International Code Council, is hereby adopted by the Village by reference and is made a part hereof as if fully set forth in this section with the additions, insertions, deletions and changes set forth in section 7-4-2 of this article. To the extent that the provisions of the IMC are inconsistent with any codes previously adopted by the Village by reference, the provisions of the 2009 IMC shall govern unless specifically set forth in this code. In the event of a conflict between any provisions of the IMC and any provision of the Oak Park Village Code, the provisions of the Oak Park Village Code shall govern.

B.   There shall be three (3) copies of the IMC kept on file for public inspection in the office of the Chief Building Official. (Ord. 2014-0-61, 10-6-2014, eff. 1-1-2015; amd. Ord. 20-079, 9-21-2020; Ord. 23-51, 6-20-2023)

## 7-4-2: AMENDMENTS:

The 2021 international mechanical code, as adopted pursuant to section 7-4-1 of this article is hereby amended by adding the underlined language and deleting the overstricken language as follows:

**CHAPTER 1**

**SCOPE AND ADMINISTRATION**

**PART I - SCOPE AND APPLICATION**

**SECTION 101 - GENERAL**

**Section 101.1 Title.** These regulations, as amended and adopted by the Village, shall be known as the mechanical code of the Village of Oak Park, hereinafter referred to as "this code".

**CHAPTER 1, PART 2 - ADMINISTRATION AND ENFORCEMENT** is deleted in its entirety with the exception of the following sections to remain:

1.   Section 105 Approval,

2.   Section 107 Inspections And Testing,

3.   Section 108 Violations, sections 108.7 through 108.7.3 inclusive, and

4.   Section 110 Temporary Equipment, Systems And Uses.

Administration and enforcement of this code shall be governed by the sections set forth above and by the applicable provisions of chapter 1 of the international building code, as amended by the Village.

**CHAPTER 5**

**EXHAUST SYSTEMS**

**SECTION 506 - COMMERCIAL KITCHEN HOOD VENTILATION SYSTEM DUCTS AND EXHAUST EQUIPMENT**

**Section 506.6 Exhaust System Discharge.** The permit holder shall verify that the exhaust system discharge does not constitute a nuisance as defined in the Village Code or violate the provisions of any county, state or federal law regulating smoke and particulate emissions. In the event that the building official determines that a nuisance exists, or that a violation of any county, state or federal regulation is found to occur, the business owner or other responsible party shall take immediate measures to abate the nuisance or violation within the timeframe established by the building official for compliance.

**SECTION 509 - FIRE SUPPRESSION SYSTEMS**

**Section 509.1 Where Required.** Commercial ~~Cooking~~ cooking appliances required by section ~~507.2~~ 507.2.1 to have a type I hood be provided with an approved automatic fire suppression system complying with the international building code and the

international fire code, each as amended and adopted by the Village, and NFPA 17A, wet chemical extinguishing systems - 2009 and NFPA 96, ventilation control and fire protection of commercial cooking operations.

**CHAPTER 12**

**HYDRONIC PIPING**

**SECTION 1206 - PIPING INSTALLATION**

**Section 1206.8 Steam Piping Pitch.** Steam piping shall be installed to drain to the boiler or the steam trap. Steam systems shall not have drip pockets that reduce the capacity of the steam piping. Steam condensate pipe shall be pitched to the boiler or condensate receiver.

(Ord. 2014-0-61, 10-6-2014, eff. 1-1-2015; amd. Ord. 20-079, 9-21-2020; Ord. 23-51, 6-20-2023)

---

## ARTICLE 5

## FIRE CODE

---

SECTION:

**7-5-1: Adoption**

**7-5-2: Amendments**

**7-5-1: ADOPTION:**

   A.   The 2021 international fire code (IFC) as published by the International Code Council, is hereby adopted by the Village by reference and is made a part hereof as if fully set forth in this section with the additions, insertions, deletions and changes set forth in section 7-5-2 of this article. To the extent that the provisions of the IFC are inconsistent with any codes previously adopted by the Village by reference, the provisions of the IFC shall govern unless specifically set forth in this code. In the event of a conflict between any provisions of the IFC and any provision of the Oak Park Village Code, the provisions of the Oak Park Village Code shall govern.

   B.   There shall be three (3) copies of the IFC kept on file for public inspection in the office of the Chief Building Official. (Ord. 2014-0-62, 10-6-2014, eff. 1-1-2015; amd. Ord. 20-083, 9-21-2020; Ord. 23-52, 6-20-2023)

**7-5-2: AMENDMENTS:**

The 2021 international fire code, as adopted pursuant to section 7-5-1 of this article, is hereby amended by adding the underlined language and deleting the overstricken language as follows:

**CHAPTER 1**

**SCOPE AND ADMINISTRATION**

**PART 1 - GENERAL PROVISIONS**

**SECTION 101 - GENERAL**

   **101.2.1 Appendices.** Provisions in the appendices shall not apply unless specifically adopted. The following appendices are adopted as part of this code:

   1.   Appendix B - Fire Flow Requirements for Buildings;

   2.   Appendix C - Fire Hydrant Locations and Distribution;

   3.   Appendix D - Fire Apparatus Access Roads;

   4.   Appendix F - Hazard Ranking;

   5.   Appendix H - Hazardous Materials Management Plan (HMMP) and Hazardous Materials Inventory Statement (HMIS) Instructions;

   6.   Appendix I - Fire Protection Systems - Noncompliant Conditions;

   7.   Appendix K - Construction Requirements for Existing Ambulatory Care Facilities; and

   8.   Appendix L - Requirements for Fire Fighter Air Replenishment Systems.

**SECTION 103 – CODE COMPLIANCE AGENCY**

   **103.1 Creation of agency.** The Village of Oak Park Fire Department Fire Prevention Bureau is hereby created and the official in charge there shall be known as the Fire Code Official. The function of the agency shall be the implementation, administration and enforcement of the provisions of this code.

   **SECTION 111 MEANS OF APPEALS** is deleted in its entirety and appeals shall be governed by section 113 of the 2021 International Building Code, as amended and adopted by the Village.

## CHAPTER 2

## DEFINITIONS

## SECTION 202 - GENERAL DEFINITIONS

**202 General Definitions** is modified to add the definition of "Responsible Party" to read as follows:

**RESPONSIBLE PARTY:** Except as may otherwise be set forth herein, the owner or the owner's designated agent shall be considered a responsible party for ensuring compliance with this code. In addition, any other person or entity that may be reasonably considered to have a role or responsibility in the creation, continuation, or correction of any violation of this code shall be considered a responsible party or additional responsible party for such violation.

## CHAPTER 6

## BUILDING SERVICES AND SYSTEMS

## SECTION 606 - COMMERCIAL COOKING EQUIPMENT AND SYSTEMS

**606.1 General.** Commercial kitchen exhaust hoods shall comply with the requirements of the International Building Code and the International Mechanical Code, each as amended and adopted by the Village, and National Fire Protection Agency ("NFPA") 17A and 96.

## CHAPTER 9

## FIRE PROTECTION SYSTEMS

## SECTION 901 - GENERAL

**901.4.2 Nonrequired fire protection and life safety system.** Fire protection and life safety systems or portion thereof not required by this code or the International Building Code shall be allowed to be furnished for partial or complete protection provided that such installed systems meet the applicable requirements of this code, ~~and~~ the International Building Code, NFPA 72 and the current Illinois Accessibility Code.

**901.4.3 Alterations in buildings and structures.** For any alteration within a building or structure, the fire protection and life safety systems shall be extended, altered or augmented to maintain and continue protection within the building or structure. Persons shall not remove or modify any fire protection or life safety system installed or maintained under the provisions of this code or the international building code without approval from the fire code official. Fire panels approved for replacement by the Fire Code Official require all components to be listed within such panel and the panel service area to comply with this code and NFPA 72.

## SECTION 903 - AUTOMATIC SPRINKLER SYSTEMS

**903.2.1.1 Group A-1.** An automatic sprinkler system shall be provided for group A-1 occupancies where one of the following conditions exists:

1. The fire area exceeds 12,000 square feet.

2. The fire area has an occupant load of ~~300~~ 100 or more.

3. The fire area is located on a floor other than a level of exit discharge serving such occupancies.

4. The fire area contains a multi-theater complex.

**903.2.1.3 Group A-3.** An automatic sprinkler system shall be provided for group A-3 occupancies where one of the following conditions exists:

1. The fire area exceeds 12,000 square feet.

2. The fire area has an occupant load of ~~300~~ 100 or more.

3. The fire area is located on a floor other than a level of exit discharge serving such occupancies.

**903.2.1.4 Group A-4.** An automatic sprinkler system shall be provided for group A-4 occupancies where one of the following conditions exists:

1. The fire area exceeds 12,000 square feet.

2. The fire area has an occupant load of ~~300~~ 100 or more.

3. The fire area is located on a floor other than a level of exit discharge serving such occupancies.

**903.2.1.6 Assembly Occupancies on roofs.** Where an occupied roof has an assembly occupancy with an occupant load exceeding 100 ~~for Group A. A-2 and 300 for other Group A occupancies~~, all floors between the occupied roof and the level of exit discharge shall be equipped with an automatic sprinkler system in accordance with Section 903.3.1.1 or 903.3.1.2.

**Exception:** Open parking garages of Type I or Type II construction.

**903.2.1.7 Multiple fire areas.** An automatic sprinkler system shall be provided where multiple fire areas of Group A-1, A-2, A-3 or A-4 occupancies share exit or exit access components and the combined occupant load of these fire areas is ~~300~~ 100 or more.

**903.2.2 Ambulatory Care Facilities** is hereby re-numbered in its entirety and relocated to Section 903.2.2.1.

**903.2.2 Group B.** An automatic sprinkler system shall be provided for group B occupancies where one of the following conditions exists:

1.  The fire area has an occupant load of 100 or more.

2.  The fire area is located in a basement.

**903.2.2.1 Ambulatory Care Facilities.** An automatic sprinkler system shall be installed throughout the entire floor area containing an ambulatory care facility where either of the following conditions exist at any time:

1.  Four or more care recipients are incapable of self-preservation, whether rendered incapable by staff or staff has accepted responsibility for care recipients already incapable.

2.  One or more care recipients that are incapable of self-preservation are located at other than the level of exit discharge serving such a facility.

In buildings where, ambulatory care is provided on levels other than the level of exit discharge, an automatic sprinkler system shall be installed throughout the entire floor where such care is provided as well as all floors below, and all floors between the level of ambulatory care and the nearest level of exit discharge, including the level of exit discharge.

**Exception:** Floors classified as an open parking garage are not required to be sprinklered.

**903.2.3 Group E.** An automatic sprinkler system shall be provided for group E occupancies as follows:

1.  Throughout all group E fire areas greater than 12,000 square feet in area.

2.  Throughout every portion of educational buildings below the lowest level of exit discharge serving that portion of the building

**Exception:** In buildings where every classroom has not fewer than one exterior exit door at ground level, an *automatic sprinkler system* is not required in any area below the *lowest level of exit discharge* serving that area.

3.  The Group E *fire area* has an occupant load of ~~300~~ 100 or more.

**903.2.7 Group M.** An automatic sprinkler system shall be provided throughout buildings containing a group M occupancy where one of the following conditions exists:

1.  A group M fire area exceeds 12,000 square feet in area.

2.  A group M fire area is located more than three stories above grade plane.

3.  The combined area of all group M fire areas on all floors, including any mezzanines, exceeds 24,000 square feet (2300 m²).

4.  The fire area has an occupant load of 100 or more.

**903.2.11.1.3 Basements.** ~~Where any portion of a basement is located more than 75 feet (22 860 mm) from openings required by Section 903.2.11.1., or where walls, partitions or other obstructions are installed that restrict the application from hose streams, the basement shall be equipped throughout with an approved automatic sprinkler system.~~ Where any occupancy classification except Group S or U occurs in a basement, the entire basement shall be equipped throughout with an approved automatic sprinkler system.

**903.3.1.1 NFPA 13 sprinkler systems.** Where the provisions of this code require that a building or portion thereof be equipped throughout with an automatic sprinkler system in accordance with this section, sprinklers shall be installed throughout in accordance with NFPA 13 except as provided in Sections 903.3.1.1.1 and 903.3.1.1.2. A safety factor for hydraulic calculations shall be a minimum of 5 psi or 10% of the available pressure, whichever is greater. Flexible sprinkler hose is not be permitted for use in any NFPA 13, 13R or 13D system, unless specifically approved by the Fire Code Official.

**903.3.1.2 NFPA 13R sprinkler systems.** Automatic Sprinkler Systems in Group R occupancies shall be permitted to be installed throughout in accordance with NFPA 13R where the Group R occupancy meets all of the following conditions:

1.  Four stories or less above grade plane.

2.  The floor level of the highest story is 30 feet or less above the lowest level of fire department vehicle access.

3.  The floor level of the lowest story is 30 feet or less below the lowest level of fire department vehicle access.

The number of stories of Group R occupancies constructed in accordance with Sections 510.2 and 510.4 of the *International Building Code* shall be measured from grade plane. A safety factor for hydraulic calculations shall be a minimum of 5 psi or 10% of the available pressure, whichever is greater.

**903.3.1.2.1 Balconies and decks.** Sprinkler protection shall be provided for exterior balconies, decks and ground floor patios of *dwelling units* and *sleeping* units. ~~where either of the following conditions exists:~~

~~1.  The building is of Type V construction, provided that there is a roof or deck above.~~

~~2.  Exterior balconies, decks and ground floor patios of *dwelling units* and *sleeping units* are constructed in accordance with Section 705.2.3.1, Exception 3 of the International Building Code.~~

Sidewall sprinklers that used to protect such areas shall be permitted to be located such that their deflectors are within 1 inch to 6 inches below the structural members and a maximum distance of 14 inches below the deck of the exterior balconies and decks ~~that are constructed of open wood joist construction.~~

**903.4 Sprinkler systems supervision and alarms.** Valves controlling the water supply for automatic sprinkler systems, pumps, tanks, water levels and temperatures, critical air pressures and water flow switches on all sprinkler systems shall be electrically supervised by a ~~listed fire alarm control unit~~ manual fire alarm system in compliance with NFPA 72 requirements and the Illinois Accessibility Code for occupant notification.

Exceptions:

1.  Automatic Sprinkler systems protecting one- and two family dwellings.

2.  Limited area sprinkler systems in accordance with Section 903.3.8

3.  Automatic sprinkler systems installed in accordance with NFPA 13R where a common supply main is used to supply both domestic water and the *Automatic sprinkler system*, and a separate shutoff valve for the *automatic sprinkler system* is not provided.

4.  Jockey pump control valves that are sealed or locked in the open position.

5.  Control valves to commercial kitchen hoods, paint spray booths or dip tanks that are sealed or locked in the open position.

6.  Valves controlling the fuel supply to fire pump engines that are sealed or locked in the open position.

7.  Trim valves to pressure switches in dry, preauction and deluge sprinkler systems that are sealed or locked in the open position.

8.  Underground key or hub gate valves in roadway boxes.

**903.4.2 Alarms.** An approved audible and visual device with a blue lens, located on the exterior of the building in an *approved* location, shall be connected to each automatic sprinkler system. Such sprinkler waterflow alarm devices shall be activated by water flow equivalent to the flow of a single sprinkler of the smallest orifice size installed in the system. Where a fire alarm system is installed, actuation of the automatic sprinkler system shall actuate the building fire alarm system.

## FIRE PROTECTION SYSTEMS

## SECTION 907 - FIRE ALARM AND DETECTION SYSTEMS

**907.1.3 Equipment.** All fire alarm systems shall be of the addressable type and shall be installed per NFPA 72. Systems and components shall be listed and approved for the purpose for which they are installed.

**907.1.4 Notification of Disconnection.** Any disconnection of an active fire alarm system from the system monitoring station on file with the Village's Fire Department shall be reported in writing to the Fire Department by the property owner or other responsible party within 24 hours of such disconnection. Failure to make such notification to the Fire Department shall be a violation of this code.

**907.1.4 Re-Connection of Alarm System.** Failure to reconnect a required fire alarm system to a system monitoring station approved by the Village's Fire Department within 24 hours of any disconnection shall be a violation of this code.

**907.2 Where Required-new buildings and structures.** An approved fire alarm system installed in accordance with the provisions of this code and NFPA 72, shall be provided-in new buildings and structures in accordance with Sections 907.2.1 through 907.2.23, and provide occupant notification in accordance with Section 907.5, unless other requirements are proved by another section of this code. Not fewer than one manual fire alarm box shall be provided in an approved location to initiate a fire alarm signal for fire alarm systems employing automatic fire detectors or waterflow detection devices. Where other sections of this code allow elimination of fire alarm boxes due to sprinklers, a single fire alarm box shall be installed.

~~Exceptions~~ Exception:

1.  The manual fire alarm box is not required for alarm systems dedicated to elevator recall control supervisory service.

2.  ~~The manual fire alarm box is not required for Group R-2 occupancies unless required by the fire code official to provide a means for fire watch personnel to initiate an alarm during a sprinkler system impairment event. Where provided, the manual fire alarm box shall not be located in an area that is open to the public.~~

**907.2.1 Group A.** Group A is deleted and replaced in its entirety with the following:

**907.2.1 Group A.** A manual/automatic fire alarm system and an automatic fire detection system that activates an occupant notification system in accordance with Section 907.5 of this code shall be installed throughout all Group A occupancies.

**Exception:** Where an automatic sprinkler system is provided throughout a building and connected to the building fire alarm system, an automatic fire detection system is not required unless otherwise required by law.

**907.2.2 Group B.** Group B is deleted and replaced in its entirety with the following:

**907.2.2 Group B.** A manual/automatic fire alarm system and an automatic fire detection system that activates the occupant notification system in accordance with Section 907.5 shall be installed throughout all occupancies containing group B occupancies.

Exceptions:

1.  Group B occupancies having an occupant load of less than 50 which have a direct exit to a building exterior except restaurants or establishments where alcoholic beverages or cannabis are permitted to be consumed.

2.  Where an automatic sprinkler system is provided throughout the building and connected to the building fire alarm system, and automatic fire detection system is not required unless otherwise required by law.

**907.2.3 Group E.** Group E is deleted and replaced in its entirety with the following:

**907.2.3 Group E.** A manual/automatic fire alarm system and an automatic fire detection system which activates an occupant notification system in accordance with Section 907.5 of this code shall be installed throughout group E occupancies. Activation of the fire alarm in Group E occupancies shall initiate a signal using an emergency voice/alarm communication system in accordance with Section 907.5.2.2 of this code.

**Exception:** Where an automatic sprinkler system is provided throughout a building and connected to a building fire alarm system, an automatic fire detection system is not required unless required by law.

**907.2.4 Group F.** Section 907.2.4 Group F is deleted and replaced in its entirety with the following:

**907.2.4 Group F and S.** A manual/ automatic fire alarm system and an automatic fire detection system that activates an occupant notification system in accordance with Section 907.5 of this code shall be installed throughout all group F and S occupancies.

Exceptions:

1.   Occupancies having an occupant load of less than 50 and having direct exiting to the building exterior.

2.   Where an automatic sprinkler system is provided throughout a building and connected to a building fire alarm system, an automatic fire detection system is not required unless otherwise required by law.

3.   An automatic fire detection system is not required in open parking garages.

**907.2.7 Group M.** Section 907.2.7 is deleted and replaced in its entirety with the following:

**907.2.7 Group M.** A manual/automatic fire alarm system and an automatic fire detection system that activates the occupant notification system in accordance with Section 907.5 shall be installed throughout group M occupancies.

Exceptions:

1.   Occupancies having an occupant load less than 50 which have a direct exit to the building exterior.

2.   Where an automatic sprinkler system is provided throughout a building and connected to a building fire alarm system, an automatic fire detection system is not required unless otherwise required by law.

**907.2.8 Group R-1.** Section 907.2.8 is deleted and replaced in its entirety with the following:

**907.2.8 Group R-1.** A manual/automatic fire alarm system and an automatic fire detection system that activates the occupant notification system in accordance with Section 907.5 shall be installed throughout all occupancies containing group R-1 occupancies.

**Exception:** Where an automatic sprinkler system is provided throughout a building and connected to a building fire alarm system, an automatic fire detection system is not required unless otherwise required by law.

**907.2.8 Group R-2.** Section 907.2.8 is deleted and replaced in its entirety with the following:

**907.2.8 Group R-2.** A manual/automatic fire alarm system and an automatic fire detection system that activates an occupant notification system in accordance with Section 907.5 of this code shall be installed throughout all group R-2 occupancies.

Exception: Where an automatic sprinkler system is provided throughout the building and connected to the building fire alarm system, an automatic fire detection system is not required unless otherwise specified.

**907.2.10 Group S.** Section 907.2.10 deleted in its entirety.

**907.5.2 Alarm notification appliances.** Alarm notification appliances shall be provided and shall be listed for their purpose. The code requires that fire alarm systems be equipped with approved alarm notification appliances so that in an emergency, the fire alarm system will notify the occupants of the need for evacuation or implementation of the fire emergency plan. Alarm notification devices required by the code are of two general types: visible and audible. An additional audible and visual device with a red lens, shall be located on the exterior of the building in an approved location. Except for voice/ alarm signaling systems, once the system has been activated, all visible and audible alarms are required to activate. Voice/alarm signaling systems are special signaling systems that are activated selectively in response to specific emergency conditions.

**907.5.2.3 Visible alarms.** Visible alarm notification appliances shall be provided in accordance with Sections 907.5.2.3.1 through 907.5.2.3.4 ~~907.5.2.3.3~~.

**Exceptions:**

~~1.   Visible alarm notification appliances are not required in alterations, except where an existing fire alarm system is upgraded or replaced, or a new fire alarm system is installed.~~

1 ~~2~~.   Visible alarm notification appliances shall not be required in exits as defined in Chapter .

2 ~~3~~.   Visible alarm notification appliances shall not be required in elevator cars.

3 ~~4~~.   Visual alarm notification appliances are not required in critical care areas of Group I-2, Condition 2 occupancies that are in compliance with Section 907.2.6, Exception 2.

4 ~~5~~.   A visible alarm notification appliance installed in a nurses' control station or other continuously attended staff location in a Group I-2 Condition 2 occupancies that are in compliance with Section 907.2.6, Exception 2.

**907.5.2.3.3 Group R-2.** In Group R-2 occupancies required by Section 907 to have a fire alarm system, each story that contains *dwelling units* and *sleeping units* shall be provided with the capability to support future visible alarm notification appliances in

accordance with Chapter 11 of ICC A117.1. Such capability shall accommodate wired or wireless equipment. Type A units as described in the International Building Code shall be equipped with audio/visual devices.

**907.5.2.3.4 Visible alarms in new, existing and alterations.** Visible alarm notification appliances shall be provided in the following buildings:

1. Where a new fire alarm system is installed;

2. Where an existing fire alarm system is upgraded or replaced; or

3. Buildings undergoing alterations in any occupancy group where a fire alarm currently exists.

**907.6.4.3 Zone maps.** Fire alarm zone maps shall be provided at all fire alarm control panels, annunciator panels, fire command center, and any other location as determined by the fire official. The zone maps shall provide the locations of all fire alarm initiating devices set forth in a floor plan.

### SECTION 913 – FIRE PUMPS

**1913.2 Protection against interruption of service:** The fire pump, driver and controller shall be protected in accordance with NFPA 20 against possible interruption of service through damage caused by explosion, fire flood, earthquake, rodents, insects, windstorm, freezing, vandalism and other adverse conditions. Where a building is equipped with an emergency generator, any fire pump shall be connected to the generator.

### CHAPTER 10

### MEANS OF EGRESS

**1013.5 Internally illuminated exit signs.**

Electrically powered, *self-luminous and photoluminescent* exit signs shall be *listed* and *labeled* in accordance with UL 924 and shall be installed in accordance with the manufacturer's instructions, Section 1203, and the latest edition of the National Electric Code as adopted and amended by the Village of Oak Park. Exit signs shall be illuminated at all times.

### CHAPTER 11

### CONSTRUCTION REQUIREMENTS FOR EXISTING BUILDINGS

**1103.2 Emergency Responder Radio Coverage in Existing Buildings.** Existing buildings other than Group R-3, that do not have an approved radio coverage for emergency responders in the building based on existing coverage levels of the public safety communication systems, shall be equipped with such coverage according to one of the following:

1. Where an existing wired communication system cannot be repaired or is being replaced, or where not approved in accordance with Section 510.1, Exception 1.

2. Within a time, frame established by the adopting authority

3. Existing systems shall be maintained in accordance with Section 510.6.

**1103.5 Sprinkler Systems.** An *automatic sprinkler system* shall be provided in existing buildings in accordance with Sections 1103.5.1 through ~~1103.5.4~~ 1103.5.6

**1103.5.1 Group A-2.** Where alcoholic beverages or cannabis are consumed in a Group A-2 occupancy having an occupant load of ~~300~~ 100 or more, the fire area containing the Group A-2 occupancy shall be equipped with an *automatic sprinklers system* in accordance with Section 903.3.1.1. Restaurants or establishments where alcoholic beverages or cannabis are permitted to be consumed shall have a manual fire alarm and an automatic fire alarm system with notification of any size or occupant load.

**1103.5.5 Existing Basements.** If occupancy is permitted in a basement within any occupancy classification except Group R-2, R-3, S or U, the entire basement shall be equipped with an approved automatic sprinkler system.

**1103.5.6 Monitoring and Notification for Existing Sprinkler Systems.** Sprinkler systems installed in commercial buildings shall have monitoring and notification devices installed per Sections 903.4 and 907.5 where existing fire alarms are installed within the building.

(Ord. 2014-O-62, 10-6-2014, eff. 1-1-2015; amd. Ord. 20-083, 9-21-2020; Ord. 23-52, 6-20-2023)

---

## ARTICLE 6

## RESIDENTIAL CODE

---

SECTION:

**7-6-1: Adoption**

**7-6-2: Amendments**

**7-6-1: ADOPTION:**

A.   The 2021 international residential code (2009 IRC) as published by the International Code Council, is hereby adopted by the Village by reference and is made a part hereof as if fully set forth in this section with the additions, insertions, deletions and changes set forth in section 7-6-2 of this article. To the extent that the provisions of the IRC are inconsistent with any codes previously adopted by the Village by reference, the provisions of the IRC shall govern unless specifically set forth in this code. In the event of a conflict between any provisions of the IRC and any provision of the Oak Park Village Code, the provisions of the Oak Park Village Code shall govern.

B.   There shall be three (3) copies of the IRC kept on file for public inspection in the office of the Chief Building Official. (Ord. 2014-0-63, 10-6-2014, eff. 1-1-2015; amd. Ord. 20-080, 9-21-2020; Ord. 23-53, 6-20-2023)

## 7-6-2: AMENDMENTS:

The 2021 international residential code, as adopted pursuant to section 7-6-1 of this article, is hereby amended by adding the underlined language and deleting the overstricken language as follows:

### CHAPTER 1

### SECTION R102 - APPLICABILITY

**R102.5 Appendices.** ~~Provisions in the appendices shall not apply unless specifically referenced in the adopting ordinance.~~ The following appendices are adopted as part of this code:

1.   Appendix A - Sizing And Capacities Of Gas Piping;

2.   Appendix B - Sizing Of Venting Systems Serving Appliances Equipped With Draft Hoods, Category 1 Appliances, And Appliances Listed For Use With Type B Vents;

3.   Appendix C - Exit Terminals Of Mechanical Draft And Direct-Vent Venting Systems;

4.   Appendix D - Recommended Procedure For Safety Inspection Of An Existing Appliance Installation;

5.   Appendix F - Radon Control Methods, as amended hereinafter;

6.   Appendix G - Piping Standards for Various Applications;

7.   Appendix H - Patio Covers;

8.   Appendix J - Existing Buildings And Structures;

9.   Appendix K - Sound Transmission;

10.   Appendix M - Home Day Care - R-3 Occupancy,; and

11.   Appendix X . Electrification For New Residential Buildings.

### TABLE R302.1(1)

### EXTERIOR WALLS

| EXTERIOR WALL ELEMENT | | MINIMUM FIRE RESISTANCE RATING | MINIMUM FIRE SEPARATION DISTANCE |
|---|---|---|---|
| EXTERIOR WALL ELEMENT | | MINIMUM FIRE RESISTANCE RATING | MINIMUM FIRE SEPARATION DISTANCE |
| Walls | Fire resistance rated | 1 hour—tested in accordance with ASTM E119 or UL263 or Section 703.3 of the International Building Code with exposure from both sides | 0 feet |
| | Not fire resistance rated | 0 hours | 3 feet |
| Projections | Not allowed | N/A | < 1 foot |
| | Fire resistance rated | 1 hour on the underside, or heavy timber, or fire-retardant-treated wood [a,b] | 1 foot to < 2 feet |
| | Not fire resistance rated | 0 hours | 2 feet |
| Openings in walls | Not allowed | N/A | < 3 feet |
| | 25% maximum of wall area | 0 hours | < 5 feet |
| | Unlimited | 0 hours | 5 feet |
| Penetrations | All | Comply with Section R302.4 | < 3 feet |
| | | None required | 3 feet |

For SI: 1 foot = 304.8mm

NA = Not Applicable.

a.   ~~The fire-resistance rating shall be permitted to be reduced to 0 hours on the underside of the eave overhang if fireblocking is provided from the wall top plate to the underside of the roof sheathing.~~

b.   ~~The fire-resistance rating shall be permitted to be reduced to 0 hours on the underside of the rake overhang where gable vent openings are not installed.~~

## SECTION R313 - AUTOMATIC FIRE SPRINKLER SYSTEMS

**R313.2 One- And Two-Family Dwellings Automatic Fire Systems.** An automatic residential fire sprinkler system shall be installed in new construction of one- and two-family dwellings.

**Exception:** An automatic residential fire sprinkler system shall not be required for additions or alterations to existing buildings that are not already provided with an automatic residential sprinkler system.

**R313.3 Existing Structures.** See Section AJ101.9 below for sprinkler requirements for existing structures.

## CHAPTER 15

## EXHAUST SYSTEMS

## SECTION M1503 . DOMESTIC COOKING EXHAUST EQUIPMENT

**M1503.6.3 Makeup Air Temperature.** The temperature differential between makeup air and the air in the conditioned space shall not exceed 10°F except where the added heating and cooling loads of the makeup air do not exceed the capacity of the HVAC system.

**CHAPTER 25 PLUMBING ADMINISTRATION** is deleted in its entirety.

## CHAPTER 26

## GENERAL PLUMBING REQUIREMENTS

## SECTION P2601 - GENERAL

**P2601.1 Scope.** The provisions of this chapter shall govern the installation of plumbing not specifically covered in other chapters applicable to plumbing systems. ~~The installation of plumbing, appliances, equipment and systems not addressed by this code shall comply with the applicable provisions of the international plumbing code.~~ The provisions of the current edition of the state of Illinois plumbing code shall govern the erection, installation, alteration, repairs, relocation, replacement, addition to, use or maintenance of plumbing equipment and systems

**P2601.2 ~~Connection.~~** ~~Plumbing fixtures, drains and appliances used to receive or discharge liquid wastes or sewage shall be connected to the sanitary drainage system of the building or premises in accordance with the requirements of this code. This section shall not be construed to prevent indirect waste systems.~~

Exception: Bathtubs, showers, lavatories, clothes washers and laundry trays shall not be required to discharge to the sanitary drainage system where such fixtures discharge to systems complying with Sections P2910 AND 92911.

All new one or two-family dwellings shall contain the following:

1.   New sewer service from the principle structure to the Village sewer main;

2.   Over-head sewer system in buildings with basements;

3.   New water service from the principle structure to the Village water main;

4.   A new water meter, which shall be purchased from the Village; and

5.   A new buffalo box water shut off valve installed in the parkway, which shall be purchased from the Village.

Delete Section P2601.3 Flood Hazard Area in its entirety.

Delete Sections P2602, Individual Water Supply and Sewage Disposal, through section P2609 Materials Evaluation and Listing, inclusive, in their entirety.

Delete Chapter 27 Plumbing Fixtures in its entirety.

Delete Chapter 28 Water Heaters in its entirety.

Delete Chapter 29 Water Supply and Distribution in its entirety.

Delete Chapter 30 Sanitary Drainage in its entirety.

Delete Chapter 31 Vents in its entirety.

Delete Chapter 32 Traps in its entirety.

Delete Chapter 33 Storm Drainage in its entirety.

## CHAPTER 34

## GENERAL REQUIREMENTS

**Sections E3401.2 Scope, E3401.3 Not Covered, E3401.4 Additions and Alterations, E3402 Building Structure Protection and, E403.1 Approval in its entirety** are deleted in their entirety.

**Section E3403.2 Inspection Required.** New electrical work and parts of existing systems affected by new work or alterations shall be inspected by the building official to ensure compliance with the requirements of chapters 34 through 43. Work inspected and approved shall not be modified without obtaining a subsequent approval after the modification. The chief building official may require any equipment, component, or panelboard, or access to these elements to be opened for inspection. The building official may require any project related personnel to be on site for any inspection, including, but not limited to property owners, design professionals, general contractor and/or sub-contractor representatives or owners.

Safe access shall be provided to all areas required for inspection. The building official reserves the right to not perform any inspection where safe access is not provided, including but not necessarily limited to, trenches, ladders, temporary stairs, guardrails, areas requiring the removal of safety equipment such as boots or hard hats, and/or manholes or vaults. Where specialty safety equipment is required to perform an inspection, it shall be provided for the inspector to use for the inspection, by a responsible party to the construction project.

The property owner shall ultimately be responsible for assuring that all the required inspections are approved.

**Sections E3403.3 LISTING AND LABELING IN ITS ENTIRETY, E3404 - GENERAL EQUIPMENT REQUIREMENTS; E3405 - EQUIPMENT LOCATION AND CLEARANCES; E3406 - ELECTRICAL CONDUCTORS AND CONNECTIONS, E3407 CONDUCTOR AND TERMINAL IDENTIFICATION** are deleted in their entirety.

Delete Chapter 35 Electrical Definitions in its entirety.

Delete Chapter 36 Services in its entirety.

Delete Chapter 37 Branch Circuit And Feeder Requirements in its entirety.

Delete Chapter 38 Wiring Methods in its entirety.

Delete Chapter 39 Power And Lighting Distribution in its entirety.

Delete Chapter 40 Devices And Luminaires in its entirety.

Delete Chapter 41 Appliance Installation in its entirety.

Delete Chapter 42 Swimming Pools in its entirety.

Delete Chapter 43 Class 2 Remote-Control, Signaling And Power-Limited Circuits in its entirety.

## APPENDIX F

## RADON CONTROL METHODS

## SECTION AF101 - SCOPE

**Appendix F section AF101.1 General.** This appendix contains requirements for new construction in jurisdictions where radon resistant construction is required. Where installed, radon control methods shall be in accordance with this appendix unless superseded by state law.

## APPENDIX J

## EXISTING BUILDINGS AND STRUCTURES

## SECTION AJ102 - COMPLIANCE

**Appendix J sections AJ102.10 and AJ102.11** are added as follows:

**Section AJ102.10 Conversion Into Habitable Space.** When any area not previously approved or utilized as habitable space is converted into and/or utilized as habitable space, regardless of the amount of construction work done in this area, it shall be considered as reconstruction and shall be subject to the requirements of this appendix and the provisions of section R310 of this code.

**Section AJ102.11 Conversion Into A Sleeping Room.** When any area not previously approved or utilized as a sleeping room is converted into and/or utilized as a sleeping room, regardless of the amount of construction work that was or was not done in this conversion or change of utilization, it shall be subject to all requirements for new construction of a sleeping room as found in this code.

**AJ102.12 Adding Insulation to Existing Attics**

Additional structural load of insulation in existing attics: When insulation is added to existing attics, either at the attic floor level or under the roof deck, winter snow will accumulate on the roof structure potentially adding load beyond the ability of the existing structure to adequately support the added load. Where total attic insulation exceeds R-25, calculations shall be submitted demonstrating proof that the existing structure complies with the requirements of Table 301.2(1) or Table 301.6 whichever is greater. Where existing roof framing does not comply, submit drawings and calculations showing required alterations to the structure to bring the roof structure into compliance.

## SECTION AJ107 - REPAIRS

## AJ107.2 Water Closets

Where any water closet is replaced with a newly manufactured water closet, the replacement water closet shall comply with the requirements of Section P2903.2 the Illinois Plumbing Code.

### SECTION AJ109 - Alterations

Add section AJ109.9 as follows:

**AJ109.9 Automatic Fire Sprinkler Systems in existing one- and two- family _dwellings_ and _townhouses_:**

**AJ109.9.1 Additions.** An automatic NFPA 13D residential fire sprinkler system shall be installed throughout existing one- and two-family dwellings and townhouses where the building area of an addition is more than 50% of the existing building area. A plan clearly showing the total existing building area and the addition building area shall be provided for approval by the Building Official.

**AJ109.9.2 Alterations.** An automatic NFPA 13D residential fire sprinkler system shall be installed throughout one- and two- family dwellings and townhouses where either or both of the following alterations occur:

1.  Where a work area of more than 50% of the existing building area is altered. Provide a plan clearly showing the total existing building area except for covered porches and extent of the work area for approval by the Chief Building Official and/or the Fire Official; or

2.  Where more than 50% of plaster or drywall interior wall finishes are removed down to the studs and replaced with new drywall or plaster wall finishes. Provide a plan clearly showing the total wall elevation areas of wall finishes to be removed and replaced. The work area shall be considered the square footage area from the wall being altered to the center of the room. Work area calculations shall include the whole house square footage and the altered square footage and submitted for approval by the Chief Building Official and/or the Fire Code Official.

### APPENDIX X - ELECTRIFICATION FOR NEW RESIDENTIAL BUILDINGS

### SECTION 0101- Administration

**X101.1 Purpose.** The purpose of this appendix is to provide minimum requirements for enhanced environmental features in all new residential buildings regulated by this code.

**X01.2 Objectives.** The objectives of this appendix are to reduce production of greenhouse gasses.

### SECTION X201- Definition

**Definitions.** The following words and terms shall for the purpose of this appendix have the meaning set forth below.

**FOSSIL FUELS:** Fossil fuels are made from decomposing plants and animals and contain carbon and include coal, crude oil and natural gas.

**NEW RESIDENTIAL BUILDING:** A new residential building/structure shall mean a new independent or attached residential structure on a newly created foundation.

### SECTION X301- ELECTRIFICATION REQUIREMENTS

**X301.1 Electrification requirement for New Residential Buildings.** New residential buildings shall be designed and constructed as follows:

1.  The source of energy for the building shall be all electric and the source of energy shall not be fossil fuels. Energy from fossil fuels may be provided by generators for emergency backup power.

2.  All heating and air conditioning shall be provided by cold climate air source or ground source heat pumps.

3.  A building shall contain an energy recovery ventilation system.

4.  A building design shall include Manuals J and S calculations, or an equivalent design, by a licensed design professional.

5.  All refrigerators, dishwashers, and clothes washers shall be Energy Star certified.

6.  Energy for any clothes dryer shall be provided by an electric heat pump.

7.  A building shall contain at least one level 2 electric vehicle charging station at one parking location if a building contains a parking space/garage.

8.  Directly piped exterior gas fire pits and gas cooking grills whose source of energy are fossil fuels are prohibited.

(Ord. 2014-0-63, 10-6-2014, eff. 1-1-2015; amd. Ord. 20-080, 9-21-2020; Ord. 23-53, 6-20-2023)

<div style="border:1px solid #000; text-align:center;">

## ARTICLE 7

## SIGNS

</div>

SECTION:

**7-7-1: Findings And Purpose**

**7-7-1-1: Scope**

**7-7-2: Relationship To Other Ordinances**

**7-7-3: Definitions**

**7-7-4: Sign Permit**

**7-7-5: Sign Variance**

**7-7-6: Master Sign Plan**

**7-7-7: Establishment Of Sign Overlay Districts**

**7-7-8: Dimension Measurement**

**7-7-9: General Construction And Design Standards**

**7-7-10: Obsolete, Abandoned Or Unsafe Signs**

**7-7-11: Prohibited Signs**

**7-7-12: Exempt Signs**

**7-7-13: Temporary Signs**

**7-7-14: Ground Sign Construction And Design Standards**

**7-7-15: Building Sign Construction And Design Standards**

**7-7-16: Electronic Sign Construction And Design Standards**

**7-7-17: Signs For Hospital Use**

**7-7-18: Classic Signs**

**7-7-19: Nonconforming Signs**

**7-7-20: Signs Projecting Into The Public Right Of Way**

**7-7-1: FINDINGS AND PURPOSE:**

The following findings and purposes are hereby adopted:

   A.   It is necessary for the promotion and preservation of the public health, safety and welfare of the Village that the erection, construction, location and maintenance of all signs be regulated and controlled.

   B.   A multiplicity of signs is distracting to motorists and a hazard to vehicular and pedestrian traffic.

   C.   A proliferation of off premises signs obscures the legitimate effort of local business establishments to reasonably identify the location and nature of their businesses.

   D.   It is a legitimate public purpose to limit signs in the Village to those reasonably necessary to identify local businesses. Such limitations and all other sign regulations herein are established to accomplish the following purposes:

     1.   To protect public safety and welfare.

     2.   To ensure adequate and appropriate identification of uses by controlling the size and number of signs.

     3.   To enhance the economy and the business and industry of the Village by promoting the reasonable, orderly and effective display of signs, and encouraging better communication with the public.

     4.   To protect commercial districts from sign clutter.

     5.   To protect the public's ability to identify uses and premises without confusion.

     6.   To limit or eliminate unnecessary distractions that may jeopardize pedestrian or vehicular traffic safety.

     7.   To assure the maintenance of signs.

     8.   To preserve and protect historic signs and signs of special significance to the Village.

     9.   To implement the objectives expressed in the Comprehensive Plan.

     10.   To preserve and enhance the natural beauty of the landscape and residential and commercial architecture, one of the prime assets of the Village.

     11.   To control and abate the unsightly use of buildings or land.

     12.   To protect the property values and economic well being of the Village. (Ord. 2009-0-019, 3-23-2009)

**7-7-1-1: SCOPE:**

It is unlawful for any person to construct, maintain, display or alter or cause to be constructed, maintained, displayed or altered, a sign within the Village, except in conformance with this article. (Ord. 2009-0-019, 3-23-2009)

### 7-7-2: RELATIONSHIP TO OTHER ORDINANCES:

   A.   Nothing herein contained shall be deemed or construed to modify or alter the provisions of any other chapter of the Village Code. In the event of a conflict between the requirements of this article and those of any other provision of the Village Code, the latter shall prevail and control.

   B.   If any section, paragraph, clause, phrase or part of this article is, for any reason, held invalid, such decision shall not affect the validity of the remaining provisions of this article; and, the application of these provisions to any persons or circumstances shall not be affected thereby. (Ord. 2009-0-019, 3-23-2009)

### 7-7-3: DEFINITIONS:

For the purpose of this article, certain words and terms are hereby defined:

A-FRAME SIGN: A temporary advertising device ordinarily in the shape of an "A", or some variation thereof, located on the ground, not permanently attached and easily movable, and usually two (2) sided. Also called a "sandwich board".



ABANDONED OR OBSOLETE SIGN: A sign which no longer correctly directs or exhorts any person, advertises a business, lessor, owner, product, activity conducted or available on the premises where the sign is displayed.

ALLEY: A private or dedicated public way that affords only a secondary means of access to contiguous property and is less than thirty three feet (33') in width.

ARCHITECTURAL ELEMENT: A prominent or significant part or feature of a building, structure, or site.

ATTENTION GETTING DEVICE: A display that utilizes motion or flashing lights to attract attention of passers-by. Examples include strings of pennants, banners or streamers, advertising flags, clusters of flags, strings of twirlers or propellers, flares, balloons, strobe lights, and sequential flashing "runner" lights.

AWNING: A structure of canvas, canvaslike or other materials extended over a window or door or over a patio, deck, etc., as a protection from the sun or rain.

BALLOON SIGN: Any sign that is any lighter than air or gas filled balloon attached by means of a rope or tether to a definite or fixed location. A display designed to inflate or move by use of a fan or blower is also considered a balloon sign. Balloons used as temporary attention getting devices in conjunction with another sign which are no more than eighteen inches (18") in diameter, are not considered balloon signs.

BANNER SIGN: Any sign printed or displayed upon cloth or other flexible material with or without frames.

BARBER POLE: A pole painted in spiral stripes used as a sign by a barbershop or hairdresser for advertisement.

BUILDING: Any covered structure securely affixed to the land which is designed for the support, shelter, enclosure or protection of persons, animals, chattels or other tangible property.

BUILDING OFFICIAL: The Chief Building Official or his or her designee.

BULLETIN BOARD: A sign which accommodates manually changeable copy which displays information on activities and events on the premises.

CANOPY: Any structure, movable or stationary, attached to and deriving its support from the side of a building or structure for the purpose of shielding a platform, stoop or sidewalk from the elements.



CONSTRUCTION FENCE WRAP: A temporary sign made of durable, weather resistant material such as canvas, nylon or vinyl coated fabric, placed on a construction fence to conceal a construction site and promote a building being constructed.

CONSTRUCTION SIGN: A temporary sign which functions to denote the architect, contractor or engineer, placed on a lot that is the construction site of such architect, contractor or engineer.

CURB LINE: The edge of the roadway pavement for any street or alley.

DIRECTIONAL SIGN: Any on premises, be it a pole, monument or other type of sign, providing directions necessary or convenient for motorists or pedestrians coming onto premises including signs marking entrances and exits, parking areas, loading zones or circulation directions.

DIRECTORY SIGN: A sign which functions to identify the location of occupants of a building or group of buildings which are divided into rooms or suites used as offices or studios.

DWELLING, MULTIPLE-FAMILY: A building having three (3) or more dwelling units.

DWELLING, SINGLE-FAMILY: A building having one dwelling unit.

DWELLING, TWO-FAMILY: A building having two (2) dwelling units.

ELECTRONIC SIGN: Signs whose alphabetic, pictographic or symbolic informational content can be changed or altered on a fixed display screen composed of electrically illuminated segments. For the purposes of this article, electronic signs within ground or wall signs are regulated as one of the two (2) following types:

Electronic Display Screen: A sign, or portion of a sign, that displays an electronic image or video, which may or may not include text. This definition includes television screens, plasma screens, digital screens, flat screens, LED screens, video boards and holographic displays.



Electronic Message Sign: Any sign, or portion of a sign, that uses changing lights to form a sign message or messages in text form wherein the sequence of messages and the rate of change is electronically programmed and can be modified by electronic processes. "Time and temperature devices" are not considered electronic message signs.



EXTERIOR ILLUMINATED SIGN: Any sign, any part of which is illuminated from an exterior artificial light source mounted on the sign, another structure or the ground.

FLASHING SIGN: A sign with blinking or flashing lights, or other illuminating devices that change light intensity, brightness or color, traveling/chasing or blinking lights, or rotating beacons are prohibited. Electronic signs are not considered flashing signs; however, the messages or images on an electronic sign may not imitate flashing signs.

FRONTAGE: All the property on one side of a street between two (2) intersecting streets measured along the street line, or, if the street is a dead end, then all the property abutting on one side between an intersecting street and the dead end of the street.

GHOST SIGN: A painted wall sign that remains from an earlier time or advertises the use of a building that provides evidence of the history of the use of the building or activities of the community. A "ghost sign" is not considered an off premises sign.



GRADE: Grade is measured as the average level of the finished surface of the ground adjacent to the exterior walls of the structure. Grade is used as the starting point to measure height. For purposes of this article, any wall approximately parallel to and not more than twenty feet (20') from a street line is to be considered as adjoining the street.

   A.   For buildings having walls adjoining one street only, "grade" is defined as the elevation of the sidewalk at the midpoint of the wall adjoining the street.

   B.   For buildings having walls adjoining more than one street, "grade" is defined as the average of the elevation of the sidewalk at the midpoints of all walls adjoining the streets.

   C.   For buildings having no wall adjoining the street, "grade" is defined as the average level of the finished surface of the ground adjacent to the exterior walls of the building.

   D.   Where no sidewalk exists, the grade shall be established by the Village Engineer.

GROUND FLOOR: Any floor that is not more than three feet (3') above or below grade.

GROUND SIGN: A sign that is attached to a completely self-supporting structure. A ground sign may be a pole or monument sign.

Sign, Ground - Monument: Any sign, other than a pole sign, placed upon or supported by the ground independently of any other structure. Ground monument signs are typically mounted on a masonry base. As distinguished from a ground pole sign, the sign base of any monument sign must be a minimum of seventy five percent (75%) or more of the width of the sign face that is to be situated upon the base. A sign base less than seventy five percent (75%) of the width of the sign face is considered a ground pole sign.



Sign, Ground - Pole: A sign erected and maintained on one or more freestanding mast(s) or pole(s) and not attached to any building, but not including a ground monument sign.



HOSPITAL: A place with a full time staff of resident licensed physicians and registered nurses and with complete facilities for the general diagnosis, treatment, and care of inpatients suffering from illness, disease, injury, deformity or other abnormal physical or mental condition and offering customary outpatient services as an accessory use.

IDENTIFICATION SIGN: Any sign which functions to identify an institution, occupant, apartment, residence, school or church, and not advertising any product or service.

INTERNALLY ILLUMINATED SIGN: A sign illuminated by a light source, either incandescent, fluorescent, neon or other light, that is enclosed by the sign panel(s) or within the sign.

LOT: A zoning lot, except as the context herein shall indicate a lot of record.

LOT LINE: A boundary of a zoning lot.

LOT OF RECORD: A single lot which is part of a subdivision or resubdivision which has been recorded in the office of the Recorder of Deeds of Cook County, Illinois.

LOT, ZONING: A parcel of land, at least one lot line of which is a street line, which is located within a single block, and which is or will be used, developed or built upon as a unit. A zoning lot may or may not coincide with a lot of record.

MENU BOARD: A device which functions to list items for sale at a drive-through restaurant.

MOVING SIGN: A sign or other advertising structure with moving, revolving or rotating parts or visible mechanical movement of any kind, including wind activated signs. Clocks are not considered signs with moving parts.

MURAL: A picture or photograph painted or applied directly on a wall and which in no way identifies a product.

NONCOMMERCIAL MESSAGE: A message that does not direct attention to a business or to a service or commodity for sale, and is typically of a political, religious, or ideological nature.

OBSCENE SIGN: A sign which is found to meet the three (3) established criteria of obscenity: a) prurient in nature; b) devoid of scientific, political, educational or social value; and c) a violation of local community standards.

OFF PREMISES SIGN: Any sign which directs attention to a business, service, product or entertainment not sold or offered or only incidentally sold or offered on the premises on which the sign is located.

PENNANT SIGN: Any geometric shaped cloth, fabric or other lightweight material normally fastened to a stringer, which is secured or tethered so as to allow movement of the sign.

PERMANENT SIGN: A sign attached to a structure or the ground which is made of materials intended for long term use.

POLITICAL SIGN: A sign whose function is to draw attention to or communicate a position on any issue, candidate or measure in any national, state or local election.

PORTABLE SIGN: A sign which is mounted or designed to be mounted on a self-propelled or towed vehicle, and shall include, but not be limited to, mobile advertising signs attached to a trailer or other vehicle.

PROJECTING SIGN: A sign which extends out from a building face or wall so that the sign face is perpendicular or at an angle to the building face or wall.



ROOF SIGN: Any sign located on or attached to and extending above the roof of a building.

SIGN: Any visual device or representation designed or used for the purpose of communicating a message or identifying a product, service, person, organization, business or event, with the use of words or characters, visible from outside the premises on which such device is located. Murals are not considered to be signs.

SIGN AREA: The area of the largest single face of the sign within a perimeter which forms the outside shape including any frame that forms an integral part of the display, but excluding the necessary supports or uprights on which the sign may be placed. See subsection 7-7-8A of this article for measurement of sign area.

SIGN FACE: The visible sign proper including all characters and symbols, excluding essential structural elements which are not an integral part of the display.

SIGN STRUCTURE: Any structure or material which supports, has supported or is capable of supporting or helping maintain a sign in a stationary position, including decorative covers.

STREET: A right of way dedicated or used as a public thoroughfare or easement that affords primary means of access to contiguous property and is thirty three feet (33') or more in width.

STREET LINE: A lot line that is also the boundary line of the right of way of an existing or dedicated street.

STRUCTURE: Anything constructed or erected with a fixed location on the ground, or attached to something having a fixed location on the ground. Without limitation on the foregoing, a structure shall include buildings, fences, walls, billboards and signs.

TEMPORARY POLE SIGN: A freestanding sign not intended or designed for permanent display mounted on a pole or other structure, which is also temporary in construction.

TEMPORARY SIGN: A sign not intended or designed for permanent display.

TEMPORARY WALL SIGN: A temporary sign attached to a wall not intended or designed for permanent display.

TEMPORARY WINDOW SIGN: A temporary sign attached to or placed upon a window or door of a building intended for viewing from the exterior of such a building and not intended or designed for permanent display.

TIME AND TEMPERATURE DEVICE: A mechanism integrated into a sign that displays the time and/or temperature, but does not display any commercial advertising or identification.

TRANSIT SHELTER SIGNS: Signs integrated into the design of a transit shelter when that shelter is installed on property owned or operated by a public transit corporation, or on the public right of way pursuant to an agreement authorized by the Village.

UNDER AWNING SIGN: Any sign attached to and mounted under an awning.



UNDER CANOPY SIGN: Any sign attached to and mounted under a canopy.

WALL SIGN: A sign attached to, painted on or erected against the wall of a building with the face in a parallel plane of the building wall.

WINDOW SIGN: A sign printed on, affixed to, in contact with or etched on, intended for viewing from the exterior of such a building. Any sign within twelve inches (12") of a window or the glass surface of a door, and is visible from the public street. (Ord. 2009-0-019, 3-23-2009; amd. Ord. 2011-0-63, 10-3-2011; Ord. 2014-0-66, 10-6-2014; Ord. 15-183, 11-2-2015; Ord. 22-18, 3-21-2022)

## 7-7-4: SIGN PERMIT:

No sign shall be constructed, maintained, displayed or altered within the Village except pursuant to an approved sign permit, unless the sign is specifically exempt from permit requirements.

   A.   Applicability: No sign, except those identified as exempt, shall be erected, constructed, altered or relocated without first obtaining a sign permit.

   B.   Authority And Execution: The Zoning Administrator shall be responsible for determining compliance with this article, and the Development Services Department shall be responsible for issuing a sign permit.

   C.   Permit Issuance:

      1.   Upon the filing of an application with the Development Services Department for a sign permit for erection, alteration or relocation of a sign, the Development Services Department shall determine whether the application is complete. If the application is not complete, the Development Services Department shall notify the applicant of any deficiencies, and shall take no steps to process the application until the deficiencies are remedied.

      2.   The Development Services Department shall examine the plans and specifications, and the premises upon which the proposed sign is to be erected to ensure compliance with the requirements of the Village's building code and all other applicable ordinances of the Village. The Development Services Department shall issue a sign permit if the proposed sign complies with the requirements of this article and all other ordinances of the Village.

   D.   Approval Of Electrified Signs: A sign for which electrical wiring and connections are to be used shall comply with the electrical code of the Village as a condition of granting the sign permit.

   E.   Inspection: The Development Services Department may inspect, at such times as deemed appropriate, signs regulated by this article. The purpose of the inspection is to ascertain whether the structure is secure or not secure, whether in need of repair or removal, or in conformance with the permit application and the provisions of this article.

F.   Revocation Of Permit: All rights and privileges acquired under the provisions of this section are licenses revocable at any time by the Village Board. Upon the termination or revocation of the sign permit, the licensee shall remove the sign or other sign structure without cost or expense to the Village. In the event of the failure, neglect or refusal on the part of the licensee to do so, the Village may proceed to remove the same and charge the expense to the licensee.

G.   Void: If the work authorized under a sign permit is not completed within six (6) months after the date of issuance, the permit shall be null and void.

H.   Enforcement: If any sign shall be unlawfully installed, erected or maintained in violation of any of the provisions of this article, the sign owner or other person responsible for maintaining the sign, shall, upon written notice from the Development Services Department, bring such sign into conformance with this article or remove the sign within ten (10) business days of the date of such notice. (Ord. 16-070, 6-6-2016; amd. Ord. 25-111, 3-4-2025)

## 7-7-5: SIGN VARIANCE:

The Zoning Board of Appeals shall hear and decide upon requests for variances from this article.

A.   Determination Of Need For A Variance: It shall be the duty of the Zoning Administrator, after an application for any sign permit, to determine and advise the applicant whether under the provisions of this article, a sign variance is required.

B.   Preliminary Conference: Any applicant for a sign permit that requires a variance may file a written request for a preliminary conference with the Zoning Board of Appeals. At the conference, the Zoning Board of Appeals shall consider preliminary exterior drawings, sketches or photographic examples, landscape and site plans and materials on a specific project, and shall provide the applicant with guidance in the development of a plan which would be consistent with the requirements and purposes of this article.

C.   Procedure:

1.   Application; Meeting: An applicant for a sign permit that requires a variance shall apply to the Zoning Board of Appeals for such variance and shall submit all items as required in subsection 7-7-5 C4 of this section. Upon receipt of such application, the Zoning Board of Appeals shall schedule a meeting where the applicant shall be given an opportunity to make a presentation and all interested parties shall be given the opportunity to comment.

2.   Notice Of Public Hearing: Notice of public hearings on requests for variances shall be given no more than thirty (30) days nor less than fifteen (15) days before the hearing by publication in a newspaper of general circulation in the Village. Such notice shall include the time and place of the hearing, a general description of the contents of the request to be heard, and the address or location of the property to which the request applies. The published notice may be supplemented by such additional form of notice as provided by rule of the hearing body.

3.   Posted Notice: Posted notice must be provided by an applicant and/or property owner and must be located on the property that is the subject of an application. The sign must be posted at a prominent location on the property, near the sidewalk or public right-of-way so that it is visible to pedestrians and motorists. Properties with more than one street frontage are required to post one sign visible on each street frontage. The required posting period must be no less than fifteen (15) days and no more than 30 days in advance of the scheduled hearing date. For the purposes of this subsection, a day is a calendar day. The sign must include the date, time, and place of the hearing/decision, purpose of such hearing/decision, and the appropriate Village personnel to contact for additional information. The sign must be approximately 48 inches by forty-eight (48) inches, containing one-inch minimum typeface. The sign must be weatherproof. Failure to post a sign and/or the removal or knocking down of a sign before a public hearing shall not invalidate, impair, or otherwise affect any subsequent variance approval following a public hearing. The sign must, whenever possible, remain posted until a hearing is completed. An applicant is responsible for removal of a sign within ten days of the issuance of a variance decision.

4.   Submittal Requirements: At the time of the public hearing, the applicant shall provide the Zoning Board of Appeals with the following documents depicting exterior design features:

   a.   Drawings which shall include plans, elevations, and site plans.

   b.   Landscaping and screening plans (when appropriate).

   c.   Renderings and specifications for signs.

   d.   A statement as to kind, color and texture of materials.

All documents shall be drawn to scale.

5.   Decision: Based upon the findings of fact in subsection 7-7-5 D of this section, the Zoning Board of Appeals shall render its decision within thirty (30) days of the conclusion of the hearing and shall notify the Zoning Administrator, or his/her designee, and the applicant of its decision. The concurring vote of a majority of the members of the Zoning Board of Appeals shall be necessary to grant a variance. The order of the Zoning Board of Appeals shall be by written resolution and contain its findings of fact.

6.   Inspection Upon Completion: Upon the granting of a variance, the exterior drawings, sketches, landscape and site plans, renderings and materials upon which the variance was granted shall be turned over to the Zoning Administrator whose responsibility it shall be to determine that, upon completion, there have been no deviations from the approval regarding sign design, aesthetics, or regulations contained within this article. The Development Services Department will be responsible for inspecting the built sign plans and built sign to ensure that it does not deviate from this article and other Village codes related to structural, electrical, and any other regulations contained in this article or other Village Codes. Such deviations shall constitute a violation of this article, in which event the Zoning Administrator or Development Services Department may stop work on the project in the same manner as for a violation of the Village Code. Work may not be resumed until such deviations are corrected.

7.   Compliance: It shall be the duty of the person to whom a variance has been granted to comply with the requirements of the variance and to obtain such inspections as are necessary to assure compliance. The Building Official shall give notice to said person of any deficiencies found to exist. Failure to correct any deficiencies within ten (10) days after receipt of notification of such deficiency shall constitute a violation of this article.

D.   Findings Of Fact: After hearing and considering the materials presented, the Zoning Board of Appeals shall grant a variance if it finds that:

1.   The applicant's plans are substantially consistent with the design criteria of this article.

2.   The proposed exterior design features of the sign are suitable and compatible with the character of neighboring buildings and structures existing or under construction and with the character of the neighborhood and the applicable zoning district, and enhance the environment of the Village.

3.   The exterior design features of the sign will not be detrimental to the harmonious and orderly growth of the Village.

4.   The exterior design features of the sign will not cause a substantial depreciation in the property values in the neighborhood.

E.   Appeal:

1.   Within fifteen (15) days of receipt of a denial of a variance, the applicant and/or his or her representative may appeal the Zoning Board of Appeals's decision to the Village Board. The Village Board, within forty five (45) days of the applicant filing his or her appeal, shall affirm, reverse or modify the decision of the Zoning Board of Appeals after due consideration of the facts contained in the record, which the Zoning Board of Appeals shall submit to the Village Board within ten (10) working days of the filing of the appeal. The Board of Trustees may receive comments on the contents of the record, orally at the meeting or in writing, not less than ten (10) days prior to the meeting at which the Board will first consider the appeal but shall not consider any new matters that were not presented during the Zoning Board of Appeals hearings.

2.   The Village shall, within seven (7) days of its decision, advise the applicants and the Zoning Board of Appeals, in writing, of its final decision and shall direct the Village Manager to advise all affected departments of the Village government.

3.   The failure of the Village Board to affirm, modify or reverse the decision of the Zoning Board of Appeals within forty five (45) days of the applicant filing his or her appeal shall be considered as an affirmance by the Village Board of the decision of the Zoning Board of Appeals and a denial of the appeal, and the Zoning Board of Appeals shall so notify the applicant and the affected departments of the Village government.

The decision of the Village Board will be the final administrative decision of the Village.

F.   Validity And Extension Of Time:

1.   No order granting a variance shall be valid longer than twelve (12) months from the date the approval was granted unless an application for building permit is filed within such period or the sign is completely installed within such period.

2.   The Village Board may grant one additional extension of time not exceeding twelve (12) months, upon written application made within the initial twelve (12) month period, without further notice or hearing. The right to so extend said time shall not include the right to grant additional relief by expanding the scope of the variance.

G.   Amendments To Approved Variances: Amendments to a variance may be obtained by application in the same manner as provided for an original variance. (Ord. 2009-0-019, 3-23-2009; amd. Ord. 15-183, 11-2-2015; Ord. 22-18, 3-21-2022; Ord. 25-111, 3-4-2025)

## 7-7-6: MASTER SIGN PLAN:

For new commercial development with multiple tenants, where more than one wall sign, awning or canopy is proposed, the applicant must submit a master sign plan for review and approval by the Zoning Administrator. The purpose of a master sign plan is to coordinate signs on multi-tenant buildings, and create a plan that establishes a building or site's overall sign design, which then provides direction to future tenants. A master sign plan must include, at a minimum, criteria and specifications for general appearance, location, lighting, and approved construction materials. (Ord. 2009-0-019, 3-23-09)

## 7-7-7: ESTABLISHMENT OF SIGN OVERLAY DISTRICTS:

A.   Sign Overlay Districts: The following sign overlay districts are established, and are mapped in subsection 7-7-7C of this section:

1.   Residential Sign Overlay District: The purpose of the residential sign overlay district is to ensure proper regulation of signs common to residential areas for both limited nonresidential uses that need to identify their location and services, and the variety of temporary and noncommercial signs residents may require, provided in a manner that is not contrary to the established predominant residential character of the district.

2.   Downtown Sign Overlay District: The purpose of the downtown sign overlay district is to ensure that signs within the downtown are compatible with the character and image of the downtown, and provide businesses with a number of alternatives for identifying their premises and the goods and/or services sold on the premises to pedestrian and automotive patrons.

3.   Neighborhood Commercial Sign Overlay District: The purpose of the neighborhood commercial sign overlay district is to ensure that signs within these areas are able to balance the needs of commercial users located within or adjacent to residential neighborhoods to identify their premises and the goods and/or services sold on the premises without negative impact to the character of the surrounding residential neighborhoods. Signs within the neighborhood commercial areas are to be primarily oriented toward the pedestrian.

4.   Corridor Commercial Sign Overlay District: The purpose of the corridor commercial sign overlay district is to ensure that signs located along major arterials provide an effective means of identifying their premises and the goods and/or services sold on the

premises, as well as presenting a positive and coordinated appearance along the roadway. Signs within the corridor commercial areas are to be primarily oriented toward the automobile.

   B.   Hospital Use: A hospital that falls within any of the sign overlay districts established is subject to the regulations for a "hospital", as defined in this article, provided under section 7-7-17 of this article.

   C.   Sign Overlay District Location: The sign overlay districts are shown in figure 7.7.7-1, as follows:



**Figure: 7.7.7-1**                                                    *Data Source: Village of Oak Park

# Sign Overlay Districts Map

Sign Ordinance Update          **March 2009**          C A M I R O S
Oak Park, Illinois



(Ord. 2009-O-019, 3-23-09)

## 7-7-8: DIMENSION MEASUREMENT:

   A.   Computation Of Sign Area: Sign area is calculated as described in this section.

1.   For signs on a background, the entire area of the background shall be calculated for sign area, including any material or color forming the sign face or background used to differentiate the sign from the structure against which it is placed. Sign area does not include any supporting framework or bracing, unless such framework or bracing is part of the message or sign face.





2.   For signs consisting of freestanding letters or logos, the area of a sign face ("sign area") is calculated by means of the smallest square, circle, rectangle or triangle, or combination thereof, that will encompass the extreme limits of the writing, representation, emblem or other display. Sign area does not include any supporting framework or bracing, unless such framework or bracing is part of the message or sign face. Window signs printed on a transparent film and affixed to a window pane shall be considered freestanding letters or logos, provided that the portion of the transparent film around the perimeter of the sign message maintains the transparent character of the window and does not contain any items in the sign message.



3.   The sign area of free form or sculptural (nonplanar) signs is calculated as fifty percent (50%) of the sum of the area of the four (4) vertical sides of the smallest cube that will encompass the sign.



4.   For a double faced sign, if the interior angle between two (2) sign faces is forty five degrees (45°) or less, the sign area is computed as the area of one face only. If the angle between two (2) sign faces is greater than forty five degrees (45°), the sign area is computed as the sum of the areas of the two (2) faces.

B.   Measurement Of Sign Height: Sign height is measured as described below. When measuring sign height, the height of the entire structure, including decorative elements, must be included. Sign height is measured from the elevation of the grade at the midpoint of the sign.

1.   Pole and monument signs: The vertical distance measured from the grade to the highest point of the sign.



2.   Signs attached to buildings: The vertical distance from the base of the building to which a sign is attached to the highest point of the sign.



(Ord. 2009-0-019, 3-23-09)

## 7-7-9: GENERAL CONSTRUCTION AND DESIGN STANDARDS:

The following standards apply to all signs requiring permits, unless specifically noted otherwise:

   A.   Location:

   1.   Only signs placed by federal, state and/or local government may be erected upon public property, unless a sign's placement has been authorized by the Village. Any sign placed on public property without authorization may be removed by the Village without notice.

   2.   No sign may be erected on private property without prior consent of the owner and, when applicable, issuance of a sign permit.

   3.   No sign mounted on the exterior of a building shall cover any windows, doors or any architectural features.

   4.   On a corner lot, no freestanding sign over two feet (2') tall may be placed within the clear sight area. The "clear sight area", as defined in section 25-1-8 of this code, is a triangle with one point at the intersection of the intersecting streets' centerlines, and the other two (2) points located on each street's centerline one hundred feet (100') away from the intersection of said centerlines. The clear sight area is illustrated below.



B.   Sign Structure And Installation: Supports and braces shall be an integral part of the sign design. Supports or braces shall be hidden from public view to the extent technically feasible. All signs attached to a building shall be installed and maintained so that wall penetrations are watertight and the structure does not exceed allowable stresses of supporting materials. All fasteners used to attach signs to a structure or building shall be properly sized for the design loads and material of the support, have a minimum cross section diameter of one-fourth inch ($^{1}/_{4}$"), and be made of corrosion resistant material.

C.   Design Loads (Wind, Direct, And Snow): All signs and awnings must be designed and constructed to withstand their self-weight (dead load), a wind pressure of no less than thirty (30) pounds per square foot, snow loads as required by the Village Code, and ASCE/SEI minimum design loads for buildings and other structures.

D.   Illumination:

1.   Any sign illumination, including gooseneck reflectors and internally illuminated signs, and all electronic signs must be designed, located, shielded and directed to prevent the casting of glare or direct light upon roadways and surrounding properties, or the distraction of motor vehicle operators or pedestrians in the public right of way. In the case of internally illuminated signs, the sign face must function as a filter for any illumination.

2.   No sign illumination shall exceed one (1) foot candle of illumination at the property line, except for projecting signs and wall signs where illumination shall not exceed one (1) foot candle at its face.

3.   The use of neon lighting as an accent is permitted for projecting, window and wall signs in the downtown, neighborhood commercial and corridor commercial sign overlay districts, subject to the following:

a.   Neon lighting shall be used as an accent material on projecting and wall signs, such as for letters, logos and/or sign details. No projecting, window or wall sign may be entirely illuminated with neon.

b.   Neon lighting on projecting and wall signs shall not be illuminated during the daylight hours. When lit, neon lighting must be continuously illuminated. Flashing neon is prohibited.

c.   Neon lighting on projecting and wall signs shall not be combined with any reflective materials (e.g., mirrors, polished metal, highly glazed tiles, or other similar materials) that would cause glare and increase the spread of light.





4. Any lighting, either incandescent, fluorescent, neon or other light source, including strip lighting, for outlining buildings or elements, such as doors and windows is prohibited.

5. Any sign that uses illumination shall be turned off while the related business is not open to the public for regular distribution of goods or services.

E. Landscaping: All ground signs must be landscaped at the base of the sign in accordance with the following:

1. Landscaping must extend a minimum of two feet (2') from the sign base on all sides. All landscaping must be maintained in good condition, and free and clear of rubbish and weeds. Landscaping around the base of a sign is included in the total amount of landscaping required on a site, if applicable.

2. Ground signs (monument or pole) must be landscaped with small shrubs a minimum of eighteen inches (18") in height at planting. The remainder of the landscaped area must be planted with perennials, turf or other ground cover. If the ground sign is designed with a decorative base, landscaping requirements may be waived as part of sign permit approval.

F. Glass: Glass forming any part of a sign must be safety glass.

G. Lettering: All letters, figures, characters or representations in cutout or irregular form, maintained in conjunction with, attached to, or superimposed upon any sign must be safely and securely built or attached to the sign structure.

H. Items Of Information:

1. All signs must limit the number of items of information on any single sign face to no more than six (6) items to prevent traffic hazards for passing motorists and to minimize the cluttered appearance of signs.

2. Each piece of information on a sign shall be defined as an item of information. For example, each of the following would be defined as one item of information: a telephone number, the name of the business, even if multiple words, or the business logo. If the sign advertises products or services, each product or service would be one item of information. The street number address of the business is not counted as an item of information.



3. In the case of an electronic sign, the electronic portion of the sign counts as one item of information. Changeable message signs, where the items of information are changed manually, are also counted as one item of information. For a sign that contains a time and temperature component, the time and temperature component shall not be counted as one item of information.

4. All signs on a zoning lot must be related to goods and/or services sold or offered on the premises, with the exception of noncommercial or political signs.

5. Ground signs for multi-tenant commercial buildings used to advertise which tenants are located within the development, are limited to one item of information per tenant within the development, in addition to the name and address of the development.

6. Directory signs and hospital signs are exempt from the items of information limitation.

I. Maintenance: All signs shall be kept and maintained in a safe, neat and orderly condition and appearance, and shall be repainted or otherwise maintained periodically by the owner to prevent corrosion or deterioration caused by the weather, age or any other condition, and to keep the same in a safe, neat and orderly condition and appearance. All signs must be maintained to prevent any kind of safety hazard, including faulty sign structures, a fire hazard or an electrical shock hazard.

J. Design Criteria: The purpose of the design criteria set forth below is to establish a checklist of those items relative to signs that affect the physical aspect of Oak Park's environment. Pertinent to signs is the design of the sign and its relation to building and structures, planting, street furniture and miscellaneous other objects.

The following criteria are not intended to restrict imagination, innovation or variety, but rather to assist in focusing on design principles that can result in creative solutions that will develop a satisfactory visual appearance within the Village, preserve property values and promote the public health, safety and welfare:

1. Every sign shall have good scale and proportion in its design and in its visual relationship to buildings and surroundings.

2. Sign materials, size, color, lettering, location and arrangement shall be an integral part of site and building design.

3. The colors, materials and lighting of every sign shall be restrained and harmonious.

4. The number of graphic elements on a sign shall be held to the minimum needed to convey the sign's major message, and shall be composed in proportion to the area of the sign face. Text should be kept to a minimum.

5. Lighting for signs shall be in harmony with the signs' and the project's design. If external lighting is used, it should be arranged so the light source is shielded from view.

6. Sign supports and braces shall whenever possible be an integral part of the sign design. Necessary supports or braces shall whenever possible be hidden from public view. (Ord. 2009-0-019, 3-23-2009; amd. Ord. 2014-0-11, 2-18-2014; Ord. 22-18, 3-21-2022)

## 7-7-10: OBSOLETE, ABANDONED OR UNSAFE SIGNS:

A. Obsolete Or Abandoned Signs: Any sign, whether existing on or erected after the effective date of this article, which advertises a business no longer being conducted or a product no longer being sold in or from the premises to which the sign relates, shall be taken down and removed by the owner or agent of the building, structure or premises upon which such sign is found. Removal shall be effected within twenty (20) days after written notice from the Permits and Development Division of the Development Services Department. If such a sign is not removed after such twenty (20) day period, the Permits and Development Division of the Development Services Department is authorized to have the sign removed. Any reasonable cost incident thereto shall be filed as a lien against the property where the sign was located.

B. Unsafe Signs: When any sign becomes insecure, in danger of falling, or otherwise unsafe, or if any sign shall be unlawfully installed, erected or maintained in violation of any of the provisions of this article or any other provisions of this code, the owner thereof or the person or firm maintaining same shall, upon written notice of the Permits and Development District of the Development Services Department, forthwith in the case of immediate danger, and in any case within no more than ten (10) days, make such sign conform to the provisions of this article or remove it. (Ord. 2009-0-019, 3-23-2009; amd. Ord. 15-183, 11-2-2015; Ord. 25-111, 3-4-2025)

## 7-7-11: PROHIBITED SIGNS:

It is unlawful to erect or maintain any of the following signs:

A. Signs with flashing or blinking lights or other means not providing constant illumination including strobe lights, moving or fixed spotlights and floodlights.

B. Moving signs. No sign or part of any sign shall move or give the illusion of movement in any manner.

C. Illegally affixed signs.

D. Permanent banners and pennants. This does not include temporary banners and pennants permitted in accordance with this article.

E. Roof signs.

F. Projecting signs in the residential sign overlay district.

G. Portable signs.

H. Signs of an obscene nature.

I. Signs placed or painted on parked vehicles where the primary purpose is to advertise a product or service, or to direct the public to a business or activity located on or off the premises are prohibited. Signs displayed on trucks, buses or other vehicles, which are being operated and stored in the normal course of a business, such as signs indicating the owner or business that are located on delivery trucks, moving vans and rental trucks, are permitted, provided that the primary purpose of such vehicles is not the display of signs, and that they are parked or stored in areas appropriate to their use as vehicles. Vehicle for sale signs are also permitted in accordance with subsection 7-7-13B4 of this article.

J. Signs which constitute a traffic hazard, including those signs that:

1. Obstruct free and clear vision at any street, intersection, parking lot entrance or exit, or driveway.

2. Interfere with, obstruct the view of, or may be confused with any authorized traffic sign, signal or device because of its position, shape or color, including signs illuminated in red, green or amber color to resemble a traffic signal.

3. Make use of the words "stop", "look", "detour", "danger" or any other word, phrase, symbol or character in a manner that misleads, interferes with, or confuses traffic.

K. Signs which obstruct any ingress or egress, including doors, windows or fire escapes.

L. Off premises signs, except for transit shelter signs.

M. Any strip lighting, such as but not limited to, incandescent, fluorescent, or neon lighting visible from, or applied to, the exterior outlining buildings, doors or windows or other architectural elements is prohibited. (Ord. 2009-0-019, 3-23-2009; amd. Ord. 2011-0-63, 10-3-2011; Ord. 22-18, 3-21-2022)

## 7-7-12: EXEMPT SIGNS:

The following signs shall be allowed without a sign permit:

A. Bulletin Board: One bulletin board not more than twelve (12) square feet in surface area for a place of worship, library, school or other public building, provided such sign shall be located on the same zoning lot as the principal building.

B. Temporary Construction Sign: Temporary construction signs, subject to the regulations of subsection 7-7-13B7 of this article.

C. Warning Sign: Warning signs, such as "no trespassing", "beware of dog", etc., each not more than one square foot in size and not to exceed four (4) per zoning lot.

D.   Official Flags, Banners, Emblems Or Historical Markers: Official federal, state or local government flags, banners, emblems or historical markers.

E.   Official Traffic, Directional And Informational Signs And Notices: Official federal, state or local government traffic, directional and informational signs and notices issued by any court, person or officer in performance of a public duty or any other sign that is required to be posted by any government agency.

F.   Hazard Signs: Signs warning of construction, excavation or similar hazards so long as the hazard exists.

G.   Holiday Decorations: Holiday decorations.

H.   Political And Noncommercial Signs: These signs are permitted on private property only and require consent of the property owner.

I.   Temporary A-Frame Signs: Temporary A-frame signs, subject to the regulations of subsection 7-7-13B1 of this article.

J.   Temporary Banner Signs: Temporary banner signs, subject to the regulations of subsection 7-7-13B2 of this article.

K.   Temporary Vehicle For Sale Signs: Temporary vehicle for sale signs, subject to the regulations of subsection 7-7-13B4 of this article.

L.   Temporary Window Signs: Temporary window signs, subject to the regulations of subsection 7-7-13B6 of this article.

M.   Miscellaneous Information Signs: The following types of miscellaneous information signs shall be exempt from sign permit requirements:

1.   Matter appearing on gasoline pumps, and service station rate signs, including the names of grades of fuel and prices and conditions relating to prices such as full or self-service.

2.   Matter appearing on newspaper vending boxes.

3.   Matter appearing on or adjacent to entry doors such as "push", "pull", "open" and/or "closed".

4.   Matter appearing on display windows or doors denoting hours of operation, credit cards accepted, and similar information.

5.   Information pertaining to the operating instructions of vending machines and automatic teller machines, including bank logos on the face of ATM machines.

N.   Signs Showing Location Of Public Telephones And Underground Facilities: Signs showing the location of public telephones and signs placed by utilities to show the location of underground facilities.

O.   Directory Signs: Directory signs no more than six (6) square feet in surface area.

P.   Real Estate Signs: In all sign overlay districts, one real estate sign no more than sixteen (16) square feet in surface area for condominium multiple-family dwellings, and in the downtown, neighborhood commercial and corridor commercial sign overlay districts, one commercial real estate sign no more than sixteen (16) square feet in surface area per street frontage, which advertises the sale or rental of the premises on the lot upon which the sign is located.

Q.   Traffic Control Signs: Traffic control signs and other such signs, other than advertising signs, designed for the public safety and convenience, may be authorized by the Board of Trustees of the Village.

R.   Accessibility Signs: All signs required for compliance with accessibility acts and codes.

S.   Directional Sign: Any on premises sign, be it a pole, monument or other type of sign, providing directions necessary or convenient for motorists or pedestrians coming onto premises including signs marking entrances and exits, parking areas, loading zones or circulation directions. Except when for hospital use, directional signs shall not exceed four (4) square feet and, if a pole or monument sign type, shall not be higher than four feet (4') in height.

T.   Barber Pole: A pole painted in spiral stripes used as a sign by a barbershop or hairdresser for advertisement. One pole sign no more than two feet (2') in length and projecting no more than twelve inches (12") from a building wall to which it is attached.

U.   Construction Fence Wrap Signs: Construction fence wrap signs, subject to the regulations of subsection 7-7-13B7 of this article.

V.   Murals: Murals as defined in section 7-7-3 above. (Ord. 2014-0-66, 10-6-2014; amd. Ord. 22-18, 3-21-2022)

## 7-7-13: TEMPORARY SIGNS:

A.   General Regulations For All Temporary Signs:

1.   Any sign listed in section 7-7-11, "Prohibited Signs", of this article is prohibited.

2.   Temporary signs must be related to goods and/or services sold on the premises, except for noncommercial or political messages. Temporary off premises signs are prohibited.

3.   No temporary sign may be illuminated.

4.   All temporary signs must remain in good condition during the display period. Throughout the display period, corrective action must be taken immediately should there be any problems with the appearance, condition or maintenance of the sign and/or support hardware.

5. Certain types of temporary signs are controlled by the provisions of section 7-7-12, "Exempt Signs", of this article. Those temporary signs not listed in section 7-7-12 of this article are controlled by these provisions.

B.    Regulations By Temporary Sign Type: Temporary signs must comply with the regulations contained in subsection 7-7-13A, "General Regulations For All Temporary Signs", of this section and the following:

1.    Temporary A-Frame Signs:

a.    Temporary A-frame signs are permitted only within the downtown and neighborhood commercial sign overlay districts.

b.    Temporary A-frame signs are limited to six (6) square feet in area and four feet (4') in height.

c.    The use of temporary A-frame signs is limited to business hours only. Signs must be stored indoors at all other times. Temporary A-frame signs must not be used outdoors when high winds or heavy snow conditions exist.

d.    Only one temporary A-frame sign is permitted per business. A minimum twenty foot (20') separation is required between all temporary A-frame signs.

e.    A temporary A-frame sign must be placed within fifteen feet (15') of the primary entrance of the business, and must not interfere with pedestrian traffic or violate standards of accessibility as required by the ADA or other accessibility codes. Placement of temporary A-frame signs must maintain a five foot (5') sidewalk clearance at all times.

f.    Temporary A-frame signs are exempt from sign permit requirements and fees. However, the Village shall monitor compliance with this section for temporary A-frame signs placed in the public right of way.

If an A-frame sign is not maintained in accordance with this article, the Village may serve a notice of noncompliance to the owner of the A-frame sign that the owner must bring the A-frame sign into compliance within five (5) days of service of the notice.

If an owner fails to bring an A-frame sign into compliance within five (5) days after service of a notice, the Village is authorized to remove the A-frame sign to a secure location. The Village shall notify the A-frame sign owner that it must collect the A-frame sign from the secure location within ten (10) days following service of the notice. If the A-frame sign owner does not collect the A-frame sign from its secure location within ten (10) days following notice, the Village is authorized to dispose of the A-frame sign. The A-frame sign owner shall be liable for the Village's reasonable costs of removal and disposal.

2.    Temporary Banners:

a.    Temporary banners are permitted for any nonresidential use in any nonresidential district.

b.    Temporary banners are limited to thirty two (32) square feet in area.

c.    Only one banner is permitted per zoning lot.

d.    No temporary banner may be located higher than the roofline of the building to which it is attached or, if attached to a permanent sign, higher than the sign. There must be no encroachment into the public right of way.

e.    Temporary banners require a sign permit.

f.    Temporary banners are limited to a display of seven (7) days when not related to a date specific or, if date specific, may be erected no earlier than five (5) days prior to the event plus the duration of the event and must be removed within two (2) days after the event. Temporary banners may be erected on a zoning lot no more than four (4) times in a year.

g.    Temporary banners mounted on light poles or Village owned structures within the Village are subject to the following requirements. Temporary banners mounted on light poles or Village owned structures do not include "local government banners" as described in subsection 7-7-12D of this article.

(1)    No banner shall be affixed to any light pole or structure except by authorization of the Department of Public Works. A sign permit and an obstruction permit are required.

(2)    Banners may not block any public signs or lighting.

(3)    No banner shall exceed a maximum size of thirty inches (30") in width and seventy two inches (72") in length.

(4)    All banners must serve a legitimate public interest and shall not contain any advertising other than that which is directed toward the specific event. Sponsorship logos may only take up to twenty five percent (25%) of the space on the banner.

(5)    Banners shall not be in place earlier than two (2) weeks before the event and must be removed within three (3) days after the event. Seasonal banners may remain in place for up to three (3) months as long as they are still in serviceable condition. Business district banners may remain in place for up to one year.

(6)    Banner material shall be of a durable, weather resistant material like canvas, nylon or vinyl coated fabric. Grommets must be installed in the top and bottom corners of the banner one inch (1") above the bottom rod pocket and one inch (1") below the top rod pocket. Grommets shall be of brass construction and installed in a minimum of four (4) layers of fabric.

(7)    If the Village must remove a banner or perform maintenance work on a banner, the cost for such work will be billed to the organization for which the banners are being installed.

(8)    The applicant shall submit the following information to the Village as part of the sign permit application:

(A)    The name of company that will perform the installation work.

(B)   A sketch or copy of artwork that will appear on the banners.

(C)   A copy of an insurance certificate naming the Village as additionally insured on the liability policy of the organization for which the banners are installed. Minimum coverage must be one million dollars ($1,000,000.00). This insurance coverage is independent of the insurance required by the contractor installing the banners.

(D)   The name, address and phone number of contact person for maintenance of banners or emergency relating to banners.

(E)   A timetable for the installation and removal of banners, which must comply with the above time limits.

3.   Temporary Pole Signs:

a.   Temporary pole signs are permitted for any nonresidential use in any nonresidential district.

b.   Temporary pole signs are limited to thirty two (32) square feet in area and six feet (6') in height.

c.   All temporary pole signs must be set back ten feet (10') from any property line.

d.   Temporary pole signs require a sign permit.

e.   Temporary pole signs are limited to a display of seven (7) days when not related to a date specific or, if date specific, may be erected no earlier than five (5) days prior to the event plus the duration of the event and must be removed within two (2) days after the event. Temporary pole signs may be erected on a zoning lot no more than four (4) times in a year.

4.   Temporary Vehicle For Sale Signs:

a.   Vehicles are permitted to display a "for sale" or similar sign in sales lots where the sale of new or used vehicles is permitted.

b.   A vehicle may be parked and displayed for sale, with a "for sale" sign, by a private individual at that individual's home, including in the driveway, as well as driven and parked throughout the normal daily routine. Once the vehicle is sold, the sign must be removed.

c.   The vehicle must remain drivable with the "for sale" sign in place. Any "for sale" sign over four (4) square feet in sign area requires a sign permit.

d.   There are no time limit restrictions on vehicle "for sale" signs. Vehicle "for sale" signs are not counted toward the number of temporary signs permitted on a zoning lot.

5.   Temporary Wall Signs:

a.   Temporary wall signs are permitted for any nonresidential use in any nonresidential district.

b.   Temporary wall signs are limited to thirty two (32) square feet in area.

c.   No temporary wall sign may be located higher than the roofline of the building to which it is attached. There must be no encroachment into the public right of way. No temporary wall sign may cover windows, doors or architectural features.

d.   Temporary wall signs require a sign permit.

e.   Temporary wall signs are limited to a display of seven (7) days when not related to a date specific or, if date specific, may be erected no earlier than five (5) days prior to the event plus the duration of the event and must be removed within two (2) days after the event. Temporary wall signs may be erected on a zoning lot no more than four (4) times in a year.

6.   Temporary Window Signs:

a.   Temporary window signs are permitted for any nonresidential use in any nonresidential district.

b.   Temporary window signs are limited to twenty five percent (25%) of the window area. Window area is counted as a continuous surface until divided by an architectural or structural element. Mullions are not considered an element that divides window area.





c.   A sign attached to, placed upon or printed on the interior of a window or door of a building intended for viewing from the exterior of such a building is considered a temporary window sign.

d.   Temporary window signs are exempt from sign permit requirements.

e.   There is a thirty (30) day time limit restriction on temporary window signs.

f.   Temporary solid window coverings intended to block interior construction activities are permitted. If a sign is printed on, affixed to, in contact with or etched on the window and intended for viewing from the exterior of a window, the sign shall not exceed twenty five percent (25%) of the total window area.

7.   Temporary Construction Signs:

a.   Construction Signs: One construction sign no more than sixteen (16) square feet in surface area in the residential sign overlay district and no more than sixty four (64) square feet in surface area in the downtown, neighborhood commercial and corridor commercial sign overlay districts, which denotes the architect, contractor or engineer, when placed on the zoning lot which is a construction site of such architect, contractor or engineer.

b.   Construction Fence Wrap Signs: Construction fence wrap signs are permitted.

(1)   Temporary construction fence wrap signs require approval by the Zoning Administrator.

(2)   The text for a temporary construction fence wrap is limited to twenty five percent (25%) of the surface area of the construction fence. Renderings of the building under construction shall not be included in the area calculation.

(3)   Temporary construction fence wrap signs are limited to a display of eighteen (18) months after initial approval by the Zoning Administrator for the sign. If construction of an applicable building begins within the eighteen (18) month display period, a sign may continue to be displayed for an additional nine (9) months after the expiration of the eighteen (18) month period. If construction does not commence within eighteen (18) months, the sign shall be removed within seven (7) calendar days after the expiration of the eighteen (18) month display period. If a sign is continued to be displayed after said period, the property shall be subject to a five hundred dollar ($500.00) fine for every seven (7) calendar days that the sign is displayed.

(4)   The wrap material shall be of a durable, weather resistant material like canvas, nylon, or vinyl coated fabric.

(5)   Temporary construction fence wrap signs shall not be displayed at the same time as a construction sign.

(6)   Construction fence wrap signs may include the following content:

(A)   A rendering, elevation drawing of building, or zoning diagram of the building exterior;

(B)   Anticipated project completion date;

(C)   The name, address, and telephone number of the owner of the property;

(D)   The name and telephone number of the general contractor; and

(E)   General information regarding the price and size of units and other similar information.

c.   Construction Window Signs: Temporary solid window coverings intended to block interior construction activities are permitted. If a sign is printed on, affixed to, in contact with or etched on the window and intended for viewing from the exterior of a window, the sign shall not exceed twenty five percent (25%) of the total window area.

8.   Temporary Attention Getting Devices: Attention getting devices are permitted for special events and for new business openings subject to the following:

a.   Attention getting devices for special events may be erected on a zoning lot no more than four (4) times in a year beginning on the first date that a permit is issued for an attention getting device.

b.   Attention getting devices are limited to a display of thirty (30) days when not related to a date specific or, if date specific, may be erected no earlier than five (5) days prior to an event plus the duration of the event and must be removed within two (2) days after the event.

c.   Attention getting devices are limited to a display of sixty (60) days in conjunction with a new business opening. (Ord. 16-110, 9-19-2016; amd. Ord. 22-18, 3-21-2022)

## 7-7-14: GROUND SIGN CONSTRUCTION AND DESIGN STANDARDS:

Ground signs are permitted subject to the following:

A.   Ground signs are permitted only in the districts listed in tables 1 and 2 of this section, subject to the regulations of tables 1 and 2 of this section and this article.

B.   One ground sign is permitted per street frontage of a zoning lot, whether a monument or pole sign. In addition to a ground sign, drive-through establishments are permitted one menu board sign, whether constructed as a pole or monument sign, no more than forty (40) square feet in sign area, no more than six feet (6') in height and no less than twenty feet (20') from any lot line.

C.   The primary support of a pole sign must be erected in such a manner that at least forty two inches (42") of the length of the support is underground. The Development Services Department may require proper documentation from a structural engineer or manufacturer that indicates proper installation instructions for the sign, as well as the sign's ability to withstand wind pressures.

D.   No part of any ground sign may be located within the public right of way.

E.   Time and temperature devices are permitted as part of ground pole and monument signs. Such devices are included in all calculations of sign area.

TABLE 1

GROUND SIGNS - MONUMENT SIGNS

| Sign Overlay Districts | Maximum Sign Area | Maximum Sign Height | Minimum Setback | Additional Regulations |
|---|---|---|---|---|
| Residential sign overlay district | 32 sq. ft. | 6 ft. | 18 in. | Permitted for multi-family and nonresidential uses only |
| Downtown sign overlay district | 32 sq. ft. | 6 ft. | 18 in. | n/a |
| Neighborhood commercial sign overlay district | 32 sq. ft. | 6 ft. | 18 in. | n/a |
| Corridor commercial sign overlay district | 48 sq. ft. | 8 ft. | 18 in. | n/a |

TABLE 2

GROUND SIGNS - POLE SIGNS

| Sign Overlay Districts | Maximum Sign Area | Maximum Sign Height | Minimum Setback | Additional Regulations |
|---|---|---|---|---|
| Residential sign overlay district | 24 sq. ft. | 5 ft. | 18 in. | Permitted for multi-family and nonresidential uses only |
| Downtown sign overlay district | Prohibited | Prohibited | Prohibited | Prohibited |
| Neighborhood commercial sign overlay district | Prohibited | Prohibited | Prohibited | Prohibited |
| Corridor commercial sign overlay district | 50 sq. ft. | 20 ft. | 18 in. | n/a |

(Ord. 2009-0-019, 3-23-09; amd. Ord. 22-18, 3-21-2022; Ord. 25-111, 3-4-2025)

**7-7-15: BUILDING SIGN CONSTRUCTION AND DESIGN STANDARDS:**

A.   Maximum Surface Area; All Exterior Signs:

1.   The surface area of all exterior signs, including permanent window signs, shall not exceed, in the aggregate, three (3) square feet per linear foot of width of lot for the first one hundred (100) linear feet, and one square foot per linear foot of width of lot for each linear foot in excess of one hundred (100).

2.   Width of lot shall be measured at the front lot line; provided, however, for lots having more than one street line, width of the lot shall be measured at the street line of the greatest dimension lying in a frontage which is wholly within a commercial or industrial district; or, in the street line of the shortest dimension if the lot has no street line lying in a frontage which is wholly within a commercial or industrial district.

B.   Projecting Signs: Projecting signs are permitted in the downtown, neighborhood commercial and corridor commercial sign overlay districts, subject to the following. Projecting signs are prohibited in the residential sign overlay district.

1.   The maximum area of a projecting sign is as follows:

a.   Downtown sign overlay district: Twenty four (24) square feet.

b.   Neighborhood commercial sign overlay district: Twenty four (24) square feet.

c.   Corridor commercial sign overlay district: Thirty two (32) square feet, except for lots fronting on Madison Street and Garfield Street, where the maximum allowable area is twenty four (24) square feet.

2.   One projecting sign per ground floor establishment with frontage on a public street is permitted. In the case of a multi-tenant building, one additional projecting sign identifying the name of the multi-tenant development is permitted.

3.   A projecting sign must be pinned away from the wall at least six inches (6"). Projecting signs shall not project more than six and one-half feet (6.5') from the face of the building to which they are attached, including the area between the sign and the face of the building, and in no event more than within two feet (2') of the curb line of any street or alley. Provided, however, where more than one-half ($^1/_2$) of the frontage in a block is located in a residence district, no sign, other than a sign permitted in a residence district, shall project more than twelve inches (12") beyond the face of the building or structure, unless a yard is provided, the depth of which is in excess of that required in the business district, in which case, a sign may project into the nonrequired portion of such yard, but in no event shall such sign be closer to the street line than:

a.   The required residential setback; or

b.   The actual average setback, for the residentially zoned portion of the frontage, whichever is less. Unless such sign is one hundred feet (100') or more from the residentially zoned property, then said sign shall project not more than six feet six inches (6'6") into the public right of way and in no event more than within two feet (2') of any street or alley.



4.   The bottom of any projecting sign must be at least eight feet (8') above the sidewalk or thoroughfare. The top of a projecting sign may be no higher than twenty feet (20') above the sidewalk or thoroughfare; providing that no projecting sign affixed to a building may project higher than the building height, including the sign support structure.



5.   Projecting signs, including frames, braces, and supports must be designed by a licensed structural engineer or manufacturer. No projecting sign may be secured with external wire, chains, cables, strips of wood or nails nor may any projecting sign be hung or secured to any other sign. Any removable part of a projecting sign, such as the cover of a service opening, must be securely fastened internally by chains or hinges.

6. External illumination, such as gooseneck type lighting, is permitted on projecting signs provided that illumination is concentrated on the area of the sign face only. Projecting signs may be internally illuminated in the downtown and corridor commercial sign overlay districts only, provided internally illuminated signs are constructed with an opaque background with only letters, logos and/or details as translucent features.

7. Time and temperature devices are permitted as part of projecting signs. Such devices must be included in all calculations of sign area.

C. Window Signs (Permanent): Permanent window signs are permitted in the downtown, neighborhood commercial and corridor commercial sign overlay districts and for nonresidential uses in the residential sign overlay district, subject to the following:

1. Permanent window signs affixed to or painted on the inside of a window shall be considered to be wall signs subject to all such regulations and shall occupy no more than twenty five percent (25%) of the surface of each window area. Window area is counted as a continuous surface until divided by an architectural or structural element. Mullions are not considered an element that divides window area.

2. The total area of all temporary and permanent window signs must not occupy more than fifty percent (50%) of the total window area. Temporary window signs are subject to the regulations of subsection 7-7-13B6b of this article.

3. Neon window signs are considered a window sign and must be included in the twenty five percent (25%) limitation. However, no more than fifteen percent (15%) of total window area may be comprised of neon window signs. Neon window sign area is measured by the height and width of the sign. Neon window signs are prohibited in all residential sign overlay districts.

4. All ground floor street-side building facades must allow pedestrians to view goods and activities inside and encourage walking and browsing. Substantially opaque, frosted, etched, tinted, black, and reflective mirror glass are prohibited.

D. Wall Signs: Permanent wall signs are permitted in the downtown, neighborhood commercial and corridor commercial sign overlay districts and for nonresidential uses in the residential sign overlay district, subject to the following:

1. Within the downtown, neighborhood commercial and corridor commercial sign overlay districts, the maximum size of a wall sign shall be established at one square foot per linear foot of zoning lot frontage. Within residential districts, wall signs are permitted at a size of one square foot per linear foot of zoning lot frontage up to a maximum size of forty (40) square feet.

a. For an interior lot, the maximum size of a wall sign shall be established at one square foot per linear foot of zoning lot frontage as measured along the front lot line.

b. For a corner lot, the maximum size of a wall sign located on each building wall shall be established at one square foot per linear foot of zoning lot frontage as measured along the front or corner side lot line of that building wall. The size of a wall sign on each side of the building shall be limited to the square footage calculated on that side only. In no case shall the square footage permitted for the building wall located along the front lot line and the square footage permitted for the building wall located along the corner side lot line be combined to create a larger sign on a wall other than that permitted on each individual wall.

c. In a multi-tenant structure, each tenant shall be permitted a wall sign of one square foot per linear foot of business frontage, with a minimum of twenty five (25) square feet permitted for a wall sign for each tenant. In no case shall the total amount of wall signs on the structure exceed one square foot per linear foot of business frontage or the sum total of twenty five (25) square feet per tenant, whichever is greater. If a multi-tenant structure is located on a corner lot, the maximum size of the wall sign located on the wall along the corner lot line shall be limited to one square foot per linear foot of zoning lot frontage as measured along the front lot line, with a minimum of twenty five (25) square feet per tenant permitted.

2. If there is a secondary entrance, an additional wall sign is permitted but shall be limited to no more than sixteen (16) square feet and shall only indicate the name of the business and the words "Entrance", "Enter" or similar term.

3. Wall signs must be safely and securely attached to the building wall. Wall signs must be affixed flat against the building wall and must not project more than twelve inches (12") from the building wall. No aesthetic sign elements may be affixed or painted directly on a building's exterior facade. All signs must be mounted in such a way that they may be removed with minimal impact on the building's exterior wall.

4. No wall sign affixed to a building, including sign support structure, may project beyond the ends or top of the wall to which it is attached. On existing buildings, a parapet wall must not be constructed for the sole purpose of increasing the allowable height of a wall sign. For new buildings, when a sign is to be mounted on a parapet wall, that parapet wall must be consistent with the architectural design of the building, including building materials. Wall signs may not be attached to unreinforced masonry parapets. Wall signs shall not cover windows, doors or architectural features.

5. Wall signs should be located on the sign frieze or the sign band of the building immediately above the first floor window and below the second floor windowsills in the case of a two-story building. No wall sign shall be permitted to rise above the second story sill line. On one-story buildings, the top of the sign shall be no more than five feet (5') above the top of the main display window on the first floor.

6. Gooseneck reflectors are permitted on all wall signs provided the reflectors must concentrate the illumination upon the area of the sign face only. Internally illuminated signs shall be constructed with an opaque background with only letters, logos and/or details as translucent features. A white or light-colored background is prohibited.

7. Within a multi-tenant commercial development, all wall signs must be located at a generally uniform height on the building wall.

8. Time and temperature devices are permitted as part of wall signs. Such devices are included in all calculations of sign area.

9.   Ghost signs are considered wall signs. Existing ghost signs are exempt from these requirements and are considered conforming. No new wall signs may be painted on buildings or structures.

E.   Awnings And Canopies: Awnings and canopies that are considered an architectural feature of a building and are not used for identifying the premises or the goods and/or services sold are not considered a sign. Awnings and canopies used as signs are considered to be wall signs subject to all such regulations and are further subject to the following regulations:

1.   Awnings and canopies are permitted in any sign overlay district for multi-family residential and nonresidential uses.

2.   All awnings or canopies must maintain a minimum seven foot (7') clearance above grade at all points along the awning. Awnings and supports for canopies must not extend beyond a point two feet (2') from the curb line.

3.   Printing on any individual awning or canopy is limited to thirty percent (30%) of the surface of any side of an awning or canopy.

4.   An awning and canopy sign may be maintained in combination with a wall sign at a particular premises subject to the following requirements:

   a.   The awning and canopy sign shall only have printing on its valance; and

   b.   The awning and canopy sign shall not contain the name of the establishment located at the premises or any other business.

5.   Awnings and canopies shall be constructed out of canvas or canvaslike material treated for fire resistance. Backlit and metal awnings and canopies are prohibited.

6.   Awnings and canopies must be securely attached to and supported by a building. All frames and supports must be made of metal or similar material. Frames and supports may not be made of wood or plastics.

7.   Under awning and under canopy signs are permitted subject to the following:

   a.   Under awning and under canopy signs must be attached to the underside of an awning or canopy. Under awning and under canopy signs must not project beyond the awning.

   b.   Under awning and under canopy signs must maintain a minimum eight foot (8') clearance above the grade directly below the sign.

   c.   Maximum of one under awning and under canopy sign per frontage per tenant.

   d.   Under awning and under canopy signs may not exceed two (2) square feet.

   e.   Under awning and under canopy signs are to be securely fixed with metal supports.

8.   All awnings or canopies shall comply with the following design standards:

   a.   Awnings and canopies shall be compatible in material and construction to the style and character of the building. The color of the awning or canopy shall be compatible with the overall color scheme of the facade.

   b.   When feasible, awnings and canopies shall be generally aligned with others nearby in order to maintain a sense of visual continuity.

   c.   Awnings and canopies shall fit the facade of the building and positioned so that distinctive architectural features remain visible.






(Ord. 2009-0-019, 3-23-2009; amd. Ord. 2014-0-20, 4-7-2014; Ord. 22-18, 3-21-2022)

## 7-7-16: ELECTRONIC SIGN CONSTRUCTION AND DESIGN STANDARDS:

Electronic display screens are permitted in the downtown and neighborhood commercial sign overlay districts only. Electronic message signs are prohibited. Electronic display screens must comply with the following:

   A.   Electronic display screens are limited to six (6) square feet.

   B.   Electronic display screens must be mounted such that the highest portion of the sign is no higher than seven feet (7') above grade and shall not cover prominent architectural features. Electronic display screens that are mounted on, in front of, or inside transparent window areas shall be included in the calculation of window sign area.

   C.   Electronic display screens are permitted as wall or window signs only.

   1.   When an electronic display screen is used as a window sign, the electronic display screen shall be included in the twenty five percent (25%) window sign area maximum for permanent window signs.

   2.   When an electronic display screen is used as a wall sign, the electronic display screen shall be included in the maximum permitted amount of wall sign area.

   D.   Only one electronic display screen is permitted per zoning lot.

   E.   No electronic display screen shall display messages or images of off premises advertising.

   F.   Each message or image displayed on an electronic display screen must be static or depicted for a minimum of eight (8) seconds. Animation, streaming video and images which move or give the appearance of movement are prohibited. No text message may blink, flash or mimic strobe lighting effects.

   G.   No illumination from any electronic display screen may glare into any residential premises or interfere with the safe movement of motor vehicles on public thoroughfares.

   H.   No electronic display screens may have audio speakers or any audio component.

   I.   Electronic display screens must comply with the light trespass requirements of subsection 7-7-9D2 of this article. (Ord. 2009-0-019, 3-23-09)

## 7-7-17: SIGNS FOR HOSPITAL USE:

Signs for a hospital use shall comply with the following regulations for the corridor commercial sign overlay district and this article, except as follows:

   A.   Directional Signs (Permanent):

   1.   Such signs may designate hospital entrances, parking, walkways, emergency room locations, and other hospital related facilities, as well as entrances or exits, by means of symbols or words. There is no limitation on the items of information.

   2.   One directional sign is permitted for each driveway access from a public street. One additional directional sign is permitted for each intersection of drives within a site, to identify traffic routing, entrances and services, such as drive-in lanes. Additional directional signs may be permitted subject to Zoning Administrator approval.

   3.   Directional signs shall be located entirely on the property to which they pertain. Directional signs shall not project beyond the property line.

   4.   Directional signs may have a maximum height of twelve feet (12') and a maximum surface area of fifty (50) square feet.

   5.   Directional signs may be illuminated. (Ord. 2009-0-019, 3-23-09; amd. Ord. 22-18, 3-21-2022)

## 7-7-18: CLASSIC SIGNS:

   A.   Eligibility:

   1.   Any person of the Village may apply for designation of an existing sign, as of the date of adoption of this article, as a classic sign. Classic signs are exempt from area, setback, height, lighting, movement, flashing, placement, type, content, and construction materials requirements of this article.

   2.   To qualify for designation as a classic sign, the sign must:

   a.   Be at least twenty five (25) years old or a duplicate of an original sign where the combined age of the duplicate and original sign is at least twenty five (25) years.

   b.   Possess unique physical design characteristics, such as configuration, message, color, texture, etc.

   c.   Be of extraordinary significance to the Village, regardless of the use identified by the sign.

   B.   Application:

   1.   An application for classic sign status must include plans for sign maintenance, renovation or possible reconstruction, acceptable to the Zoning Administrator.

   2.   Application for classic sign status must be made to the Village Planner, or his/her designee, who schedules a public hearing of the Zoning Board of Appeals and presents his/her recommendations to the Zoning Board of Appeals at a public hearing.

3. The Zoning Board of Appeals shall approve or deny the application.

4. The applicant may appeal a decision of the Zoning Board of Appeals to the Village Board within thirty (30) days of notification of the decision.

C. Maintenance: The owner of a classic sign must ensure that the sign is not structurally dangerous, a fire hazard, an electrical shock hazard, or any other kind of hazard. Classic signs may be rebuilt if damaged.

D. Designated Classic Signs: The following are deemed to be signs of special significance in the Village and are, therefore, exempted from the provisions of this article:

1. Marshall Field marquee and clock.

2. Lake Theater marquee and sign.

3. Oak Park Federal clock/temperature sign (Forsyth Building).

4. Oak Park Trust clock/temperature sign (Oak Park Trust And Savings Bank Building).

5. Petersen's Ice Cream sign (1100 Chicago Avenue). (Ord. 2009-0-019, 3-23-2009; amd. Ord. 25-111, 3-4-2025)

## 7-7-19: NONCONFORMING SIGNS:

Nonconforming signs may be maintained subject to the following regulations:

A. No nonconforming sign shall be expanded or altered to prolong the life of the sign. No nonconforming sign shall be changed to another nonconforming sign.

B. The copy, message or graphic of a nonconforming sign may be changed. A nonstructural component of the sign on which the copy, message or graphic is displayed, such as a plastic or metal panel or insert, may be replaced to the extent necessary to accommodate this change.

C. If the copy, message or graphic of a nonconforming sign cannot be changed without altering a structural component, then such change is not permitted. Structural components include any part of a sign attached directly to the ground or to a building or structure, any part of the supporting structure of a sign without which the sign fails to maintain its structural integrity, or support any part of a sign's electrical or lighting equipment.

D. No nonconforming sign shall be relocated in whole or in part unless, when relocated, it conforms to all of the provisions of this article.

E. Signs which do not conform to the provisions of this article but which lawfully existed and were maintained prior to the adoption hereof shall be removed or made to conform within sixty (60) days after written notice by the Development Services Department when:

1. The use of the establishment changes and the exterior of the building or other site conditions are to be altered; or

2. A sign is damaged by any cause resulting in replacement or repair cost equal to or greater than one-half ($1/2$) of its replacement value at the time the damage occurs; or

3. The maximum cost to bring a sign into conformance with this article is five hundred dollars ($500.00) or less, which shall include the removal of neon, wall and window signs and the removal of neon lighting outlining buildings, doors and windows. If a property owner or agent claims that the cost to bring a sign into conformance with this article is more than five hundred dollars ($500.00), the property owner or agent shall provide a written cost estimate from a reputable sign business to the Village to be exempt from the requirements of this section; or

4. A new business is proposed to be located at the applicable property where the nonconforming sign is maintained and the new business owner or agent proposes to alter the sign at the location and the proposed alteration requires a sign permit pursuant to this article. (Ord. 2013-0-59, 10-21-2013; amd. Ord. 15-183, 11-2-2015; Ord. 22-18, 3-21-2022; Ord. 25-111, 3-4-2025)

## 7-7-20: SIGNS PROJECTING INTO THE PUBLIC RIGHT OF WAY:

Any person who installs and maintains a sign projecting into the public right of way by more than twelve inches (12") shall be required to provide a general liability insurance policy with limits of not less than five hundred thousand dollars ($500,000.00) combined single limit or five hundred thousand dollars ($500,000.00) per occurrence and per aggregate, and shall submit a certificate or policy of insurance as evidence of such coverage, issued by an insurance company licensed to do business in the state of Illinois and having a "Best" rating acceptable to the Village. The effective period of such insurance coverage shall coincide with the period the projecting sign pursuant to this section continues to be in place. (Ord. 15-068, 3-2-2015)

| |
|---|
| **ARTICLE 8** |
| **FEES** |

SECTION:

### 7-8-1: Annual Fee Ordinance

**7-8-2: Administration**

**7-8-3: Waiver Of Fees**

### 7-8-1: ANNUAL FEE ORDINANCE:

The Village Board shall annually adopt an ordinance setting forth the applicable fees and charges due for the various permits, and services authorized by this chapter, including building and construction permit fees and zoning application fees. Whenever reference is made to the "annual fee ordinance", such reference shall mean the most current annual fee ordinance adopted pursuant to this section. By this reference, the annual fee ordinance, as the same may, from time to time, be adopted or amended, is hereby incorporated as if fully set forth herein. (Ord. 15-086, 4-20-2015)

### 7-8-2: ADMINISTRATION:

A.   Plan Review Fee Conditions: Plan review fees shall be nonrefundable. Accessory buildings under five hundred (500) square feet and repairs to one-, two- and three-family homes are exempt from plan review fees. If plans are sent out for review by agencies outside the Village, the plan review fee paid by the Village shall be passed on to the applicant with a two hundred dollar ($200.00) add on fee or ten percent (10%) above Village costs, whichever is greater.

B.   Refunds: No fees shall be refunded when a permit has lapsed after work is started. When a permit is revoked at the request of the applicant prior to lapsing due to time limits, and no work has been done, all but the basic fee and the plan review fee may be refunded.

C.   Plan Self-Certification Program: Illinois licensed architects and structural engineers may apply for annual registration in the Village's plan self-certification program.

1.   Plan Program Description: The self-certification program ("program") allows design professionals to self-certify their drawings for code compliance on projects of limited scope as set forth hereinbelow.

2.   Plan Program Participation Requirement: To qualify for annual participation in the program, Illinois licensed architects and/or structural engineers must meet the following requirements: (Ord. 15-086, 4-20-2015)

a.   Complete and file a program application with the Development Customer Services Department;

b.   Maintain a copy of the applicant's current state of Illinois professional license on file with the Development Customer Services Department; (Ord. 15-086, 4-20-2015; amd. Ord. 15-183, 11-2-2015)

c.   Maintain professional licensure in good standing; (Ord. 15-086, 4-20-2015)

d.   Maintain a copy of a current certification of professional liability insurance on file with the Development Customer Services Department;

e.   Attend all required building code training sessions conducted by the Development Customer Services Department;

(1)   The Director of the Development Customer Services Department will be responsible for determining all training program requirements and content; (Ord. 15-086, 4-20-2015; amd. Ord. 15-183, 11-2-2015)

f.   Pay an annual administrative fee in the amount set forth in the annual fee ordinance.

g.   Once an applicant has satisfied all of the above program requirements, the applicant will be provided with a registration number and certificate that must be presented when submitting project plans.

3.   Requirements For Maintenance Of Existing Certification: To maintain their existing certification on an annual basis, program participants shall satisfy the following requirements: (Ord. 15-086, 4-20-2015)

a.   Maintain minimum levels of performance as established by the Director of the Development Customer Services Department with regard to: (Ord. 15-086, 4-20-2015; amd. Ord. 15-183, 11-2-2015)

(1)   Accuracy and completeness of permit submittal packages;

(2)   Fulfilling annual recertification training requirements;

(3)   Earning a minimum of four (4) continuing education credits or eight (8) contact hours annually in areas related to design or construction of one- and two-family residential structures; and

(4)   Accuracy and completeness of work in accordance with plans and code during on site inspections.

4.   Projects Eligible For Plan Self-Certification Program: Projects which may be processed through the plan self- certification program shall be limited to the following scopes of work on one- and two-family residential and accessory structures which do not require either a zoning variance or review by the Historic Preservation Commission:

a.   Single-story additions at grade level up to five hundred (500) square feet in floor area;

b.   Interior renovations not requiring structural modifications including bathrooms, kitchens, resurfacing walls and ceilings and relocation or removal of nonstructural walls but excluding all basement renovations; (Ord. 15-086, 4-20-2015)

c.   Interior renovations requiring structural modifications only if plans for same are signed and sealed by an Illinois licensed structural engineer or an Illinois licensed architect, if the architect demonstrates his or her qualification in the area of structural design by passing a structural design proficiency examination for residential construction as developed and administered by the Director of the Development Customer Services Department; (Ord. 15-086, 4-20-2015; amd. Ord. 15-183, 11-2-2015)

d.  One-story porches, decks, stairs and railings;

e.  One-story detached garages up to five hundred seventy six (576) square feet in area;

f.  Foundation repairs only if plans for same are signed and sealed by an Illinois licensed structural engineer or an Illinois licensed architect if the architect demonstrates his or her qualifications in the area of structural design in the same manner set forth in subsection 7-8-2C4c of this section;

g.  Window and door replacement;

h.  Accessibility upgrades. (Ord. 15-086, 4-20-2015)

5.  Plan Self-Certification Program Oversight: The Director of the Development Customer Services Department shall be responsible for oversight of the plan self-certification program. The Director shall establish internal program oversight procedures which shall be carried out by department management and plan review staff to ensure the completeness and accuracy of plans subject to the self-certification process. Such internal procedures may include, but shall not be limited to, checklist reviews of all such submitted plans and complete plan review of a periodic random sampling of all such submitted plans. (Ord. 15-086, 4-20-2015; amd. Ord. 15-183, 11-2-2015)

6.  Plan Self-Certification Program Annual Fee: The annual fee for participation in the plan self-certification process shall be three hundred fifty dollars ($350.00). (Ord. 15-086, 4-20-2015)

## 7-8-3: WAIVER OF FEES:

Fees required pursuant to section 7-8-1 of this article (except cost for plan review, bonds, licenses and construction water) are waived for construction on all property entitled to a real estate tax exemption pursuant to article 15 of the Illinois property tax code, 35 Illinois Compiled Statutes 200/15-5 et seq., as amended. When property is entitled to a partial exemption, then said fees shall be reduced in the same ratio as the estimated value of the exempt portion bears to the estimated value of the taxable portion of the property. Said fees shall also be waived insofar as they are applicable to that portion of any work undertaken to make building accessible to the handicapped.

The board may also waive permit fees for any governmental or quasi-governmental agency, charitable organization, or for construction where grant loan funds of the Village of Oak Park are to be used. (Ord. 15-086, 4-20-2015)

---

## ARTICLE 9

## HISTORIC PRESERVATION

---

SECTION:

**7-9-1: Purpose Of Article**

**7-9-2: Definitions**

**7-9-3: Historic Districts**

**7-9-4: Criteria For Designation Of Historic Landmarks And Interior Historic Landmarks**

**7-9-5: Nomination And Preliminary Determination Of Eligibility For Designation As An Historic Landmark Or Interior Historic Landmark**

**7-9-6: Designation Hearing**

**7-9-7: Designation Of Historic Landmarks And Interior Historic Landmarks**

**7-9-8: Work Requiring The Issuance Of A Certificate Of Appropriateness, A Certificate Of Economic Hardship Or A Certificate Of Advisory Review**

**7-9-9: Zoning And Subdivision Actions Affecting Any Nominated, Eligible Or Designated Historic Landmarks Or Designated Historic Districts**

**7-9-10: Acquisition Or Use Of Public Property**

**7-9-11: Review Criteria For Certificate Of Appropriateness; Certificate Of Advisory Review; Noncontributing Resources**

**7-9-12: Procedures For Certificate Of Appropriateness**

**7-9-13: Procedures For Certificate Of Economic Hardship**

**7-9-14: Appeals**

**7-9-15: Advisory Review Procedures**

**7-9-16: Prevention Of Demolition By Neglect**

**7-9-17: Hazardous Structures And Public Nuisances**

**7-9-18: Handicapped Accessibility Provisions**

**7-9-19: Enforcement And Penalties For Violation**

**7-9-20: Judicial Review Of Final Decision**

## 7-9-1: PURPOSE OF ARTICLE:

The purpose of this Article is to promote the economic, educational, cultural and general welfare of Oak Park by:

A.   Providing a municipal process to identify, preserve, protect and enhance the distinctive historic and architectural heritage of Oak Park representing elements of the Village's cultural, social, economic, political and architectural history;

B.   Conserving and improving the value of properties designated as historic landmarks or located within historic districts;

C.   Enhancing the attractiveness of the Village to homeowners, visitors, tourists, and shoppers and, thereby, supporting business, commerce and industry in the Village and providing economic benefits to the Village;

D.   Fostering civic pride in the accomplishments of the past as manifested in properties, structures, improvements and areas of historical and architectural significance within the Village;

E.   Fostering and encouraging the preservation, restoration and rehabilitation of properties, structures, improvements and areas and, thereby, preventing deterioration, dilapidation and blight. (Ord. 1999-0-7, 3-15-1999; amd. Ord. 22-8, 2-7-2022)

## 7-9-2: DEFINITIONS:

For the purposes of this Article, the following words and phrases shall have the following meanings and words and phrases used in the context of this Article but not defined below shall have the meanings ascribed to them in section 1-1-2 of this code and this chapter, other than this Article, including the building, mechanical, electrical and plumbing codes adopted by reference in this Code. All other words and phrases used in the context of this Article shall have the commonly understood meanings normally ascribed to them.

ADVISORY REVIEW: The process of examining the documents prepared by an owner of property and/or an improvement within a historic district that is not a historic landmark which describe proposed construction on such property and/or improvement, which will lead to a certificate of advisory review.

ALTERATION: Any act or process that changes one or more of the exterior architectural features of property which has been designated as a historic landmark under this Article, or any interior architectural feature of any structure when such interior has been specifically designated as an interior historic landmark.

ARCHITECTURAL REVIEW COMMITTEE: A Committee of no less than three (3) members of the Commission, of which one member need not possess the demonstrated expertise required under subsection 2-23-1C of this Code for at least eight (8) members of the full Commission, appointed by the chairperson to review documents for certificates of advisory review which shall be issued by the Commission, based upon the Committee's review of the documents and recommendations to the owner. Subsection 7-9-11C of this Article authorizes the Commission to recommend and the Village Board to adopt amended rules and regulations which would expand Committee and/or Commission staff liaison authority to minimal types of construction and alteration work requiring a certificate of appropriateness.

BUILDING PERMIT: Any permit required by the Development Customer Services Department of the Village of Oak Park.

CERTIFICATE OF ADVISORY REVIEW: A certificate issued by the Commission after advisory review of plans for construction on, or relocation of, property and/or improvements located within a historic district which have not been designated as historic landmarks, indicating that the Commission has conducted a review of the plans and has made recommendations to the owner with regard to same.

CERTIFICATE OF APPROPRIATENESS: A certificate issued by the Commission indicating its approval of plans for the alteration, or construction, or relocation of a historic landmark, or the removal or demolition of a historic landmark or a building, structure or improvement within a historic district.

CERTIFICATE OF ECONOMIC HARDSHIP: A certificate issued by the Commission, after denying a certificate of appropriateness, which authorizes the performance of alterations, construction or relocation with regard to historic landmarks, or the removal or demolition of a historic landmark or a building, structure or improvement within a historic district when such historic landmarks, or properties within a historic district, cannot be put to a reasonably beneficial use or the owner will suffer a substantial economic loss thereon without the proposed alteration, construction, relocation, removal or demolition; and the owner is not responsible in any way for the hardship from which he or she is seeking relief.

COMMISSION: The Oak Park Historic Preservation Commission as established pursuant to Article 23 ("Historic Preservation") of Chapter 2 ("Administration") of this Code.

COMMISSION STAFF LIAISON: An employee of the Village assigned by the Village Manager or the Village Manager's designee as staff liaison to the Commission.

CONSTRUCTION: Any act or process which requires a building permit, including the act of adding to a structure by an addition, or the erection of a new principal or accessory structure on a lot or property.

CONTRIBUTING RESOURCE: A property and/or improvement located within a historic district that represents the significant historical and/or aesthetic characteristics which qualified that district as a historic district under this Article.

DAY: A calendar day, except where otherwise specified in this Article.

DEMOLITION: The razing or destruction, whether entirely or in significant part of a building, structure, site or object. Demolition includes the removal of a building, structure or object from its site or the removal or destruction of its facade or surface.

ELIGIBLE HISTORIC LANDMARK: Any property and/or improvement nominated for designation as an historic landmark which has been determined by the Commission, after notice and an opportunity to be heard for the owner(s), nominators and other interested parties in accordance with Section 7-9-4 of this Article, to be eligible for designation by resolution and recommendation of the Commission to the Village Board, but which has not yet been so designated by the Village Board.

EXTERIOR ARCHITECTURAL FEATURES: The architectural character and general composition of the exterior of a structure or improvement, including the kind and texture of all the building materials and the type, design and character of all architectural details, including, but not limited to, windows, walls, roofs, doors, light fixtures, fences, signs and appurtenant elements.

HISTORIC DISTRICT: A historic district is an area with geographically definable boundaries, possessing a significant concentration, linkage or continuity of properties and/or improvements united by past events or aesthetically by plan or physical development that has been designated as an Oak Park historic district pursuant to Village ordinance. A district may include properties and/or improvements which are individually designated as historic landmarks under this Article and may also contain other properties and/or improvements which, while not of such individual historical and/or architectural value to be designated historic landmarks, nevertheless contribute to the overall special character or value of the landmark or landmarks located within the district.

HISTORIC LANDMARK: Any property and/or improvement which has special character or significant historical, cultural, architectural, archeological, community or aesthetic value as part of the heritage of the Village of Oak Park, the State of Illinois, or the United States which has been designated as an Oak Park historic landmark pursuant to this Article and shall include all designated interior historic landmarks.

IMPROVEMENT: Any visible built feature constituting a physical addition or any part of such addition to a property, including any building, structure, fixture, bridge, work of art, place, parking facility, fence, gate, wall, landscaping or paving.

INTERIOR ARCHITECTURAL FEATURES: The architectural character and general composition of the interior of a structure, including the room design and configuration, color and texture of materials, and the type, pattern and character of all architectural details and elements, including, but not limited to, staircases, doors, hardware, moldings, trim, plaster work, light fixtures and wall coverings.

INTERIOR HISTORIC LANDMARK: An interior, or part thereof, which is normally open or accessible to the public and which has a significant historical or aesthetic interest or value as part of the development, heritage or cultural characteristics of the Village, State of Illinois or United States and which has been designated as an interior landmark pursuant to the provisions of this Article.

NOMINATED HISTORIC LANDMARK: A property and/or improvement nominated by an interested party for consideration by the Commission for designation as a historic landmark prior to determination by the Commission that it is eligible for historic landmark designation.

NONCONTRIBUTING RESOURCE: A property and/or improvement located within a historic district that does not represent significant historical and/or aesthetic characteristics which qualified that district as a historic district under this Article.

OWNER: Owner of record as determined by the tax rolls except where otherwise specified herein in this Article.

PROPERTY: Land and improvements identified as a separate lot for purposes of the zoning regulations of the Village of Oak Park.

PUBLIC WORKS PROJECT: Work carried out by the Village of Oak Park for public use or service, including, but not limited to, the installation, major repair or improvements to streets, curbs and gutters, alleys, sidewalks, public utilities, streetlights, signs, banners and traffic signals.

RELOCATION: Any repositioning of an improvement on the same property upon which it is located.

REMOVAL: Any moving of an improvement from the property upon which it was originally located.

REPAIR: Minor work which does not require a building permit and which does not affect the architectural features of an improvement.

REVIEW: The process of examining the plans and documents prepared by an owner of property and/or an improvement designated as a historic landmark which describes proposed work on the landmark, which will lead to the decision to grant or deny a certificate of appropriateness or a certificate of economic hardship.

SITE: The location of an event, activity, building, structure or improvement.

STRUCTURE: Anything constructed or erected, the use of which requires permanent or semi-permanent location on or in the ground.

THE SECRETARY OF THE INTERIOR'S STANDARDS: The "Secretary Of The Interior's Standards For Rehabilitation And Guidelines For Rehabilitating Historic Buildings", revised U.S. 1990, Department of the Interior, National Park Service, Preservation Assistance Division, Washington, D.C.

WORK: Any construction, alteration, repair, relocation, removal or demolition of an improvement.

(Ord. 1999-0-7, 3-15-1999; amd. Ord. 22-8, 2-7-2022)

## 7-9-3: HISTORIC DISTRICTS:

A. Historic districts shall be designated, amended and removed only upon by an ordinance adopted by the Village Board.

B. Frank Lloyd Wright-Prairie School of Architectural Historic District:

1. On February 7, 1972, the Oak Park Historic District, renamed the Frank Lloyd Wright-Prairie School of Architecture Historic District, was recognized and affirmed as a locally designated historic district within the Village of Oak Park.

2. On December 6, 1973, the Oak Park Historic District, renamed the Frank Lloyd Wright-Prairie School of Architecture Historic District, was listed in the National Register of Historic Places where such district remains officially registered as the Frank Lloyd Wright-Prairie School of Architecture Historic District.

3. On May 22, 2009, a newly expanded Frank Lloyd Wright-Prairie School of Architecture Historic District was listed in the National Register of Historic Places.

4. On February 12, 2012, a newly expanded Frank Lloyd Wright-Prairie School of Architecture Historic District was recognized and affirmed as a locally designated historic district within the Village of Oak Park.

5. The Village hereby designates the area set forth on the map attached to Ordinance 1972-O-8 as Exhibit A which is incorporated in this Article by reference, as amended, historic district within the Village known as the Frank Lloyd Wright-Prairie School of Architecture Historic District. Such designation shall be reflected in the official zoning map of the Village.

C. Ridgeland/Oak Park Historic District:

1. On July 20, 1983, the Ridgeland/Oak Park Historic District was listed in the National Register of Historic Places where such district remains officially registered as the Ridgeland/Oak Park Historic District.

2. On February 26, 1993, the Ridgeland/Oak Park Historic District was recognized and affirmed as a locally designated historic district within the Village of Oak Park.

3. The Village hereby designates the area set forth on the map on file in the office of the Village Clerk attached to Ordinance 1993-O-12 as Exhibit A which is incorporated in this Article by reference, as amended, as a historic district within the Village known as the Ridgeland/Oak Park Historic District. Such designation shall be reflected on the official zoning map of the Village.

D. Gunderson Historic District:

1. On March 1, 2002, the Gunderson Historic District was listed in the National Register of Historic Places where such district remains officially registered as the Gunderson Historic District.

2. On June 17, 2002, the Gunderson Historic District was recognized and affirmed as a locally designated historic district within the Village of Oak Park.

3. On May 19, 2003, a newly expanded Gunderson Historic District was recognized and affirmed as a locally designated historic district within the Village of Oak Park.

4. The Village hereby designates the area set forth on the map on file in the office of the Village Clerk attached to Ordinance 2003-O-28 as Exhibit A which is incorporated in this Article by reference, as amended, as a historic district within the Village known as the Gunderson Historic District. Such designation shall be reflected on the official zoning map of the Village. (Ord. 2012-0-08, 2-21-2012; amd. Ord. 22-8, 2-7-2022) (Ord. 2012-0-08, 2-21-2012; amd. Ord. 22-8, 2-7-2022)

## 7-9-4: CRITERIA FOR DESIGNATION OF HISTORIC LANDMARKS AND INTERIOR HISTORIC LANDMARKS:

A. The Commission, in determining whether to recommend for designation, and the Village Board, in determining whether to approve designation of particular sites, structures, or improvements as historic landmarks and/or interiors of structures or parts thereof as interior historic landmarks, shall consider the following criteria:

B. Historical And/Or Cultural Importance:

1. Significance as an example of the architectural, cultural, economic, historic or social development or heritage of the Village of Oak Park, the state, or the United States;

2. Location as a site of a historic event, with a significant effect on the Village of Oak Park, the state, or the United States; and

3. Identification with a person or persons who significantly contributed to the architectural, cultural, economic, historic or social heritage, or other aspect, of the Village of Oak Park, the State, or the United States.

C. Architectural And/Or Engineering Importance:

1. Existence on the National Register of Historic Places;

2. Embodiment of those distinguishing characteristics of significant architectural type, or style, or engineering specimen;

3. Identification as the work of a builder, designer, architect, craftsperson, engineer or landscape architect whose individual work is significant in the development of the Village of Oak Park, the State, or the United States;

4. Contains design elements, detail, materials or craftsmanship that make the property or building structurally or architecturally innovative, rare or unique; and

5. Representation of an architectural, cultural, economic, historic or social theme, style or period, expressed in distinctive areas, districts, places, buildings or structures that may or may not be contiguous.

D. Any site, structure or improvement that meets one or more of the above criteria shall also be at least fifty (50) years old and shall have sufficient integrity of location, design, materials and workmanship to make it worthy of preservation or restoration.

E. It shall be within the discretion of the Village Board to deny designation of any historic landmark, irrespective of whether or not the proposed landmark satisfies one or more of the above listed criteria. (Ord. 1999-0-7, 3-15-99; amd. Ord. 22-8, 2-7-2022)

## 7-9-5: NOMINATION AND PRELIMINARY DETERMINATION OF ELIGIBILITY FOR DESIGNATION AS AN HISTORIC LANDMARK OR INTERIOR HISTORIC LANDMARK:

A.   Submission Of Nominations: Historic landmark and interior historic landmark nominations may be submitted to the Commission by any person, group of persons, or association, including any member of the Commission, on a nomination form provided by the Commission. The nomination form shall include, or be accompanied by, the following:

1.   The name and address of the owner of the property proposed for designation, including the names of the beneficial owners of property held in a land trust, where possible.

2.   The legal description and common street address of the property proposed for designation.

3.   An indication of whether or not the owner is in favor of the proposed designation.

4.   A written statement describing the property and setting forth reasons in support of the proposed designation.

5.   Photographs of the property or selected properties within a district.

6.   Such other information as may be required by the Commission.

B.   Commission Action:

1.   The Commission staff liaison shall, upon receipt of a properly completed nomination, immediately the Director of the Development Customer Services Department or the Director's designee of the Commission's receipt of such nomination and shall deliver copies of same to the and Development Customer Services Department as soon thereafter as is possible and shall make a preliminary determination of eligibility within fifteen (15) days of the receipt of the nomination, or by the Commission's next regularly scheduled meeting, whichever occurs later. A determination by the Commission of preliminary eligibility must be based upon a finding by the Commission that there is a likelihood that a nominated historic landmark will meet one or more of the "Criteria for Designation" set forth in Section 7-9-4 of this Article.

2.   If a majority of the Commission members determine that there is not a likelihood that the nominated historic landmark may meet at least one of the criteria for designation, it shall enter a formal denial of the nomination and so notify the party making the nomination in writing. Such a denial shall be the final administrative decision. The Commission may not reconsider the preliminary eligibility of such a historic landmark for at least one year following the submission of the original nomination and, then, only upon further evidence of qualification. If a preliminary determination is made that there is a likelihood that the nominated historic landmark may meet one or more criteria, the Commission shall schedule a designation hearing to be held within forty five (45) days of the preliminary determination and shall send the owner of record written notice of same no less than fifteen (15) days in advance of such hearing by regular and electronic mail, properly addressed to the owner of record as shown in the records of the Recorder of Deeds or Registrar of Titles, whichever is appropriate, and with sufficient postage affixed thereto. Failure to receive notice shall not invalidate the proceedings of the Commission. (Ord. 1999-0-7, 3-15-99; amd. Ord. 22-8, 2-7-2022)

## 7-9-6: DESIGNATION HEARING:

A.   Following a preliminary determination by the Commission that there is a likelihood that a proposed historic landmark may be eligible for designation, the Commission shall conduct a hearing and shall notify the party making the nomination, the owner(s) of record of the proposed historic landmark and the owners of record of any property within two hundred fifty feet (250') of the proposed historic landmark, by regular mail as to the date, time, place and purpose of the public hearing. Notice shall also be published in a newspaper of general circulation in the Village. The notice shall be sent and published not less than fifteen (15) days nor more than thirty (30) days prior to the date of the hearing. Such notice shall include the date, time and place of the hearing, a general description of the request to be heard, and the address or location of the property to which the request applies. If the owner(s) of record is not the party making the nomination, the Commission's notice to the owner(s) of record of the proposed historic landmark shall also include a copy of the nominating petition, any supporting documentation submitted therewith and a form for use by the owner entitled the "Owner(s) of Record Statement of Position" form indicating the owner's support for or opposition to the proposed designation and a brief statement of the owner's position. The form shall provide a return address for the Commission and shall direct the owner to return the completed form to the Commission no less than seven (7) days prior to the scheduled hearing. The form shall further indicate that the owner's failure to respond shall be presumed by the Commission to indicate the owner's support for the proposed designation. The owner may rebut this presumption by appearing at the hearing and testifying in opposition to the proposed designation. The Commission shall make every reasonable effort to contact personally or by telephone owner(s) of record who have not returned an executed owner's form to explain the designation process and to encourage the return of the signed form.

B.   At the hearing the Commission shall take testimony and receive evidence from the nominators, owner(s) of record, and any other interested parties who wish to be heard and/or present evidence on the application of the criteria for designation, set forth in Section 7-9-4 of this Article, to the proposed historic landmark. The Commission shall hear testimony and receive evidence in accordance with such procedural rules that are not inconsistent with this Article as the Commission may, from time to time, propose and the Village Board may, from time to time, adopt for the purpose of governing the conduct of such hearings before the Commission. (Ord. 1999-0-7, 3-15-99; amd. Ord. 22-8, 2-7-2022)

## 7-9-7: DESIGNATION OF HISTORIC LANDMARKS AND INTERIOR HISTORIC LANDMARKS:

A.   Within forty five (45) days following completion of the public hearing(s), the Commission shall determine, based on the criteria set forth in Section 7-9-4 of this Article whether to recommend designation of an historical landmark to the Village Board and shall deliver to the nominator, the Village Board, the Village Clerk or the Village Clerk's designee, the Development Customer Service Department and to the owner(s) of record, a resolution and report recommending designation if such a determination has been made by the Commission. The resolution shall require an affirmative vote of a majority of the full members of the Commission to recommend designation to the Village Board. The resolution shall include or be accompanied by a written report summarizing the evidence presented at the hearing, setting forth findings of fact based thereon, and explaining the basis for the Commission's recommendation. A decision by the Commission not to recommend designation is final and will terminate the designation process. The Commission shall notify the owner and nominators of its decision not to recommend designation within forty-five (45) days of the completion of the public hearing. The Commission shall not consider the re-nomination of the same or a substantially similar historic landmark for at

least one year following submission of the original nomination and the nominated property shall not be considered an eligible historic landmark during that time.

B.   Within thirty (30) days after receiving the resolution and report containing the recommendation for designation from the Commission, the Village Board shall either designate the historic landmark or reject the nomination by a simple majority vote of the full Village Board, unless the owner is opposed to the nomination, in which case designation of the historic landmark may only occur upon a unanimous vote of the Village Board. In making this determination, the Village Board shall apply the designation criteria set forth in Section 7-9-4 of this Article and shall give due consideration to the record of the public hearing(s), and findings and recommendations of the Commission set forth in the Commission's resolution and report and may take public testimony with regard to same. Upon a majority vote of the Village Board to approve designation, the Village Board shall enact an ordinance designating the historic landmark, which ordinance shall provide that the newly designated historic landmark shall be subject to the provisions of this Article.

C.   Upon designation of a historic landmark by the Village Board, the Commission shall provide written notification by regular and electronic mail to the owner(s) of record of the designated historic landmark which notification shall include a copy of the ordinance designating same. Failure to receive electronic notice shall not invalidate the proceedings of the Commission. The Village shall file a copy of the designation ordinance with the Cook County Clerk for each historic landmark designated. A copy of the designation ordinance shall be sent to the Village Development Customer Services Department and the Village Clerk.

D.   If the Board of Trustees does not approve a designation, then a nomination for the same or a substantially similar historic landmark may not be considered by the Commission for at least one year from the date of the Village Board action and the nominated property shall not be considered an eligible historic landmark during that time.

E.   Designations may be amended or rescinded by the same procedure and according to the same criteria set forth in this Article for an original designation.

F.   The following properties and/or improvements have been designated as Oak Park historic landmarks (including interior landmarks) pursuant to this Article:

| | Landmark Properties | Designation Date |
|---|---|---|
| | Landmark Properties | Designation Date |
| 1. | Frank Lloyd Wright Home & Studio | June 17, 1996 |
| | 428 Forest and 951 Chicago Avenue | |
| | Interior, exterior and improvements | |
| | | |
| 2. | John Farson Home | June 17, 1996 |
| | 217 Home Avenue | |
| | Exterior, walk and fence | |
| | | |
| 3. | Pilgrim Congregational Church | June 17, 1996 |
| | 460 Lake Street | |
| | Exterior | |
| | | |
| 4. | Unity Temple | June 17, 1996 |
| | 875 Lake Street | |
| | Interior and exterior | |
| | | |
| 5. | Ernest Hemingway Birthplace Home | June 17, 1996 |
| | 339 N. Oak Park Avenue | |
| | Interior and exterior | |
| | | |
| 6. | The Plaza Hotel | March 16, 1998 |
| | 123 S. Marion Street | |
| | Exterior | |
| | | |
| 7. | The Plaza Hotel | March 16, 1998 |
| | 123 S. Marion Street | |
| | Interior | |
| | The lobby or foyer area including: the four-story atrium with a turned spindle latticework stairway, the ornamental | |

|  | stained and beveled glass door surround between the foyer of the original building and the former dining area in the addition, and the two (2) brick archways leading off from the foyer area. | |
|---|---|---|
|  | | |
| 8. | The Hills-DeCaro House | January 7, 2002 |
|  | 313 Forest Avenue | |
|  | Exterior | |
|  | | |
| 9. | The Rollin Furbeck House | January 7, 2002 |
|  | 515 Fair Oaks Avenue | |
|  | Exterior | |
|  | | |
| 10. | The Harry S. Adams House | January 7, 2002 |
|  | 710 Augusta Street | |
|  | Exterior - house and coach house | |
|  | | |
| 11. | The George Furbeck House | November 18, 2002 |
|  | 223 N. Euclid Avenue | |
|  | Exterior | |
|  | | |
| 12. | The Thomas Gale House | November 18, 2002 |
|  | 1027 Chicago Avenue | |
|  | Exterior | |
|  | | |
| 13. | The Oak Park and River Forest Day Nursery | November 18, 2002 |
|  | 1139 Randolph Street | |
|  | Exterior | |
|  | | |
| 14. | Charles Roberts House | December 2, 2002 |
|  | 321 N. Euclid Avenue | |
|  | Exterior - house and garage | |
|  | | |
| 15. | Roberts Building | December 2, 2002 |
|  | 300-304 N. Grove Avenue/818 Erie Street | |
|  | Exterior | |
|  | | |
| 16. | Odd Fellows Hall | November 17, 2003 |
|  | 812-818 Harrison Street | |
|  | Exterior | |
|  | | |
| 17. | The Albert and Kittie Ernst House | November 17, 2003 |
|  | 1023 Wenonah Avenue | |
|  | Exterior | |
|  | | |
| 18. | Oak Park Conservatory | June 21, 2004 |
|  | 615 Garfield Street | |
|  | Exterior - original structure | |
|  | | |

| 19. | Park Grove and Park View Manor | June 21, 2004 |
| | 173-181 N. Grove Avenue | |
| | Exterior | |
| | | |
| 20. | Bishop Quarter School Addition | June 21, 2004 |
| | 605 Lake Street | |
| | Exterior | |
| | | |
| 21. | C.A. Sharpe House (Dole/Cheney Mansion) | July 6, 2004 |
| | 220 N. Euclid Avenue | |
| | Exterior - house, greenhouse, coach house, fence | |
| | | |
| 22. | Andreas Brisch House | December 6, 2004 |
| | 701 S. East Avenue | |
| | Exterior | |
| | | |
| 23. | Harold C. Lewis House | December 6, 2004 |
| | 950 Columbian Avenue | |
| | Exterior | |
| | | |
| 24. | George and James Tough House | December 6, 2004 |
| | 1045 Wesley Avenue | |
| | Exterior - house and garage | |
| | | |
| 25. | Poley Building | December 6, 2004 |
| | 408-410 S. Austin Boulevard | |
| | Exterior | |
| | | |
| 26. | Margaret Morse House | February 22, 2005 |
| | 1036 Fair Oaks Avenue | |
| | Exterior | |
| | | |
| 27. | Albert Schneider House | February 22, 2005 |
| | 553 N. Marion Street | |
| | Exterior | |
| | | |
| 28. | Dorothy Manor Apartments | June 20, 2005 |
| | 424-426 S. Austin Boulevard | |
| | Exterior | |
| | | |
| 29. | Maze Branch Library | November 7, 2005 |
| | 845 Gunderson Avenue | |
| | Exterior, interior (main floor, foyer) | |
| | | |
| 30. | First United Methodist Church | November 7, 2005 |
| | 324 N. Oak Park Avenue | |
| | Exterior | |
| | | |

| 31. | Howard Jenkins House | May 1, 2006 |
|---|---|---|
| | 500 Linden Avenue | |
| | Exterior - house and garage | |
| | | |
| 32. | Dr. Harry Bernhardt Cottage | May 1, 2006 |
| | 705 S. East Avenue | |
| | Exterior - house and garage | |
| | | |
| 33. | Charles W. Eils House | November 6, 2006 |
| | 625 S. Oak Park Avenue | |
| | Exterior - house and garage | |
| | | |
| 34. | Boulevard Arcade Building | June 4, 2007 |
| | 1033 South Boulevard | |
| | Exterior | |
| | | |
| 35. | Cicero Fire House No. 2 | June 16, 2008 |
| | 129 Lake Street | |
| | Exterior | |
| | | |
| 36. | Gustaf and Fride Benson House | July 20, 2009 |
| | 1139 Woodbine Avenue | |
| | Exterior - house and garage | |
| | | |
| 37. | Robert Parker House | July 20, 2009 |
| | 1019 Chicago Avenue | |
| | Exterior | |
| | | |
| 38. | Linden Apartments | October 6, 2009 |
| | 175-181 Linden Avenue/643-645 Ontario Street | |
| | Exterior - building and garage | |
| | | |
| 39. | Charles Schwerin House | March 15, 2010 |
| | 639 Fair Oaks Avenue | |
| | Exterior - house and garage | |
| | | |
| 40. | Edward and Caroline McCready House | March 15, 2010 |
| | 231 N. Euclid Avenue | |
| | Exterior - house, garage, and retaining wall | |
| | | |
| 41. | Russell Wallace House | March 15, 2010 |
| | 178 N. Euclid Avenue | |
| | Exterior - house and garage | |
| | | |
| 42. | Charles S. Castle House | March 15, 2010 |
| | 647 Linden Avenue | |
| | Exterior - house and garage | |
| | | |

| 43. | Joseph D. Everett House | May 17, 2010 |
| | 228 Forest Avenue | |
| | Exterior | |
| | | |
| 44. | Chester Flitcraft House | June 21, 2010 |
| | 845 Chicago Avenue | |
| | Exterior | |
| | | |
| 45. | Paul Blatchford House No. 1 | June 21, 2010 |
| | 250 Forest Avenue | |
| | Exterior | |
| | | |
| 46. | William A. Douglass House | September 20, 2010 |
| | 317 N. Kenilworth Avenue | |
| | Exterior, coach house | |
| | | |
| 47. | Nineteenth Century Club | September 20, 2010 |
| | 178 Forest Avenue | |
| | Exterior | |
| | | |
| 48. | Rutherford-Dodge House | January 3, 2011 |
| | 308 N. Oak Park Avenue | |
| | Exterior | |
| | | |
| 49. | Vernon W. Skiff House | January 3, 2011 |
| | 633 N. East Avenue | |
| | Exterior, coach house, fence | |
| | | |
| 50. | Charles E. Matthews House | February 22, 2011 |
| | 432 N. Kenilworth Avenue | |
| | Exterior, garage | |
| | | |
| 51. | Harlem Office Building | March 7, 2011 |
| | 1515 N. Harlem Avenue | |
| | Exterior | |
| | | |
| 52. | John D. Caldwell House | July 5, 2011 |
| | 130 S. East Avenue | |
| | Exterior | |
| | | |
| 53. | Charles W. Helder House | July 5, 2011 |
| | 629 Fair Oaks Avenue | |
| | Exterior, garage | |
| | | |
| 54. | Freeman Landon House | September 19, 2011 |
| | 700 S. Lombard Avenue | |
| | Exterior, garage | |
| | | |

| 55. | George and Mary Sheppard House | October 3, 2011 |
|---|---|---|
| | 217 S. Humphrey Avenue | |
| | Exterior | |
| | | |
| 56. | Rankin-Hemingway House | November 28, 2011 |
| | 639 N. Oak Park Avenue | |
| | Exterior, garage | |
| | | |
| 57. | William J. Ehlers Flats | July 2, 2012 |
| | 241 S. Elmwood Avenue | |
| | Exterior, garage | |
| | | |
| 58. | Edwin H. Ehrman House | July 2, 2012 |
| | 410 N. Kenilworth Avenue | |
| | Exterior | |
| | | |
| 59. | George L. Smith House | November 5, 2012 |
| | 743 Columbian Avenue | |
| | Exterior, garage | |
| | | |
| 60. | Charlton H. Catlin Flats | April 1, 2013 |
| | 209 - 211 S. Elmwood Avenue | |
| | Exterior, garage | |
| | | |
| 61. | Andreas Brisch House no. 1 | July 1, 2013 |
| | 745 S. East Avenue | |
| | Exterior | |
| | | |
| 62. | Purcell-Yager House | May 5, 2014 |
| | 300 Forest Avenue | |
| | Exterior, garage | |
| | | |
| 63. | Walter S. Gerts House | October 6, 2014 |
| | 200 S. East Avenue | |
| | Exterior | |
| | | |
| 64. | Edward B. Kittle House | October 6, 2014 |
| | 636 Fair Oaks Avenue | |
| | Exterior | |
| | | |
| 65. | I.M. and Fannabell Fixman House | December 8, 2014 |
| | 1010 Fair Oaks Avenue | |
| | Exterior | |
| | | |
| 66. | Charles Roberts Stables | November 21, 2016 |
| | 317 North Euclid Avenue | |
| | Exterior | |
| | | |

| 67. | James T. Hayden House | June 5, 2017 |
| --- | --- | --- |
|  | 209 Forest Avenue |  |
|  | Exterior |  |
|  |  |  |
| 68. | Edgar Rice Burroughs House no. 1 | December 11, 2017 |
|  | 414 Augusta Street |  |
|  | Exterior |  |
|  |  |  |
| 69. | John J. Schmidt House | May 7, 2018 |
|  | 400 North Kenilworth Avenue |  |
|  | Exterior |  |
|  |  |  |
| 70. | Robbins-Chapmen House | November 4, 2019 |
|  | 408 North Kenilworth Ave |  |
|  | Exterior |  |
|  |  |  |
| 71. | Telfer MacArthur House | February 1, 2021 |
|  | 609 Linden Ave |  |
|  | Exterior, coach house |  |
| 72. | Swenson-Gottlieb House | May, 15, 2023 |
|  | 1201 Fair Oaks Avenue |  |
|  | Exterior, garage |  |

(Ord. 1999-0-7, 3-15-1999; amd. Ord. 2012-0-60, 11-5-2012; Ord. 2013-0-29, 4-1-2013; Ord. 2013-0-50, 7-1-2013; Ord. 2014-0-25, 5-5-2014; Ord. 2014-0-71, 10-6-2014; Ord. 2014-0-72, 10-6-2014; Ord. 2014-0-109, 12-8-2014; Ord. 16-152, 11-21-2016; Ord. 17-215, 6-5-2017; Ord. 17-315, 12-11-201; Ord. 18-367, 5-7-2018; Ord. 19-102, 11-4-2019; Ord. 21-4, 2-1-2021; Ord. 22-8, 2-7-2022; Ord. 23-24, 5-15-2023)

## 7-9-8: WORK REQUIRING THE ISSUANCE OF A CERTIFICATE OF APPROPRIATENESS, A CERTIFICATE OF ECONOMIC HARDSHIP OR A CERTIFICATE OF ADVISORY REVIEW:

A.   No building permit or demolition permit shall be issued and no alteration authorized by the Development Customer Services affecting any site, building, structure or improvement designated in this Article until such time as the corresponding requirement or requirements set forth in this Article for each such designated site, building, structure or improvement shall first have been satisfied:

1.   In the case of the construction on, and/or the alteration, relocation, demolition or removal of an eligible historic landmark, the building or demolition permit shall be issued or the alteration authorized upon the denial of designation of historic landmark status by the Village Board; provided, however, that if the site, building, structure or improvement which has been denied landmark status is located within a designated historic district, then the issuance of a building or demolition permit shall also be contingent upon satisfying the requirements set forth in this Article for property located within a designated historic district; or

2.   In the case of a demolition or removal of:

a.   An eligible or designated historic landmark; or

b.   Any site, building, structure or improvement within a designated historic district; or

c.   A site, building, structure or improvement located in a designated historic district or listed in the National Register of Historic Places, which is wholly or partially financed by the Village or by one or more Federal, State or Village funding sources which are dispersed through or administered by the Village, the demolition permit shall be issued upon the authorization of such a permit by formal resolution of the Village Board as being necessary to protect the public health, safety or welfare; or

3.   In the case of:

a.   The construction on, and/or the alteration, relocation, demolition or removal of an eligible or designated historic landmark; or

b.   The alteration, demolition or removal of a site, building, structure or improvement located in a designated historic district or listed in the National Register of Historic Places which is wholly or partially financed by the Village or by one or more Federal, State or Village funding sources which are dispersed through or administered by the Village; or

c.   The removal or demolition of any building, structure or improvement located within a designated historic district for which demolition has not been authorized under subsection 7-9-8A2 of this section, the building or demolition permit shall be issued or the alteration shall be authorized upon the issuance of a certificate of appropriateness in accordance with Section 7-9-12 of this Article or a certificate of economic hardship in accordance with Section 7-9-13 of this Article.

B. No building permit for construction shall be issued by the Development Customer Services Department affecting any non-landmark property or structure within a designated historic district unless a certificate of advisory review is issued in accordance with Section 7-9-15 of this Article.

C. The Development Customer Services Department shall provide written authorization for alteration work affecting eligible or designated historic landmarks, which does not require a building permit, upon receipt of the certificate of appropriateness or certificate of economic hardship for such alteration work. Such authorization must be given prior to commencement of such alteration work.

D. No work requiring the issuance of a building or demolition permit or the authorization of an alteration by the Development Customer Services Department, shall commence prior to such issuance or authorization in accordance with this Section.

E. Public works projects within designated historic districts or affecting eligible or designated historic landmarks shall require a certificate of advisory review. The Director of Public Works or the Director's designee shall report such projects to the Commission as they are proposed by the Director or Director's designee in a timely fashion. In emergency situations, or where time constraints otherwise require the immediate commencement of such projects, work may commence prior to the issuance of the certificate of advisory review. (Ord. 1999-0-7, 3-15-99; amd. Ord. 22-8, 2-7-2022)

## 7-9-9: ZONING AND SUBDIVISION ACTIONS AFFECTING ANY NOMINATED, ELIGIBLE OR DESIGNATED HISTORIC LANDMARKS OR DESIGNATED HISTORIC DISTRICTS:

A. The Director of the Development Services Department or applicable Village staff, in the case of applications before the Zoning Board of Appeals or Plan Commission, shall notify the applicable staff liaison, within a reasonable time of submission to the Department, of all applications for zoning amendments, variances, special use permits, design review applications, subdivision or planned unit developments affecting:

   1. Property in any designated historic district;

   2. Any eligible or designated historic landmarks; or

   3. Any property located within two hundred fifty feet (250') of such landmark.

B. In furtherance of its duties as set forth in subsection 2-23-2F of the Village Code, the Commission, or applicable staff liaison when appropriate, shall evaluate the anticipated effect of the zoning action requested in the application on the designated historic district or nominated, eligible or designated historic landmark(s) and shall consider the long-term compatibility of the proposed zoning action with the character of the affected historic resources and the effect of any proposed zoning action on the long-range preservation of these resources. In its review, the Commission shall also consider the criteria specified in Section 7-9-11 of this Article.

C. The Commission may present its evaluation or opinion on the effects of such anticipated zoning action on a historic district or nominated, eligible or designated landmark to the board or commission hearing such zoning action.

D. In no event shall the provisions of this Section preclude the necessity of obtaining a certificate of appropriateness or a certificate of economic hardship when required under Section 7-9-12 or 7-9-13 of this Article. (Ord. 1999-0-7, 3-15-99; amd. Ord. 22-8, 2-7-2022; Ord. 25-112, 3-4-2025)

## 7-9-10: ACQUISITION OR USE OF PUBLIC PROPERTY:

A. The Village Manager shall advise the Commission, in a timely manner, of all proposed or pending acquisitions, sales or changes in use by the Village or by any other public agency, including any other unit of local government, when known to the Village, of any property designated as a historic landmark, or located within two hundred fifty feet (250') of a landmark, or located in an historic district. The Commission shall advise the Village Board, other appropriate public agency or other units of local government, as to the effects of such actions on the special historic, architectural, community or aesthetic interest or value of such properties to Oak Park.

B. The Commission shall request that other public agencies serving the community agree to advise the Commission of pending acquisition, sales or changes by such agencies in use of property designated as an historic landmark or located within two hundred fifty feet (250') of a landmark, or located in an historic district, in order that the Commission may advise such agencies as to the impact of such actions on the historic, architectural, community or aesthetic interest or value of such properties to Oak Park. The Commission shall take appropriate steps to notify all public agencies which own or may acquire property in the Village about the existence and character of designated historic landmarks and historic districts, and the Commission shall provide a current record of such landmarks and districts to such public agencies for their maintenance. (Ord. 1999-0-7, 3-15-99; amd. Ord. 22-8, 2-7-2022)

## 7-9-11: REVIEW CRITERIA FOR CERTIFICATE OF APPROPRIATENESS; CERTIFICATE OF ADVISORY REVIEW; NONCONTRIBUTING RESOURCES:

A. Guidelines For Construction, Alteration And Relocation Work: In making a determination to issue or deny a certificate of appropriateness for construction, alteration or relocation work affecting an eligible or designated historic landmark, or a determination to conduct an advisory review and either approve or make recommendations with regard to construction or relocation work on property located in a designated historic district, either the Commission or the Village Board, when considering an appeal, shall consider the effect of the proposed construction, alteration, or relocation on the architectural features and on the historic, aesthetic or architectural value, characteristics and significance of the eligible or designated historic landmark or designated historic district

B. In determining whether to issue a certificate of appropriateness or a certificate of advisory review, the Commission, or the Village Board when considering an appeal, shall follow the "Secretary of the Interior's Standards", revised 1990, as amended in this Article, and such other criteria and guidelines as the Commission may recommend, and which the Village Board may adopt, for use by the Commission, or the Village Board when considering an appeal. Such criteria shall include, but are not limited to, the following:

   1. A property shall be used for its historic purpose or be placed in a new use that requires minimal change to the defining characteristics of the building and its site and environment.

2.   The significant original qualities and/or historic character of a property shall be retained and preserved. The removal or alteration of historic or distinctive architectural materials or features and spaces that characterize a property shall be avoided.

3.   Each property shall be recognized as a physical record of its time, place and use. Changes that create a false sense of historical development, such as adding conjectural features or architectural elements from other buildings, shall not be undertaken.

4.   Most properties change over time; those changes that have acquired historic significance in their own right shall be retained and preserved.

5.   Distinctive features, finishes and construction techniques or examples of craftsmanship that characterize an historic property shall be preserved.

6.   Deteriorated historic features shall be repaired rather than replaced. Where the severity of deterioration requires replacement of a distinctive feature, the new feature shall match the old in design, inherent and not renewable color, texture and other visual qualities and, where possible, materials. Replacement of missing features shall be substantiated by documentary, physical or pictorial evidence.

7.   Chemical or physical treatments, such as sandblasting, that cause damage to historic materials shall not be used. The surface cleaning of structures, if appropriate, shall be undertaken using the gentlest means possible.

8.   Significant archaeological resources affected by a project shall be protected and preserved. If such resources must be disturbed, mitigation measures shall be undertaken.

9.   The historic and architectural integrity of the property and its environment shall be protected by making the new work compatible with the existing structures, surrounding structures, streetscape or the character of the historic district, whenever one or more of these elements is affected by such work, with respect to the following design criteria:

    a.   The height of the alteration, addition or construction;

    b.   Proportions between the width and height of structure's front façade;

    c.   The proportions and relationships between doors and windows;

    d.   Relationship of building masses and the open space around them, including setbacks and placement on the lot;

    e.   The design of the roof shapes, forms and materials;

    f.   Landscaping and appurtenances which should also be sensitive to the individual structure, its occupants and their needs;

    g.   The scale of the proposed structure;

    h.   Dominant horizontal or vertical directional expression of front elevation.; and

    i.   Architectural style, design, details and materials, including textures and patterns, but not necessarily color.

10.   New additions and adjacent or related new construction shall be undertaken in such a manner that if removed in the future, the essential form and integrity of the historic property and its environment would be unimpaired.

C.   Guidelines For Removal Or Demolition Of Historic Landmarks, Or Buildings, Structures Or Improvements Located Within An Historic District: Guidelines to be used by the Commission, or by the Village Board when considering an appeal, in determining of appropriateness of the removal or demolition of a landmark or a building, structure or improvement in an historic district shall include, but not be limited to, the guidelines set forth in subsection 7-9-11A of this Section

D.   Noncontributing Resources: A property or improvement shall be considered to be a noncontributing resource if it is contained as a noncontributing resource in the National Register Historic District nomination form for the historic district. A noncontributing resource is not subject to the requirements of this Article, except for advisory reviews pursuant to Section 7-9-15 of this Article or if the resource is listed as an Oak Park Landmark. (Ord. 1999-0-7, 3-15-99; amd. Ord. 22-8, 2-7-2022)

## 7-9-12: PROCEDURES FOR CERTIFICATE OF APPROPRIATENESS:

A.   Preapplication: Any owner of an historic landmark may, at any time, request the Commission to make a preliminary review of proposed work in order to determine whether the proposed work will meet the criteria set forth in this Article. The Commission or Committee may, on the basis of documents and other material presented, make a preliminary finding of acceptability which may then be used by the Commission to expedite the processing of a certificate of appropriateness after the owner has applied for a building permit and/or a certificate of appropriateness. The certificate of appropriateness will be issued by the Commission only if the work described on the permit documents submitted by the owner to obtain the permit are found to be substantially the same as that which was preapproved. If, during the preapplication review, the Commission or Committee finds that the proposed work does not meet the criteria, the Commission or Committee may advise the owner on possible ways to meet the criteria.

B.   Application: Any application for a building permit and/or certificate of appropriateness for construction, alteration or relocation affecting an eligible or designated historic landmark or for the removal of an eligible or designated historic landmark or the removal of a building, structure or improvement from a property within a designated historic district and any application for a demolition permit for the demolition of an eligible or designated historic landmark or for the demolition of a building, structure or improvement in a designated historic district shall be sent by the Development Customer Services Department, within three (3) working days of receipt, to the Commission. At the time of receipt of the application(s), the Development Customer Services Department shall issue to the applicant an historic preservation guidelines pamphlet prepared by the Commission which summarizes the preservation requirements and preservation assistance available in the Village with regard to the historic landmarks and historic districts. The Development Customer Services Department shall not issue a building permit and shall not authorize any alterations until a certificate of appropriateness or certificate of economic hardship has been issued.

C.   Architectural Review Committee And Commission Staff Liaison Review And Issuance Of Certificate of Appropriateness: The Commission may propose, and the Village Board may adopt rules, procedures and criteria under which a committee of the Commission and/or Commission staff liaison may approve applications for certificates of appropriateness when the proposed work involves:

1.   Restoration to original conditions;

2.   No changes in materials;

3.   Changes not visible from the street and not affecting an interior landmark; or

4.   Other types of activities determined by the Commission to have limited effect on the historic, architectural or aesthetic qualities of landmarks or districts.

Such rules, procedures and criteria for the above-mentioned limited activities only, if adopted, shall provide that Commission staff liaison shall act within five (5) working days from receipt of the application to review, approve and issue a certificate of appropriateness, refer the application to the Architectural Review Committee, or refer the application to the full Commission for its consideration.

D.   Commission Review: If rules, procedures and criteria are adopted providing for committee and/or staff issuance of certificates of appropriateness under certain limited circumstances, applications which would not meet the criteria for committee or staff review under subsection 7-9-12C of this Section, shall be referred to the Commission by such committee or Commission staff liaison, or applications which have been denied a certificate of appropriateness by committee or Commission staff liaison shall be referred to the Commission. Except as otherwise provided for in rules and procedures adopted in accordance with subsection 7-9-12C of this Section, all applications for certificates of appropriateness shall be referred directly to the full Commission for review. The Commission shall review the completed application and supporting information within forty-five (45) days of receiving same, either from a committee or directly from the Development Customer Services Department. The applicant shall be notified, in writing, of the date, time and place of the meeting at which Commission review on the proposed work shall take place. The applicant shall be requested to submit such plans, drawings, photographs or other information the Commission may request to complete its review. Requested information shall not delay the meeting. The notice shall be sent no less than five (5) days before the meeting at which the proposed work is to be reviewed. The requirement for this five (5) day advance notice may be waived by the applicant. A final vote, as to approval or denial, shall be made within forty-five (45) days of the receipt of a complete application. If a decision is not made within forty-five (45) days, it will constitute an automatic withdrawal of the application and the Commission staff liaison will reschedule the application if appropriate.

E.   Acceptance Of Proposed Work And Issuance Of Certificate Of Appropriateness: If, upon review, a quorum the Commission finds the proposed work is in accordance with the applicable criteria set forth in Section 7-9-11 of this Article and the purposes of this Article, it may issue a certificate of appropriateness, with or without conditions reasonably related to the review guidelines. Notice of the issuance of a certificate of appropriateness shall be provided to the applicant and the Development Customer Services Department within five (5) working days after the decision. A certificate of appropriateness shall expire one year after the date of issuance. Any change in the proposed work after issuance of a certificate of appropriateness shall require inspection by the Commission staff liaison to determine whether the work is still in substantial compliance with the certificate of appropriateness. If staff determines that the change in work is not in substantial compliance with the certificate of appropriateness, then the owner must immediately cease work upon notification and submit a revised application to the Commission for review. The owner may be required to revise plans and redo work to comply with the certificate of appropriateness. The owner may dispute conditions regarding a certificate of appropriateness at a public hearing as set forth below.

F.   Failure To Issue A Certificate Of Appropriateness: If the Commission finds that the proposed work does not meet the established criteria and, therefore, will adversely affect or destroy any significant historic, aesthetic or architectural feature or value of an eligible or designated historic landmark, or that the demolition or removal of a building, structure or improvement in a designated historic district will adversely affect the historic, aesthetic or architectural character or value of the historic district or is inappropriate or inconsistent with the spirit and purposes of this Article, it shall not take action on the application and shall so advise the applicant and the Development Customer Services Department, in writing, within five (5) working days of the determination not to act on the application and shall further indicate to the applicant at that time that the applicant may submit an amended application for expedited review or may request a public hearing.

Within the same five (5) working day time frame, the Commission shall send a letter to the applicant explaining any changes recommended by the Commission before an amended application may be considered. The letter will address the appropriate review criteria and other points deemed pertinent by the Commission. The applicant may either amend the application and resubmit same for expedited review, or the applicant may request a public hearing on the application. If the applicant submits an amended application and it is determined to conform to Commission recommendations, a certificate of appropriateness may be issued by a quorum of the Commission.

G.   Public Hearing Following Denial Of A Certificate Of Appropriateness Or Disputed Conditions: Within fifteen (15) days of notice to the applicant of either an approval of a certificate of appropriateness with conditions or to file an amended application or request a public hearing, the applicant may request that the Commission hold a public hearing where additional evidence and testimony may be heard regarding the application for a certificate of appropriateness. The Commission shall hold such a public hearing within forty-five (45) days of receipt of the written request.

1.   Notice of the date, time, place and purpose of the public hearing shall be sent by regular and electronic mail to the applicant and by regular mail to property owners within two hundred fifty feet (250') of the property for which the application has been made, and said notice shall also be published in a newspaper of general circulation in the Village of Oak Park. The notice shall be sent and published not less than fifteen (15) days nor more than thirty (30) days prior to the date of the hearing. Such notice shall include the date, time and place of the hearing, a general description of the request to be heard, and the address or location of the property to which the request applies. Failure to receive electronic notice shall not invalidate the proceedings of the Commission.

2. At the public hearing, the Commission shall take testimony presented by the applicant and any other interested parties concerning the effect of the proposed alteration, construction, relocation, removal or demolition of an eligible or designated historic landmark upon an eligible or designated historic landmark and the surrounding neighborhood or the effect of the proposed removal or demolition of any structure, building or improvement within an historic district upon the district, and shall conduct such hearings in a manner consistent with the Rules of Procedure for Hearings before the Historic Preservation Commission, as amended from time to time, which are, adopted pursuant to this Article and made a part hereof and as may be amended, from time to time, by action of the Commission and the Village Board. The hearing may be continued to a date certain, with the concurrence of the applicant.

3. Within fifteen (15) days following the completion of the public hearing, the Commission shall issue or deny the certificate of appropriateness or modify or keep intact conditions of approval related thereto. Notice of the Commission's decision will be sent to the applicant and owner and the Development Customer Services Department within five (5) working days of rendering the decision. Notification procedures outlined under Sections 7-9-6 and 7-9-7 of this Article will apply.

H. Appeal To The Village Board: Upon denial of the application for a certificate of appropriateness by the Commission or denial of a request to modify conditions related thereto, the applicant may either appeal the denial to the Village Board or may request a certificate of economic hardship. (Ord. 1999-0-7, 3-15-99; amd. Ord. 22-8, 2-7-2022; Ord. 24-163, 12-3-2024)

## 7-9-13: PROCEDURES FOR CERTIFICATE OF ECONOMIC HARDSHIP:

A. Application: Following denial of a certificate of appropriateness by the Commission or by the Village Board on appeal, the owner or designated representative may apply for a certificate of economic hardship by submitting to the Commission a completed application for a certificate of economic hardship, which form shall be available in the Village Hall and in particular, at Development Customer Services Department.

B. Public Hearing Process: The Commission shall hold a public hearing within forty-five (45) days of receipt of a completed application for a certificate of economic hardship. Notice of the public hearing shall be sent by regular and electronic mail to the applicant and by regular mail to property owners within two hundred fifty feet (250') of the property for which application has been made. Notice also shall be published in a newspaper of general circulation in the Village of Oak Park. The notice shall be sent not less than fifteen (15) days nor more than thirty (30) days prior to the date of the hearing. Such notice shall include the date, time and place of the hearing, a general description of the contents of the request to be heard and the address or location of the property to which the request applies. Failure to receive electronic notice shall not invalidate the proceedings of the Commission.

At the public hearing, the Commission shall take testimony presented by the owner(s) and any other interested parties concerning the effect of the proposed alteration, construction, relocation, removal or demolition of an eligible or designated historic landmark or removal or demolition of a building, structure or improvement within a designated historic district based upon the criteria set forth in Section 7-9-11 of this Article and shall conduct such hearing in a manner consistent with the rules of procedure for hearings before the Commission. The hearing may be continued to a date certain. A record shall be kept of all proceedings.

C. Standards For Commission Decision And Factors To Be Considered: The Commission shall issue a certificate of economic hardship only if the Commission finds that the subject property cannot be put to any reasonably beneficial use or that the owner/applicant will suffer a substantial economic loss thereon without the alteration, construction, relocation, removal or demolition being sought by the owner/applicant and that the owner/applicant is not responsible in any way for the hardship from which he or she is seeking relief. The factors to be considered by the Commission and the Village Board on the issue of economic hardship shall include, but are not limited to, the following:

1. A substantial decrease in the fair market value of the property as a result of the denial of the certificate of appropriateness;

2. A substantial decrease in the pretax or after-tax return to owners of record or other investors in the property as a result of the denial of the certificate of appropriateness;

3. The cost of the proposed construction, alteration, relocation or demolition, and an estimate of any additional cost that would be incurred to comply with the recommendations of the Commission for changes necessary for the issuance of a certificate of appropriateness;

4. The structural soundness of any structures on the property and their suitability for rehabilitation;

5. The economic feasibility of rehabilitation or reuse of the existing structure or improvement on the property in the case of a proposed demolition.

6. The owner/applicant's purchase of the subject property after the enactment of the relevant provisions of this Article without making said purchase contingent upon the owner/applicant first obtaining necessary Board and/or Commission approvals under the this Article shall be deemed to be conclusive evidence of the fact that the applicant is responsible for the applicant's own economic hardship, if any.

D. Evidence: The Commission may solicit expert testimony. The applicant may be required to submit evidence at the hearing to support any of the factors, including those listed above, which the applicant believes to have contributed to the economic hardship which the applicant alleges he or she would suffer if the applicant is not granted a certificate of appropriateness. Specific information and documentation which should be presented by the applicant as competent evidence at the hearing shall include, but not be limited to, the following:

1. The amount paid for the property, the date of purchase and the party from whom purchased (including description of the relationship, if any, between the owner and the person from whom the property was purchased);

2. The assessed value of the land and improvements thereon according to the two (2) most recent assessments;

3. Real estate taxes for the previous two (2) years;

4. Annual debt service, if any, for the previous two (2) years;

5. All appraisals obtained within the previous two (2) years by the owner or applicant in connection with the owner or applicant's purchase, financing or ownership of the property;

6. Any listing of the property for sale or rent, price asked and offers received, if any;

7. Any consideration by the owner as to profitable adaptive uses for the property;

8. If the property is income-producing, the annual gross income from the property for the previous two (2) years, itemized operating and maintenance expenses for the previous two (2) years, and annual cash flow, if any, during the same period;

9. Executed construction agreements or proposals;

10. Engineering or architect reports on the structural integrity of the building or structure upon which work is being proposed.

In the event that any of the required information is not reasonably available to the applicant and cannot be obtained by the applicant, the applicant shall provide to the Commission a statement of the information which cannot be obtained and describe the reasons why such information cannot be obtained.

E. Issuance Or Denial Of Certificate of Economic Hardship:

1. If the Commission finds that the owner/applicant has not established that the owner/applicant will suffer a demonstrable economic hardship as a result of the denial of a certificate of appropriateness, then the Commission shall deny the applicant's application for a certificate of economic hardship.

2. If the Commission makes an initial determination that the applicant has presented a case which may establish that without approval of the proposed work all reasonable use of, or return from, a designated historic landmark or building, structure, or improvement within a designated historic district will be denied a property owner, but the Commission finds that reasonable alternatives may exist which should be addressed by the applicant, then the application shall be delayed for a period of no more than sixty (60) days following the finding. During the first thirty (30) days of this period, the Commission shall investigate plans and make recommendations to the owner and Village Board are intended to provide for reasonable use of, or return from the property, or to otherwise preserve the subject property. During the second thirty (30) days of this period, the applicant will investigate the proposal of the Commission and provide the Commission with written response thereto.

3. If, at the end of this sixty (60) day period, after reviewing its initial finding and its subsequent proposals and the applicant's response thereto, the Commission finds that without approval of the proposed work the property cannot be put to any reasonable use or the owner cannot obtain a reasonable economic return, then the Commission shall issue a certificate of economic hardship approving the proposed work. If the Commission finds otherwise, it shall deny the application for a certificate of economic hardship. Within fifteen (15) days following the completion of the public hearing and within fifteen (15) days of the sixty (60) day delay period provided for in subsection 7-9-13E of this Section, if applicable, the Commission shall render its decision on the certificate of economic hardship by adopting a resolution which shall set forth the findings of fact and decision of the Commission either granting or denying the certificate of economic hardship.

4. An executed copy of the resolution shall be sent to the applicant and property owner and the Development Customer Services Department within five (5) working days after the decision. (Ord. 1999-0-7, 3-15-99; amd. Ord. 22-8, 2-7-2022)

## 7-9-14: APPEALS:

A. Within fifteen (15) days of receipt of a final denial of a certificate of appropriateness or a certificate of economic hardship by the Commission, the applicant and/or the applicant's representative may appeal the Commission's decision to the Village Board. The Village Board, within forty-five (45) days of the applicant filing an appeal, shall affirm, reverse or modify the decision of the Commission after due consideration of the facts contained in the record, which the Commission shall submit to the Village Board within ten (10) working days of the filing of the appeal. The Village Board may receive comments on the contents of the record, orally at the meeting or in writing, not less than ten (10) days prior to the meeting at which the Board will first consider the appeal but shall not consider any new matters that were not presented during the Commission hearings.

B. The Village Board shall, within ten (10) days of its decision, advise the applicants and the Commission, in writing, of its final decision and shall direct the Village Manager or the Village Manager's designee to advise all affected departments of the Village government.

C. The failure of the Village Board to affirm, modify or reverse the decision of the Commission within forty-five (45) days of the applicant filing an appeal shall be considered as an affirmance by the Village Board of the decision of the Commission and a denial of the appeal, and the Commission shall so notify the applicant and the affected departments of the Village government

The decision of the Village Board will be the final administrative decision of the Village. (Ord. 1999-0-7, 3-15-99; amd. Ord. 22-8, 2-7-2022)

## 7-9-15: ADVISORY REVIEW PROCEDURES:

A. Application For Advisory Review:

1. Advisory review is provided by the Commission as a service to the public. Any owner may, at any time, consult with the Commission to determine whether intended work on a structure may comply with the review guidelines and seek the Commission's advice on how best to accomplish the work to comply with them.

2. Except as otherwise provided by rules and procedures adopted in accordance with subsection 7-9-15B of this Section, any application for a building permit for construction or relocation work on a property within a historic district other than historic landmarks, government-funded projects and structures intended to be demolished (which receive certificate of appropriateness reviews as outlined above), shall be sent to Commission staff by the Development Customer Services Department. The Development Customer Services Department shall not issue a building permit until the Commission, Architectural Review Committee, and/or Commission

staff, have reviewed the permit application and acted, or until the passage of thirty (30) days from the filing of the said application, whichever occurs first.

B. Architectural Review Committee And Commission Liaison Staff Review And Approval: The Commission may propose and the Village Board may approve rules, procedures and criteria under which a committee of the Commission, or the Commission staff liaison, may review applications for advisory review when the proposed work involves: 1) restoration to original conditions, or 2) no changes in materials, or 3) changes not visible the street, or 4) other types of activities determined by the Commission to have limited effect on the historic, architectural or aesthetic qualities of the structure. Such committee or Commission staff liaison shall take one of the following actions within five (5) days from receipt of the application from the Development Customer Services Department:

1. Review the permit application return to the Development Customer Services Department marked: "approved";

2. Request that the owner meet with the review committee to receive suggestions concerning revisions to the proposed work which will bring it in line with review criteria. As soon as possible, but no later than ten (10) days after the meeting, staff will provide a review summary and confirmation to the applicant and will mark the permit as "approved" for historic review. At this point the applicant is free to either revise the applicant's plans in accordance with the suggested changes and proceed with the permit process without changes.; and

3. Meet with the owner and/or submit the permit application and project description to the full Commission to review at its next regularly scheduled meeting.

C. Commission Review: Applications which have been referred to the Commission either directly from the Development Customer Services Department or indirectly through the committee or Commission staff, liaison shall be reviewed by the full Commission within thirty (30) days of receipt of the complete application. The applicant shall be notified, in writing, of the date, time and place of the meeting at which a review of the proposed work shall take place. The applicant may be requested to submit plans, drawings, photographs or other information to enable the Commission to conduct a more complete review. The Commission may, at that meeting, make recommendations concerning revisions to the proposed work which will bring the work into conformity with review criteria set forth in Section 7-9-11 of this Article. These recommendations will be forwarded, in writing, to the applicant as soon as possible after this meeting, but no later than ten (10) days after the meeting, and the application for permit will be marked as "approved" for historic review. At this point, the applicant is free to either revise the plans in accordance with the suggested changes and submit them to the Development Customer Services Department, or to submit them without change, and the permit will be issued if the application is otherwise in compliance with Village Code. The Commission may delay issuance of the permit by a period of no longer than thirty (30) days from time of its receipt of the complete permit application in an attempt to resolve nonconformity issues with regard to the review criteria. (Ord. 1999-0-7, 3-15-99; amd. Ord. 22-8, 2-7-2022)

## 7-9-16: PREVENTION OF DEMOLITION BY NEGLECT:

The Commission, on its own initiative, may file a petition with the Development Customer Services Department requesting that the Department require correction of defects or repairs to eligible or designated historic landmarks or buildings, structures or improvements in designated historic districts so that such landmarks, buildings, structures or improvements shall be preserved and protected in accordance with the purposes of this Article. (Ord. 1999-0-7, 3-15-99; amd. Ord. 22-8, 2-7-2022)

## 7-9-17: HAZARDOUS STRUCTURES AND PUBLIC NUISANCES:

A. This Article shall not prohibit the demolition of any structure which poses an immediate hazard to human health and safety. When an eligible or designated historic landmark or building, structure or improvement in a designated historic district requires immediate demolition due to its imminent threat to human health and safety and an authorized Village official, pursuant to ordinance, has made the determination that the landmark, building, structure or improvement should be demolished immediately, then nothing in this Article shall prohibit the demolition of such landmark, building, structure or improvement. The Village official ordering the demolition shall, prior to causing the demolition, attempt notification of the Commission and Commission staff liaison, of the imminent threat posed by the landmark, building, structure or improvement if such notice may be given without jeopardizing human health and safety.

B. If the Village has, pursuant to official action, declared a building, structure or improvement that is an eligible or designated landmark or is located in a designated historic district as a public nuisance and has authorized its demolition, the Village Manager or the Village Manager's designee shall have a copy of the declaration of public nuisance delivered to the chairperson of the Commission and Commission staff liaison, who shall place the matter on the agenda of the next meeting of the Commission. The Commission shall be authorized to review the building, structure or improvement and determine if the owner or some other person can commence rehabilitation of it immediately. The Commission shall ensure that whoever will rehabilitate the building, structure or improvement shall have either public or private financing, or both, to make sure that the building, structure or improvement is promptly rehabilitated in accordance with the criteria set forth in this Article. If the Commission is unable to secure the rehabilitation of the building, structure or improvement within ninety (90) days of the date that it was declared a public nuisance by the Village or by the date the Village obtains judicial authorization to demolish it, whichever is later, then the Village may proceed with the demolition of the building, structure or improvement.

C. An owner of a building, structure or improvement eligible or designated as a landmark or located within a historic district shall not be authorized to demolish such building, structure or improvement without filing an application for obtaining a certificate of appropriateness or certificate of economic hardship, except when an authorized Village official, pursuant to ordinance, or has made the determination that the building, structure or improvement poses an imminent threat to human health and safety and should be demolished immediately.

D. If the Village has declared an eligible or designated landmark or a building, structure or improvement in a designated historic district to be a public nuisance and, after such declaration, the owner of the building, structure or improvement files an application for a certificate of appropriateness so the building, structure or improvement may be rehabilitated, the Commission may exercise jurisdiction over the application and the structure until such time as the Village obtains judicial authorization to demolish the structure. Once the Village has obtained such judicial authorization, then the rehabilitation of the structure may proceed only if the Village Board

consents to withholding its authority to demolish the structure in abeyance while the structure is rehabilitated. (Ord. 1999-0-7, 3-15-99; amd. Ord. 22-8, 2-7-2022)

## 7-9-18: HANDICAPPED ACCESSIBILITY PROVISIONS:

Nothing in this Article shall exempt owners from complying with applicable Federal, State or Village laws concerning handicapped accessibility. In providing for handicapped accessibility as may be required by such laws or desired by an owner, every effort shall be made to visually integrate such physical devices as may be necessary to accomplish accessibility with the architectural design of the historic landmark or building, structure or improvement in a historic district. Emphasis shall be placed on providing readily removable physical accessibility provisions such as ramps or chair lifts, with no permanent damage to the historic fabric of the building. (Ord. 1999-0-7, 3-15-99; amd. Ord. 22-8, 2-7-2022)

## 7-9-19: ENFORCEMENT AND PENALTIES FOR VIOLATION:

A.   It shall be unlawful for any person to alter, relocate, remove or demolish any historic landmark or to do construction work on, relocate, remove or demolish any building, structure or improvement within an historic district, or attempt to take any of these actions without complying with the provisions of this Article. Persons violating any provision of this Article other than mandatory advisory review shall also be subject to the institution of proceedings by the Village to prevent, restrain, abate or correct such violations of this Article, including restoration of the building or structure and its site to its appearance prior to the violation if such appearance is integral to the significance of the site or structure as determined by the Commission. Any action to enforce this Section shall be brought by the Village Attorney, the Village Attorney's designee or by designated representatives of the Village Manager. This civil remedy shall be in addition to and not in lieu of any criminal prosecution and penalty contained in this Section.

B.   If construction, alteration, relocation, removal or demolition of an eligible or designated historic landmark or of any building, structure or improvement, located in a designated historic district occurs without a permit or without proper authorization as set forth in this Article, then the Village may seek to revoke the license of the company, individual, principal owner, or its or his/her successors' interest in performing such construction, alteration, relocation, removal or demolition for a period of one year.

C.   If demolition of an historic landmark occurs without a permit, the person causing such demolition shall, upon conviction, be guilty of a misdemeanor offense punishable by incarceration in the County jail for a term not to exceed six (6) months.

D.   Any person violating any provision of this Article shall, upon conviction, be punished by a fine not to exceed five hundred dollars ($500.00). Each day during which any violation hereof is committed shall constitute a separate offense. (Ord. 1999-0-7, 3-15-99; amd. Ord. 22-8, 2-7-2022)

## 7-9-20: JUDICIAL REVIEW OF FINAL DECISION:

Any final decisions rendered by the Village Board under this Article shall be subject to judicial review pursuant to the provisions of the Administrative Review Law, 735 Illinois Compiled Statutes 5/3-101 et seq., as amended, and rules adopted pursuant thereto. (Ord. 1999-0-7, 3-15-99; amd. Ord. 22-8, 2-7-2022)

---

| ARTICLE 10 |
| VACANT BUILDINGS |

SECTION:

**7-10-1: Declaration Of Policy**

**7-10-2: Other Ordinances**

**7-10-3: Definitions**

**7-10-4: "Vacant Building" Determination**

**7-10-5: Appeal Of Director's Determination Of "Vacant Buildings"**

**7-10-6: Obligation To Register Vacant Buildings And Unoccupied Buildings Acquired Through Mortgage Foreclosure**

**7-10-7: Approval Of Plan**

**7-10-8: Authority To Modify Plan, Right To Appeal**

**7-10-9: Failure To Comply With Plan**

**7-10-10: Other Enforcement**

**7-10-11: Real Estate Transfer Stamps**

**7-10-12: Certification**

**7-10-13: Time Restrictions; Vacant Buildings**

**7-10-14: Enforcement And Penalties**

## 7-10-1: DECLARATION OF POLICY:

The purpose of this article is to protect the public health, safety, and welfare by enactment of this article which:

A. Establishes a program for identification, registration, and regulation of buildings which are or become "vacant" as defined herein on and after the effective date of this article;

B. Determines the responsibilities of owners of vacant buildings; and

C. Provides for administration, enforcement, including abatement of public nuisances, and imposition of penalties.

This article shall be liberally construed to affect its purposes. (Ord. 15-183, 11-2-2015)

## 7-10-2: OTHER ORDINANCES:

This article shall not be construed to prevent the enforcement of other applicable ordinances, codes, legislation, and regulations which prescribe standards other than are provided herein, and in the event of conflict, the most restrictive shall apply. (Ord. 15-183, 11-2-2015)

## 7-10-3: DEFINITIONS:

Unless otherwise expressly stated or clearly indicated by the context, the following terms shall, for the purpose of this article, have the meanings indicated in this section:

BUILDING: Any structure occupied or intended for supporting or sheltering any occupancy.

DANGEROUS BUILDING: A structure defined as "unsafe" in article 13 of this chapter, as it may be amended. Such buildings are public nuisances.

DIRECTOR: The Director of the Development Customer Services Department or the Director's designee.

OWNER: Any person, agent, operator, firm, or corporation having a legal or equitable interest in the property; or recorded in the official records of the state, county, or municipality as holding title to the property; or otherwise having control of the property, including the guardian of the estate of any such person, and the executor or administrator of the estate of such person if ordered to take possession of real property by a court.

PERSON: Includes a corporation, a partnership, or other entity as well as an individual.

PREMISES: A lot, plot or parcel of land including any structure thereon.

PUBLIC NUISANCE: Includes the following:

A. The physical condition, or uses of any premises regarded as a public nuisance at common law, under the Illinois Compiled Statutes, or under this code; or

B. Any physical condition, use or occupancy of any premises or its appurtenances considered an attractive nuisance to children, including, but not limited to, abandoned wells, shafts, basements, excavations, and unsafe fences or structures; or

C. Any building which has unsanitary sewerage or plumbing facilities; or

D. Any building designated by the Director as unsafe for human habitation or use; or

E. Any building which constitutes a fire hazard, or is unsafe or insecure to a degree that endangers life, limb or property; or

F. Any premises which is unsanitary, or which is littered with rubbish or garbage, or which has an uncontrolled growth of weeds; or

G. Any building that is: dangerous; in a state of dilapidation, deterioration or decay; improperly constructed; unsecured; vacant with the doors, windows, or other openings boarded up or secured by any means other than conventional methods used in the design of the building or permitted for new construction of similar type; damaged by fire to the extent that it no longer provides shelter; in danger of collapse or structural failure; and dangerous to anyone on or near the premises; or

H. Any building defined as a "dangerous" or "unsafe structure" by article 13 of this chapter, as it may be amended.

SECURED BUILDING: A building which has had, in a manner intended to be temporary or permanent, any or all openings, which openings are windows or doors which were present for the purpose of light, ventilation or egress, some material whether opaque, solid or transparent, affixed to such openings, from the interior or exterior of the building, for the purpose of securing or preventing access or damage to the building or its components.

UNOCCUPIED BUILDING: A building or portion thereof which lacks the habitual presence of human beings who have a legal right to be on the premises, including buildings ordered vacated by the Director pursuant to authority granted to him by this code.

In determining whether a building is "unoccupied", the Director may consider these factors, among others:

A. A building at which substantially all lawful residential or business activity has ceased.

B. The percentage of the overall square footage of occupied to unoccupied space or the overall number of occupied and unoccupied units shall be considered.

C. The building is substantially devoid of contents. The condition and value of fixtures or personal property in the building are relevant to this determination.

D. The building lacks utility services, i.e., water, sewer, electric or natural gas.

E. The building is the subject of a foreclosure action.

F. The building is not actively for sale as part of a contractual agreement to sell the building.

G.   The presence or recurrence of uncorrected code violations.

UNSECURED BUILDING: A building that is not secured as defined herein at which any or all openings are locked, including windows or doors.

VACANT BUILDING: A building or portion of a building which is:

A.   Unoccupied and unsecured; or

B.   Unoccupied and secured by boarding or other similar means for more than three (3) months; or

C.   Unoccupied and a dangerous structure; or

D.   Declared unsafe for occupancy by the Director pursuant to applicable provisions of this code; or

E.   Unoccupied and containing multiple Village Code violations; or

F.   Unoccupied with the building or its premises having been used for unlawful activity at any time while unoccupied or at any time during the previous six (6) months whether occupied or not; or

G.   Declared unsafe for occupancy by the Director and unlawfully occupied; or

H.   Unoccupied for over three (3) months and during which time the Director has issued an order to correct public nuisance conditions and same have not been corrected in a code compliant manner; or

I.   Unoccupied for over six (6) months.

But not including:

Unoccupied buildings which are undergoing construction, renovation, or rehabilitation and which are in compliance with all applicable ordinances, codes, legislation, and regulations, and for which construction, renovation or rehabilitation is proceeding diligently to completion. (Ord. 15-183, 11-2-2015)

### 7-10-4: "VACANT BUILDING" DETERMINATION:

A.   Within sixty (60) days after the effective date of this article, the Director shall evaluate all buildings in the Village which he or she believes to be unoccupied on or after the effective date of this article and make a determination for each as to whether the building is a "vacant building" within the meaning of section 7-10-3 of this article. The Director may determine that a building which meets any of the criteria set forth in the definition of "vacant building" in section 7-10-3 of this article is not to be regulated under this article for a stated period, if upon consideration of reliable, substantiated and sufficient evidence, he or she determines that the circumstances which give rise to the building being eligible for regulation hereunder are clearly temporary in nature and are either in the process of being addressed or will soon be addressed by the owner and that therefore regulation of the building under this article would not serve the public health, welfare, and safety and makes written findings in support of his or her decision. The determination shall be in writing and shall state the factual basis for the determination. For buildings the Director determines to be "vacant buildings", he or she shall, within seven (7) days of making that determination, send notice of his/her written determination with the factual findings to the name and address of the last taxpayer of record for such parcel listed on the most recent Cook County tax roll. Said notice of determination shall be sent first class United States mail, with proper postage prepaid. Failure of delivery shall not excuse a person from complying with this article. The Director may personally serve or cause personal service of the notice of determination. Any person making such service shall execute an affidavit attesting to the facts of service. The Director shall maintain an affidavit of such mailing for each notice of determination sent.

B.   The Director shall cause a comprehensive inspection of the interior of all "vacant buildings" to determine compliance with Village property maintenance, building, health, fire, water and sewer codes.

C.   The notice of determination shall set a tentative date and time for the code compliance inspection of the interior of the vacant building to determine the extent of compliance with Village property maintenance, building, health, fire, water and sewer codes. After receipt of the notice of determination, if the owner does not appeal the determination, the owner shall either confirm the tentative date for the inspection or shall schedule a new date and time for same. If the owner fails to confirm the tentative date and time for the inspection or refuses to schedule or permit the inspection it shall be the responsibility of the Village to obtain an administrative search warrant to accomplish the inspection.

D.   The Village shall charge the owner a fee of five hundred dollars ($500.00) to offset the cost to the Village of said inspection. The owner shall pay the inspection fee to the Village within thirty (30) days of receipt of the bill for same.

E.   Village real estate transfer stamps will not be issued by the Village for the sale of such property until such inspection has taken place and the fee therefor has been paid and, if necessary, an administrative search warrant for same has been timely obtained. Such stamps shall be issued if the Village is required to obtain an administrative search warrant and fails to obtain same in a timely manner.

F.   The notice of determination shall contain a statement of the obligations of the owner of a building determined to be a vacant building, a copy of the registration form the owner is required to file pursuant to section 7-10-6 of this article, and a notice of the owner's right to appeal the Director's determination. (Ord. 15-183, 11-2-2015)

### 7-10-5: APPEAL OF DIRECTOR'S DETERMINATION OF "VACANT BUILDINGS":

A.   An owner of a building determined by the Director to be a vacant building as provided for in this article may appeal that determination to the Village Manager. Such appeal shall be in writing and shall be filed with the Village Manager within fifteen (15) days of the date of mailing of the notice of determination. The filing of an appeal stays the owner's obligation to register his or her building as required by section 7-10-6 of this article. The appeal shall contain a complete statement of the reasons the owner disputes the Director's determination, shall set forth specific facts in support thereof, and shall include all evidence the owner relies upon to

support the appeal. The Village Manager shall decide the appeal on the basis of facts presented by the owner in his or her written appeal and the Director's written determination.

B.   The burden is upon the owner to present sufficient evidence to persuade the Village Manager that it is more likely than not that the subject building is not a "vacant building" within the meaning of this article.

C.   The Village Manager shall send written notice of his or her decision to the owner within ten (10) days of his or her receipt of the appeal. The Village Manager may, but is not required to, seek additional information from the owner. The Village Manager may, upon written notice thereof to the owner, take no more than ten (10) additional days, to decide the appeal if he or she determines that such additional time is required for consideration of the appeal.

D.   An owner who wishes to challenge applicability of this article to his/her building without the Director's determination having been made, shall set forth specific facts to support nonapplicability in a writing to the Director. In the event the Director determines that the subject building is a "vacant building", the owner shall have the right to appeal the Director's determination to the Village Manager as provided for herein. (Ord. 15-183, 11-2-2015)

## 7-10-6: OBLIGATION TO REGISTER VACANT BUILDINGS AND UNOCCUPIED BUILDINGS ACQUIRED THROUGH MORTGAGE FORECLOSURE:

Owners of "vacant buildings" and mortgage lenders who acquire title to unoccupied buildings shall be required to register same with the Director of Development Customer Services as prescribed below:

A.   Owner's Obligation To Register Vacant Buildings: The owner of a building who knows, or from all the facts and circumstances should know, that his or her building is or has become a "vacant building" within the meaning of this article after the effective date of this article or the owner of a building, which the Director determines at any time to be a "vacant building", or the owner of a building whose appeal from the Director's determination has been denied by the Village Manager, shall take the actions provided for in this section within fifteen (15) days after either the date of Director's notice of determination or occurrence of the facts which would cause a reasonable person to believe that the building was a "vacant building", or denial of the appeal, whichever is applicable.

1.   Registration Of Building: Register the building with the Director of Development Customer Services, on a form provided by the Director and pay the two hundred dollar ($200.00) annual nonprofit vacant building registration fee.

a.   The form shall include, as a minimum, the name, street address, and telephone number of the owner; the case name and number of any litigation pending concerning or affecting the building, including bankruptcy cases; and the name, street address, and telephone number of all persons with any legal interest in the building or the premises. The form shall require the owner to identify a natural person twenty one (21) years of age or older who maintains a permanent address in Cook County, Illinois, to accept service on behalf of the owner with respect to any notices the Director sends pursuant to this article or service of process in any proceeding commenced to enforce any provision of this article, and file with the Director on the registration form, the name, address, telephone number, of said person. A street address is required. A post office box is not an acceptable address.

b.   The form shall state that the owner, by affixing his or her signature, is advised that the Village will not issue real estate transfer tax stamps without Village inspectors having first conducted an interior inspection for code compliance and, if necessary, having first timely obtained an administrative search warrant for same.

c.   (1) The form shall require the owner to indicate his or her "acceptance of notice by posting" consenting to service of notices sent or required to be sent, pursuant to this article, by posting on the building if the owner fails to renew the registration if required, or maintain as current with the Director the information required regarding the person designated to accept notice and service of process;

(2)   Renew the vacant building registration each year on the anniversary date of the first filing for the time the building remains vacant and pay the required two hundred dollar ($200.00) annual fee; and

(3)   File an amended registration within fifteen (15) days of any change in the information contained in the annual registration. A new registration is required for any change in ownership whatsoever.

d.   Registration does not exonerate the owner from compliance with all applicable codes and ordinances, including this article, nor does it preclude any of the actions the Village is authorized to take pursuant to this article or elsewhere in this code.

2.   Inspection Conducted: The Village shall conduct a comprehensive code compliance inspection of the interior of the vacant building and the owner shall pay a five hundred dollar ($500.00) fee to the Village to defray the Village's cost of same within thirty (30) days of the inspection. Such inspection will determine the extent of compliance with Village property maintenance, building, health, fire, water and sewer codes. The Village shall send the inspection report to the owner within thirty (30) days. Periodic reinspections shall take place, as necessary, until code compliance is achieved. Timely code compliance is required.

3.   Insurance Required: Obtain liability insurance and maintain such insurance for as long as the building is vacant, and file evidence of such insurance with the Director, as follows: five hundred thousand dollars ($500,000.00) for a vacant residential building of one to three (3) units; seven hundred fifty thousand dollars ($750,000.00) for a vacant residential building of four (4) to eleven (11) units; one million dollars ($1,000,000.00) for a vacant residential building of twelve (12) to forty eight (48) units; two million dollars ($2,000,000.00) for a vacant residential building of more than forty eight (48) units; and two million dollars ($2,000,000.00) for a vacant manufacturing, industrial, storage, or nonresidential commercial building.

4.   Vacant Building Plan: At the time a building is registered as required herein, the owner shall submit a vacant building plan. The Director may prescribe a form for the plan. If the owner fails to submit the plan as provided for by this article, the Director may determine the plan. The plan shall contain the following as a minimum:

a.   A plan of action to repair any doors, windows, or other openings which are boarded up or otherwise secured or covered by any means other than conventional methods used in the design of the building or permitted for new construction or similar type. The proposed repair shall result in openings being secured by conventional methods used in the design of the building or by methods

permitted for new construction of similar type with board removed. Boarding shall be accomplished with materials and methods described by the Director and available from the Director. The owner shall maintain the building in an enclosed and secure state until the building is reoccupied or made available for immediate occupancy. If the owner demonstrates that securing of the building will provide adequate protection to the public, the Director may waive the requirement of an enclosure.

b.    For buildings and/or premises which are determined by the Director as being or containing public nuisances, as defined in section 7-10-3 of this article, then the vacant building/premises plan shall contain a plan of action to remedy such public nuisance(s).

c.    A time schedule identifying a date of commencement of repair and date of completion of repair for each improperly secured opening and nuisance identified by the Director.

d.    When the owner proposes to demolish the vacant building, then the owner shall submit a plan and time schedule for such demolition.

e.    A plan of action to maintain the building and/or premises thereof in conformance with this article.

f.    A plan of action, with a time schedule, identifying the date the building will be habitable and occupied or offered for occupancy or sale. The time schedule shall include date(s) of commencement and completion of all actions required to achieve habitability. No plan which fails to provide for compliance with this article or, which will not, as determined by the Director, achieve such compliance, within three (3) months, in the case of a vacant boarded building, and two (2) years, in the case of a vacant, unboarded, and code compliant building will be approved, except that the Director may approve an extension of the time during which the building will be unoccupied beyond two (2) years to a date certain but then only based upon clear and documented evidence of good cause shown by the owner as determined by the Director.

g.    All premises upon which unoccupied or vacant buildings are located and the exteriors shall at all times be maintained in compliance with this code.

h.    Exterior lighting shall be maintained according to standards established by the Director and available from the Director.

i.    All ground floor windows facing street frontage, including, but not limited to, all display windows in unoccupied or vacant commercial buildings shall be kept in a well maintained and clean condition and shall be covered on the interior side in a professionally finished manner with an opaque window covering material manufactured for that purpose and approved by the Village Business Services Manager, or in the case of display windows, such windows shall be kept in a well maintained and clean condition and the display area shall be enclosed with a professionally finished backdrop, floor, side walls and ceiling all of which shall be kept in a well maintained and clean condition and shall be well lighted from ten o'clock (10:00) A.M. to ten o'clock (10:00) P.M. each day. Photographs, paintings and other works of art or other tasteful forms of decoration may be professionally displayed in these properly enclosed clear glass display windows. If opaque window covering material is used, a one foot by one foot (1' x 1') clear glass opening through which the interior space is clearly visible shall be maintained at standing eye level along one edge of one such window.

5.    Security Guard Service: On written notice of the Director, provide bonded, licensed, and insured security guard service at the building between the hours of three o'clock (3:00) P.M. and eight o'clock (8:00) A.M. Such service to remain in place until the Director gives written notice that the service is no longer required. Such service shall be required when the Director makes a written determination that the vacant building constitutes a fire hazard, is otherwise dangerous to human life or the public welfare, involves illegal or improper use, occupancy, or maintenance, under such conditions that securing the building is insufficient to prevent the actual or threatened harm.

6.    Additional Information Posted: Affix to any building which is boarded, a two foot by two foot (2' x 2') sign compliant with the Village's sign regulation ordinance, and which otherwise provides the following information: the name, address, and telephone number of the owner, and in addition, for buildings which are the subject of a foreclosure action, the name, address, and telephone number of the plaintiff and the plaintiff's attorney, if any, in the foreclosure action. The sign must be placed so that its message is legible from the public way.

B.    Mortgage Lender's Obligation To Register Unoccupied Buildings Acquired Through Mortgage Foreclosure: The obligation to register buildings shall extend to mortgage lenders that have obtained title to unoccupied buildings through a mortgage foreclosure action.

1.    Mortgage lenders shall register unoccupied buildings with the Director within fifteen (15) days of obtaining title to same.

2.    The registration obligation of mortgage lenders under subsection 7-10-6B of this section shall be limited to providing the Director with the same information required under subsection 7-10-6A1 of this section on the registration form prescribed by the Director.

3.    Mortgage lenders shall not be responsible for paying the two hundred dollar ($200.00) registration fee and shall not be required to comply with subsections 7-10-6A2 through A6 of this section.

4.    An amended registration form shall be filed in accordance with subsection 7-10-6A1c(3) of this section within fifteen (15) days of any change in the information provided in any registration form provided hereunder.

5.    If such unoccupied, registered building is later determined to have become a "vacant building" as defined in section 7-10-3 of this article then such building and building owner shall be required to comply with all of the provisions of subsection 7-10-6A of this section. (Ord. 15-183, 11-2-2015)

## 7-10-7: APPROVAL OF PLAN:

A.    Review Of Building Plan: The Director shall review the proposed vacant building plan in accordance with the standards below. The Director shall send notice to the owner of the vacant building of his or her determination.

B.   Standards For Plan Approval: In considering the appropriateness of a vacant building plan, the Director shall include the following in his or her consideration and shall make written findings as to each:

1.   The purposes of this article and intent of the Village Board to minimize the time a building is boarded or otherwise vacant.

2.   The effect of the building and the proposed plan on adjoining property.

3.   The length of time the building has been vacant.

4.   The presence of any public nuisances on the property.

5.   The likelihood that the plan or portion(s) thereof will prevent or ameliorate the condition it is designed to address. (Ord. 15-183, 11-2-2015)

## 7-10-8: AUTHORITY TO MODIFY PLAN, RIGHT TO APPEAL:

The Director shall, upon notice to the vacant building owner, have the right to modify the vacant building plan by modifying the dates of performance, the proposed methods of action, or by imposing additional requirements consistent with this article he or she deems necessary to protect the public health, safety, or welfare. (Ord. 15-183, 11-2-2015)

## 7-10-9: FAILURE TO COMPLY WITH PLAN:

Failure to have an approved plan within thirty (30) days of filing the registration form or failure to comply with the approved plan shall constitute a violation of this article subjecting the owner of the building to penalties as provided in this article and to any remedies the Village may avail itself of as provided for herein and elsewhere in this code, including, but not limited to, an action to compel correction of property maintenance violations. (Ord. 15-183, 11-2-2015)

## 7-10-10: OTHER ENFORCEMENT:

The registration of a vacant building shall not preclude action by the Village to demolish or to take other action against the building pursuant to other provisions of this article, this code, or other applicable legislation. (Ord. 15-183, 11-2-2015)

## 7-10-11: REAL ESTATE TRANSFER STAMPS:

A premises upon which is situated a vacant building for which inspection fees or registration fees imposed pursuant to this article have not been paid in full or which is not otherwise eligible under this article for the Village real estate transfer tax stamps shall not be permitted to acquire same until the fees are paid and/or the eligibility issues are addressed. Unpaid fees shall be a lien upon the property. (Ord. 15-183, 11-2-2015)

## 7-10-12: CERTIFICATION:

A certificate of code compliance for vacant buildings issued by the Development Customer Services Department and payment in full of all fees imposed pursuant to this article are required prior to any occupancy of a vacant building. (Ord. 15-183, 11-2-2015)

## 7-10-13: TIME RESTRICTIONS; VACANT BUILDINGS:

It is the policy of the Village that boarding is a temporary solution to prevent unauthorized entry into a vacant building and that boarded buildings are a public nuisance. A vacant building may not remain boarded longer than three (3) months unless an extension of that time is part of a plan approved by the Director.

A vacant building which is otherwise code compliant and secure as determined by the Director on the basis of police reports, citizen complaints, and other information considered reliable by reasonable persons, may not remain vacant for more than two (2) years and must have an approved plan for occupancy, sale, demolition, or other disposition of the building in place within the time frames established in this article, except as otherwise provided for in subsection 7-10-6A4 of this article. (Ord. 15-183, 11-2-2015)

## 7-10-14: ENFORCEMENT AND PENALTIES:

A.   Any person found to have violated any provision of this article shall be subject to a minimum fine of one hundred dollars ($100.00) per day per violation to a maximum of seven hundred fifty dollars ($750.00) per day per violation, in addition to any other legal or equitable remedies available to the Village. Such other remedies include, but are not limited to, injunctive relief, application to a court of competent jurisdiction for a receiver, demolition, or condemnation, contracting for the repair or purchase of the premises, or foreclosure of any lien the Village may have thereon.

B.   A separate and distinct offense shall be committed each day on which such person or persons shall violate the provisions of this article.

C.   The Village may enforce this article in its administrative adjudication system or through the court system.

D.   Nothing herein contained shall prohibit the Village from immediately condemning as provided for in this code a building or taking other immediate action upon a determination that the building is a public nuisance or poses an imminent danger to the occupants of the building, or the public health, safety and welfare. (Ord. 15-183, 11-2-2015)

---

## ARTICLE 11

## FUEL GAS CODE

---

SECTION:

## 7-11-1: Adoption

**7-11-2: Amendments**

### 7-11-1: ADOPTION:

A. The 2021 international fuel gas code (IFGC) as published by the International Code Council, is hereby adopted by the Village by reference and is made a part hereof as if fully set forth in this section with the additions, insertions, deletions and changes set forth in section 7-11-2 of this article. To the extent that the provisions of the IFGC are inconsistent with any codes previously adopted by the Village by reference, the provisions of the IFGC shall govern unless specifically set forth in this code. In the event of a conflict between any provisions of the IFGC and any provision of the Oak Park Village Code, the provisions of the Oak Park Village Code shall govern.

B. There shall be three (3) copies of the IFGC kept on file for public inspection in the office of the Chief Building Official. (Ord. 2014-0-64, 10-6-2014, eff. 1-1-2015; amd. Ord. 20-078, 9-21-2020; Ord. 23-54, 6-20-2023)

### 7-11-2: AMENDMENTS:

The 2021 international fuel gas code, as adopted pursuant to section 7-11-1 of this article, is hereby amended by adding the underlined language and deleting the overstricken language as follows:

**CHAPTER 1**

**SCOPE AND ADMINISTRATION**

**PART 1 - SCOPE AND APPLICATION**

**SECTION 101 (IFGC) - GENERAL**

**Section 101.1 Title.** These regulations, as amended and adopted by the Village, shall be known as the fuel gas code of the Village of Oak Park, hereinafter referred to as "this code."

**PART 2 - ADMINISTRATION AND ENFORCEMENT**

**CHAPTER 1, PART 2 - ADMINISTRATION AND ENFORCEMENT,** is deleted in its entirety with the exception of the following sections to remain:

1. Section 105 (IFGC) Approval,

2. Section 107 (IFGC) Inspections And Testing,

3. Section 108 (IFGC) Violations, sections 108.7 through 108.7.3 inclusive, and

4. Section 110 (IFGC) Temporary Equipment, Systems And Uses.

Administration and enforcement of this code shall be governed by the sections set forth above and by applicable provisions of chapter 1 of the international building ode as amended and adopted by the Village.

(Ord. 2014-0-64, 10-6-2014, eff. 1-1-2015; amd. Ord. 20-078, 9-21-2020; Ord. 23-54, 6-20-2023)

### ARTICLE 12
### PLUMBING CODE

SECTION:

**7-12-1: Adoption**

### 7-12-1: ADOPTION:

A. The current edition of the state of Illinois plumbing code, pursuant to 77 Illinois administrative code 890, as amended, is hereby adopted by the Village by reference and is made a part hereof as if fully set forth in this section.

B. There shall be three (3) copies of the current edition of the state of Illinois plumbing code kept on file for public inspection in the office of the Village Clerk.

C. All new and replacement plumbing fixtures and irrigation controllers shall bear the WaterSense label as designated by the United States environmental protection agency WaterSense program and shall be in compliance with section 2.5(g) of the Illinois plumbing license law, 225 Illinois Compiled Statutes 320/2.5(g), as amended. (Ord. 15-179, 11-16-2015)

### ARTICLE 13
### PROPERTY MAINTENANCE CODE

SECTION:

**7-13-1: Adoption**

**7-13-2: Amendments**

## 7-13-1: ADOPTION:

A.   The international property maintenance code, 2024 edition ("IPMC"), as published by the International Code Council, is hereby adopted by the Village by reference and is made a part hereof as if fully set forth in this section with the additions, insertions, deletions and changes set forth in section 7-13-2 of this article. To the extent that the provisions of the IPMC are inconsistent with any codes previously adopted by the Village by reference, the provisions of the IPMC shall govern unless specifically set forth in this code. In the event of a conflict between any provisions of the IPMC and any provision of the Oak Park Village Code, the provisions of the Oak Park Village Code shall govern.

B.   There shall be three (3) copies of the international property maintenance code, 2024 edition, kept on file for public inspection in the office of the Village Clerk. (Ord. 15-181, 11-2-2015, eff. 12-1-2015; amd. Ord. 25-135, 3-18-2025)

## 7-13-2: AMENDMENTS:

The International Property Maintenance Code, 2024 edition, as adopted pursuant to section 7-13-1 of this article is hereby amended by adding the underlined language and deleting the overstricken language as follows:

**Section 101.1 Title.** These regulations, as amended and adopted by the Village shall be known as the Property Maintenance Code of the Village of Oak Park, hereinafter referred to as "this code."

**Section 102.3 Application of other codes.** Repairs, additions or alterations to a structure, or changes of occupancy, shall be done in accordance with the procedures and provisions of the International Existing Building Code, International Energy Conservation Code, International Fire Code, International Fuel Gas Code, International Mechanical Code, International Residential, State of Illinois Plumbing Code and NFPA 70. Nothing in this code shall be construed to cancel, modify or set aside any provision of the International Zoning Code.

### SECTION 103 Department of Neighborhood Services

**Section 103.1 Creation of agency.** The Neighborhood Services Department is hereby assigned to enforce this code and the official in charge thereof, the Neighborhood Services Director or the Director's designee, shall be known as the code official. The function of the agency shall be the implementation, administration and enforcement of the provisions of this code.

**Section 105.3.2 Obligation.** A property owner shall allow a code official, upon proper request, to inspect a dwelling unit in association with the provisions of the Village Code Article 12-2-6 Inspections of Buildings; Violations; Suspension and Revocation of License.

is deleted in its entirety and is replaced with a new **Section 106 Board of Appeals**, as follows:

**Section 106.1 General.** In order to hear and decide appeals of orders, decisions or determinations made by the code official relative to the application and interpretation of this code, there shall be and is hereby created a board of appeals which shall be the Village's Building Codes Advisory Commission.

**Section 106.2 Limitations on Authority.** An application for appeal shall be based on a claim that the true intent of this code or the rules legally adopted thereunder have been incorrectly interpreted, the provisions of this code do not fully apply or an equally good or better form of construction is proposed. The board shall have no authority to waive requirements of this code.

**Section 106.3 Application for Appeal.** Any person directly affected by a decision of the code official or a notice or order issued under this code shall have the right to appeal to the board of appeals, provided that a written appeal is filed within twenty (20) calendar days after the day the decision, notice or order was served. An appeal filed or received by the Village shall not be eligible to be heard after a citation has been issued which is the subject of the appeal.

**Section 106.4 Board Decision.** The board of appeals shall modify or reverse the decision of the code official or the code official's designee or a notice or order issued under this code upon a concurring vote of a majority of the total number of appointed board members. The board of appeals shall have the discretion to allow a variance from the provisions of the code if, after having received a written report, certified by a licensed architect or engineer, the board of appeals determines that strict compliance with the code is impractical from an engineering, architectural or structural standpoint, that the spirit and intent of the code has been met and life safety has not been materially compromised as a result of the variance. The decision of the board of appeals shall be in writing and shall be furnished to the appellant and to the building official.

**Section 106.5 Administration.** The code official shall take immediate action in accordance with the decision of the board of appeals. Appeals of decisions of the building official or a notice or order issued under this code (other than those of immediate threat to life safety) shall stay the enforcement of the decision, notice or order until the appeal is heard by the board of appeals and a decision is rendered.

**Section 106.6 Stays of Enforcement.** Appeals of notices and orders (other than imminent danger notices) shall stay the enforcement of the notice and order until the appeal is heard by the board of appeals.

**Section 107.4 Violation Penalties.** . Any person who violates a provision of this code, or fail to comply therewith, or with any of the requirements thereof, shall be prosecuted within the limits provided by state law or the Village Code. Any person who violates any provision of this code shall upon conviction be punished by a fine of not less than twenty dollars ($20.00) nor more than seven hundred fifty dollars ($750.00), and each day that a violation continues shall constitute a separate and distinct offense. No fine shall be levied for a day upon which a written appeal is filed with the Village through the date the board of appeals issues its written decision on the appeal.

**Section 109.6.1 Pre-Sale Inspection of Buildings Containing Four Or More Units.** No building containing four (4) or more dwelling units shall be sold unless the seller furnishes the buyer with a report of presale inspection no more than one hundred twenty (120) days prior to the closing and no later than the day of the closing on the sale of the property. Said report of presale inspection shall be based on an inspection of all dwelling units by the Village and shall be issued by same. The report shall provide that the building is in compliance with all applicable building and zoning regulations of the Village, or, in the alternative, set forth the building and/or zoning violations present at the building. The request for a presale inspection must be made at least two (2) weeks prior to the scheduled date of the closing. An inspection made pursuant to this section satisfies the annual inspection requirement of section 12-2-6A of the Village Code. A sale for purposes of this section includes contract sales, exchanges, conversions to condominiums and transfers of possession or control of a building. A person participating in such a sale in violation of this section, either as a seller or by receipt of a sales commission in connection therewith, shall be subject to the applicable penalties as provided in this code. Any contract executed in violation of this section shall be voidable by a buyer. Nothing herein shall relieve the buyer from compliance with section 12-2-6A of the Village Code.

**Section 111.1 General.** The code official shall order the owner of any premises upon which is located any structure, which in the code official judgment after review is so deteriorated or dilapidated or has become so out of repair as to be dangerous, unsafe, insanitary or otherwise unfit for human habitation or occupancy, and such that it is unreasonable to repair the structure, to demolish and remove such structure; or if such structure is capable of being made safe by repairs, to repair and make safe and sanitary, or to board up and hold for future repair or to demolish and remove at the owner's option; or where there has been a cessation of normal construction of any structure for a period of more than two years, the code official shall order the owner to demolish and remove such structure, or board up until future repair. Boarding the building up for future repair shall not extend beyond three months, unless approved by the building official.

## CHAPTER 2

## DEFINITIONS

Add the following definitions to **Section 202 General Definitions:**

**Cultivated Garden.** An area of land in which plants, other than turf grasses, are intentionally grown and receive care such as mulching, watering, pruning, or the removal of noxious plants. Plants within a cultivated garden may be installed or naturally recruited, as may occur with native plants.

**Days.** Unless otherwise stated, "days" shall mean calendar days.

**Parking Area.** A parking area is any parcel of land used for the parking of motor vehicles and having a capacity of one to four (4) motor vehicles and excluding places where motor vehicles are parked within a building.

**Responsible Party.** Except as may otherwise be specified herein, the owner or the owner's designated agent shall be considered a responsible party for ensuring compliance with this code. In addition, any other person or entity that may be reasonably considered to have a role or responsibility in the creation, continuation, or correction of any violation of this code shall be considered a responsible party or additional responsible party for such violation. A licensed real estate agent or broker whose sole authority is to show and lease property for rent shall not be considered a responsible party subject to penalties under this code.

The definition for "Rooming House" shall be modified as follows:

**Rooming House.** A building arranged or occupied for lodging, with or without meals, for compensation and not occupied as a one- or two-family dwelling. A primary or accessory building or structure or part thereof, in which living and sleeping quarters (but not meals or cooking facilities) are provided by prearrangement for compensation on a weekly or longer basis for three (3) or more persons who are not members of the keeper's family.

## CHAPTER 3

## GENERAL REQUIREMENTS

**Section 302.4 Weeds.** All premises and exterior property shall be maintained free from weeds or plant growth in excess of eight (8) inches in height. All noxious weeds shall be prohibited. Weeds shall be defined as all grasses, annual plants and vegetation, other than trees or shrubs provided; however, this term shall not include cultivated flowers and gardens.

Upon failure of the owner or agent having charge of a property to cut and destroy weeds after service of a notice of violation, they shall be subject to prosecution in accordance with Section 108.3 and as prescribed by the authority having jurisdiction. Upon failure to comply with the notice of violation, any duly authorized employee of the jurisdiction or contractor hired by the jurisdiction shall be authorized to enter upon the property in violation and cut and destroy the weeds growing thereon, and the costs of such removal shall be paid by the owner or agent responsible for the property.

**Section 302.8.1 Parking.** It shall be unlawful for the owner of a property to allow parking of a motor vehicle upon any unimproved surface. As used in this section, the term "unimproved surface" includes, but is not limited to, grass and dirt surfaces or any other surface not in compliance with the pavement design standards in Oak Park's Zoning Ordinance.

**Section 302.10 Surface of Parking Areas And Driveways.** The surface of parking areas and driveways serving as access to parking areas shall consist of a minimum five-inch (5") thick unreinforced concrete slab or standard blacktop or other equivalent material approved by the Building Official, or shall be constructed by excavating the parking or driveway area to a six-inch (6") (152.4 mm) depth and placing six inches (6") (152.4 mm) of compacted gravel or crushed stone thereupon. Compacted gravel surfaces may not be used in areas or pathways required for ingress and egress to and from a building or structure.

**Section 302.11 Security Gates.** Metal security gates and bars on the exterior or interior of doors or windows of commercial establishments are prohibited. Metal security gates or bars on doors or windows not facing a public street or sidewalk are permitted.

## Section 302.12 Landscaping.

A.   Duty to prune. Trees, bushes or other shrubbery on private property adjacent to a street right-of-way shall be pruned in such a manner so as to not obstruct or shade street lights, obstruct the passage of pedestrians on sidewalks or vehicles in the street, obstruct the ability to see traffic signs, obstruct the view of any intersection or create a public safety hazard in general.

B.   Yard maintenance. Yards shall be maintained without ruts caused by pedestrian or vehicle use.

**Section 304.3 Premises Identification.** Buildings shall have approved address numbers placed in a position to be plainly legible and visible from the street or road fronting the property. These numbers shall contrast with their background. Address numbers shall be Arabic numerals or alphabet letters. Numbers shall be not less than 3 inches ( 76 mm) in height with a minimum stroke width of 0.5 inch (12.7 mm) and be permanently affixed. If a garage is built adjacent to an alley, the rear address number shall be placed in a conspicuous location on the side of the garage facing the alley. A rear address number shall not be required where the rear of the property is not adjacent to an alley.

## CHAPTER 4

## LIGHT, VENTILATION AND OCCUPANCY LIMITATIONS

**Section 403.1 Habitable Spaces.** Every habitable room shall have one or more of the following ventilation systems:

A.   At least one window which can be easily opened, with the total of all such openable window area in such room at least 45 percent of the minimum window area size required by section 402.1; or

B.   A ventilator or similar device, leading directly to outside air, with effective opening area equivalent to openable window area required under subsection 403.1(A) of this section; or

C.   A forced air ventilation system, properly installed, maintained in safe and good working condition, supplying outside air to such room, which meets the requirements of the current International Property Maintenance Code. A forced air ventilation system may not substitute for natural ventilation in sleeping rooms.

**Exception:** Where rooms and spaces without openings to the outdoors are ventilated through an adjoining room, the unobstructed opening to the adjoining room shall be not less than 8 percent of the floor area of the interior room or space, but not less than 25 square feet (2.33 m$^2$). The ventilation openings to the outdoors shall be based on a total floor area being ventilated.

**Section 404.4.6 Basement Occupancy.** No basement space shall be used as a habitable room or dwelling unit unless:

A.   The minimum clear ceiling height is 6 feet 8 inches (2033 mm), as permitted in section 404.3.

B.   The minimum glazed area is 8 percent of the floor square footage for habitable rooms.

C.   The minimum ventilation area is 50 percent of the glazed area or is 4 percent of the square footage for habitable rooms.

D.   The basement complies with the 2021 International Residential Code for emergency escape.

E.   The floors and walls are impervious to leakage of underground and surface runoff water or measures have been taken to mitigate the effects of water penetration and are insulated against dampness; and

F.   The dwelling unit meets the other requirements of this code.

**Section 404.4.7 Basement and Third Floor Occupancy for Rooming Houses.** No license required by this article shall be issued to any person proposing to use a basement or any part thereof as a habitable room for rooming house purposes. Third floor occupancy of any frame dwelling shall not be permitted without the written approval of the Neighborhood Services Director, Fire Chief and the Public Health Director.

**Section 404.5.3 Age Limit.** For purposes of this section, children under three (3) years of age shall not be counted in determining the occupancy of any dwelling unit.

## CHAPTER 6

## MECHANICAL AND ELECTRICAL REQUIREMENTS

**Section 602.3 Heat Supply.** Every owner and operator of any building who rents, leases or lets one or more dwelling units or sleeping units on terms, either expressed or implied, to furnish heat to the occupants thereof shall supply heat during the period from September 15 of each year to May 15 of the succeeding year to maintain a temperature in all habitable rooms, bathroom and toilet rooms as follows:

1.   A minimum temperature of sixty-eight degrees Fahrenheit (68°F) from six thirty o'clock (6:30) A.M. to eleven o'clock (11:00) P.M. and

2.   A minimum temperature of sixty-five degrees Fahrenheit (65°F) from eleven o'clock (11:00) P.M. to six thirty o'clock (6:30) A.M.

The minimum temperature shall be averaged throughout any dwelling unit or rooming unit and shall be maintained without undue restriction of ventilation as to interfere with proper healthful conditions.

## Exception:

When the outdoor temperature is below the winter outdoor design temperature for the Village, maintenance of the minimum room temperature shall not be required provided that the heating system is operating at its full design capacity.

**Section 605.2 Receptacles.** Every habitable space in a dwelling shall contain <u>not less than</u> two separate and remote receptacle outlets. Every laundry area shall contain <u>not less than</u> one grounding-type receptacle or a receptacle with a ground fault circuit interrupter. Every bathroom shall contain <u>not less than</u> one receptacle. Any new bathroom receptacle outlet shall have ground fault circuit interrupter protection. <u>All receptacle outlets shall have the appropriate faceplate cover for the location.</u> Existing electrical systems shall be maintained to the same standards as required by the applicable code under which it was originally installed unless the system is altered or there is some known defect or unsafe condition in the system.

**CHAPTER 7**

**FIRE SAFETY REQUIREMENTS**

**Section 703.3.<u>4</u> Occupancy Above Garages.** Where a habitable room, rooming unit or dwelling unit is located above an area used for parking or storage of motor vehicles, a fire stop of one- hour fire resistant materials, approved by the Board Of Fire Underwriters Laboratory, shall be provided above such area and below the floor of such room or unit.(Ord. 15-181, 11-2-2015, eff. 12-1-2015; amd. Ord. 25-135, 3-18-2025)

---

## ARTICLE 14

## ENERGY AND WATER BENCHMARKING

---

SECTION:

**7-14-1: Purpose**

**7-14-2: Definitions**

**7-14-3: Benchmarking Schedule**

**7-14-4: Collecting And Entering Benchmarking Data**

**7-14-5: Benchmarking Reporting**

**7-14-6: Benchmarking Exemptions**

**7-14-7: Maintenance Of Records**

**7-14-8: Penalty**

**7-14-1: PURPOSE:**

The purpose of this article is to establish energy and water benchmarking reporting requirements for certain buildings within the Village. (Ord. 23-18, 2-6- 2023)

**7-14-2: DEFINITIONS:**

The following words and phrases whenever used in this article shall have the following meanings and are defined as follows:

| | |
|---|---|
| AGGREGATED WHOLE-BUILDING DATA: | Energy or water data that has been totaled for an entire property, which may include a single occupant or a group of separately metered tenants. |
| BENCHMARK: | To input and submit the total energy and water consumed by a property, as well as other descriptive information of such Property, during the previous calendar year, as required by the Village. Total energy and water consumption shall not include separately metered uses that are not integral to building operations, as determined by the Director. |
| BENCHMARKING REPORT: | A subset of information input into the benchmarking tool and benchmarking information generated by the benchmarking tool as determined by the Director. |
| BENCHMARKING TOOL: | The United States Environmental Protection Agency's ENERGY STAR® Portfolio Manager® tool, or any additional or alternative tool adopted by the Director, used to track and assess the energy and water use of certain properties relative to similar properties. |
| CONDOMINIUM: | A property that combines separate ownership of individual units with common ownership of other elements such as common areas. |
| COVERED VILLAGE PROPERTY: | A property that:<br>A.  Exceeds ten thousand (10,000) square feet in gross floor area; and<br>B.  Is owned by the Village; or<br>C.   A property for which the Village regularly pays all or most of the annual energy and/or water bills. |

| COVERED NON-VILLAGE PROPERTY: | A property other than a covered Village property that exceeds ten thousand (10,000) square feet in Gross Floor Area. |
|---|---|
| COVERED PROPERTY: | Any covered Village property or covered non-Village property.<br>A.  Single family, duplex, and triplex residential homes and related accessory structures, or any other residential building with less than four units are exempt from the requirements of this article.<br>B.  The State of Illinois and the Federal Government shall make reasonable efforts to comply with the requirements of this article with regard to a covered property which they own. |
| DATA QUALITY CHECKER: | The function in ENERGY STAR® Portfolio Manager® that runs a set of basic data checks on properties to help identify possible data entry errors and to see whether a building differs from typical operational patterns. |
| DATA TRANSPARENCY: | Information generated by the benchmarking tool, other descriptive information about a physical property and its operational characteristics that is shared with the public. This information shall include, but is not limited to:<br>A.  Descriptive information:<br>  1.  Property address;<br>  2.  Primary use of a building;<br>  3.  Gross floor area;<br>  4.  Number of years a property has been ENERGY STAR® certified and the last certification date, if applicable;<br>  5.  Name of the property owner; and<br>  6.  Individual or entity responsible for the benchmarking report.<br>B.  Output information:<br>  1.  Site and source energy use intensity;<br>  2.  Weather normalized site and source energy use intensity;<br>  3.  The ENERGY STAR® score when available;<br>  4.  Total annual greenhouse gas emissions;<br>  5.  Monthly energy use by fuel type;<br>  6.  Indoor water use and water use intensity (consumption per gross square foot);<br>  7.  Outdoor water use (where available);<br>  8.  Total water usage;<br>  9.  The ENERGY STAR® Water Score, where available; and<br>  10.  Any property Notes, if needed, to explain a building's ENERGY STAR® score and/or operating characteristics.<br>C.  Status of compliance or noncompliance with the requirements of the article. |
| DEPARTMENT: | The Development Customer Services Department. |
| DIRECTOR: | The Development Customer Services Department Director or the Director's designee. |
| ENERGY: | Electricity, natural gas, steam, or other products sold by a Utility to an owner of property, or renewable on-site electricity generation, for purposes of providing heating, cooling, lighting, water heating, or powering or fueling other end uses as recorded in the benchmarking tool. |
| ENERGY STAR® PORTFOLIO MANAGER®: | The tool developed and maintained by the United States Environmental Protection Agency to track and assess the relative energy performance of buildings. |
| ENERGY STAR® Score: | The 1-100 numeric rating generated by the ENERGY STAR® Portfolio Manager® tool as a measurement of a building's energy efficiency. |
| GROSS FLOOR AREA: | The total property area, measured between the outside surfaces of the exterior walls of the building(s). This includes all areas inside the building(s) including but not limited to lobbies, Tenant areas, common areas, meeting rooms, break rooms, atriums (count the base level only), restrooms, elevator shafts, stairwells, mechanical equipment areas, basements, and storage rooms. |
| OWNER: | Any of the following:<br>A.  An individual or entity possessing title to a property; |

| | |
|---|---|
| | B.   The board of a condominium association in the case of a condominium;<br>C.   The condominium association in the case of a Condominium where the powers of an owners' association are exercised by or delegated to an association;<br>D.   The board of directors in the case of a cooperative apartment corporation; or<br>E.   An agent authorized to act on behalf of any of the above. |
| PROPERTY: | Any of the following:<br>A.   A single building;<br>B.   One or more buildings held in a condominium form of ownership and governed by a single board of managers; or<br>C.   A campus of two or more buildings which are owned and operated by the same party, have a single shared primary function, and are:<br>   1.   Behind a common utility meter or served by a common mechanical/electrical system, such as a chilled water loop, which would prevent an owner from being able to easily determine the energy use attributable to each of the individual buildings; or<br>   2.   Used primarily for one of the following functions:<br>      a.   K-12 school;<br>      b.   Hospital;<br>      c.   Hotel;<br>      d.   Multifamily housing; or<br>      e.   Senior care community. |
| TENANT: | A person or entity occupying or holding possession of a building, or part of a building or premises, pursuant to a rental or lease agreement. |
| UTILITY: | An entity that distributes and/or sells natural gas, electricity, water, or thermal energy services for buildings. (Ord. 23-18, 2-6-2023) |

## 7-14-3: BENCHMARKING SCHEDULE:

   A.   The owner of a covered property shall ensure that a benchmarking report is generated, completed, and submitted to the Director annually for a covered property.

   B.   The initial benchmarking report for a covered property shall be filed in accordance with the schedule in the table below. Subsequent benchmarking reports for each covered property shall be due by December 31 of each year thereafter.

   C.   The Director shall make each covered property's data transparency information available to the public beginning the year after the property is first required to submit a benchmarking report in accordance with the schedule in the table below. Subsequent data transparency information will be made public each year thereafter.

| Property | Initial Reporting Date | Data Transparency Year |
|---|---|---|
| Covered Village Properties = 10k sq. ft. | June 1, 2023 | 2024 |
| Covered Non-Village Properties = 10k sq. ft. | December 31, 2023 | 2024 |

(Ord. 23-18, 2-6-2023)

## 7-14-4: COLLECTING AND ENTERING BENCHMARKING DATA:

   A.   Each year, an owner of a covered property shall collect and enter all data needed to benchmark the entire property for the previous calendar year into the benchmarking tool. Aggregated whole-building data for a property's energy and water use shall be compiled using one or more of the following methods:

   1.   Obtaining aggregated whole-building Data from a utility;

   2.   Collecting data from all tenants; or

   3.   Reading a master meter.

   B.   If the owner of a covered property does not have access to aggregated whole-building data (energy and water), such owner shall request aggregated whole-building data from each utility company that provides energy or water service to a property. If a utility does not provide aggregated whole-building data for energy ow water service, an owner of a covered property shall request energy and water data from any applicable tenants. An owner may also request authorization from any applicable tenants for the utility to share their data with an owner.

C.   Each nonresidential tenant located at a covered property shall provide an owner with all information necessary to comply with the requirements of this article that cannot otherwise be acquired by an owner within forty-five (45) days of a request.

D.   Nothing in this article shall be construed to permit a property owner to use tenant energy usage data for purposes other than compliance with benchmarking report requirements, nor shall the reporting requirements of this article be construed to excuse property owners from compliance with federal or state laws governing direct access to tenant utility data from a responsible utility. (Ord. 23-18, 2-6-2023)

## 7-14-5: BENCHMARKING REPORTING:

A.   For each covered property subject to this article, an owner shall submit a benchmarking report in an electronic format via the benchmarking tool annually by the date set forth in section 7-14-3 above.

B.   The information included in a benchmarking report shall include the data information was entered in the benchmarking tool as set forth in sections 7-14-3 above for the previous calendar year.

C.   An owner of a covered property shall ensure that data entered into the benchmarking tool shall be based on the aggregated whole-building data for energy and water service for the calendar year being reported.

D.   Before submitting a benchmarking report, an owner shall run all data quality checker functions available within the benchmarking tool and shall verify that all data has been accurately entered into the benchmarking tool. In order for the benchmarking report to be considered in compliance with this article, an owner shall correct all missing or incorrect information as identified by the data quality checker prior to submitting the benchmarking report to the Director.

E.   If an owner becomes aware that any information reported as part of the current year benchmarking report is inaccurate or incomplete, the owner shall amend the information reported within the benchmarking tool, and shall provide the Director with an updated benchmarking report within thirty (30) days of learning of the inaccurate or incomplete information. (Ord. 23-18, 2-6-2023)

## 7-14-6: BENCHMARKING EXEMPTIONS:

A covered property that meets one or more of the following conditions for the calendar year to be benchmarked may apply for an exemption from the benchmarking and data transparency requirements set forth in this article if:

A.   The property did not have a certificate of occupancy or temporary certificate of occupancy from the Village or other applicable entity for the applicable full year; or

B.   A demolition permit was issued for an applicable building located at a property during the prior calendar year; or

C.   The property had an average physical occupancy rate of less than fifty percent (50%) over a given year; or

D.   The benchmarking or data transparency information would disclose trade secrets as provided by applicable law; or

E.   Buildings primarily used for manufacturing or other industrial purposes for which benchmarking results would not meaningfully reflect building energy use characteristics due to the intensive use of process energy. "Process energy" refers to energy used in the actual manufacturing, production, or processing of a good, commodity, or other material. (Ord. 23-18, 2-6-2023)

## 7-14-7: MAINTENANCE OF RECORDS:

An owner shall maintain the data submitted through the benchmarking tool and supporting data, including but not limited to, the energy and water bills and reports or forms received from tenants and/or utilities pursuant to this article. Such records shall be preserved for a period of three (3) years. At the request of the Director, such records shall be made available for inspection by the Director or the Director's designee. (Ord. 23-18, 2-6-2023)

## 7-14-8: PENALTY:

Any owner, entity or person in violation of any provision of this article shall be fined in accordance with the provisions of section 1-1-5 of this Code. (Ord. 23-18, 2-6-2023)

---

| ARTICLE 15 |
| POOL CODE |

---

SECTION:

**7-15-1: Adoption**

**7-15-2: Amendments**

## 7-15-1: ADOPTION:

A.   The 2021 International Swimming Pool and Spa Code (ISPSC) as published by the International Code Council, is hereby adopted by the Village by reference and is made a part hereof as if fully set forth in this section with the additions, insertions, deletions and changes set forth in section 7-6-2 of this article. To the extent that the provisions of the ISPSC are inconsistent with any codes previously adopted by the Village by reference, the provisions of the 2021 ISPSC shall govern unless specifically set forth in this code. In the event of a conflict between any provisions of the IRC and any provision of the Oak Park Village Code, the provisions of the Oak Park Village Code shall govern.

B. There shall be three (3) copies of the NEC kept on file for public inspection in the office of the Village Clerk Chief Building Official. (Ord. 23-56, 6-20-2023)

# 7-15-2: AMENDMENTS:

The 2021 International Swimming Pool and Spa Code, as adopted pursuant to section 7-15-1 of this article, is hereby amended by adding the underlined language and deleting the overstricken language as follows:

## CHAPTER 1

## CODE AND ADMINISTRATION

### PART 1 – SCOPE AND APPLICATION

#### Section 101 – GENERAL

**Section 101.1 Title.** These regulations, as amended and adopted by the Village of Oak Park, shall be known as the Swimming Pool and Spa Code of the Village of Oak Park, herein referred to as "this code."

### PART 2 – ADMINISTRATION AND ENFORCEMENT

**CHAPTER 1, PART 2 – ADMINISTRATION AND ENFORCEMENT** is deleted in its entirety and replaced with the following:

**CHAPTER 1, PART 2 – ADMINISTRATION AND ENFORCEMENT**

Administration and enforcement of this code shall be governed by applicable provisions of chapter 1 of the International Building Code as amended and adopted by the Village.

### CHAPTER 3 – GENERAL COMPLAIANCE

#### Section 302 – Electrical, Plumbing, Mechanical, and Fuel Gas Requirements

**302.2 Water service and drainage.**

Piping and fittings used for water service, makeup and drainage piping for pools and spas shall comply with the provisions of the current edition of the state of Illinois plumbing code. Fittings shall be approved for installation with the piping installed.

**302.5 Backflow protection.**

Water supplies for pools and spas shall be protected against backflow in accordance with the provisions of the current edition of the state of Illinois Plumbing Code, or the International Residential Code, as applicable in accordance with Section 102.7.1.

**302.6 Wastewater discharge.**

Where wastewater from pools or spas, such as backwash water from filters and water from deck drains discharge to a building drainage system, the connection shall be through an air gap in accordance with the provisions of the current edition of the state of Illinois Plumbing Code or the International Residential Code as applicable in accordance with Section 102.7.1.

**306.9.1 Hose bibbs.**

Hose bibbs shall be provided for rinsing down the entire deck and shall be installed in accordance with the provisions of the current edition of the state of Illinois Plumbing Code or International Residential Code, as applicable in accordance with Section 102.7.1, and shall be located not greater than 150 feet (45 720 mm) apart. Water-powered devices, such as water-powered lifts, shall have a dedicated hose bibb water source.

**318.2 Protection of potable water supply.**

Potable water supply systems shall be designed, installed and maintained so as to prevent contamination from nonpotable liquids, solids or gases being introduced into the potable water supply through cross-connections or other piping connections to the system. Means of protection against backflow in the potable water supply shall be provided through an air gap complying with ASME A112.1.2 or by a backflow prevention assembly in accordance with the International Residential Code or the provisions of the current edition of the state of Illinois Plumbing Code, as applicable in accordance with Section 102.7.1.

### SECTION 410

### SANITARY FACILITIES

#### 410.1 Toilet facilities.

Class A and B pools shall be provided with toilet facilities having the required number of plumbing fixtures in accordance with the International Building Code or the provisions of the current edition of the state of Illinois Plumbing Code.

## CHAPTER 6

## AQUATIC RECREATION FACILITIES

### SECTION 609 - DRESSING AND SANITARY FACILITIES

**609.1 General.**

Dressing and sanitary facilities shall be provided in accordance with the minimum requirements of the International Building Code and provisions of the current edition of the state of Illinois plumbing code and Sections 609.2 through 609.9.

## 609.2 Number of fixtures.

The minimum number of required water closets, urinals, lavatory, and drinking fountain fixtures shall be provided as required by the International Building Code and provisions of the current edition of the state of Illinois Plumbing Code and the dressing facilities and number of cleansing and rinse showers shall be provided in accordance with Sections 609.2.1, 609.2.2, and 609.3.1.

(Ord. 23-56, 6-20-2023)