# EXHIBIT G

# NATIONAL APPLIANCE ENERGY CONSERVATION ACT

MARCH 3, 1987.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. DINGELL, from the Committee on Energy and Commerce, submitted the following

# REPORT

together with

## DISSENTING VIEWS

[To accompany H.R. 87]

[Including cost estimate of the Congressional Budget Office]

The Committee on Energy and Commerce, to whom was referred the bill (H.R. 87) to amend the Energy Policy and Conservation Act with respect to energy conservation standards for appliances, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

## CONTENTS

|  | Page |
|---|---|
| The Amendment | 1 |
| Purpose and Summary | 18 |
| Background and Need for Legislation | 26 |
| Hearings | 31 |
| Committee Consideration | 31 |
| Committee Oversight Findings | 31 |
| Committee on Government Operations | 31 |
| Committee Cost Estimate | 31 |
| Congressional Budget Office Estimate | 32 |
| Inflationary Impact Statement | 32 |
| Section-by-Section Analysis and Discussion | 32 |
| Changes in Existing Law Made by the Bill, As Reported | 40 |

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

## SECTION 1. SHORT TITLE.

This Act may be cited as the "National Appliance Energy Conservation Act of 1987".

## SEC. 2. DEFINITIONS.

(a) ENERGY CONSERVATION STANDARD.—Section 321(a)(6) of the Energy Policy and Conservation Act (42 U.S.C. 6291(a)(6)) is amended to read as follows:

"(6) The term 'energy conservation standard' means—

"(A) a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use for a covered product, determined in accordance with test procedures prescribed under section 323; or

"(B) a design requirement for the products specified in paragraphs (6), (7), (8), (10), and (13) of section 322(a); and

includes any other requirements which the Secretary may prescribe under section 325(o)."

(b) NEW DEFINITIONS.—Section 321(a) of the Energy Policy and Conservation Act (42 U.S.C. 6291(a)) is amended by adding at the end the following paragraphs:

"(19) The term 'AV' is the adjusted volume for refrigerators, refrigerator-freezers, and freezers, as defined in the applicable test procedure prescribed under section 323.

"(20) The term 'annual fuel utilization efficiency' means the efficiency descriptor for furnaces and boilers, determined using test procedures prescribed under section 323 and based on the assumption that all—

"(A) weatherized warm air furnaces or boilers are located out-of-doors;

"(B) warm air furnaces which are not weatherized are located indoors and all combustion and ventilation air is admitted through grills or ducts from the outdoors and does not communicate with air in the conditioned space; and

"(C) boilers which are not weatherized are located within the heated space.

"(21) The term 'central air conditioner' means a product, other than a packaged terminal air conditioner, which—

"(A) is powered by single phase electric current;

"(B) is air-cooled;

"(C) is rated below 65,000 Btu per hour;

"(D) is not contained within the same cabinet as a furnace the rated capacity of which is above 225,000 Btu per hour; and

"(E) is a heat pump or a cooling only unit.

"(22) The term 'efficiency descriptor' means the ratio of the useful output to the total energy input, determined using the test procedures prescribed under section 323 and expressed for the following products in the following terms:

"(A) For furnaces and direct heating equipment, annual fuel utilization efficiency.

"(B) For room air conditioners, energy efficiency ratio.

"(C) For central air conditioning and central air conditioning heat pumps, seasonal energy efficiency ratio.

"(D) For water heaters, energy factor.

"(E) For pool heaters, thermal efficiency.

"(23) The term 'furnace' means a product which utilizes only single-phase electric current, or single-phase electric current or DC current in conjunction with natural gas, propane, or home heating oil, and which—

"(A) is designed to be the principal heating source for the living space of a residence;

"(B) is not contained within the same cabinet with a central air conditioner whose rated cooling capacity is above 65,000 Btu per hour;

"(C) is an electric central furnace, electric boiler, forced-air central furnace, gravity central furnace, or low pressure steam or hot water boiler; and

"(D) has a heat input rate of less than 300,000 Btu per hour for electric boilers and low pressure steam or hot water boilers and less than 225,000 Btu per hour for forced-air central furnaces, gravity central furnaces, and electric central furnaces.

"(24) The terms 'heat pump' or 'reverse cycle' mean a product, other than a packaged terminal heat pump, which—

"(A) consists of one or more assemblies;

"(B) is powered by single phase electric current;

"(C) is rated below 65,000 Btu per hour;

"(D) utilizes an indoor conditioning coil, compressors, and refrigerant-to-outdoor-air heat exchanger to provide air heating; and

"(E) may also provide air cooling, dehumidifying, humidifying circulating, and air cleaning.

"(25) The term 'pool heater' means an appliance designed for heating nonpotable water contained at atmospheric pressure, including heating water in swimming pools, spas, hot tubs and similar applications.

"(26) The term 'thermal efficiency of pool heaters' means a measure of the heat in the water delivered at the heater outlet divided by the heat input of the pool heater as measured under test conditions specified in section 2.8.1 of the American National Standard for Gas Fired Pool Heaters, Z21.56-1986, or as may be prescribed by the Secretary.

"(27) The term 'water heater' means a product which utilizes oil, gas, or electricity to heat potable water for use outside the heater upon demand, including—

"(A) storage type units which heat and store water at a thermostatically controlled temperature, including gas storage water heaters with an input of 75,000 Btu per hour or less, oil storage water heaters with an input of 105,000 Btu per hour or less, and electric storage water heaters with an input of 12 kilowatts or less;

"(B) instantaneous type units which heat water but contain no more than one gallon of water per 4,000 Btu per hour of input, including gas instantaneous water heaters with an input of 200,000 Btu per hour or less, oil instantaneous water heaters with an input of 210,000 Btu per hour or less, and electric instantaneous water heaters with an input of 12 kilowatts or less; and

"(C) heat pump type units, with a maximum current rating of 24 amperes at a voltage no greater than 250 volts, which are products designed to transfer thermal energy from one temperature level to a higher temperature level for the purpose of heating water, including all ancillary equipment such as fans, storage tanks, pumps, or controls necessary for the device to perform its function.

"(28) The term 'weatherized warm air furnace or boiler' means a furnace or boiler designed for installation outdoors, approved for resistance to wind, rain, and snow, and supplied with its own venting system."

SEC. 3. COVERAGE.

Section 322(a) of the Energy Policy and Conservation Act (42 U.S.C. 6292(a)) is amended to read as follows:

"COVERAGE

"SEC. 322. (a) IN GENERAL.—The following consumer products, excluding those consumer products designed solely for use in recreational vehicles and other mobile equipment, are covered products:

"(1) Refrigerators, refrigerator-freezers, and freezers which can be operated by alternating current electricity, excluding—

"(A) any type designed to be used without doors; and

"(B) any type which does not include a compressor and condenser unit as an integral part of the cabinet assembly.

"(2) Room air conditioners.

"(3) Central air conditioners and central air conditioning heat pumps.

"(4) Water heaters.

"(5) Furnaces.

"(6) Dishwashers.

"(7) Clothes washers.

"(8) Clothes dryers.

"(9) Direct heating equipment.

"(10) Kitchen ranges and ovens.

"(11) Pool heaters.

"(12) Television sets.

"(13) Any other type of consumer product which the Secretary classifies as a covered product under subsection (b)."

SEC. 4. TEST PROCEDURES.

Section 323 of the Energy Policy and Conservation Act (42 U.S.C. 6293) is amended to read as follows:

"TEST PROCEDURES

"SEC. 323. (a) GENERAL RULE.—All test procedures and related determinations prescribed or made by the Secretary with respect to any covered product (or class thereof) which are in effect on the date of enactment of the National Appliance Energy Conservation Act of 1987 shall remain in effect until the Secretary amends such test procedures and related determinations under subsection (b).

"(b) AMENDED AND NEW PROCEDURES.—(1)(A) The Secretary may amend test procedures with respect to any covered product if the Secretary determines that amended test procedures would more accurately or fully comply with the requirements of paragraph (3).

"(B) The Secretary may, in accordance with the requirements of this subsection, prescribe test procedures for any consumer product classified as a covered product under section 322(b).

"(C) The Secretary shall direct the National Bureau of Standards to assist in developing new or amended test procedures.

"(2) If the Secretary determines, on his own behalf or in response to a petition by any interested person, that a test procedure should be prescribed or amended, the Secretary shall promptly publish in the Federal Register proposed test procedures and afford interested persons an opportunity to present oral and written data, views, and arguments with respect to such procedures. The comment period shall not be less than 60 days and may be extended for good cause shown to not more than 270 days. In prescribing or amending a test procedure, the Secretary shall take into account such information as the Secretary determines relevant to such procedure, including technological developments relating to energy use or energy efficiency of the type (or class) of covered products involved.

"(3) Any test procedures prescribed or amended under this section shall be reasonably designed to produce test results which measure energy efficiency, energy use, or estimated annual operating cost of a covered product during a representative average use cycle or period of use, as determined by the Secretary, and shall not be unduly burdensome to conduct.

"(4) If the test procedure is a procedure for determining estimated annual operating costs, such procedure shall provide that such costs shall be calculated from measurements of energy use in a representative average use cycle or period of use, as determined by the Secretary, and from representative average unit costs of the energy needed to operate such product during such cycle. The Secretary shall provide information to manufacturers with respect to representative average unit costs of energy.

"(c) RESTRICTION ON CERTAIN REPRESENTATIONS.—(1) No manufacturer, distributor, retailer, or private labeler may make any representation—

"(A) in writing (including a representation on a label); or

"(B) in any broadcast advertisement,

with respect to the energy use or efficiency of a covered product to which a test procedure is applicable under subsection (a) or the cost of energy consumed by such product, unless such product has been tested in accordance with such test procedure and such representation fairly discloses the results of such testing.

"(2) Effective 180 days after an amended or new test procedure applicable to a covered product is prescribed under subsection (b), no manufacturer, distributor, retailer, or private labeler may make any representation—

"(A) in writing (including a representation on a label); or

"(B) in any broadcast advertisement,

with respect to energy use or efficiency of such product or cost of energy consumed by such product, unless such product has been tested in accordance with such amended or new test procedures and such representation fairly discloses the results of such testing.

"(3) On the petition of any manufacturer, distributor, retailer, or private labeler, filed not later than the 60th day before the expiration of the period involved, the 180-day period referred to in paragraph (2) may be extended by the Secretary with respect to the petitioner (but in no event for more than an additional 180 days) if the Secretary determines that the requirements of paragraph (2) would impose an undue hardship on such petitioner.

"(d) CASE IN WHICH TEST PROCEDURE IS NOT REQUIRED.—(1) The Secretary is not required to publish and prescribe test procedures for a covered product (or class thereof) if the Secretary determines, by rule, that test procedures cannot be developed which meet the requirements of subsection (b)(3) and publishes such determination in the Federal Register, together with the reasons therefor.

"(2) For purposes of section 327, a determination under paragraph (1) with respect to any covered product or class shall have the same effect as would a standard prescribed for a covered product (or class).

"(e) AMENDMENT OF STANDARD.—(1) In the case of any amended test procedure which is prescribed pursuant to this section, the Secretary shall determine, in the rulemaking carried out with respect to prescribing such procedure, to what extent, if any, the proposed test procedure would alter the measured energy efficiency or measured energy use of any covered product as determined under the existing test procedure.

"(2) If the Secretary determines that the amended test procedure will alter the measured efficiency or measured use, the Secretary shall amend the applicable energy conservation standard during the rulemaking carried out with respect to such test procedure. In determining the amended energy conservation standard, the Secretary shall measure, pursuant to the amended test procedure, the energy efficiency or energy use of a representative sample of covered products that minimally comply with the existing standard. The average of such energy efficiency or energy use levels determined under the amended test procedure shall constitute the amended energy conservation standard for the applicable covered products.

"(3) Models of covered products in use before the date on which the amended energy conservation standard becomes effective (or revisions of such models that come into use after such date and have the same energy efficiency or energy use characteristics) that comply with the energy conservation standard applicable to such covered products on the day before such date shall be deemed to comply with the amended energy conservation standard.

"(4) The Secretary's authority to amend energy conservation standards under this subsection shall not affect the Secretary's obligation to issue final rules as described in section 325."

SEC. 5. ENERGY CONSERVATION STANDARDS.

Section 325 of the Energy Policy and Conservation Act (42 U.S.C. 6295) is amended to read as follows:

"ENERGY CONSERVATION STANDARDS

"SEC. 325. (a) PURPOSES.—The purposes of this section are to—
    "(1) provide Federal energy conservation standards applicable to covered products; and
    "(2) authorize the Secretary to prescribe amended or new energy conservation standards for each type (or class) of covered product.

"(b) STANDARDS FOR REFRIGERATORS, REFRIGERATOR-FREEZERS, AND FREEZERS.—(1) The following is the maximum energy use allowed in kilowatt hours per year for the following products (other than those described in paragraph (2)) manufactured on or after January 1, 1990:

| | Energy Standards Equations |
|---|---|
| "Refrigerators and Refrigerator-Freezers with manual defrost | 16.3 AV + 316 |
| Refrigerator-Freezers—partial automatic defrost | 21.8 AV + 429 |
| Refrigerator-Freezers—automatic defrost with: | |
| Top mounted freezer without ice | 23.5 AV + 471 |
| Side mounted freezer without ice | 27.7 AV + 488 |
| Bottom mounted freezer without ice | 27.7 AV + 488 |
| Top mounted freezer with through the door ice service | 26.4 AV + 535 |
| Side mounted freezer with through the door ice | 30.9 AV + 547 |
| Upright Freezers with: | |
| Manual defrost | 10.9 AV + 422 |
| Automatic defrost | 16.0 AV + 623 |
| Chest Freezers and all other freezers | 14.8 AV + 223 |

"(2) The standards described in paragraph (1) do not apply to refrigerators and refrigerator-freezers with total refrigerated volume exceeding 39 cubic feet or freezers with total refrigerated volume exceeding 30 cubic feet.

"(3)(A)(i) The Secretary shall publish a proposed rule, no later than July 1, 1988, to determine if the standards established by paragraph (1) should be amended. The Secretary shall publish a final rule no later than July 1, 1989, which shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after January 1, 1993. If such a final rule is not published before January 1, 1990, any amendment of such standards shall apply to products manufactured on or after January 1, 1995. Nothing in this subsection provides any

justification or defense for a failure by the Secretary to comply with the nondiscretionary duty to publish final rules by the dates stated in this paragraph.

"(ii)(I) If the Secretary does not publish a final rule before January 1, 1990, relating to the revision of the energy conservation standards for refrigerators, refrigerator-freezers and freezers, the regulations which established standards for such products and were promulgated by the California Energy Commission on December 14, 1984, to be effective January 1, 1992 (or any amendments to such standards that are not more stringent than the standards in the original regulations), shall apply in California to such products, effective beginning January 1, 1993, and shall not be preempted after such effective date by any energy conservation standard established in this section or prescribed, on or after January 1, 1990, under this section.

"(II) If the Secretary does not publish a final rule before January 1, 1992, relating to the revision of the energy conservation standards for refrigerators, refrigerator-freezers and freezers, State regulations which apply to such products manufactured on or after January 1, 1995, shall apply to such products until the effective date of a rule issued under this section with respect to such products.

"(B) After the publication of a final rule under subparagraph (A), the Secretary shall publish a final rule no later than five years after the date of publication of the previous final rule. The Secretary shall determine in such rule whether to amend the standards in effect for the products described in paragraph (1).

"(C) Any amendment prescribed under subparagraph (B) shall apply to products manufactured after a date which is five years after—

"(i) the effective date of the previous amendment; or

"(ii) if the previous final rule did not amend the standards, the earliest date by which the previous amendment could have been effective;

except that in no case may any amended standard apply to products manufactured within three years after publication of the final rule establishing such amended standard.

"(c) STANDARDS FOR ROOM AIR CONDITIONERS.—(1) The energy efficiency ratio of room air conditioners shall be not less than the following for products manufactured on or after January 1, 1990:

| "Product Class | Ratio |
|---|---|
| Without Reverse Cycle and With Louvered Sides: | |
| Less than 6,000 Btu | 8.0 |
| 6,000 to 7,999 Btu | 8.5 |
| 8,000 to 13,999 Btu | 9.0 |
| 14,000 to 19,999 Btu | 8.8 |
| 20,000 and more Btu | 8.2 |
| Without Reverse Cycle and Without Louvered Sides: | |
| Less than 6,000 Btu | 8.0 |
| 6,000 to 7,999 Btu | 8.5 |
| 8,000 to 13,999 Btu | 8.5 |
| 14,000 to 19,999 Btu | 8.5 |
| 20,000 and more Btu | 8.2 |
| With Reverse Cycle and With Louvered Sides | 8.5 |
| With Reverse Cycle, Without Louvered Sides | 8.0 |

"(2)(A) The Secretary shall publish a final rule no later than January 1, 1992, to determine if the standards established under paragraph (1) should be amended. Such rule shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after January 1, 1995.

"(B) After January 1, 1992, the Secretary shall publish a final rule no later than five years after the date of publication of a previous final rule. The Secretary shall determine in such rule whether to amend the standards in effect for room air conditioners.

"(C) Any amendment prescribed under subparagraph (B) shall apply to products manufactured after a date which is five years after—

"(i) the effective date of the previous amendment; or

"(ii) if the previous final rule did not amend the standards, the earliest date by which a previous amendment could have been effective;

except that in no case may any amended standard apply to products manufactured within three years after publication of the final rule establishing such amended standard.

"(d) STANDARDS FOR CENTRAL AIR CONDITIONERS AND HEAT PUMPS.—(1) The seasonal energy efficiency ratio of central air conditioners and central air conditioning heat pumps shall be not less than the following:

"(A) Split Systems: 10.0 for products manufactured on or after January 1, 1992.

"(B) Single Package Systems: 9.7 for products manufactured on or after January 1, 1993.

"(2) The heating seasonal performance factor of central air conditioning heat pumps shall be not less than the following:

"(A) Split Systems: 6.8 for products manufactured on or after January 1, 1992.

"(B) Single Package Systems: 6.6 for products manufactured on or after January 1, 1993.

"(3)(A) The Secretary shall publish a final rule no later than January 1, 1994, to determine whether the standards established under paragraph (1) should be amended. Such rule shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after January 1, 1999. The Secretary shall publish a final rule no later than January 1, 1994, to determine whether the standards established under paragraph (2) shall be amended. Such rule shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after January 1, 2002.

"(B) The Secretary shall publish a final rule after January 1, 1994, and no later than January 1, 2001, to determine whether the standards in effect for central air conditioners and central air conditioning heat pumps should be amended. Such rule shall provide that any amendment shall apply to products manufactured on or after January 1, 2006.

"(e) STANDARDS FOR WATER HEATERS; POOL HEATERS; DIRECT HEATING EQUIPMENT.—(1) The energy factor of water heaters shall be not less than the following for products manufactured on or after January 1, 1990:

"(A) Gas Water Heater: .62 − (.0019 x Rated Storage Volume in Gallons)
"(B) Oil Water Heater: .59 − (.0019 x Rated Storage Volume in Gallons)
"(C) Electric Water Heater: .95 − (.00132 x Rated Storage Volume in Gallons)

"(2) The thermal efficiency of pool heaters manufactured on or after January 1, 1990, shall not be less than 78 percent.

"(3) The efficiencies of gas direct heating equipment manufactured on or after January 1, 1990, shall be not less than the following:

"Wall

Fan type

| | |
|---|---|
| Up to 42,000 Btu/hour | 73% AFUE |
| Over 42,000 Btu/hour | 74% AFUE |

Gravity type

| | |
|---|---|
| Up to 10,000 Btu/hour | 59% AFUE |
| Over 10,000 Btu/hour up to 12,000 Btu/hour | 60% AFUE |
| Over 12,000 Btu/hour up to 15,000 Btu/hour | 61% AFUE |
| Over 15,000 Btu/hour up to 19,000 Btu/hour | 62% AFUE |
| Over 19,000 Btu/hour up to 27,000 Btu/hour | 63% AFUE |
| Over 27,000 Btu/hour up to 46,000 Btu/hour | 64% AFUE |
| Over 46,000 Btu/hour | 65% AFUE |

"Floor

| | |
|---|---|
| Up to 37,000 Btu/hour | 56% AFUE |
| Over 37,000 Btu/hour | 57% AFUE |

"Room

| | |
|---|---|
| Up to 18,000 Btu/hour | 57% AFUE |
| Over 18,000 Btu/hour up to 20,000 Btu/hour | 58% AFUE |
| Over 20,000 Btu/hour up to 27,000 Btu/hour | 63% AFUE |
| Over 27,000 Btu/hour up to 46,000 Btu/hour | 64% AFUE |
| Over 46,000 Btu/hour | 65% AFUE |

"(4)(A) The Secretary shall publish final rules no later than January 1, 1992, to determine whether the standards established by paragraph (1), (2), or (3) for water heaters, pool heaters, and direct heating equipment should be amended. Such rule shall provide that any amendment shall apply to products manufactured on or after January 1, 1995.

"(B) The Secretary shall publish a final rule no later than January 1, 2000, to determine whether standards in effect for such products should be amended. Such rule shall provide that any such amendment shall apply to products manufactured on or after January 1, 2005.

"(f) Standards for Furnaces.—(1) Furnaces (other than furnaces designed solely for installation in mobile homes) manufactured on or after January 1, 1992, shall have an annual fuel utilization efficiency of not less than 78 percent, except that—

"(A) boilers (other than gas steam boilers) shall have an annual fuel utilization efficiency of not less than 80 percent and gas steam boilers shall have an annual fuel utilization efficiency of not less than 75 percent; and

"(B) the Secretary shall prescribe a final rule not later than January 1, 1989, establishing an energy conservation standard—

"(i) which is for furnaces (other than furnaces designed solely for installation in mobile homes) having an input of less than 45,000 Btu per hour and manufactured on or after January 1, 1992;

"(ii) which provides that the annual fuel utilization efficiency of such furnaces shall be a specific percent which is not less than 71 percent and not more than 78 percent; and

"(iii) which the Secretary determines is not likely to result in a significant shift from gas heating to electric resistance heating with respect to either residential construction or furnace replacement.

"(2) Furnaces which are designed solely for installation in mobile homes and which are manufactured on or after September 1, 1990, shall have an annual fuel utilization efficiency of not less than 75 percent.

"(3)(A) The Secretary shall publish a final rule no later than January 1, 1992, to determine whether the standards established by paragraph (2) for mobile home furnaces should be amended. Such rule shall provide that any amendment shall apply to products manufactured on or after January 1, 1994.

"(B) The Secretary shall publish a final rule no later than January 1, 1994, to determine whether the standards established by this subsection for furnaces (including mobile home furnaces) should be amended. Such rule shall provide that any amendment shall apply to products manufactured on or after January 1, 2002.

"(C) After January 1, 1997, and before January 1, 2007, the Secretary shall publish a final rule to determine whether standards in effect for such products should be amended. Such rule shall contain such amendment, if any, and provide that any amendment shall apply to products manufactured on or after January 1, 2012.

"(g) Standards for Dishwashers; Clothes Washers; Clothes Dryers.—(1) Dishwashers manufactured on or after January 1, 1988, shall be equipped with an option to dry without heat.

"(2) All rinse cycles of clothes washers shall include an unheated water option, but may have a heated water rinse option, for products manufactured on or after January 1, 1988.

"(3) Gas clothes dryers shall not be equipped with a constant burning pilot for products manufactured on or after January 1, 1988.

"(4)(A) The Secretary shall publish final rules no later than January 1, 1990, to determine if the standards established under this subsection for products described in paragraphs (1), (2), and (3) should be amended. Such rules shall provide that any amendment shall apply to products the manufacture of which is completed on or after January 1, 1993.

"(B) After January 1, 1990, the Secretary shall publish a final rule no later than five years after the date of publication of the previous final rule. The Secretary shall determine in such rule whether to amend the standards in effect for such products.

"(C) Any such amendment shall apply to products manufactured after a date which is five years after—

"(i) the effective date of the previous amendment; or

"(ii) if the previous final rule did not amend the standard, the earliest date by which a previous amendment could have been in effect;

except that in no case may any amended standard apply to products manufactured within three years after publication of the final rule establishing such standard.

"(h) Standards for Kitchen Ranges and Ovens.—(1) Gas kitchen ranges and ovens having an electrical supply cord shall not be equipped with a constant burning pilot for products manufactured on or after January 1, 1990.

"(2)(A) The Secretary shall publish a final rule no later than January 1, 1992, to determine if the standards established for kitchen ranges and ovens in this subsection should be amended. Such rule shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after January 1, 1995.

"(B) The Secretary shall publish a final rule no later than January 1, 1997, to determine whether standards in effect for such products should be amended. Such rule shall apply to products manufactured on or after January 1, 2000.

"(i) STANDARDS FOR OTHER COVERED PRODUCTS.—(1) The Secretary may prescribe an energy conservation standard for any type (or class) of covered products of a type specified in paragraph.(13) of section 322(a) if the requirements of subsections (l) and (m) are met and the Secretary determines that—

"(A) the average per household energy use within the United States by products of such type (or class) exceeded 150 kilowatt-hours (or its Btu equivalent) for any 12-month period ending before such determination;

"(B) the aggregate household energy use within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period;

"(C) substantial improvement in the energy efficiency of products of such type (or class) is technologically feasible; and

"(D) the application of a labeling rule under section 324 to such type (or class) is not likely to be sufficient to induce manufacturers to produce, and consumers and other persons to purchase, covered products of such type (or class) which achieve the maximum energy efficiency which is technologically feasible and economically justified.

"(2) Any new or amended standard for covered products of a type specified in paragraph (13) of section 322(a) shall not apply to products manufactured within five years after the publication of a final rule establishing such standard.

"(3) The Secretary may, in accordance with subsections (l) and (m), prescribe an energy conservation standard for television sets. Any such standard may not become effective with respect to products manufactured before January 1, 1992.

"(j) FURTHER RULEMAKING.—After issuance of the last final rules required under subsections (b) through (h) of this section, the Secretary may publish final rules to determine whether standards for a covered product should be amended. An amendment prescribed under this subsection shall apply to products manufactured after a date which is five years after—

"(1) the effective date of the previous amendment made pursuant to this part; or

"(2) if the previous final rule published under this part did not amend the standard, the earliest date by which a previous amendment could have been in effect,

except that in no case may an amended standard apply to products manufactured within three years (in the case of refrigerators, refrigerator-freezers, and freezers, room air-conditioners, dishwashers, clothes washers, clothes dryers, and kitchen ranges and ovens) or five years (in the case of central air-conditioners and heat pumps, water heaters, pool heaters, direct heating equipment, and furnaces) after publication of the final rule establishing a standard.

"(k) PETITION FOR AN AMENDED STANDARD.—(1) With respect to each covered product described in paragraphs (1) through (11) of section 322(a), any person may petition the Secretary to conduct a rulemaking to determine for any such covered product if the standards contained either in the last final rule required under subsections (b) through (h), as the case may be, of this section or in a final rule published for such product under subsection (j) or this subsection should be amended.

"(2)(A) The Secretary shall grant a petition if he finds that it contains evidence which, assuming no other evidence were considered, provides an adequate basis for amending the standards under the following criteria—

"(i) amended standards will result in significant conservation of energy;

"(ii) amended standards are technologically feasible; and

"(iii) amended standards are cost effective as described in subsection (l)(2)(B)(i)(II).

"(B) The grant of a petition by the Secretary under this subsection creates no presumption with respect to the Secretary's determination of any of the criteria in a rulemaking under this section.

"(3) An amendment prescribed under this subsection shall apply to products manufactured after a date which is five years after—

"(A) the effective date of the previous amendment pursuant to this part; or

"(B) if the previous final rule published under this part did not amend the standard, the earliest date by which a previous amendment could have been in effect;

except that in no case may an amended standard apply to products manufactured within three years (in the case of refrigerators, refrigerator-freezers, and freezers, room air-conditioners, dishwashers, clothes washers, clothes dryers, and kitchen ranges and ovens) or five years (in the case of central air-conditioners and heat

pumps, water heaters, pool heaters, direct heating equipment, and furnaces) after publication of the final rule establishing a standard.".

"(l) CRITERIA FOR PRESCRIBING NEW OR AMENDED STANDARDS.—(1) The Secretary may not prescribe any amended standard which increases the maximum allowable energy use, or decreases the minimum required energy efficiency, of a covered product.

"(2)(A) Any new or amended energy conservation standard prescribed by the Secretary under this section for any type (or class) of covered product shall be designed to achieve the maximum improvement in energy efficiency which the Secretary determines is technologically feasible and economically justified.

"(B)(i) In determining whether a standard is economically justified, the Secretary shall, after receiving views and comments furnished with respect to the proposed standard, determine whether the benefits of the standard exceed its burdens by, to the greatest extent practicable, considering—

"(I) the economic impact of the standard on the manufacturers and on the consumers of the products subject to such standard;

"(II) the savings in operating costs throughout the estimated average life of the covered product in the type (or class) compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the covered products which are likely to result from the imposition of the standard;

"(III) the total projected amount of energy savings likely to result directly from the imposition of the standard;

"(IV) any lessening of the utility or the performance of the covered products likely to result from the imposition of the standard;

"(V) the impact of any lessening of competition, as determined in writing by the Attorney General, that is likely to result from the imposition of the standard;

"(VI) the need for national energy conservation; and

"(VII) other factors the Secretary considers relevant.

"(ii) For purposes of clause (i)(V), the Attorney General shall make a determination of the impact, if any, of any lessening of competition likely to result from such standard and shall transmit such determination, not later than 60 days after the publication of a proposed rule prescribing or amending an energy conservation standard, in writing to the Secretary, together with an analysis of the nature and extent of such impact. Any such determination and analysis shall be published by the Secretary in the Federal Register.

"(iii) If the Secretary finds that the additional cost to the consumer of purchasing a product complying with an energy conservation standard level will be less than three times the value of the energy savings during the first year that the consumer will receive as a result of the standard, as calculated under the applicable test procedure, there shall be a rebuttable presumption that such standard level is economically justified. A determination by the Secretary that such criterion is not met shall not be taken into consideration in the Secretary's determination of whether a standard is economically justified.

"(3) The Secretary may not prescribe an amended or new standard under this section for a type (or class) of covered product if—

"(A) for products other than dishwashers, clothes washers, clothes dryers, and kitchen ranges and ovens, a test procedure has not been prescribed pursuant to section 323 with respect to that type (or class) of product; or

"(B) the Secretary determines, by rule, that the establishment of such standard will not result in significant conservation of energy or that the establishment of such standard is not technologically feasible or economically justified. For purposes of section 327, a determination under subparagraph (B) with respect to any type (or class) of covered products shall have the same effect as would a standard prescribed for such type (or class).

"(4) The Secretary may not prescribe an amended or new standard under this section if the Secretary finds (and publishes such finding) that interested persons have established by a preponderance of the evidence that the standard is likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States at the time of the Secretary's finding. The failure of some types (or classes) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a standard for other types (or classes).

"(m) PROCEDURE FOR PRESCRIBING NEW OR AMENDED STANDARDS.—Any new or amended energy conservation standard shall be prescribed in accordance with the following procedure:

"(1) The Secretary—
"(A) shall publish an advance notice of proposed rulemaking which specifies the type (or class) of covered products to which the rule may apply;
"(B) shall invite interested persons to submit, within 60 days after the date of publication of such advance notice, written presentations of data, views, and arguments in response to such notice; and
"(C) may identify proposed or amended standards that may be prescribed.
"(2) A proposed rule which prescribes an amended or new energy conservation standard or prescribes no amendment or no new standard for a type (or class) of covered products shall be published in the Federal Register. In prescribing any such proposed rule with respect to a standard, the Secretary shall determine the maximum improvement in energy efficiency or maximum reduction in energy use that is technologically feasible for each type (or class) of covered products. If such standard is not designed to achieve such efficiency or use, the Secretary shall state in the proposed rule the reasons therefor.
"(3) After the publication of such proposed rulemaking, the Secretary shall, in accordance with section 336, afford interested persons an opportunity, during a period of not less than 60 days, to present oral and written comments (including an opportunity to question those who make such presentations, as provided in such section) on matters relating to such proposed rule, including—
"(A) whether the standard to be prescribed is economically justified (taking into account those factors which the Secretary must consider under subsection (1)(2)) or will result in the effects described in subsection (1)(4);
"(B) whether the standard will achieve the maximum improvement in energy efficiency which is technologically feasible;
"(C) if the standard will not achieve such improvement, whether the reasons for not achieving such improvement are adequate; and
"(D) whether such rule should prescribe a level of energy use or efficiency which is higher or lower than that which would otherwise apply in the case of any group of products within the type (or class) that will be subject to such standard.
"(4) A final rule prescribing an amended or new energy conservation standard or prescribing no amended or new standard for a type (or class) of covered products shall be published as soon as is practicable, but not less than 90 days, after publication of the proposed rule in the Federal Register.
"(n) SPECIAL RULE FOR CERTAIN TYPES OR CLASSES OF PRODUCTS.—(1) A rule prescribing an energy conservation standard for a type (or class) of covered products shall specify a level of energy use or efficiency higher or lower than that which applies (or would apply) for such type (or class) for any group of covered products which have the same function or intended use, if the Secretary determines that covered products within such group—
"(A) consume a different kind of energy from that consumed by other covered products within such type (or class); or
"(B) have a capacity or other performance-related feature which other products within such type (or class) do not have and such feature justifies a higher or lower standard from that which applies (or will apply) to other products within such type (or class).
In making a determination under this paragraph concerning whether a performance-related feature justifies the establishment of a higher or lower standard, the Secretary shall consider such factors as the utility to the consumer of such a feature, and such other factors as the Secretary deems appropriate.
"(2) Any rule prescribing a higher or lower level of energy use or efficiency under paragraph (1) shall include an explanation of the basis on which such higher or lower level was established.
"(o) INCLUSION IN STANDARDS OF TEST PROCEDURES AND OTHER REQUIREMENTS.—Any new or amended energy conservation standard prescribed under this section shall include, where applicable, test procedures prescribed in accordance with section 323 and may include any requirement which the Secretary determines is necessary to assure that each covered product to which such standard applies meets the required minimum level of energy efficiency or maximum quantity of energy use specified in such standard.
"(p) DETERMINATION OF COMPLIANCE WITH STANDARDS.—Compliance with, and performance under, the energy conservation standards (except for design standards authorized by this part) established in, or prescribed under, this section shall be determined using the test procedures and corresponding compliance criteria prescribed under section 323.

"(q) SMALL MANUFACTURER EXEMPTION.—(1) Subject to paragraph (2), the Secretary may, on application of any manufacturer, exempt such manufacturer from all or part of the requirements of any energy conservation standard established in or prescribed under this section for any period not longer than the 24-month period beginning on the date such rule becomes effective, if the Secretary finds that the annual gross revenues of such manufacturer from all its operations (including the manufacture and sale of covered products) does not exceed $8,000,000 for the 12-month period preceding the date of the application. In making such finding with respect to any manufacturer, the Secretary shall take into account the annual gross revenues of any other person who controls, is controlled by, or is under common control with, such manufacturer.

"(2) The Secretary may not exercise the authority granted under paragraph (1) with respect to any type (or class) of covered product subject to an energy conservation standard under this section unless the Secretary makes a finding, after obtaining the written views of the Attorney General, that a failure to allow an exemption under paragraph (1) would likely result in a lessening of competition.".

SEC. 6. REQUIREMENTS OF MANUFACTURERS.

Section 326(d) of the Energy Policy and Conservation Act (42 U.S.C. 6296(d)) is amended to read as follows:

"(d) INFORMATION REQUIREMENTS.—(1) For purposes of carrying out this part, the Secretary may require, under this part or other provision of law administered by the Secretary, each manufacturer of a covered product to submit information or reports to the Secretary with respect to energy efficiency or energy use of such covered product and the economic impact of any proposed energy conservation standard, as the Secretary determines may be necessary to establish and revise test procedures, labeling rules, and energy conservation standards for such product and to insure compliance with the requirements of this part. In making any determination under this paragraph, the Secretary shall consider existing public sources of information, including nationally recognized certification programs of trade associations.

"(2) The Secretary shall exercise authority under this section in a manner designed to minimize unnecessary burdens on manufacturers of covered products.

"(3) The provisions of section 11(d) of the Energy Supply and Environmental Coordination Act of 1974 shall apply with respect to information obtained under this subsection to the same extent and in the same manner as they apply with respect to energy information obtained under section 11 of such Act."

SEC. 7. EFFECT ON OTHER LAW.

Section 327 of the Energy Policy and Conservation Act (42 U.S.C. 6297) is amended to read as follows:

"EFFECT ON OTHER LAW

"SEC. 327. (a) PREEMPTION OF TESTING AND LABELING REQUIREMENTS.—(1) Effective on the date of enactment of the National Appliance Energy Conservation Act of 1987, this part supersedes any State regulation insofar as such State regulation provides at any time for the disclosure of information with respect to any measure of energy consumption of any covered product if—

"(A) such State regulation requires testing or the use of any measure of energy consumption or energy descriptor in any manner other than that provided under section 323; or

"(B) such State regulation requires disclosure of information with respect to the energy use or energy efficiency of any covered product other than information required under section 324.

"(2) For purposes of this section, the term 'State regulation' means a law, regulation, or other requirement of a State or its political subdivisions.

"(b) GENERAL RULE OF PREEMPTION FOR ENERGY CONSERVATION STANDARDS BEFORE FEDERAL STANDARD BECOMES EFFECTIVE FOR A PRODUCT.—Effective on the date of enactment of the National Appliance Energy Conservation Act of 1987 and ending on the effective date of an energy conservation standard established under section 325 for any covered product, no State regulation, or revision thereof, concerning the energy efficiency or energy use of the covered product shall be effective with respect to such covered product, unless the State regulation or revision—

"(1) was prescribed or enacted before January 8, 1987, and is applicable to products before January 3, 1988;

"(2) is a State procurement regulation described in subsection (e);

"(3) is a regulation described in subsection (f)(1) or is prescribed or enacted in a building code for new construction described in subsection (f)(2);

"(4) is a regulation prohibiting the use in pool heaters of a constant burning pilot;

"(5) is a regulation described in subsection (d)(5)(B) for which a waiver has been granted under subsection (d); or

"(6) is a regulation effective on or after January 1, 1992, concerning the energy efficiency or energy use of television sets.

"(c) GENERAL RULE OF PREEMPTION FOR ENERGY CONSERVATION STANDARDS WHEN FEDERAL STANDARD BECOMES EFFECTIVE FOR A PRODUCT.—Except as provided in section 325(b)(3)(A)(ii) and effective on the effective date of an energy conservation standard established in or prescribed under section 325 for any covered product, no State regulation concerning the energy efficiency or energy use of such covered product shall be effective with respect to such product unless the regulation—

"(1) is a regulation described in paragraph (2) or (4) of subsection (b);

"(2) is a regulation which has been granted a waiver under subsection (d); or

"(3) is in a building code for new construction described in subsection (f)(3).

"(d) WAIVER OF FEDERAL PREEMPTION.—(1)(A) Any State with a State regulation which provides for any energy conservation standard or other requirement with respect to energy use or energy efficiency for any type (or class) of covered product for which there is a Federal energy conservation standard under section 325 may file a petition with the Secretary requesting a rule that such State regulation become effective with respect to such covered product.

"(B) Subject to paragraphs (2) through (5), the Secretary shall, within the period described in paragraph (2) and after consideration of the petition and the comments of interested persons, prescribe such rule if the Secretary finds (and publishes such finding) that the State has established by a preponderance of the evidence that such State regulation is needed to meet unusual and compelling State or local energy interests.

"(C) For purposes of this subsection, the term 'unusual and compelling State or local energy interests' means interests which—

"(i) are substantially different in nature or magnitude than those prevailing in the United States generally; and

"(ii) are such that the costs, benefits, burdens, and reliability of energy savings resulting from the State regulation make such regulation preferable or necessary when measured against the costs, benefits, burdens, and reliability of alternative approaches to energy savings or production, including reliance on reasonably predictable market-induced improvements in efficiency of all products subject to the State regulation.

The factors described in clause (ii) shall be evaluated within the context of the State's energy plan and forecast.

"(2) The Secretary shall give notice of any petition filed under paragraph (1)(A) and afford interested persons a reasonable opportunity to make written comments, including rebuttal comments, thereon. The Secretary shall, within the 6-month period beginning on the date on which any such petition is filed, deny such petition or prescribe the requested rule, except that the Secretary may publish a notice in the Federal Register extending such period to a date certain but no longer than one year after the date on which the petition was filed. Such notice shall include the reasons for delay. In the case of any denial of a petition under this subsection, the Secretary shall publish in the Federal Register notice of, and the reasons for, such denial.

"(3) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that such State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis. In determining whether to make such finding, the Secretary shall evaluate all relevant factors, including—

"(A) the extent to which the State regulation will increase manufacturing or distribution costs of manufacturers, distributors, and others;

"(B) the extent to which the State regulation will disadvantage smaller manufacturers, distributors, or dealers or lessen competition in the sale of the covered product in the State;

"(C) the extent to which the State regulation would cause a burden to manufacturers to redesign and produce the covered product type (or class), taking into consideration the extent to which the regulation would result in a reduction—

"(i) in the current models, or in the projected availability of models, that could be shipped on the effective date of the regulation to the State and within the United States; or

"(ii) in the current or projected sales volume of the covered product type (or class) in the State and the United States; and

"(D) the extent to which the State regulation is likely to contribute significantly to a proliferation of State appliance efficiency requirements and the cumulative impact such requirements would have.

"(4) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the Secretary's finding, except that the failure of some classes (or types) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a rule for other classes (or types).

"(5) No final rule prescribed by the Secretary under this subsection may—

"(A) permit any State regulation to become effective with respect to any covered product manufactured within three years after such rule is published in the Federal Register or within five years if the Secretary finds that such additional time is necessary due to the substantial burdens of retooling, redesign, or distribution needed to comply with the State regulation; or

"(B) become effective with respect to a covered product manufactured before the earliest possible effective date specified in section 325 for the initial amendment of the energy conservation standard established in such section for the covered product; except that such rule may become effective before such date if the Secretary finds (and publishes such finding) that, in addition to the other requirements of this subsection the State has established, by a preponderance of the evidence, that—

"(i) an energy emergency condition exists within the State which—

"(I) imperils the health, safety, and welfare of its residents because of the inability of the State or utilities within the State to provide adequate quantities of gas or electric energy to its residents at less than prohibitive costs; and

"(II) cannot be substantially alleviated by the importation of energy or the use of interconnection agreements; and

"(ii) the State regulation is necessary to alleviate substantially such condition.

"(6) In any case in which a State is issued a rule under paragraph (1) with respect to a covered product and subsequently a Federal energy conservation standard concerning such product is amended pursuant to section 325, any person subject to such State regulation may file a petition with the Secretary requesting the Secretary to withdraw the rule issued under paragraph (1) with respect to such product in such State. The Secretary shall consider such petition in accordance with the requirements of paragraphs (1), (3), and (4), except that the burden shall be on the petitioner to show by a preponderance of the evidence that the rule received by the State under paragraph (1) should be withdrawn as a result of the amendment to the Federal standard. If the Secretary determines that the petitioner has shown that the rule issued by the State should be so withdrawn, the Secretary shall withdraw it.

"(e) EXCEPTION FOR CERTAIN STATE PROCUREMENT STANDARDS.—Any State regulation which sets forth procurement standards for a State (or political subdivision thereof) shall not be superseded by the provisions of this part if such standards are more stringent than the corresponding Federal energy conservation standards.

"(f) EXCEPTION FOR CERTAIN BUILDING CODE REQUIREMENTS.—(1) A regulation or other requirement enacted or prescribed before January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 325 for such covered product.

"(2) A regulation or other requirement, or revision thereof, enacted or prescribed on or after January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 325 for such covered product if the code does not require that the energy efficiency of such covered product exceed—

"(A) the applicable minimum efficiency requirement in a national voluntary consensus standard; or

"(B) the minimum energy efficiency level in a regulation or other requirement of the State meeting the requirements of subsection (b)(1) or (b)(5), whichever is higher.

"(3) Effective on the effective date of an energy conservation standard for a covered product established in or prescribed under section 325, a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of such covered product is not superseded by this part if the code complies with all of the following requirements:

"(A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.

"(B) The code does not require that the covered product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under section 325, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

"(C) The credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 325 or the efficiency level required in a State regulation referred to in subparagraph (B) is on a one-for-one equivalent energy use or equivalent cost basis.

"(D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered product subject to an energy conservation standard established in or prescribed under section 325, the baseline building designs are based on the efficiency level for such covered product which meets but does not exceed such standard or the efficiency level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

"(E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds by more than 5 percent either standard or level referred to in subparagraph (D), there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard.

"(F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

"(G) The estimated energy use of any covered product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 323, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 323 or other technically accurate documented procedure.

"(4)(A) Subject to subparagraph (B), a State or local government is not required to submit a petition to the Secretary in order to enforce or apply its building code or to establish that the code meets the conditions set forth in this subsection.

"(B) If a building code requires the installation of covered products with efficiencies exceeding both the applicable Federal standard established in or prescribed under section 325 and the applicable standard of such State, if any, that has been granted a waiver under subsection (d), such requirement of the building code shall not be applicable unless the Secretary has granted a waiver for such requirement under subsection (d).

"(g) No WARRANTY.—Any disclosure with respect to energy use, energy efficiency, or estimated annual operating cost which is required to be made under the provisions of this part shall not create an express or implied warranty under State or Federal law that such energy efficiency will be achieved or that such energy use or estimated annual operating cost will not be exceeded under conditions of actual use.".

SEC. 8. CITIZEN SUITS.

Section 335(a) of the Energy Policy and Conservation Act (42 U.S.C. 6305) is amended—

(1) by striking out "or" at the end of paragraph (1);

(2) by striking out the period at the end of paragraph (2) and inserting in lieu thereof "; or";

(3) by inserting after paragraph (2) the following new paragraph:

"(3) the Secretary in any case in which there is an alleged failure of the Secretary to comply with a nondiscretionary duty to issue a proposed or final rule according to the schedules set forth in section 325."; and

(4) by adding after the last sentence the following:

"The courts shall advance on the docket, and expedite the disposition of, all causes filed therein pursuant to paragraph (3) of this subsection. If the court finds that the Secretary has failed to comply with a deadline established in section 325, the court shall have jurisdiction to order appropriate relief, including relief that will ensure the Secretary's compliance with future deadlines for the same covered product.".

## SEC. 9. ADMINISTRATIVE REVIEW AND JUDICIAL REVIEW.

Section 336 of the Energy Policy and Conservation Act (42 U.S.C. 6306) is amended to read as follows:

### "ADMINISTRATIVE PROCEDURE AND JUDICIAL REVIEW

"SEC. 336. (a)(1) In addition to the requirements of section 553 of title 5, United States Code, rules prescribed under section 323, 324, 325, 327, or 328 of this part shall afford interested persons an opportunity to present written and oral data, views, and arguments with respect to any proposed rule.

"(2) In the case of a rule prescribed under section 325, the Secretary shall, by means of conferences or other informal procedures, afford any interested person an opportunity to question—

"(A) other interested persons who have made oral presentations; and

"(B) employees of the United States who have made written or oral presentations with respect to disputed issues of material fact.

Such opportunity shall be afforded to the extent the Secretary determines that questioning pursuant to such procedures is likely to result in a more timely and effective resolution of such issues.

"(3) A transcript shall be kept of any oral presentations made under this subsection.

"(b)(1) Any person who will be adversely affected by a rule prescribed under section 323, 324, or 325 may, at any time within 60 days after the date on which such rule is prescribed, file a petition with the United States court of appeals for the circuit in which such person resides or has his principal place of business, for judicial review of such rule. A copy of the petition shall be transmitted by the clerk of the court to the agency which prescribed the rule. Such agency shall file in the court the written submissions to, and transcript of, the proceedings on which the rule was based, as provided in section 2112 of title 28, United States Code.

"(2) Upon the filing of the petition referred to in paragraph (1), the court shall have jurisdiction to review the rule in accordance with chapter 7 of title 5, United States Code, and to grant appropriate relief as provided in such chapter. No rule under section 323, 324, or 325 may be affirmed unless supported by substantial evidence.

"(3) The judgment of the court affirming or setting aside, in whole or in part, any such rule shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28, United States Code.

"(4) The remedies provided for in this subsection shall be in addition to, and not in substitution for, any other remedies provided by law.

"(5) The procedures applicable under this part shall not—

"(A) be considered to be modified or affected by any other provision of law unless such other provision specifically amends this part (or provisions of law cited herein); or

"(B) be considered to be superseded by any other provision of law unless such other provision does so in specific terms by referring to this part and declaring that such provision supersedes, in whole or in part, the procedures of this part.

"(c) Jurisdiction is vested in the Federal district courts of the United States over actions brought by—

"(1) any adversely affected person to determine whether a State or local government is complying with the requirements of this part; and

"(2) any person who files a petition under section 325(k) which is denied by the Secretary.".

**SEC. 10. ANNUAL REPORT.**

Section 338 of the Energy Policy and Conservation Act (42 U.S.C. 6308) is amended by adding at the end the following: "Nothing in this section provides a defense or justification for a failure by the Secretary to comply with a nondiscretionary duty as provided for in this part."

**SEC. 11. CONFORMING AMENDMENTS.**

(a) IN GENERAL.—Part B of title III of the Energy Policy and Conservation Act is amended as follows:

(1) Section 324 is amended—

(A) in subsection (a)(1), by striking out "paragraphs (1) through (9)" and inserting in lieu thereof "paragraphs (1), (2), (4), (6), and (8) through (12)";

(B) in subsection (a)(2), by striking out "paragraphs (10) through (13)" and inserting in lieu thereof "paragraphs (3), (5), and (7)"; and

(C) in subsection (a)(3)—

(i) by striking out "paragraph (14)" and inserting in lieu thereof "paragraph (13)";

(ii) by striking out subparagraph (A) and inserting in lieu thereof the following:

"(A) the Commission or the Secretary has made a determination with respect to such type (or class thereof) that labeling in accordance with this section will assist purchasers in making purchasing decisions,"; and

(iii) by striking out "section 323(a)(5)" in subparagraph (B) and inserting in lieu thereof "section 323(b)(1)(B)";

(D) by striking out subsection (b)(1) and inserting in lieu thereof the following:

"(b) RULES IN EFFECT; NEW RULES.—(1)(A) Any labeling rule in effect on the date of the enactment of the National Appliance Energy Conservation Act of 1987 shall remain in effect until amended, by rule, by the Commission.

"(B) After the date of the enactment of the National Appliance Energy Conservation Act of 1987 and not later than 30 days after the date on which a proposed test procedure applicable to a covered product of any of the types specified in paragraphs (1) through (13) of section 322(a) (or class thereof) is prescribed under section 323(b), the Commission shall publish a proposed labeling rule applicable to such type (or class thereof).";

(E) in subsection (b)(3)—

(i) by striking out "section 323" both places in which it appears and inserting in lieu thereof "section 323(b)";

(ii) by striking out "(13)" and inserting in lieu thereof "(12)"; and

(iii) by striking out "(14)" and inserting in lieu thereof "(13)";

(F) in subsection (b)(5)—

(i) by striking out "(10) through (13)" and inserting in lieu thereof "(3), (5), and (7)"; and

(ii) by striking out "(14)" and inserting in lieu thereof "(13)"; and

(G) in subsection (f), by striking out "or (2)" in the second sentence.

(2) Section 326(b)(3)(A) is amended by inserting "established in or" before "prescribed under".

(3) Section 332(a)(5) is amended by striking out "energy efficiency standard prescribed under" and inserting in lieu thereof "energy conservation standard established in or prescribed under".

(b) STYLISTIC CONFORMING AMENDMENTS.—Part B of title III of the Energy Policy and Conservation Act is amended as follows:

(1) Section 322(b)(1) is amended by striking out "(b)(1)" and inserting in lieu thereof "(b) SPECIAL CLASSIFICATION OF CONSUMER PRODUCT.—(1)".

(2) Section 324 is amended—

(A) by striking out "SEC. 324. (a)(1)" and inserting in lieu thereof "SEC. 324. (a) IN GENERAL.—(1)";

(B) in subsection (c)(1), by striking out "(c)(1)" and inserting in lieu thereof "(c) CONTENT OF LABEL.—(1)";

(C) in subsection (d), by striking out "(d)" and inserting in lieu thereof "(d) EFFECTIVE DATE.—";

(D) in subsection (e), by striking out "(e)" and inserting in lieu thereof "(e) STUDY OF CERTAIN PRODUCTS.—";

(E) in subsection (f), by striking out "(f)" and inserting in lieu thereof "(f) CONSULTATION.—"; and

(F) in subsection (g), by striking out "(g)" and inserting in lieu thereof "(g) OTHER AUTHORITY OF THE COMMISSION.—".

(3) Section 326 is amended—
    (A) in subsection (a), by striking out "(a)" and inserting in lieu thereof "(a) IN GENERAL.—";
    (B) in subsection (b)(1), by striking out "(b)(1)" and inserting in thereof "(b) NOTIFICATION.—(1)"; and
    (C) in subsection (c), by striking out "(c) Each" and inserting in lieu thereof "(c) DEADLINE.—Each".
(4) Section 329 is amended—
    (A) in subsection (a), by striking out "(a)" and inserting in lieu thereof "(a) IN GENERAL.—"; and        21
    (B) in subsection (b), by striking out "(b)" and inserting in lieu thereof "(b) CONFIDENTIALITY.—".
(5) Section 332 is amended—
    (A) in subsection (a), by striking out "SEC. 332. (a)" and inserting in lieu thereof "SEC. 332. (a) IN GENERAL.—"; and
    (B) in subsection (b), by striking out "(b)" and inserting in lieu thereof "(b) DEFINITION.—".
(6) Section 333 is amended—
    (A) in subsection (a), by striking out "SEC. 333. (a)" and inserting in lieu thereof "SEC. 333. (a) IN GENERAL.—";
    (B) in subsection (b), by striking out "(b)" and inserting in lieu thereof "(b) DEFINITION.—";
    (C) in subsection (c), by striking out "(c) It" and inserting in lieu thereof "(c) SPECIAL RULE.—It"; and
    (D) in subsection (d)(1), by striking out "(d)(1)" and inserting in lieu thereof "(d) PROCEDURE FOR ASSESSING PENALTY.—(1)".
(7) Section 335 is amended—
    (A) in subsection (b), by striking out "(b)" and inserting in lieu thereof "(b) LIMITATION.—";
    (B) in subsection (c), by striking out "(c)" and inserting in lieu thereof "(c) RIGHT TO INTERVENE.—";
    (C) in subsection (d), by striking out "(d)" and inserting in lieu thereof "(d) AWARD OF COSTS OF LITIGATION.—";
    (D) in subsection (e), by striking out "(e)" and inserting in lieu thereof "(e) PRESERVATION OF OTHER RELIEF.—"; and
    (E) in subsection (f), by striking out "(f)" and inserting in lieu thereof "(f) COMPLIANCE IN GOOD FAITH.—".
(8) Section 339 is amended—
    (A) in subsection (a), by striking out "(a)" and inserting in lieu thereof "(a) AUTHORIZATIONS FOR THE SECRETARY.—";
    (B) in subsection (b), by striking out "(b)" and inserting in lieu thereof "(b) AUTHORIZATIONS FOR THE COMMISSION.—"; and
    (C) in subsection (c), by striking out "(c)" and inserting in lieu thereof "(c) OTHER AUTHORIZATIONS.—".

## PURPOSE AND SUMMARY

Residential buildings account for 16.5 Quads of energy consumption in the United States, or 23% of the national total. Of that figure, approximately 80% is attributable to major home appliances, including central systems (central air conditioning units, furnaces, etc.) and individual units (refrigerators, freezers, washers and dryers, room air conditioners, etc.). The central tenet of this or any appliance standards bill is simple: the more efficient the appliance, the less energy is consumed.

Appliance efficiency standards are design requirements or minimum efficiency requirements for appliances. Unlike energy efficiency ratings, which are informational only, appliance efficiency standards establish actual baseline, minimum requirements for each covered product. The result is that the least energy efficient products are eliminated, resulting in greater average efficiency, decreased energy consumption by ratepayers, and decreased demand requirements on utilities.

There are two central tenets to the National Appliance Energy Conservation Act of 1987, H.R. 87. First, the bill legislates express energy conservation standards for eleven consumer products: (1) refrigerators and freezers; (2) room air conditioners; (3) central air conditioners and heat pumps; (4) water heaters; (5) furnaces; (6) dishwashers; (7) clothes washers; (8) clothes dryers; (9) direct heating equipment; (10) kitchen ranges and ovens; and (11) pool heaters. DOE is responsible for amending the standards in the future. Second, the bill preempts state law under most circumstances.

## DISCUSSION OF KEY PROVISIONS

### Section 4. Test Procedures

New Section 323(e) is intended to eliminate the impact that a change in test procedure might otherwise have on existing standard levels. The standard levels established in Section 5 of the Act are based on current test procedures. The Secretary has authority to amend test procedures at any time. If test procedures are changed, however, the measured efficiency or measured energy consumption of covered products is also likely to change. For example, a group of appliances that would consume the identical amount of energy under the use assumptions contained in the existing test procedure might consume different amounts of energy under new use assumptions contained in an amended test procedure. One purpose of new section 323(e) is to require that all models that comply with the standard under the old test procedure be deemed to comply with the standard under an amended test procedure, even if the measured energy consumption of such models is changed as a result of the new test procedure.

New Section 323(e) is also intended to eliminate any other impact that a revised test procedure might have on the energy conservation standard. An amended test procedure might alter the measured energy consumption of different models in various ways. For example, five models that are all measured to consume 10 units of energy under the existing test procedure might (in an extreme case) be measured to consume 4, 5, 6, 8, and 12 units of energy under the amended test procedure. The purpose of new section 323(e) is to require DOE to establish an amended standard that accounts for the measured change in energy consumption under the new test procedure. The new standard would be established by computing the average energy consumption (or efficiency) under the amended test procedure of a representative sample of units that barely complied with the standard as measured under the old test procedure. Thus, assusming that the existing standard in the prior example was 10 units, the new standard would be the average energy consumption under the new test procedure of a representative sample of units that consume 10 units of energy—in this case, 7 units $[(4+5+6+8+12)/5=7]$.

Section 323(e) also makes clear that the Secretary's authority to amend test procedures does not affect the Secretary's duty to issue final rules regarding energy conservation standards under Section 325.

*Section 5. Energy Conservation Standards*

*Overview.*—Section 5 of the Act amends current Section 325 of EPCA by setting explicit standard level for most of the major energy-consuming appliances. The Secretary is required to engage in at least two future rulemakings at specified dates to determine whether to revise the standards. In such future rulemakings, the Secretary may either increase the rigor of the standard, or allow it to remain at its current level; he may not decrease the standard.

This section requires that DOE standards for covered products remain effective for a specified duration ("lock-in" periods) during which manufacturers can obtain returns on their capital investments before being required to make further investments and other expenditures in order to meet more stringent requirements. Furthermore, the schedule gives industry a three- or five-year "lead-in" period, depending upon the product, between the announcement of a new standard level (issuance of final rule) and its effective date in order to make whatever product changes revised standards require.

The energy conservation standards specified in the Act apply to the principal function of an appliance, such as heating, cooling or water heating. Some appliances perform more than one function, such as furnaces, air conditioners or heat pumps that also heat potable water, and water heaters that also provide space heating. These appliances are sometimes referred to as combination appliances. Furnaces, air conditioners or heat pumps that also heat potable water must comply with the appropriate furnace or air conditioning standard and not with the water heater standard. Water heaters that also provide space heating must comply with the water heater standard and not with the furnace standard. The reason for this is that DOE test procedures are based on the average use cycle for the principle function of the appliance and do not specify a use cycle that would occur if that appliance were also performing another function.

If DOE establishes test procedures for both functions of combination appliances, energy conservation standards for both functions of such appliances may be established.

*Special Rule for Refrigerators, Refrigerator/Freezers, and Freezers Standards.*—New Section 325(b) of EPCA contains the initial standards and future rulemaking schedules for refrigerators, refrigerator-freezers, and freezers ("refrigerator/freezers"). The initial standard levels applicable to these products manufactured on or after January 1, 1990 are stronger than the most stringent existing State standards for these products, which are the standards promulgated by the California Energy Commission ("CEC") in 1984 to take effect in 1987. The initial Federal standards for these products are not as stringent as California standards, also enacted in 1984, that would be effective in 1992 in California, although the bill provides that these State standards may become effective in 1993 in California under certain circumstances.

Whether the rulemaking schedule provided in this subsection is met will determine the status of the 1992 CEC standards and other future State standards for refrigerator/freezers. The special provisions relating to the CEC 1992 standards for refrigerator/freezers

are justified because they are the only State standards substantially more stringent that those in the Act that have been promulgated at this time. The California 1992 standards for refrigerator/freezers will not take effect in California if the Secretary, as required, timely publishes a final rule which determines whether to amend the initial Federal standards. Under such circumstances, California may still petition DOE for a waiver from preemption. Although DOE's duty to publish rules by specified deadlines is nondiscretionary, DOE's failure to meet such deadlines with respect to refrigerator/freezers would allow other States to implement refrigerator/freezer standards without supersession or the need to utilize the waiver process until the Secretary determines whether to revise the Federal standards.

The Secretary must publish a proposed rule by July 1, 1988, to determine if the Federal refrigerator/freezer standards should be amended. A final rule must be published no later than July 1, 1989. If the Secretary determines to amend the standards, those revisions shall apply to products manufactured on or after January 1, 1993. However, if the final rule is not published by January 1, 1990, any revisions to the standards shall not apply to products manufactured before January 1, 1995, and there must be at least a three-year lead time between issuance of the final rule and the effective date of the amendments.

If the Secretary does not publish a final rule by July 1, 1989, then adversely affected parties may seek judicial relief through the provisions of new Section 335(a)(3) (Section 8 of the Act). This provision would allow manufacturers to sue to compel DOE to issue a final rule before January 1, 1990. If DOE does not publish a final rule by January 1, 1990, then the 1992 CEC standards (and any amendments to these standards which are not more stringent than the original regulations) would apply in California effective January 1, 1993. Thereafter, such standards would not preempted by subsequent Federal rules.

If the Secretary does not publish a final relating to the revision of the refrigerator/freezer standards by January 1, 1992, then any State requirements which might apply to such products manufactured on or after January 1, 1995, are not superseded until the effective date of a subsequent rule issued by DOE, unless DOE grants a waiver from preemption.

*Further Rulemaking.*—New EPCA section 325(j) sets forth the timetable for further rulemaking on covered products. For each covered product, two subsequent rulemakings are mandated, at specified times, in which the Secretary must determine whether the extent standard for such product should be amended. Thereafter, rulemakings to determine whether to amend a standard are discretionary. Such subsequent rulemakings may be initiated either by the Secretary of his own accord, or pursuant to a petition (new section 325(k)). The Secretary is required to grant a petition to initiate a rulemaking where the petition contains evidence which, assuming no other evidence were considered, provides an adequate basis for amending the standards under the following criteria: (1) amended standards would result in significant conservation of energy; (2) amended standards are technologically feasible;

and (3) amended standards are cost effective. A petitioner may appeal the denial of a petition in Federal District Court.

The intention of these amendments is to eliminate DOE's duty to conduct rulemakings pursuant to a rigid schedule dictated 15 or more years in advance. It is not intended to create any presumption that the need for revised standards will be diminished in the future. The Committee expects DOE to evaluate on a continuing basis whether further revisions in the standards are justified.

*Criteria for New or Amended Standards.*—Section 5 of the Act (new EPCA section 325(1)) also provides the criteria for prescribing new or amended Federal standards. The basic criterion for prescribing the standards is the same as that in current EPCA, *i.e.,* that any energy conservation standard shall be designed to achieve the maximum improvement in energy efficiency that is "technologically feasible" and "economically justified." H.R. 87 incorporates these requirements of existing law, and in addition establishes three additional criteria or factors to be considered by DOE in prescribing new standards or in reviewing standards for possible revision. These new provisions are:

*1. New Section 325(1)(l).*—DOE may not prescribe an amended standard that increases maximum allowable energy use or decreases the minimum required energy efficiency of a covered product. The purpose of this requirement is to prevent the Secretary from weakening any energy conservation standard for a product, whether established in this Act or subsequently adopted. This serves to maintain a climate of relative stability with respect to future planning by all interested parties. The Secretary may find in a particular case that no revision of a standard is required.

*2. New Section 325(1)(B)(iii).*—If the Secretary finds that the additional cost to the consumer of purchasing a product complying with an energy conservation standard would be less than three times the value of the energy savings that the consumer will receive as a result of the standard during the first year, a rebuttable presumption is created that the standard is economically justified. In other words, standard levels with a simple payback period of three years or less are entitled to a presumption of economic justification. The fact that this payback level cannot be achieved by a standard level shall not be considered in the Secretary's determination whether a standard level is economically justified. In other words, the Secretary shall not presume that a standard level is not economically justified just because the simple payback period exceeds three years. Instead, the Secretary shall analyze savings in operating costs as required by Section 325(1)(2)(B)(i)(II).

*3. New Section 325(1)(4).*—In addition to the technical feasibility and economic justification criteria, this new section ensures that energy savings are not achieved through the loss of significant consumer features. The provision states that even if a standard is "technologically feasible" and "economically justified," the Secretary may not prescribe an amended or new standard if he finds that interested persons have established by a preponderance of the evidence that the standard is likely to result in the "unavailability in a covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the

United States at the time of the Secretary's finding." This term precludes DOE from promulgating a standard that manufacturers are only able to meet by adopting engineering changes that eliminate performance characteristics. A manufacturer's decision to eliminate such characteristics rather than to implement other technologically feasible changes does not render the product type "unavailable." A standard would result in the "unavailability" of characteristics, etc., if, as a result of the standard, a product containing such characteristic would become prohibitively expensive, *i.e.* if there would be minimal demand for the product having such characteristic. Nor does the inability of a particular manufacturer to meet a standard necessarily make the product type "unavailable."

The purpose of this provision is to ensure that an amended standard does not deprive consumers of product choices and characteristics, features, sizes, etc. Significant achievements in energy conservation can be made without sacrificing the utility or convenience of applicances to cosumers. A valid standard may entail some minor loss of characteristics, features, sizes, etc.; for this reason, the Act requires that "substantially the same," though not necessarily identical, characteristics or features should continue to be available. This provision also does not apply to trivial effects in which a standard might result. If a standard level for a given product type or class fails to meet the statutory criterion, the Secretary should determine the most stringent standard level that would satisfy the criterion for that product type or class and adopt a standard for it that meets the statutory criteria. In addition, the Secretary may make adjustments to the standard levels for certain product types or classes to meet this requirement (*e.g.*, setting a lower standard level for certain types or classes), and the failure of particular product types or classes to meet this requirement shall not affect the Secretary's determination with respect to other product types or classes.

The burden of producing evidence and proving that a standard level will result in the unavailability of certain characteristics, etc., rests on interested persons asserting the claim of unavailability.

Product types or classes are those defined by the Act or by the Secretary. Examples of "performance characteristics" of particular products are: safety; cooling; refrigeration and heating; dehumidification; ability to clean or dry without adverse effects; serviceability; and incidence and cost or repair. Examples of "features" are: automatic defrost, through the door ice, size of room air conditioners, and noise levels. Assessment of standard sizes (*i.e.*, the availability of sizes that fit in standard building spaces), capacities and volumes should be based on a review of products available in the marketplace.

## Section 7. Effect on Other Law

*Overview.*—Section 7 provides for preemption of certain State and local regulations that address the energy consumption of covered products. In overall form, the section follows substantially the preemption requirements in current EPCA. Thus, the section continues the current rules for preemption with respect to certain State testing and labeling requirements applicable to covered prod-

ucts that are inconsistent with Federal law. It also continues the basic concept of preempting State energy efficiency standards and allowing waivers of preemption under certain circumstances.

Preemption applies to an entire product type as listed in the coverage section of the Act. For example, State standards for electric and gas kitchen ranges and ovens are preempted.

H.R. 87 significantly changes the criteria to be applied by the Secretary in determining whether to grant State petitions for waivers of preemption. The waiver provisions in Section 7 are intended to give DOE clearer direction and to give the States and other interested persons clearer notice of what the provisions entail. The combination of the new preemption provisions and the Federal standards mandated by Section 5 provide an appropriate solution to the problems caused by the absence of Federal standards and the adoption of numerous and inconsistent State standards. Section 7 makes appropriate allowance for the interests of the States through such features as "grandfathering" rules for exising State requirements, special rules for energy requirements relating to covered products in building codes and State procurement standards, and waivers from preemption.

Under the new waiver provisions, a State may petition for a waiver of preemption where a State regulation is necessary to meet "unusual and compelling State or local energy interests." As a general rule, a State may not receive a waiver for a standard that takes effect prior to the effective date of a Federal standard, except in the case of "unusual and compelling State or local energy interests" (discussed below) that also qualify as an energy emergency. In addition, a "grandfather" provision applies with respect to this period.

Special rules also permit State and local building codes to continue to regulate the energy consumption of covered products both before and after the effective date of Federal standards so long as the codes meet certain requirements. Provisions relating to State and local building codes recognize the increasingly important role of these codes in a State's management of energy resources. H.R. 87 does not affect a State's authority to adopt provisions in building codes that do not affect the energy efficiency or energy use of covered products, such as insulation, structure, fire, heating or safety standards.

Section 7 is designed to protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements. It is also designed to ensure that States are able to respond with their own appliance regulations to substantial and unusual energy problems, such as high electricity, gas, or heating oil prices, high dependence on oil (or fuels whose price is tied to oil) for electricity generation or on out-of-State energy sources, unusual climatic conditions, or adverse environmental or health and safety conditions that can be alleviated by energy conservation in appliances. Congress anticipates that States that have such energy problems, and that have met the burden of proof set forth in Section 327, will be granted waivers.

*Period prior to the effective date of a Federal standard.*—For the period from the date of enactment of the Act until a Federal standard becomes effective, State energy requirements for covered products are permitted to remain in effect if they were prescribed or

enacted before January 8, 1987, and are applicable to products before January 3, 1988. Otherwise, State energy efficiency requirements for covered products generally are preempted during this period. The primary exception to this general rule is that DOE may grant waivers from preemption for "unusual and compelling State or local energy interests" that qualify as an "energy emergency condition." This narrow exception is to be utilized by DOE on a case-by-case basis in conformity with the statutory criteria.

*Period when a Federal standard becomes effective.*—In general, effective on the date of a Federal standard for a covered product, the Federal standard preempts all State standards that may be applicable to that product. DOE may grant a waiver from preemption if the State establishes that a State regulation is needed to meet "unusual and compelling State or local energy interest," unless interested persons demonstrate that the waiver should not be granted. These provisions are not intended to impose an absolute bar on State regulation; it is anticipated that States satisfying the statutory criteria will be granted waivers from preemption.

To meet the criterion of "unusual and compelling State or local energy interests," a State must show that its interests are substantially different in nature or magnitude from those prevailing in the United States generally. In addition, the State must show that it has evaluated appliance standards as part of an energy plan and forecast which shows that the costs, benefits, burdens and reliability of energy savings resulting from the regulation make it preferable or necessary when measured against the costs, benefits, burdens, and reliability of alternative approaches to energy savings and production, including reliance on reasonably predictable market-induced improvements in efficiency of the product subject to the regulations. This provision does not constitute a Federal requirement for State energy planning or forecasting and does not require the State to use any specific methodology. It does require the State to show that it has engaged in a rational planning process in which the State has reviewed the cost-effectiveness of various alternatives to State appliance standards.

The Secretary may not, however, issue a waiver if he finds that interested persons have demonstrated, by a preponderance of the evidence, that the waiver would significantly burden manufacturing, marketing, distribution, sale or servicing of affected products on a national basis. H.R. 87 specifies several relevant factors that the Secretary should consider in making this determination.

Finally, the Secretary may not issue a waiver if he finds that interested persons have demonstrated that the State regulation is likely to result in the unavailability of product types, performance characteristics, features, etc. This final criterion is identical to the criterion for the establishment of a Federal standard set forth in new Section 325(1)(4), discussed above, except that the examination under Section 327 is limited to the effect in the State rather than on a national basis.

*State building codes.*—Section 7 contains new provisions relating to State building codes. These provisions are warranted because of the significant growth of State building codes as a tool for State energy management since the 1978 amendments to EPCA. These provisions generally apply only to appliances regulated directly by

a building code, such as heating and cooling equipment and water heaters, and not to appliances like refrigerators.

As a general rule, Section 7 prevents State building codes from being used as a means of setting mandatory State appliance standards in excess of the Federal standards. Subject to this restriction, Section 7 permits regulations or other requirements concerning the energy efficiency or energy use of covered products in building codes both before and after the effective date of a Federal standard under specified criteria.

The Act contains three basic provisions with respect to building codes. First, a "grandfather" provision covers energy efficiency requirements in building codes enacted or prescribed before January 8, 1987, permitting them to operate without preemption until the effective date of a Federal energy standard for a covered product.

Second, such a requirement enacted or prescribed on or after January 8, 1987 in a code for new construction is not preempted until the date of a Federal standard if the code does not require that the energy efficiency of the covered product exceed the applicable minimum efficiency requirement in national voluntary consensus standards (such as those of the American Society of Heating, Refrigeration, and Air-Conditioning Engineers) or certain other specified levels.

Third, on the effective date of a Federal standard for any covered product, such a State regulation or other requirement for a covered product in a code for new construction is not preempted if it does not require that the covered product have an energy efficiency exceeding the Federal standard or the level permitted in a waiver of preemption, and if it meets certain other criteria. The provisions give the State flexibility in implementing performance-based building code approaches. Such approaches authorize builders to adjust or trade off the efficiencies of the various building components, including certain covered products, so long as an overall energy objective is met. The section's limited restrictions are designed to ensure that performance-based codes cannot expressly or effectively require the installation of covered products whose efficiencies exceed either the applicable Federal standard or a State standard for which a waiver from preemption has been granted.

Generally, H.R. 87 does not require a State or local government to submit a petition to DOE in order to enforce or apply its building code for new construction. However, if the code requires the installation of covered products with efficiencies exceeding both the applicable Federal standard and any applicable State standard that has been granted a waiver of preemption, that requirement in the building code shall not apply unless DOE has granted a waiver for the requirement.

## BACKGROUND AND NEED FOR LEGISLATION

Appliance efficiency has been a subject of national interest since at least the initial energy price jolts of the early 1970's. In 1975, Congress passed the Energy Policy and Conservation Act (EPCA), which required the U.S. Department of Energy (DOE) to mandate energy labeling of appliances and to prescribe voluntary, industry-wide appliance efficiency improvements. In addition, ECPA author-

ized, but did not require, DOE to set mandatory efficiency standards if the labeling and voluntary approaches proved ineffective.

In 1978, Congress enacted the National Energy Conservation Policy Act (NECPA), 42 U.S.C. 6291 *et seq.* NECPA, among other things, amended EPCA to require DOE to promulgate expeditiously mandatory Federal efficiency standards for 13 covered products (refrigerators, freezers, water heaters, room air conditioners, central air conditioners, furnaces, dishwashers, clothes washers, clothes dryers, home heating equipment, kitchen ranges/ovens, television sets, and humidifiers/dehumidifers). DOE proceeded with the rulemaking and, on June 30, 1980, issued proposed standards for 8 of the 13 covered appliances.

In 1982 and 1983, DOE embarked upon a new rulemaking procedure. In December 1982 and August 1983, DOE issued final "no-standard" standards for most of the covered appliances. These standards constituted DOE's determination that, applying the statutory criteria of "technological feasibility" and "economic justification," the most appropriate Federal appliance standards were no standards at all.

The "no-standard" standards resulted in litigation. The Natural Resources Defense Council, joined by Congressman Richard Ottinger and the States of California, Minnesota and New York, sued DOE to overturn the standards as a wholesale misapplication of the Congressional directive to promulgate Federal standards. On July 16, 1985, the D.C. Circuit Court of Appeals struck the "no-standard" standards and directed the Department to initiate a new rulemaking procedure in accordance with the statutory intent. *NRDC* v. *Herrington,* 768 F.2d 1355 (D.C. Cir. 1985). That rulemaking is still in progress.

While Congress was enacting the first Federal appliance standards legislation in the 1970s, some states begin enacting their own appliance standards legislation. First California, and later New York, Wisconsin, Minnesota and Oregon, passed legislation or promulgated regulations establishing standards for appliances covered under Federal law. Although NECPA provides that Federal appliance standards preempt state standards, the law also allows DOE to grant waivers to states able to demonstrate a "significant State or local interest" justifying the State's standards in lieu of the Federal standard.

At the same time that DOE promulgated the "no-standard" standards it began a practice of granting waiver petitions filed by the states. As a result, the major activity in appliance standards over the past decade has been at the state level. At present, more than a half-dozen states have appliance standards legislation of one kind or another on the books, and another ten states are moving in that direction. In addition, many States and localities regulate the efficiency of certain products by adopting requirements in their building codes, which govern overall energy consumption in new buildings.

In December 1985, DOE and the Solicitor General's Office decided not to appeal the Court's decision in *NRDC* v. *Herrington.* Appliance manufacturers, accordingly, were confronted with the absence

of Federal appliance standards for the immediate future, and a growing plethora of differing state regulations, complicating industry's long-term planning. Environmental groups, for their part, were put to the task of fighting a series of legislative battles at the state level, with litigation ensuing in some cases. In early 1986, the major appliance manufacturer associations and the Natural Resources Defense Council began a negotiation to resolve their long-standing differences in the area of appliance standards. That negotiation continued for close to six months and resulted in a comprehensive agreement which is the foundation of the National Appliance Energy conservation Act.

A version of the appliance standards bill substantially identical to H.R. 87 passed both Houses of Congress by unanimous consent in the last days of the 99th Congress. The bill was pocket vetoed by President Reagan on November 1, 1986. The President's vote message stated that "[t]he bill intrudes unduly on the free market, limits the freedom of choice available to consumers who would be denied the opportunity to purchase lower-cost appliances, and constitutes a substantial intrusion into traditional State responsibilities and prerogatives."

*Need For and Benefits of Legislation*

As indicated, H.R. 87 represents a breakthrough in a decade-long battle between appliance manufacturers and environmental groups on the subject of appliance standards.

For manufacturers, H.R. 87 establishes explicit and uniform standards in the near term, and a detailed schedule for future standards in the long term. These provisions bring a degree of regulatory and certainty to the business planning of the appliance manfuacturing industry, which has had to grapple in recent years with a growing number of differing State appliance laws and regulations.

For environmentalists, H.R. 87 realizes a long-term objective of a rigorous, uniform standard effective in all 50 States. It also represents the close of a long era of costly, piecemeal battles in State legislatures and administrative rulemaking procedures to establish State and local appliance standards.

According to estimates prepared by the American Council for an Energy Efficient Economy (ACEEE), appliance standards will result in substantial energy cost savings to consumers and businesses. This legislation is designed to achieve these goals by establishing initial energy conservation standards for eleven major home appliances. These appliances account for approximately 24 percent of electricity consumption in the United States. In addition, this legislation requires DOE periodically to review the standards according to the schedule and criteria set forth in the new Act to determine whether to make the standards more stringent.

Table I, which was prepared by NRDC, compares the initial standards set forth in the Act with the most stringent existing or proposed State standards and with typical products currently on the market. The table also calculates the percentage difference in energy consumption of appliances meeting the initial standards set forth in the Act compared to typical current products.

Table II, also prepared by NRDC, shows the percentage of current models that do not meet the initial standards set forth in the Act.

Table III sets forth forecasts prepared by ACEEE. These forecasts project future energy consumption by appliances in the absence of standards and subtract from these values projected energy consumption with the standards.

### TABLE 1.—NATIONAL APPLIANCE ENERGY CONSERVATION ACT OF STANDARDS

| Appliance type | 1984 average efficiency | Act efficiency | Resulting efficiency | State efficiency | Percent [1] |
|---|---|---|---|---|---|
| Refrigerators | 1140 kWh/yr | 976 kWh/yr | 903 kWh/yr | 1023 kWh/yr (CA'87) 722 kWh/yr (CA'92) | 21 |
| Freezers | 799 kWh/yr | 671 kWh/yr | 621 kWh/yr | 737/yr (CA'87) 511 kWh/yr (CA'92) | 22 |
| Room air conditioners | 7.5 EER | 8.6 EER | 9.3 EER | 8.4 EER (CA'79) 8.45 EER (NY'88-prop.) 8.7 EER (NY'92-prop.) | 19 |
| Central air conditioners | 8.8 SEER | 10.0 SEER | 10.3 SEER | 9.5 SEER (NY'85) 9.9 SEER (CA'93) | 17 |
| Water heaters: | | | | | |
| Gas | .484 EF | .544 EF | .554 EF | .524 EF (ASHRAE/CA) | 13 |
| Electric | .807 EF | .884 EF | .894 EF | .864 EF (ASHRAE/CA) | 10 |
| Furnaces | 70% AFUE | 78% AFUE | 84% AFUE | 71% AFUE (CA'78) | 20% |

[1] Percent change 1984 efficiency vs. resulting efficiency.
Revised September 12, 1986.

TABLE 2.—*Redesign requirements of appliance standards in the National Appliance Energy Conservation Act*

| Appliance and product category | Percent Redesign |
|---|---|
| Refrigerators [1] (includes models with through-the-door ice): [2] | |
| Top-freezer, auto defrost [2] | 89 |
| Side-freezer, auto defrost [2] | 92 |
| Manual defrost | 42 |
| Freezers: [1] | |
| Chest | 83 |
| Upright manual | 87 |
| Room air conditioners: [3] | |
| No reverse cycle—with side louvers: | |
| Less than 6,000 Btu/hr | 78 |
| 6,000 to 7,999 Btu/hr | 49 |
| 8,000 to 13,999 Btu/hr | 56 |
| 14,000 to 19,999 Btu/hr | 81 |
| 20,000 Btu/hr and over | 60 |
| Reverse cycle—with side louvers | 17 |
| No reserve cycle—without side louvers: | |
| Less than 6,000 Btu/hr | 0 |
| 6,000 to 7,999 Btu/hr | 45 |
| 8,000 to 13,999 Btu/hr | 76 |
| 14,000 to 19,999 Btu/hr | 100 |
| 20,000 Btu/hr and over | ([2]) |
| Reverse cycle—without side louvers | 0 |
| Central air conditioners: [4] | |
| Split system | [5] 90 |
| Package system | [5] 89 |

| Appliance and product category | Percent Redesign |
|---|---|
| **Furnaces:** [6] | |
| Oil boiler | 57 |
| Oil furnace | 58 |
| Gas boiler | 79 |
| Gas furnace | 79 |

[1] NRDC sort of AHAM 1986 Directory of Certified Refrigerators and Freezers, Edition No. 2, June, 1986.

[2] No models offered.

[3] NRDC sort of AHAM 1986 Consumer Selection Guide For Room Air Conditioners. The earlier version of this table contained an error which omitted the redesign percentages for air conditioners over 20,000 BTU/hr and substituted the percent redesign for the Reverse Cycle with Side Louvers category, which in turn was left blank. Other small variations in the redesign numbers reflect differences with the AHAM sort which includes Special Application Models and other unique classes which were not considered in the original NRDC sort.

[4] ARI 3rd Quarter 1985 Efficiency Statistics of Nationally-shipped units Figure 4 of ARI Submission to Massachusetts Executive Office of Energy Resources, March,1986.

[5] These figures refer to shipments, not models.

[6] Sort of GAMA Consumers' Directory of Certified Furnace and Boiler Efficiency Ratings, May 1986, done by Glenn Reed, Massachusetts Executive Office of Energy Resources. These numbers differ from the previous version of this table because they were based on an AFUE of 78% according to GAMA's indoor air/indoor furnace test. Since the bill specifies 78% AFUE using outdoor air, the rule-of-thumb adjustment to the indoor test is 2% AFUE upward. Thus the sort is computed at the 80% AFUE level in this version, not the 78% AFUE level.

Revised September 12, 1986.

### TABLE 3.—FORECAST OF FUTURE ENERGY CONSUMPTION OF APPLIANCES

| Product | Electricity savings by 2000 | | | Energy savings by 2000 | | Cost savings by 2000 |
|---|---|---|---|---|---|---|
| | Annual (Twh/yr) | Lifetime (Twh) | Peak MW | Annual (Tbtu/yr) | Lifetime (quads) | Net lifetime $×10[6] |
| Refrigerators | 13.86 | 263 | 1,851 | 159.39 | 3.02 | $5,696 |
| Freezers | 2.59 | 54 | 340 | 29.79 | 0.62 | 1,358 |
| Electric water heaters | 20.87 | 271 | 2,573 | 240.01 | 3.12 | 8,798 |
| Room air conditioners | 4.59 | 69 | 4,890 | 52.79 | 0.79 | 854 |
| Central air conditioners | 11.62 | 139 | 12,385 | 133.63 | 1.60 | 829 |
| Furnaces | | | | 121.78 | 2.80 | 3,010 |
| Gas water heaters | | | | 190.19 | 4.37 | 6,280 |
| Gas ranges | | | | 31.83 | 0.73 | 1,325 |
| Total | 53.53 | 796 | 22,039 | 959.40 | 17.05 | 28,150 |

[1] Net lifetime, dollars×10[6].

Source: American Council for an Energy Efficient Economy, "Energy and Economic Savings Potential From National Appliance Efficiency Standards" (August 1986).

These calculations forecast energy savings up to the year 2000, and assume that DOE maintains the Federal standards at the initial levels set forth in the bill. ACEEE estimates a reduction in energy consumption of 17 quads by the year 2000 by virtue of the standards in H.R. 87. Based on their assumptions, peak demand for electrical capacity would be reduced by 22,000 megawatts. Based on the same assumptions, ACEEE estimates that the present value of cost savings to consumers, based on national average utility rates, would be $28 billion.

Although not all members of the environmentalist-industry coalition agree with these projected energy and cost savings, all do agree that the standards will enhance the certainty and reliability of future energy demand projections. Specifically, these standards would end an era of confusion and uncertainty. The issue of standards has remained unsettled for many years; in the absence of this legislation, this situation could continue for the indefinite future. The D.C. Circuit's decision in *NRDC V. Herrington* requires DOE to conduct a new rulemaking proceeding for appliance standards. This

proceeding will continue for a substantial time, and its outcome is uncertain. Litigation over DOE's determination would cause further delay and uncertainty. Such delay and uncertainty does not serve the public interest, including the interests of energy conservation and of rational planning by utilities, businesses, and other public and private entities. In the meantime, the States may be expected to fill the void—leading to a patchwork of unpredictable and inconsistent requirements. For these reasons, H.R. 87 is an important step in the Congressional initiative on appliance standards that began in 1975.

## HEARINGS

No legislative hearings were held in the 100th Congress. In the 99th Congress, the Subcommittee on Energy Conservation and Power held one day of hearings on the National Appliance Energy Conservation Act on September 10, 1986. Testimony was received from 6 witnesses, representing 6 organizations, with additional material submitted by numerous other individuals and organizations. The witnesses testifying at the hearing were: Peter A. A. Berle, President and C.E.O., National Audubon Society; Charles A. Dowd, President, Admiral, A Division of Maytag Company, representing the Association of Home Appliance Manufacturers; David Goldstein, Senior Staff Scientist, Natural Resources Defense Council; Robert J. Bauer, President and C.E.O., Empire Comfort Systems, Inc., representing the Gas Appliance Manufacturers Association; Howard Geller, Associate Director, American Council For An Energy-Efficient Economy; and John W. Norris, Jr., President and C.E.O., Lennox Industries, Inc., representing the AirConditioning and Refrigeration Institute.

## COMMITTEE CONSIDERATION

On February 24, 1987, the Subcommittee on Energy and Power met in open session and ordered reported the bill H.R. 87, as amended, by voice vote, a quorum being present. On February 26, 1987, the Committee met in open session and ordered reported the bill H.R. 87 with amendments by voice vote, a quorum being present.

## COMMITTEE OVERSIGHT FINDINGS

Pursuant to clause 2(1)(3)(A) of Rule XI of the Rules of the House of Representatives, no oversight findings or recommendations have been made by the Committee.

## COMMITTEE ON GOVERNMENT OPERATIONS

Pursuant to clause 2(1)(3)(D) of rule XI of the Rules of the House of Representatives, no oversight findings have been submitted to the Committee by the Committee on Government Operations.

## COMMITTEE COST ESTIMATE

In compliance with clause 7(a) of rule XIII of the Rules of the House of Representatives, the Committee believes that the bill will have no significant impact on spending for fiscal years 1988 through 1992.

## CONGRESSIONAL BUDGET OFFICE ESTIMATE

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, February 26, 1987.*

Hon. JOHN D. DINGELL,
*Chairman, Committee on Energy and Commerce, House of Representatives, Rayburn House Office Building, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed H.R. 87, the National Appliance Energy Conservation Act of 1987, as ordered reported by the House Committee on Energy and Commerce, February 26, 1987.

H.R. 87 establishes energy conservation standards for categories of covered appliances. It provides a schedule for the Secretary of Energy to evaluate these standards to ensure that the maximum energy efficiency that is technologically feasible and economically justified is being achieved. This bill also provides for the preemption of state energy conservation appliance standards after the federal standards are in effect.

CBO estimates that H.R. 87 will have no significant impact on government spending for fiscal years 1988 through 1992. The Department of Energy currently plans to conduct technical and economic valuations of appliances on essentially the same schedule described in H.R. 87.

Enactment of this bill would not directly affect the budgets of state or local governments.

On January 29, 1987, the Congressional Budget Office prepared a cost estimate for S. 83, a similar bill ordered reported by the Senate Committee on Energy and Natural Resources. The estimated budget impact of those two bills is the same.

If you wish further details on this estimate, we will be pleased to provide them.

With best wishes,
Sincerely,

RUDOLPH G. PENNER,
*Director.*

## INFLATIONARY IMPACT STATEMENT

Pursuant to cause 2(1)(4) of rule XI of the Rules of the House of Representatives, the Committee makes the following statement with regard to the inflationary impact of the reported bill: The legislation is not expected to have any inflationary impact.

## SECTION-BY-SECTION ANALYSIS

*Section 1* entitles the "National Appliance Energy Conservation Act" (the "Act").

*Section 2* (Definitions) amends Section 321(a) of the Energy Policy and Conservation Act ("EPCA") by adding definitions which are required to implement the specific standards provisions and other provisions added to EPCA by the Act. Section 2(a) defines "energy conservation standard" to include the standards set forth in the Act and future standards that the Secretary of the Department of

Energy ("the Secretary" or "DOE") may promulgate. Section 2(b) defines the technical terms that are used in the standards.

*Section 3* (Coverage) amends Section 322(a) of EPCA, listing the products that are covered by the Act. These products are: refrigerators; refrigerator-freezers; freezers; room air conditioners; central air conditioners and central air conditioning heat pumps; water heaters; pool heaters; direct heating equipment; furnaces; dishwashers; clothes washers; clothes dryers; and kitchen ranges and ovens. Other consumer products may be regulated by the Secretary under existing Section 322(b) of EPCA. Consumer products designed solely for use in recreational vehicles and other mobile equipment are not covered by the Act.

*Section 4* (Test Procedures) Section 323 of EPCA is amended so as to conform with the establishment of specific standard levels in the Act. New Section 323(a) states that all test procedures and related determinations prescribed or made by the Secretary with respect to any covered product which are in effect on the date of enactment of the Act remain in effect unless and until the Secretary amends the test procedures or related determinations.

New Section 323(b) authorizes the Secretary, in cooperation with the National Bureau of Standards, to amend existing test procedures, or to prescribe new test procedures for any covered product for which there are no test procedures. If the Secretary determines that a test procedure should be prescribed or amended, he shall promptly publish in the Federal Register proposed test procedures and afford interested parties an opportunity for comment. The Act extends the comment period to a minimum of 60 days (compared to 45 days under current law), and allows the Secretary to extend this comment period to up to 270 days for good cause shown.

New Section 323(c) states that until the Secretary has amended a test procedure applicable to a covered product, the existing proscriptions in EPCA—that no manufacturer, distributor, retailer or private labeler may make a representation respecting the energy use or efficiency of such product or the cost of energy consumed by such product unless the product has been tested in accordance with the test procedures—remain in effect.

New Section 323(d) restates existing law regarding cases in which test procedures are not required.

New Section 323(e) addresses the effect of amendment of a test procedure on a Federal appliance standard. The Secretary must determine in the rulemaking for the amended test procedure whether and to what extent the proposed test procedure would alter the measured energy efficiency or measured energy use of the covered products. If the amended test procedure will have such an effect, then the applicable standard levels must be ammended during the same rulemaking. In determining the amended standard level, the Secretary shall measure, pursuant to the amended test procedure, the energy efficiency or energy use of a representative sample of covered products that minimally comply with the existing standard level. The average of such energy efficiency or use levels under the amended test procedure will constitute the amended standard level. All existing models that comply with the existing standard and all revised models that have the same energy efficiency or energy use characteristics as such existing models shall be deemed

to comply with the amended standard. This provision does not modify the Secretary's duty to issue final rules relating to amended standards levels as described in new Section 325.

The purpose of this provision is to assure that amendment of a test procedure, which may occur at any time, will neither strengthen nor weaken the energy conservation standards, which may be amended only at certain specified times. The provision is needed in those cases where the measured energy efficiency or measured use of a product changes as the result of a revised test procedure. The Section also ensures that any products that comply with an energy conservation standard under an existing test procedure will still be deemed to comply with that standard even if an amended test procedure affects the measured energy efficiency or measured use of the product changes as the result of a revised test procedure.

*Section 5* (Energy Conservation Standards). This section significantly amends existing Section 325 of EPCA by establishing the specific initial energy conservation standards for the covered products, and by requiring future rulemakings under mandatory schedules and revised criteria.

Each subsection sets forth deadlines for two mandatory DOE revisions of each standard. Under each subsection, DOE must issue, by specified dates, proposed and final rules relating to amendments of the standards. Thereafter, DOE's duty to issue rules determining whether to amend the standards is discretionary. Subsequent rulemakings may also be initiated by petition.

For each standard, a minimum duration period (*i.e.*, the period between the effective date of a standard and the earliest possible effective date of a revision of that standard) is prescribed for each initial and revised standard. Manufacturers are also given specified lead times (*i.e.*, the time between final publication of a revised standard by DOE and the effective date of the revised standard) within which to redesign their products to comply with new standards. This minimum lead time is either three years or five years, depending on the products.

New Section 325(a) states that this Section provides for specific Federal energy conservation standards to be administered by DOE. The Secretary is also authorized to prescribe amended energy conservation standards for each type or class of covered product for which there is a legislated standard, and the Secretary may promulgate new standards for other consumer products.

New Section 325(b) contains the initial standard levels for refrigerators, refrigerator-freezers and freezers. This standard applies to all products manufactured on or after January 1, 1990. The initial standards do not apply to refrigerator-freezers with total refrigerated volume exceeding 39 cubic feet or freezers with total refrigerated volume exceeding 30 cubic feet.

Section 325(b)(3)(A)(i) also provides a specific date (July 1, 1988) by which a proposed rule regarding possible revisions to the standards must be published and states that a final rule shall be published no later than July 1, 1989. If a final rule is not published by January 1, 1990, then any amendment of the standards shall not apply to products manufactured before January 1, 1995.

Section 325(b)(3)(A)(ii) relates to California Energy Commission refrigerator-freezer standards. These State standards are to take

effect in 1992 under California law. If DOE fails to issue a final rule by January 1, 1990 relating to revision of the existing Federal standards, then the California 1992 standards go into effect in California on January 1, 1993. If DOE fails to issue a final rule by January 1, 1992 relating to revision of the existing Federal standards, then any State regulations which apply to products manufactured on or after January 1, 1995 apply in those States until a subsequent Federal refrigerator-freezer rule is put into effect.

New Sections 325(c) through 325(h) contain the initial standard levels and applicable dates for, respectively: room air conditioners (Section 325(c)); central air conditioners and central air conditioning heat pumps (Section 325(d)); water heaters, pool heaters, and direct heating equipment (Section 325(e)); furnaces (Section 325(f)); dishwashers, clothes washers and clothes dryers (Section 325(g)); and kitchen ranges and ovens (Section 325(h)).

The Committee modified the language of the bill amending Section 325(f)(1)(B) of EPCA to include an additional clause (iii). The purpose of the new clause is to clarify that, in setting an energy conservation standard for small gas furnaces (those having an input of less than 45,000 Btu's per hour), the Secretary of Energy shall, in a manner which is otherwise consistent with the Act, establish the standard at a level between 71 percent and 78 percent AFUE "which the Secretary determines is not likely to result in a significant shift from gas heating to electric resistance heating with respect to either residential construction or furnace replacement." The phrase "electric resistance heating" does not include "heat pump" as defined in section 2(b)(24), and does not include supplemental backup electric resistance heating included in many heat pump configurations. The phrase "gas heating" means "natural gas heating."

Nationwide, the use of electric resistance heating in single family dwellings has declined over the last ten years. Over this same time period, the use of gas furnaces and electric heat pumps has increased. The most recent DOE data show that in areas of the country where natural gas is available, 88 percent of all housing units are heated by natural gas. (Natural gas is available in all parts of the country except some rural areas.) As the technology and efficiency of heat pumps have improved, their use has also increased, but clearly the great majority of homes throughout the country rely on natural gas heat. Section 325(f)(1)(B)(iii) should be implemented in a manner that recognizes that the selection of climate control equipment for new homes and for replacements in existing homes is a marketplace decision. The Secretary, in establishing the small gas furnace standard, must take into account the criteria set forth in Section 325(l).

New Section 325(i), which essentially restates existing law, allows the Secretary, in his discretion, to promulgate standards for additional products, and specifies that a five-year lead time is required between the publication of a final rule and the effective date of the standards.

New Section 325(j) requires the Secretary to undergo two subsequent rulemakings, at specified times, to determine whether the extant standard for a covered product should be amended. Thereaf-

ter, rulemakings to determine whether to amend a standard are discretionary.

New Section 325(k) provides that the discretionary rulemakings described in Section 325(j) may be initiated pursuant to a properly stated petition. The Secretary is required to grant a petition to initiate a rulemaking where the petition contains evidence which, assuming no other evidence were considered, provides an adequate basis for amending the standards under the following criteria: (1) amended standards would result in significant conservation of energy; (2) amended standards are technologically feasible; and (3) amended standards are cost effective. Section 9 of H.R. 87, *see below*, permits the petitioner to appeal the denial of a petition in Federal District Court.

New Section 325(l) establishes the criteria under which the Secretary may prescribe new or amended standards. The Secretary may not increase the maximum allowable energy use or decrease the minimum required energy efficiency of a covered product under the standards prescribed in the Act or subsequently adopted, although the Secretary may determine that the standards should remain the same.

This Section retains the requirement of existing law that energy conservation standards, including new or amended standards, shall be designed to achieve the maximum improvement in energy efficiency which the Secretary determines is "technologically feasible" and "economically justified." This Section also essentially restates the requirements of existing law regarding the Secretary's evaluation of the technological feasibility and economic justification criteria. In addition, the Section creates a statutory presumption that a new or amended standard level is economically justified if the Secretary finds that the additional first cost to the consumer of purchasing a product complying with a given standard level will be less than three times the energy savings during the first year that the consumer will receive as a result of the standard. Although this presumption is rebuttable, it provides specific guidance to DOE that standard levels with a simple payback period of three years or less are presumptively economically justified. However, a determination that this criterion is not met shall not be taken into consideration in the Secretary's determination of whether a standard is economically justified. The Secretary shall consider, among other things, the statutory factor set forth in existing law requiring analysis of life-cycle costs.

New Section 325 also provides that the Secretary may not promulgate a new or amended standard if he finds that interested persons have established by a preponderance of the evidence that the standard is likely to result in the unavailability in the United States in any covered product type or class of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States at the time of the Secretary's finding. The failure of some classes or types to meet this criterion at a given standard level shall not affect the Secretary's authority to promulgate a standard for such classes or types at a level that does meet the criterion. Similarly, the failure of some classes or types to meet this requirement shall not affect the Secretary's authority to prescribe

a standard for other classes or types. This requirement is designed to ensure that manufacturers will not have to eliminate various performance characteristics in order to meet standards.

New subsection 325(m) contains the procedures for prescribing new or amended standards. This section increases to 60 days (versus 45 days in current law) the public comment period on an advance notice of proposed rulemaking and on proposed rules. It also provides that an amended or new rule shall be published as soon as practicable after the close of the comment period but not less than 90 days after the publication of the proposed rule in the Federal Register. In all other respects, this subsection essentially retains the requirements of current law.

Subsections (n), (o) and (q) are essentially identical to subsections (f), (j) and (e), respectively, of current law.

Subsection (p) states that compliance with the performance standards either set forth in or required by the Act shall be determined using the test procedures and compliance criteria of Section 323.

*Section 6* (Requirements of Manufacturers) Section 326(d) of EPCA is amended to add a requirement that in administering the Act the Secretary shall give due consideration to existing public sources of information including, but not limited to, nationally-recognized certification programs of trade associations. The Secretary is also required to exercise his authority in such a manner as to minimize unnecessary burdens on manufacturers of covered products. This language has been added in order to minimize to the extent possible the reporting and testing requirements of the standards program.

*Section 7* (Effect on Other Law) Section 327 of EPCA is amended significantly to create new preemption provisions, including criteria under which States can receive waivers from preemption.

Section 327(a), which restates existing law, provides that the Act supersedes State regulations which provide for the disclosure of information with respect to any measure of energy consumption of any covered product if: (1) the State regulation requires testing or use of any measure of energy consumption or any energy descriptor in any manner other than that prescribed under the Act's test procedures; or (2) such State regulation requires disclosure of information with respect to the energy use or efficiency of any covered product other than information prescribed under the labeling provisions of EPCA.

New Section 327(b) relates to the period between the date of enactment of the Act and the effective dates of each Federal energy conservation standard. This section states as a general principle that no State appliance efficiency regulations or requirements shall be applicable unless such regulations or requirements are prescribed or enacted before January 8, 1987 and are applicable to products before January 3, 1988. The section also lists other exceptions to preemption.

New Section 327(c) states that on the effective date for each Federal energy conservation standard, that standard supersedes any State regulation, as provided under current EPCA. This supersession is subject to the special provisions for building codes in new Section 327(f), the special provision for the California 1992 refriger-

ator-freezer standard, any waiver from preemption granted by DOE upon State petition, or other specified exceptions.

New Section 327(d) allows States to file petitions seeking waiver of Federal preemption. This subsection provides new and more detailed criteria that a State must establish by a preponderance of the evidence in order to receive an exemption. The State is required to show that its regulation is needed to meet "unusual and compelling State or local interests," which are defined as interests substantially different in nature or magnitude from those prevailing in the United States generally. In addition, these interests must be such that the costs, benefits, burdens and reliability of energy savings resulting from the State regulation make it preferable or necessary when measured against the costs, benefits, burdens and reliability of alternative approaches to energy savings or production, including reliance on reasonably predictable, market-induced improvements in efficiency of all products subject to the State regulation. These factors are to be evaluated as part of the State's energy plan and forecast. This subsection required the State to show that it has determined through a rational planning process that State regulations are preferable when compared to other alternatives.

New subsection (d) also provides that even if the State has made a showing of an unusual and compelling interest, the Secretary may not grant the requested waiver if interested persons have established by a prepdonerance of the evidence that such State regulation will significantly burden marketing, manufacturing, distribution, sale or servicing of affected products on a national basis. In evaluating this factor, the Secretary shall evaluate: the extent to which the State regulation will increase manufacturing and distribution costs; the extent to which the State regulation will disadvantage smaller manufacturers, distributors or dealers or lessen competition in the State; the extent to which the State regulation would cause a burden on manufacturers to redesign and produce the products, taking into account the reduction in current or projected models which would result from the regulation; and the extent to which the State regulation is likely to contribute significantly to a proliferation of State appliance efficiency requirements. These specific factors are non-exclusive.

New Section 327(d) also prohibits the Secretary from granting a State waiver petition if interested persons establish by a preponderance of the evidence that the State regulation is likely to result in the unavailability in the State of any covered product type of class of performance characteristics (including reliability), features, sizes, capacities and volumes that are substantially the same as those generally available in the State at the time of the Secretary's finding. This subsection also sets forth the procedure under which the Secretary shall give notice of any petition filed and afford persons a reasonable opportunity to comment.

New subsection 327(d) further provides that any State regulation granted an exemption shall apply to products manufactured three years after the rule granting such exemption is published in the Federal Register; however, the Secretary may lengthen the time to five years if he finds that additional time is necessary due to the

substantial burdens of retooling, redesign or distribution needed to comply with the State regulation.

In general, no State regulation, except as specified in subsection (b), may go into effect prior to the earliest possible effective date established by the Act for a revision of the energy conservation standards. However, a State may implement its regulation before that date if it can show by a preponderance of the evidence that an "energy emergency condition" exists within the State which imperils the health, safety and welfare of its residents because of the inability of the State or utilities within the State to provide adequate quantities of energy to its residents at less than prohibitive costs. The State must also show that this emergency cannot be alleviated substantially by the importation of energy or the use of interconnection agreements, and that the regulation is necessary to alleviate the condition.

This Section further provides that any interested person may file a petition requesting supersession of a State regulation which has been granted a waiver from preemption, but only if a Federal energy conservation standard for the same product has been amended since the waiver was granted. The burden of proof for superseding the State rule is on the petitioner.

Section 327(e) provides that State procurement standards more stringent than the Federal energy conservation standards are not superseded. This provision is substantially the same as Section 327(c) of current law.

New Section 327(f) describes Federal preemption with regard to energy efficiency or energy use requirements regarding covered products contained in State and local building codes. State and local building codes governing new construction typically regulate the energy efficiency of central heating and cooling equipment and water heaters. This section states that energy efficiency or use requirements contained in a State or local building code enacted or prescribed on or before January 8, 1987 are not preempted until the effective date of the Federal energy conservation standard. Such requirements adopted after January 8, 1987 are not preempted if they do not require the energy efficiency of a covered product to exceed the standard set forth in a "national voluntary consensus standard" or in an applicable State standard, whichever is higher. National voluntary consensus standards include those adopted by the Association of Air Conditioning, Heating and Refrigeration Engineers (ASHRAE), which sets energy efficiency standards using procedures sanctioned by the American National Standards Institute. ASHRAE standards are adopted by most State and local building codes.

Section 327(f) also describes the preemption applicable after the effective date of the initial Federal standard for a covered product. This section prohibits a State from expressly prescribing an efficiency standard for a covered product that exceeds the Federal standard, unless the State has obtained a waiver from preemption, but allows States flexibility to implement performance-based building code approaches. Such approaches authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy goal is met. Section 327(f)(3) sets forth limited restrictions designed to ensure that performance-based building

codes cannot effectively require the installation of covered products whose efficiencies exceed either the applicable Federal standards or State standards for which a waiver from preemption has been obtained. Finally, the Section states that a State or local government is not required to submit a petition to the Secretary in order to enforce or apply its building code, unless the building code requires the installation of covered products with efficiencies exceeding both the applicable Federal standard and any applicable State standard that has been granted a waiver from preemption.

*Section 8* (Citizen Suits) Section 335(a) of EPCA is amended by adding a Federal cause of action against the Secretary for failing to comply with the schedule in new Section 325 of EPCA. The courts are required to advance any such cases on the docket and to expedite the disposition of such cases. Jurisdiction is provided for the court to order appropriate relief, including relief that ensures the Secretary's compliance with future deadlines.

*Section 9* (Administrative Review and Judicial Review) Section 336 of EPCA remains essentially the same except for technical amendments. In addition, new subsection (c) states that jurisdiction is vested in Federal district courts over actions brought by any adversely affected person to determine whether a State or local government is complying with Section 327 of this Act and over actions brought by any person who files a petition under new Section 325(k) which is denied by the Secretary. This subsection, among other things, allows persons to seek declaratory judgments that State building codes do not comply with the criteria set forth in the Act. The provision is necessary because the Act does not require States to petition DOE to show that their building codes comply with Section 327(f).

*Section 10* (Annual Report) Section 338 of EPCA is amended by adding at the end a statement that nothing in the Section provides a defense or justification for a failure by the Secretary to comply with a nondiscretionary duty.

## CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of Rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

### ENERGY POLICY AND CONSERVATION ACT

### TITLE III—IMPROVING ENERGY EFFICIENCY

\*       \*       \*       \*       \*       \*       \*

### PART B—ENERGY CONSERVATION PROGRAM FOR CONSUMER PRODUCTS OTHER THAN AUTOMOBILES

#### DEFINITIONS

SEC. 321. (a) For purposes of this part:

(1) * * *

*     *     *     *     *     *     *

〚(6) The term "energy efficiency standard" means a performance standard—

   〚(A) which prescribes a minimum level of energy efficiency for a covered product, determined in accordance with test procedures prescribed under section 323, and

   〚(B) which includes any other requirements which the Secretary may prescribe under section 325(c).〛

(6) The term "energy conservation standard" means—

   (A) a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use for a covered product, determined in accordance with test procedures prescribed under section 323; or

   (B) a design requirement for the products specified in paragraphs (6), (7), (8), (10), and (13) of section 322(a); and includes any other requirements which the Secretary may prescribe under section 325(o).

*     *     *     *     *     *     *

(19) The term "AV" is the adjusted volume for refrigerators, refrigerator-freezers, and freezers, as defined in the applicable test procedure prescribed under section 323.

(20) The term "annual fuel utilization efficiency" means the efficiency descriptor for furnances and boilers, determined using test procedures prescribed under section 323 and based on the assumption that all—

   (A) weatherized warm air furnaces or boilers are located out-of-doors;

   (B) warm air furnaces which are not weatherized are located indoors and all combustion and ventilation air is admitted through grills or ducts from the outdoors and does not communicate with air in the conditioned space; and

   (C) boilers which are not weatherized are located within the heated space.

(21) The term "central air conditioner" means a product, other than a packaged terminal air conditioner, which—

   (A) is powered by single phase electric current;

   (B) is air-cooled;

   (C) is rated below 65,000 Btu per hour;

   (D) is not contained within the same cabinet as a furnace the rated capacity of which is above 225,000 Btu per hour; and

   (E) is a heat pump or a cooling only unit.

(22) The term "efficiency descriptor" means the ratio of the useful output to the total energy input, determined using the test procedures prescribed under section 323 and expressed for the following products in the following terms:

   (A) For furnaces and direct heating equipment, annual fuel utilization efficiency.

   (B) For room air conditioners, energy efficiency ratio.

   (C) For central air conditioning and central air conditioning heat pumps, seasonal energy efficiency ratio.

(D) For water heaters, energy factor.

(E) For pool heaters, thermal efficiency.

(23) The term "furnace" means a product which utilizes only single-phase electric current, or single-phase electric current or DC current in conjunction with natural gas, propane, or home heating oil, and which—

> (A) is designed to be the principal heating source for the living space of a residence;
>
> (B) is not contained within the same cabinet with a central air conditioner whose rated cooling capacity is above 65,000 Btu per hour;
>
> (C) is an electric central furnace, electric boiler, forced-air central furnace, gravity central furnace, or low pressure steam or hot water boiler; and
>
> (D) has a heat input rate of less than 300,000 Btu per hour for electric boilers and low pressure steam or hot water boilers and less than 225,000 Btu per hour for forced-air central furnaces, gravity central furnaces, and electric central furnaces.

(24) The terms "heat pump" or "reverse cycle" mean a product, other than a packaged terminal heat pump, which—

> (A) consists of one or more assemblies;
>
> (B) is powered by single phase electric current;
>
> (C) is rated below 65,000 Btu per hour;
>
> (D) utilizes an indoor conditioning coil, compressors, and refrigerant-to-outdoor-air heat exchanger to provide air heating; and
>
> (E) may also provide air cooling, dehumidifying, humidifying circulating, and air cleaning.

(25) The term "pool heater" means an appliance designed for heating nonpotable water contained at atmospheric pressure, including heating water in swimming pools, spas, hot tubs and similar applications.

(26) The term "thermal efficiency of pool heaters" means a measure of the heat in the water delivered at the heater outlet divided by the heat input of the pool heater as measured under test conditions specified in section 2.8.1 of the American National Standard for Gas Fired Pool Heaters, Z21.56–1986, or as may be prescribed by the Secretary.

(27) The term "water heater" means a product which utilizes oil, gas, or electricity to heat potable water for use outside the heater upon demand, including—

> (A) storage type units which heat and store water at a thermostatically controlled temperature, including gas storage water heaters with an input of 75,000 Btu per hour or less, oil storage water heaters with an input of 105,000 Btu per hour or less, and electric storage water heaters with an input of 12 kilowatts or less;
>
> (B) instantaneous type units which heat water but contain no more than one gallon of water per 4,000 Btu per hour of input, including gas instantaneous water heaters with an input of 200,000 Btu per hour or less, oil instantaneous water heaters which an input of 210,000 Btu per

*hour or less, and electric instantaneous water heaters with
an input of 12 kilowatts or less; of*

*(C) heat pump type units, with a maximum current
rating of 24 amperes at a voltage no greater then 250 volts,
which are products designed to transfer thermal energy
from one temperature level to a higher temperature level for
the purpose of heating water, including all ancillary equip-
ment such as fans, storage tanks, pumps, or controls neces-
sary for the device to perform its function.*

*(28) The term "weatherized warm air furnace or boiler"
means a furnace or boiler designed for installation outdoors,
approved for resistance to wind, rain, and snow, and supplied
with its own venting system.*

### [COVERAGE

[SEC. 322. (a) A consumer product is a covered product if it is
one of the following types (or is designed to perform a function
which is the principal function of any of the following types):

[(1) Refrigerators and refrigerator-freezers.
[(2) Freezers.
[(3) Dishwashers.
[(4) Clothes dryers.
[(5) Water heaters.
[(6) Room air conditioners.
[(7) Home heating equipment, not including furnaces.
[(8) Television sets.
[(9) Kitchen ranges and ovens.
[(10) Clothes washers.
[(11) Humidifiers and dehumidifiers.
[(12) Central air conditioners.
[(13) Furnaces.
[(14) Any other type of consumer product which the Secre-
tary classifies as a covered product under subsection (b).]

### COVERAGE

SEC. 322. (a) IN GENERAL.—*The following consumer products, ex-
cluding those consumer products designed solely for use in recre-
ational vehicles and other mobile equipment, are covered products:*

*(1) Refrigerators, refrigerator-freezers, and freezers which can
be operated by alternating current electricity, excluding—*

*(A) any type designed to be used without doors; and*

*(B) any type which does not include a compressor and
condenser unit as an integral part of the cabinet assembly.*

*(2) Room air conditioners.*

*(3) Central air conditioners and central air conditioning heat
pumps.*

*(4) Water heaters.*

*(5) Furnaces.*

*(6) Dishwashers.*

*(7) Clothes washers.*

*(8) Clothes dryers.*

*(9) Direct heating equipment.*

*(10) Kitchen ranges and ovens.*

*(11) Pool heaters.*

*(12) Television sets.*

*(13) Any other type of consumer product which the Secretary classifies as a covered product under subsection (b).*

[(b)(1)] *(b) SPECIAL CLASSIFICATION OF CONSUMER PRODUCT.*—(1) The Administrator may classify a type of consumer product as a covered product if he determines that—

(A) classifying products of such type as covered products is necessary or appropriate to carry out the purposes of this Act, and

(B) average annual per-household energy use by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year.

*          *          *          *          *          *          *

[TEST PROCEDURES

[SEC. 323. (a)(1) The Secretary shall, during the 30-day period which begins on the date of enactment of this Act, afford interested persons an opportunity to present written data, views, and arguments with respect to test procedures to be developed for covered products of each of the types specified in paragraphs (1) through (13) of section 322(a).

[(2) The Secretary shall direct the National Bureau of Standards to develop test procedures for the determination of (A) estimated annual operating costs of covered products of the types specified in paragraphs (1) through (13) of section 322(a), and (B) at least one other useful measure of energy consumption of such products which the Secretary determines is likely to assist consumers in making purchasing decisions.

[(3) The Secretary shall publish proposed test procedures with respect to all covered products of each of the types specified in paragraphs (1) through (13) of section 322(a), and shall afford interested persons an opportunity to present oral and written data, views, and arguments with respect to such proposed test procedures. Such comment period shall not be less than 45 days.

[(4) The Secretary shall prescribe test procedures for the determination of (i) estimated annual operating costs of all covered products of each of the types specified in paragraphs (1) through (13) of section 322(a), and (ii) at least one other measure of energy consumption of such products which the Secretary determines is likely to assist consumers in making such purchasing decisions. Except as provided in paragraph (6), such test procedures shall be prescribed not later than January 31, 1978.

[(5) If the Secretary has classified a type of product as a covered product under section 322(b), the Secretary may, after affording interested persons an opportunity to comment, direct the National Bureau of Standards to develop, and may publish proposed test procedures for such type of covered product (or class thereof). The Secretary shall afford interested persons an opportunity to present oral and written data, views, and arguments with respect to such proposed test procedures. Such comment period shall not be less than 45 days. The Secretary may thereafter prescribe test procedures in accordance with subsection (b) of this section with respect

to such type or class of product, if the Secretary or the Commission determines that—

[(A) the application of subsection (c) to such type of covered product (or class thereof) will assist consumers in making purchasing decisions, or

[(B) labeling in accordance with section 324 will assist purchasing in making decisions.

[(6)(A) The Secretary may delay the prescription of test procedures under paragraph (4) for a type of covered product (or class thereof) if he determines that he cannot, within applicable time period, prescribe test procedures applicable to such type (or class) which meet the requirements of subsection (b), and he submits to the Congress a report of such determination together with the reasons therefor, and also publishes such determination (and reasons) in the Federal Register. In any such case, he shall prescribe such test procedures as soon as practicable, but in no event later than 90 days after the date specified in paragraph (4).

[(B) The Secretary is not required to publish and prescribe test procedures under paragraphs (3) and (4) for a type of covered product (or class thereof) if he determines, by rule that test procedures cannot be developed which meet the requirements of subsection (b) and publishes such determination in the Federal Register, together with the reasons therefor. For purposes of section 327, a determination under this subparagraph with respect to any type (or class) of covered product, while effective, shall have the same effect as would a standard prescribed for such type (or class) under section 325.

[(7)(A) In the case of—

[(i) any test procedure prescribed under this subsection; or

[(ii) any determination under paragraphs (6) that a test procedure cannot be developed which meets the requirements of subsection (b);

the Secretary shall, not later than 3 years after the date of the enactment of this paragraph (and from time to time thereafter), conduct a reevaluation and, on the basis of such reevaluation, shall determine if such test procedure should be amended or such determination should be rescinded. In conducting such reevaluation, the Secretary shall take into account such information as he deems relevant, including technological developments relating to the energy efficiency of the type (or class) of covered products involved.

[(B) If the Secretary determines under subparagraph (A) that—

[(i) a test procedure should be amended, he shall promptly publish in the Federal Register proposed test procedures incorporating such amendments, or

[(ii) a determination under paragraph (6) should be rescinded, he shall promptly publish notice thereof in the Federal Register,

and afford interested persons an opportunity to present oral and written data, views, and arguments. Such comment period shall not be less than 45 days.

[(b)(1) Any test procedures prescribed under this section shall be reasonably designed to produce test results which reflect energy efficiency, energy use, or estimated annual operating cost of a covered product during a representative average use cycle (as deter-

mined by the Secretary), and shall not be unduly burdensome to conduct.

Ⅰ(2) If the test procedure is a procedure for determining estimated annual operating costs, such procedure shall provide that such costs shall be calculated from measurements of energy use in a representative average-use cycle (as determined by the Secretary), and from representative average unit costs of the energy needed to operate such product during such cycle. The Secretary shall provide information to manufacturers respecting representative average unit costs of energy.

Ⅰ(c)(1) Effective 180 days after a test procedure rule applicable to a covered product is prescribed under this section, no manufacturer, distributor, retailer, or private labeler may make any representation—

Ⅰ(A) in writing (including a representation on a label), or

Ⅰ(B) in any broadcast advertisement,

respecting the energy consumption of such product or cost of energy consumed by such product, unless such product has been tested in accordance with such test procedure and such representation fairly discloses the results of such testing.

(2) On the petition of any manufacturer, distributor, retailer or private labeler, filed not later than the 60th day before the expiration of the period involved, the 180-day period referred to in paragraph (1) may be extended by the Commission with respect to the petitioner (but in no event for more than an additional 180 days) if he finds that the requirements of paragraph (1) would impose on such petitioner an undue hardship (as determined by the Commission).Ⅰ

### TEST PROCEDURES

SEC. 323. (a) GENERAL RULE.—All test procedures and related determinations prescribed or made by the Secretary with respect to any covered product (or class thereof) which are in effect on the date of enactment of the National Appliance Energy Conservation Act of 1987 shall remain in effect until the Secretary amends such test procedures and related determinations under subsection (b).

(b) AMENDED AND NEW PROCEDURES.—(1)(A) The Secretary may amend test procedures with respect to any covered product if the Secretary determines that amended test procedures would not accurately or fully comply with the requirements of paragraph (3).

(B) The Secretary may, in accordance with the requirements of this subsection, prescribe test procedures for any consumer product classified as a covered product under section 322(b).

(C) The Secretary shall direct the National Bureau of Standards to assist in developing new or amended test procedures.

(2) If the Secretary determines, on his own behalf or in response to a petition by any interested person, that a test procedure should be prescribed or amended, the Secretary shall promptly publish in the Federal Register proposed test procedures and afford interested persons an opportunity to present oral and written data, views, and arguments with respect to such procedures. The comment period shall not be less than 60 days and may be extended for good cause shown to not more than 270 days. In prescribing or amending a test proce-

*dure, the Secretary shall take into account such information as the Secretary determines relevant to such procedure, including technological developments relating to energy use or energy efficiency of the type (or class) of covered products involved.*

*(3) Any test procedures prescribed or amended under this section shall be reasonably designed to produce test results which measure energy efficiency, energy use, or estimated annual operating cost of a covered product during a repreesentative average use cycle or period of use, as determined by the Secretary, and shall not be unduly burdensome to conduct.*

*(4) If the test procedure is a procedure for determining estimated annual operating costs, such procedure shall provide that such costs shall be calculated from measurements of energy use in a representative average use cycle or period of use, as determined by the Secretary, and from representative average unit costs of the energy needed to operate such product during such cycle. The Secretary shall provide information to manufacturers with respect to representative average unit costs of energy.*

*(c) RESTRICTION ON CERTAIN REPRESENTATIONS.—(1) No manufacturer, distributor, retailer, or private labeler may make any representation—*

   *(A) in writing (including a representation on a label); or*
   *(B) in any broadcast advertisement,*

*with respect to the energy use or efficiency of a covered product to which a test procedure is applicable under subsection (a) or the cost of energy consumed by such product, unless such product has been tested in accordance with such test procedure and such representation fairly discloses the results of such testing.*

*(2) Effective 180 days after an amended or new test procedure applicable to a covered product is prescribed under subsection (b), no manufacturer, distributor, retailer, or private labeler may make any representation—*

   *(A) in writing (including a representation on a label); or*
   *(B) in any broadcast advertisement,*

*with respect to the energy use or efficiency of such product or cost of energy consumed by such product, unless such product has been tested in accordance with such amended or new test procedures and such representation fairly discloses the results of such testing.*

*(3) On the petition of any manufacturer, distributor, retailer, or private labeler, filed not later than the 60th day before the expiration of the period involved, the 180-day period referred to in paragraph (2) may be extended by the Secretary with respect to the petitioner (but in no event for more than an additional 180 days) if the Secretary determines that the requirements of paragraph (2) would impose an undue hardship on such petitioner.*

*(d) CASE IN WHICH TEST PROCEDURE IS NOT REQUIRED.—(1) The Secretary is not required to publish and prescribe test procedures for a covered product (or class thereof) if the Secretary determines, by rule, that test procedures cannot be developed which meet the requirements of subsection (b)(3) and publishes such determination in the Federal Register, together with the reasons therefor.*

*(2) For purposes of section 327, a determination under paragraph (1) with respect to any covered product or class shall have the same*

*effect as would a standard prescribed for a covered product (or class).*

*(e) AMENDMENT OF STANDARD.—(1) In the case of any amended test procedure which is prescribed pursuant to this section, the Secretary shall determine, in the rulemaking carried out with respect to prescribing such procedure, to what extent, if any, the proposed test procedure would alter the measured energy efficiency or measured energy use of any covered product as determined under the existing test procedure.*

*(2) If the Secretary determines that the amended test procedure will alter the measured efficiency or measured use, the Secretary shall amend the applicable energy conservation standard during the rulemaking carried out with respect to such test procedure. In determining the amended energy conservation standard, the Secretary shall measure, pursuant to the amended test procedure, the energy efficiency or energy use of a representative sample of covered products that minimally comply with the existing standard. The average of such energy efficiency or energy use levels determined under the amended test procedure shall constitute the amended energy conservation standard for the applicable covered products.*

*(3) Models of covered products in use before the date on which the amended energy conservation standard becomes effective (or revisions of such models that come into use after such date and have the same energy efficiency or energy use characteristics) that comply with the energy conservation standard applicable to such covered products on the day before such date shall be deemed to comply with the amended energy conservation standard.*

*(4) The Secretary's authority to amend energy conservation standards under this subsection shall not affect the Secretary's obligation to issue final rules as described in section 325.*

## LABELING

SEC. 324. ⟦(a)(1)⟧ *(a) IN GENERAL.—(1)* The Commission shall prescribe labeling rules under this section applicable to all covered products of each of the types specified in paragraphs ⟦(1) through (9)⟧ *(2), (4), (6), and (8) through (12)* of section 322(a), except to the extent that, with respect to any such type (or class thereof), the Commission determines under the second sentence of subsection (b)(5) that labeling in accordance with their section is not technologically or economically feasible.

(2) The Commission shall prescribe labeling rules under this section applicable to all covered products of each of the types specified in paragraphs ⟦(10) through (13)⟧ *(3), (5), and (7)* of section 322(a), except to the extent that, with respect to any such type (or class thereof), the Commission determines under the second sentence of subsection (b)(5) that labeling in accordance with their section is not technologically or economically feasible or is not likely to assist consumers in making purchasing decisions.

(3) The Commission may prescribe a labeling rule under this section applicable to covered products of a type specified in paragraph ⟦(14)⟧ *(13)* of section 322(a) (or a class thereof) if—

[(A) the Commission or the Secretary has made a determination with respect to such type (or a class thereof) under section 323(a)(5)(B),]

*(A) the Commission or the Secretary has made a determination with respect to such type (or class thereof) that labeling in accordance with this section will assist purchasers in making purchasing decisions,*

(B) the Secretary has prescribed test procedures under section [323(a)(5)] *323(b)(1)(B)* for such type (or class thereof) and

(C) the Commission determines with respect to such type (or class thereof) that application of labeling rules under this section to such type (or class thereof) is economically and technologically feasible.

\* \* \* \* \* \* \*

[(b)(1) Not later than 30 days after the date on which a proposed test procedure applicable to a covered product of any of the types specified in paragraphs (1) through (14) of section 323(a), the Commission shall publish a proposed labeling rule applicable to such type (or class thereof).]

*(b) RULES IN EFFECT; NEW RULES.—(1)(A) Any labeling rule in effect on the date of the enactment of the National Appliance Energy Conservation Act of 1987 shall remain in effect until amended, by rule, by the Commission.*

*(B) After the date of the enactment of the National Appliance Energy Conservation Act of 1987 and not later than 30 days after the date on which a proposed test procedure applicable to a covered product of any of the types specified in paragraphs (1) through (13) of section 322(a) (or class thereof) is prescribed under section 323(b), the Commission shall publish a proposed labeling rule applicable to such type (or class thereof).*

\* \* \* \* \* \* \*

(3) Not earlier than 45 days nor later than 60 days after the date on which test procedures are prescribed under section 323*(b)* with respect to covered products of any type (or class thereof) specified in paragraphs (1) through [(13)] *(12)* of section 322(a), the Commission shall prescribe labeling rules with respect to covered products of such type (or class thereof). Not earlier than 45 days after the date on which test procedures are prescribed under section 323*(b)* with respect to covered products of a type specified in paragraph [(14)] *(13)* of section 322(a), the Commission may prescribe labeling rules with respect to covered products of such type (or class thereof).

\* \* \* \* \* \* \*

(5) The Commission may delay the publication of a proposed labeling rule, or the prescription of a labeling rule, beyond the dates specified in paragraph (1) or (3), if it determines that it cannot publish proposed labeling rules or prescribe labeling rules which meet the requirements of this section on or prior to the date specified in the applicable paragraph and publishes such determination in the Federal Register, together with the reasons therefor. In any such case, it shall publish proposed labeling rules or prescribe labeling rules for covered products of such type (or class thereof) as soon as

practicable unless it determines (A) that labeling in accordance with the section is not economically or technically feasible, or (B) in the case of a type specified in paragraphs [(10) through (13)] *(3), (5), and (7)* of section 322(a), that labeling in accordance with this section is not likely to assist consumers in purchasing decisions. Any such determination shall be published in the Federal Register, together with the reasons therefor. This paragraph shall not apply to the prescription of a labeling rule with respect to covered products of a type specified in paragraph [(14)] *(13)* of section 322(a).

[(c)(1)] *(c) CONTENT OF LABEL.—(1)* Subject to paragraph (6), a rule prescribed under this section shall require that each covered product in the type or class of covered products to which the rule applies bear a label which discloses—

(A) the estimated annual operating cost of such product (determined in accordance with test procedures prescribed under section 323), except that if—

(i) the Secretary determines that disclosure of estimated annual operating cost is not technologically feasible, or

(ii) the Commission determines that such disclosure is not likely to assist consumers in making purchasing decisions or is not economically feasible,

the Commission shall require disclosure of a different useful measure of energy consumption (determined in accordance with test procedures prescribed under section 323); and

(B) information respecting the range of estimated annual operating costs for covered products to which the rule applies; except that if the Commission requires disclosure under subparagraph (A) of a measure of energy consumption different from estimated annual operating cost, then the label shall disclose the range of such measure of energy consumption of covered products to which such rule applies.

*       *       *       *       *       *       *

[(d)] *(d) EFFECTIVE DATE.—*A rule under this section (or an amendment thereto) shall not apply to any covered product the manufacture of which was completed prior to the effective date of such rule or amendment, as the case may be.

[(e)] *(e) STUDY OF CERTAIN PRODUCTS.—*The Secretary, in consultation with the Commission, shall study consumer products for which labeling rules under this section have not been proposed, in order to determine (1) the aggregate energy consumption of such products, and (2) whether the imposition of labeling requirements under this section would be feasible and useful to consumers in making purchasing decisions. The Secretary shall include the results of such study in the annual report under section 338.

(f) *CONSULTATION.—*The Secretary and the Commission shall consult with each other on a continuing basis as may be necessary or appropriate to carry out their respective responsibilities under this part. Before the Commission makes any determination under subsection (a)(1) [or (2)], it shall obtain the views of the Secretary and shall take such views into account in making such determination.

(g) *OTHER AUTHORITY OF THE COMMISSION.—*Until such time as labeling rules under this section take effect with respect to a type

or class of covered product, this section shall not affect any authority of the Commission under the Federal Trade Commission Act to require labeling with respect to energy consumption of such type or class of covered product.

〔ENERGY EFFICIENCY STANDARDS

SEC. 325. (a)(1) The Secretary shall, by rule prescribe an energy efficiency standard for each type (or class) of covered products specified in paragraphs (1) through (13) of section 322(a).

〔(2) The Secretary may, by rule, prescribe an energy efficiency standard for any type (or class) of covered products of a type specified in paragraph (14) of section 322(a), if he determines, for the purposes of this section, that—

〔(A) the average per household energy use within the United States by products of such type (or class) exceeded 150 kilowatt-hours (or its Btu equivalent) for any 12-calendar-month period ending before such determination;

〔(B) the aggregate household energy use within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-calendar-month period;

〔(C) substantial improvement in the energy efficiency of products of such type (or class) is technologically feasible; and

〔(D) the application of a labeling rule under section 324 to such type (or class) is not likely to be sufficient to induce manufacturers to produce, and consumers and other persons to purchase, covered products of such type (or class) which achieve the maximum energy efficiency which is technologically feasible to attain and is economically justified.

Not later than 2 years after the date of the enactment of this paragraph, the Secretary shall publish in the Federal Register a list of those types (and classes) of covered products which he considers may be subject to standards authorized to be prescribed under this paragraph. The Secretary may revise such list from time to time thereafter.

〔(b) No standard for a type (or class) of covered products shall be prescribed pursuant to subsection (a) if—

〔(1) a test procedure has not been prescribed pursuant to section 323 with respect to that type (or class) of products, or

〔(2) the Secretary determines, by rule, that the establishment of such standard will not result in significant conservation of energy or that the establishment of such standard is not technologically feasible or economically justified.

For purposes of section 327, a determination under paragraph (2) with respect to any type (or class) of covered products shall have the same effect as would a standard prescribed for such type (or class) under this section.

〔(c) Energy efficiency standards for each type (or class) of covered products prescribed under this section shall be designed to achieve the maximum improvement in energy efficiency which the Secretary determines is technologically feasible and economically justified. Such standards may be phased in, over a period not in

excess of 5 years, through the establishment of intermediate standards, as determined by the Secretary.

〔(d) Before determining whether a standard is economically justified under subsection (c), the Secretary, after receiving any views and comments furnished with respect to the proposed standard under section 336, shall determine that the benefits of the standard exceed its burdens based, to the greatest extent practicable, on a weighing of the following factors:

〔(1) the economic impact of the standard on the manufacturers and on the consumers of the products subject to such standard,

〔(2) the savings in operating costs throughout the estimated average life of the covered products in the type (or class), compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the covered products which are likely to result from the imposition of the standard,

〔(3) the total projected amount of energy savings likely to result directly from the imposition of the standard,

〔(4) any lessening of the utility or the performance of the covered products likely to result from the imposition of the standard,

〔(5) the impact of any lessening of competition determined in writing by the Attorney General that is likely to result from the imposition of the standard,

〔(6) the need of the Nation to conserve energy, and

〔(7) any other factors the Secretary considers relevant.

For purposes of paragraph (5), the Attorney General shall, not later than 60 days after the publication of a proposed rule prescribing an energy efficiency standard, make a determination of the impact, if any, from any lessening of competition likely to result from such standard and transmit such determination in writing to the Secretary, together with an analysis of the nature and extent of such impact. Any such determination and analysis shall be published by the Secretary in the Federal Register.

〔(e)(1) Subject to paragraph (2), the Secretary may, on application of any manufacturer, exempt such manufacturer from all or part of the requirements of any rule prescribing an energy efficiency standard under this section for any period which does not extend beyond the date which is 24 months after the date such rule is prescribed, if the Secretary finds that the annual gross revenues to such manufacturer for the preceding 12-month period from all its operations (including the manufacture and sale of covered products) does not exceed $8,000,000. In making such finding in the case of any manufacturer, the Secretary shall take into account the annual gross revenues of any other person who controls, is controlled by, or is under common control with, such manufacturer.

〔(2) The Secretary may not exercise the authority granted under paragraph (1) with respect to any type (or class) of covered product subject to an energy efficiency standard established under this section unless he makes a finding, after obtaining the written views of the Attorney General, that a failure to allow an exemption under paragraph (1) would likely result in a lessening of competition.

〔(f)(1) A rule prescribing an energy efficiency standard for a type (or class) of covered products shall specify a level of energy efficien-

cy higher or lower than that which applies (or would apply) for such type (or class) for any group of covered products which have the same function or intended use, if the Secretary, in his discretion, determines that covered products within such group—

[(A) consume a different kind of energy from that consumed by other covered products within such type (or class), or

[(B) have a capacity or other performance-related feature which other products within such type (or class) do not have, justifying a higher or lower standard from that which applies (or will apply) to other products within such type (or class). In determining under this paragraph whether a performance-related feature justifies the establishment of a higher or lower standard, the Secretary shall consider such factors as the utility to the consumer of such a feature, and such other factors as he deems appropriate.

[(2) Any rule prescribing a higher or lower level of energy efficiency under paragraph (1) shall include an explanation of the basis on which such higher or lower level was established.

[(g) In prescribing energy efficiency standards under this section, the Secretary shall give priority to the establishment of energy efficiency standards for types of products (or classes thereof) specified in paragraphs (1), (2), (4), (5), (6), (7), (9), (12), and (13) of section 322(a).

[(h)(1) Not later than 5 years after prescribing an energy efficiency standard under this section (and from time to time thereafter), the Secretary shall—

[(A) conduct a reevaluation in order to determine whether such standard should be amended in any manner, and

[(B) make, and publish in the Federal Register, such determination.

In conducting such reevaluation, the Secretary shall take into account such information as he deems relevant, including technological developments with respect to the type (or class) of covered products involved, and the economic impact of the standard.

[(2) If the Secretary determines under paragraph (1) that a standard should be amended, he shall promptly publish a proposed rule incorporating such amendments and afford interested persons an opportunity to present oral and written data, views, and arguments. Such comment period shall not be less than 45 days.

[(i) Any energy efficiency standard shall be prescribed in accordance with the following procedure:

[(1) The Secretary shall (A) publish an advance notice of proposed rulemaking which specifies the type (or class) of covered products to which the rule is likely to apply, and (B) invite interested persons to submit, within 45 days after the date of publication of such advance notice, written presentations of data, views, and arguments relevant to establishing such an energy efficiency standard.

[(2) An advance notice of proposed rulemaking under paragraph (1) shall be published by the Secretary—

[(A) in the case of types of covered products (or classes thereof) of the types specified in paragraphs (1), (2), (4), (5), (6), (7), (9), (12), and (13) of section 322(a), not later than 30 days after a test procedure with respect to that type of covered products (or class thereof) has been prescribed, or 45 days after

the date of the enactment of this subparagraph, whichever is later; and

〔(B) in the case of types of covered products (or classes thereof) specified in paragraph (3), (8), (10), and (11), of section 322(a), not later than 30 days after a test procedure with respect to that type (or class) of covered products has been prescribed, or one year after the date of the enactment of this subparagraph, whichever is later.

〔(3) A proposed rule which prescribes an energy efficiency standard for a type (or class) of covered products may not be published earlier than 60 days after the date of publication of advance notice of proposed rulemaking for such type (or class). The Secretary shall determine the maximum improvement in energy efficiency that is technologically feasible for each type (or class) of covered products in prescribing such standard and if such standard is not designed to achieve such efficiency, the Secretary shall state in the proposed rule the reasons therefor. After the publication of such proposed rulemaking, the Secretary shall afford interested persons, in accordance with section 336, an opportunity to present oral and written comments (including an opportunity to question those who make such presentations, as provided in such section) on matters relating to such proposed rule, including—

〔(A) whether the standard to be prescribed is economically justified (taking into account those factors which the Secretary must consider under subsection (d)),

〔(B) whether the standard will achieve the maximum improvement in energy efficiency which is technologically feasible,

〔(C) if the standard will not achieve such improvement, whether the reasons for not achieving such improvement are adequate, and

〔(D) whether such rule should prescribe a level of energy efficiency which is higher or lower than that which would otherwise apply in the case of any group of products within the type (or class) to be subject to such standard.

〔(4) A rule prescribing an energy efficiency standard for a type (or class) of covered products may not be published earlier than 60 days after the date of publication of the proposed rule under this section for such type (or class). Such rule shall be published as soon as practicable after such 60-day period, but in no event later than 2 years after publication of the advance notice. Such rule shall take effect not earlier than 180 days after the date of its publication in the Federal Register. Such rule (or any amendment thereto) shall not apply to any covered products the manufacture of which was completed before the effective date of the rule or amendment as the case may be.

〔(j) An energy efficiency standard prescribed under this section shall include test procedures prescribed in accordance with section 323, and may include any requirement which the Secretary determines is necessary to assure that each covered product to which such standard applies meets the required minimum level of energy efficiency specified in such standard.〕

### ENERGY CONSERVATION STANDARDS

SEC. 325. (a) PURPOSES.—*The purposes of this section are to—*
(1) *provide Federal energy conservation standards applicable to covered products; and*
(2) *authorize the Secretary to prescribe amended or new energy conservation standards for each type (or class) of covered product.*

(b) STANDARDS FOR REFRIGERATORS, REFRIGERATOR-FREEZERS, AND FREEZERS.—(1) *The following is the maximum energy use allowed in kilowatt hours per year for the following products (other than those described in paragraph (2)) manufactured on or after January 1, 1990:*

|  | Energy Standards Equations |
|---|---|
| Refrigerators and Refrigerator-Freezers with manual defrost | $16.3\,AV + 316$ |
| Refrigerator-Freezers-partial automatic defrost | $21.8\,AV + 429$ |
| Refrigerator-Freezers-automatic defrost with: | |
|     Top mounted freezer without ice | $23.5\,AV + 471$ |
|     Side mounted freezer without ice | $27.7\,AV + 488$ |
|     Bottom mounted freezer without ice | $27.7\,AV + 488$ |
|     Top mounted freezer with through the door ice service | $26.4\,AV + 535$ |
|     Side mounted freezer with through the door ice | $30.9\,AV + 547$ |
| Upright Freezers with: | |
|     Manual defrost | $10.9\,AV + 422$ |
|     Automatic defrost | $16.0\,AV + 623$ |
| Chest Freezers and all other freezers | $14.8\,AV + 223$ |

(2) *The standards described in paragraph (1) do not apply to refrigerators and refrigerator-freezers with total refrigerated volume exceeding 39 cubic feet or freezers with total refrigerated volume exceeding 30 cubic feet.*

(3)(A)(i) *The Secretary shall publish a proposed rule, no later than July 1, 1988, to determine if the standards established by paragraph (1) should be amended. The Secretary shall publish a final rule no later than July 1, 1989, which shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after January 1, 1993. If such a final rule is not published before January 1, 1990, any amendment of such standards shall apply to products manufactured on or after January 1, 1995. Nothing in this subsection provides any justification or defense for a failure by the Secretary to comply with the nondiscretionary duty to publish final rules by the dates stated in this paragraph.*

(ii)(I) *If the Secretary does not publish a final rule before January 1, 1990, relating to the revision of the energy conservation standards for refrigerators, refrigerator-freezers and freezers, the regulations which established standards for such products and were promulgated by the California Energy Commission on December 14, 1984, to be effective January 1, 1992 (or any amendments to such standards that are not more stringent than the standards in the original regulations), shall apply in California to such products, effective beginning January 1, 1993, and shall not be preempted after such effective date by any energy conservation standard established in this section or prescribed, on or after January 1, 1990, under this section.*

(II) *If the Secretary does not publish a final rule before January 1, 1992, relating to the revision of the energy conservation standards*

for refrigerators, refrigerator-freezers and freezers, State regulations which apply to such products manufactured on or after January 1, 1995, shall apply to such products until the effective date or a rule issued under this section with respect to such products.

(B) After the publication of a final rule under subparagraph (A), the Secretary shall publish a final rule no later than five years after the date of publication of the previous final rule. The Secretary shall determine in such rule whether to amend the standards in effect for the products described in paragraph (1).

(C) Any amendment prescribed under subparagraph (B) shall apply to products manufactured after a date which is five years after—

　　(i) the effective date of the previous amendment; or
　　(ii) if the previous final rule did not amend the standards, the earliest date by which the previous amendment could have been effective;

except that in no case may any amended standard apply to products manufactured within three years after publication of the final rule establishing such amended standard.

(c) STANDARDS FOR ROOM AIR CONDITIONERS.—(1) The energy efficiency ratio of room air conditioners shall be not less than the following for products manufactured on or after January 1, 1990:

| Product class | Ratio |
|---|---|
| Without Reverse Cycle and With Louvered Sides: | |
| Less than 6,000 Btu | 8.0 |
| 6,000 to 7,999 Btu | 8.5 |
| 8,000 to 13,999 Btu | 9.0 |
| 14,000 to 19,999 Btu | 8.8 |
| 20,000 and more Btu | 8.2 |
| Without Reverse Cycle and Without Louvered Sides: | |
| Less than 6,000 Btu | 8.0 |
| 6,000 to 7,999 Btu | 8.5 |
| 8,000 to 13,999 Btu | 8.5 |
| 14,000 to 19,999 Btu | 8.5 |
| 20,000 and more Btu | 8.2 |
| With Reverse Cycle and With Louvered Sides | 8.5 |
| With Reverse Cycle, Without Louvered Sides | 8.0 |

(2)(A) The Secretary shall publish a final rule no later than January 1, 1992, to determine if the standards established under paragraph (1) should be ameded. Such rule shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after January 1, 1995.

(B) After January 1, 1992, the Secretary shall publish a final rule no later than five years after the date of publication of a previous final rule. The Secretary shall determine in such rule whether to amend the standards in effect for room air conditioners.

(C) Any amendment prescribed under subparagraph (B) shall apply to products manufactured after a date which is five years later—

　　(i) the effective date of the previous amendment; or
　　(ii) if the previous final rule did not amend the standards, the earliest date by which a previous amendment could have been effective;

except that in no case may any amended standard apply to products manufactured within three years after publication of the final rule establishing such amended standard.

*(d) STANDARDS FOR CENTRAL AIR CONDITIONERS AND HEAT PUMPS.—(1) The seasonal energy efficiency ratio of central air conditioners and central air conditioning heat pumps shall be not less than the following:*

*(A) Split Systems: 10.0 for products manufactured on or after January 1, 1992.*

*(B) Single Package Systems: 9.7 for products manufactured on or after January 1, 1993.*

*(2) The heating seasonal performance factor of central air conditioning heat pumps shall be not less than the following:*

*(A) Split Systems: 6.8 for products manufactured on or after January 1, 1992.*

*(B) Single Package Systems: 6.6 for products manufactured on or after January 1, 1993.*

*(3) (A) The Secretary shall publish a final rule no later than January 1, 1994, to determine whether the standards established under paragraph (1) should be amended. Such rule shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after January 1, 1999. The Secretary shall publish a final rule no later than January 1, 1994, to determine whether the standards established under paragraph (2) shall be amended. Such rule shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after January 1, 2002.*

*(B) The Secretary shall publish a final rule after January 1, 1994, and no later than January 1, 2001, to determine whether the standards in effect for central air conditioners and central air conditioning heat pumps should be amended. Such rule shall provide that any amendment shall apply to products manufactured on or after January 1, 2006.*

*(e) STANDARDS FOR WATER HEATERS; POOL HEATERS; DIRECT HEATING EQUIPMENT.—(1) The energy factor of water heaters shall be not less than the following for products manufactured on or after January 1, 1990:*

*(A) Gas Water Heater: .62 – (.0019 x Rated Storage Volume in Gallons).*
*(B) Oil Water Heater: .59 – (.0019 x Rated Storage Volume in Gallons).*
*(C) Electric Water Heater: .95 – (.00132 x Rated Storage Volume in Gallons).*

*(2) The thermal efficiency of pool heaters manufactured on or after January 1, 1990, shall not be less than 78 percent.*

*(3) The efficiencies of gas direct heating equipment manufactured on or after January 1, 1990, shall be not less than the following:*

| *Wall:* | *Percent* |
|---|---|
| | *AFUE* |
| *Fan type:* | |
| *Up to 42,000 Btu/hour* | *73* |
| *Over 42,000 Btu/hour* | *74* |
| *Gravity type:* | |
| *Up to 10,000 Btu/hour* | *59* |
| *Over 10,000 Btu/hour up to 12,000 Btu/hour* | *60* |
| *Over 12,000 Btu/hour up to 15,000 Btu/hour* | *61* |
| *Over 15,000 Btu/hour up to 19,000 Btu/hour* | *62* |
| *Over 19,000 Btu/hour up to 27,000 Btu/hour* | *63* |
| *Over 27,000 Btu/hour up to 46,000 Btu/hour* | *64* |
| *Over 46,000 Btu/hour* | *65* |
| *Floor:* | |
| *Up to 37,000 Btu/hour* | *56* |
| *Over 37,000 Btu/hour* | *57* |

| Room: | Percent |
|---|---|
| Up to 18,000 Btu/hour | 57 |
| Over 18,000 Btu/hour up to 20,000 Btu/hour | 58 |
| Over 20,000 Btu/hour up to 27,000 Btu/hour | 63 |
| Over 27,000 Btu/hour up to 46,000 Btu/hour | 64 |
| Over 46,000 Btu/hour | 65 |

*(4)(A) The Secretary shall publish final rules no later than January 1, 1992, to determine whether the standards established by paragraph (1), (2), or (3) for water heaters, pool heaters, and direct heating equipment should be amended. Such rule shall provide that any amendment shall apply to products manufactured on or after January 1, 1995.*

*(B) The Secretary shall publish a final rule no later than January 1, 2000, to determine whether standards in effect for such products should be amended. Such rule shall provide that any such amendment shall apply to products manufactured on or after January 1, 2005.*

*(f) STANDARDS FOR FURNACES.—(1) Furnances (other than furnaces designed solely for installation in mobile homes) manufactured on or after January 1, 1992, shall have an annual fuel utilization efficiency of not less than 78 percent, except that—*

> *(A) boilers (other than gas steam boilers) shall have an annual fuel utilization efficiency of not less than 80 percent and gas steam boilers shall have an annual fuel utilization efficiency of not less than 75 percent; and*

> *(B) the Secretary shall prescribe a final rule not later than January 1, 1989, establishing an energy conservation standard—*

>> *(i) which is for furnaces (other than furnaces designed solely for installation in mobile homes) having an input of less than 45,000 Btu per hour and manufactured on or after January 1, 1992;*

>> *(ii) which provides that the annual fuel utilization efficiency of such furnaces shall be a specific percent which is not less than 71 percent and not more than 78 percent; and*

>> *(iii) which the Secretary determines is not likely to result in a significant shift from gas heating to electric resistance heating which respect to either residential construction or furnace replacement.*

*(2) Furnaces which are designed solely for installation in mobile homes and which are manufactured on or after September 1, 1990, shall have an annual fuel utilization efficiency of not less than 75 percent.*

*(3)(A) The Secretary shall publish a final rule no later than January 1, 1992, to determine whether the standards established by paragraph (2) for mobile home furnaces should be amended. Such rule shall provide that any amendment shall apply to products manufactured on or after January 1, 1994.*

*(B) The Secretary shall publish a final rule no later than January 1, 1994, to determine whether the standards established by this subsection for furnaces (including mobile home furnaces) should be amended. Such rule shall provide that any amendment shall apply to products manufactured on or after January 1, 2002.*

*(C) After January 1, 1997, and before January 1, 2007, the Secretary shall publish a final rule to determine whether standards in effect for such products should be amended. Such rule shall contain such amendment, if any, and provide that any amendment shall apply to products manufactured on or after January 1, 2012.*

*(g) STANDARDS FOR DISHWASHERS; CLOTHES WASHERS; CLOTHES DRYERS.—(1) Dishwashers manufactured on or after January 1, 1988, shall be equipped with an option to dry without heat.*

*(2) All rinse cycles of clothes washers shall include an unheated water option, but may have a heated water rinse option, for products manufactured on or after January 1, 1988.*

*(3) Gas clothes dryers shall not be equipped with a constant burning pilot for products manufactured on or after January 1, 1988.*

*(4)(A) The Secretary shall publish final rules no later than January 1, 1990, to determine if the standards established under this subsection for products described in paragraphs (1), (2), and (3) should be amended. Such rules shall provide that any amendment shall apply to products the manufacture of which is completed on or after January 1, 1993.*

*(B) After January 1, 1990, the Secretary shall publish a final rule no later than five years after the date of publication of the previous final rule. The Secretary shall determine in such rule whether to amend the standards in effect for such products.*

*(C) Any such amendment shall apply to products manufactured after a date which is five years after—*

> *(i) the effective date of the previous amendment; or*
> *(ii) if the previous final rule did not amend the standard, the earliest date by which a previous amendment could have been in effect;*

*except that in no case may any amended standard apply to products manufactured within three years after publication of the final rule establishing such standard.*

*(h) STANDARDS FOR KITCHEN RANGES AND OVENS.—(1) Gas kitchen ranges and ovens having an electrical supply cord shall not be equipped with a constant burning pilot for products manufactured on or after January 1, 1990.*

*(2)(A) The Secretary shall publish a final rule no later than January 1, 1992, to determine if the standards established for kitchen ranges and ovens in this subsection should be amended. Such rule shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after January 1, 1995.*

*(B) The Secretary shall publish a final rule no later than January 1, 1997, to determine whether standards in effect for such products should be amended. Such rule shall apply to products manufactured on or after January 1, 2000.*

*(i) STANDARDS FOR OTHER COVERED PRODUCTS.—(1) The Secretary may prescribe an energy conservation standard for any type (or class) of covered products of a type specified in paragraph (13) of section 322(a) if the requirements of subsections (l) and (m) are met and the Secretary determines that—*

> *(A) the average per household energy use within the United States by products of such type (or class) exceeded 150 kilowatt-*

*hours (or its Btu equivalent) for any 12-month period ending before such determination;.*

   *(B) the aggregate household energy use within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period;*

   *(C) substantial improvement in the energy efficiency of products of such type (or class) is technologically feasible; and*

   *(D) the application of a labeling rule under section 324 to such type (or class) is not likely to be sufficient to induce manufacturers to produce, and consumers and other persons to purchase, covered products of such type (or class) which achieve the maximum energy efficiency which is technologically feasible and economically justified.*

  *(2) Any new or amended standard for covered products of a type specified in paragraph (13) of section 322(a) shall not apply to products manufactured within five years after the publication of a final rule establishing such standard.*

  *(3) The Secretary may, in accordance with subsections (1) and (m), prescribe an energy conservation standard for television sets. Any such standard may not become effective with respect to products manufactured before January 1, 1992.*

  *(j) FURTHER RULEMAKING.—After issuance of the last final rules required under subsections (b) through (h) of this section, the Secretary may publish final rules to determine whether standards for a covered product should be amended. An amendment prescribed under this subsection shall apply to products manufactured after a date which is five years after—*

   *(1) the effective date of the previous amendment made pursuant to this part; or*

   *(2) if the previous final rule published under this part did not amend the standard, the earliest date by which a previous amendment could have been in effect,*

*except that in no case may an amended standard apply to products manufactured within three years (in the case of refrigerators, refrigerator-freezers, and freezers, room air-conditioners, dishwashers, clothes washers, clothes dryers, and kitchen ranges and ovens) or five years (in the case of central air-conditioners and heat pumps, water heaters, pool heaters, direct heating equipment, and furnaces) after publication of the final rule establishing a standard.*

  *(k) PETITION FOR AN AMENDED STANDARD.—(1) With respect to each covered product describ ed in paragraphs (1) through (11) of section 322(a), any person may petition the Secretary to conduct a rulemaking to determine for any such covered product if the standards contained either in the last final rule required for such product under subsections (b) through (h), as the case may be, of this section or in a final rule published for such product under subsection (j) or this subsection should be amended.*

  *(2)(A) The Secretary shall grant a petition if he finds that it contains evidence which, assuming no other evidence were considered, provides an adequate basis for amending the standards under the following criteria—*

   *(i) amended standards will result in significant conservation of energy;*

*(ii) amended standards are technologically feasible; and*

*(iii) amended standards are cost effective as described in subsection (1)(2)(B)(i)(II).*

*(B) The grant of a petition by the Secretary under this subsection creates no presumption with respect to the Secretary's determination of any of the criteria in a rulemaking under this section.*

*(3) An amendment prescribed under this subsection shall apply to products manufactured after a date which is five years after—*

*(A) the effective date of the previous amendment pursuant to this part; or*

*(B) if the previous final rule published under this part did not amend the standard, the earliest date by which a previous amendment could have been in effect;*

*except that in no case may an amended standard apply to products manufactured within three years (in the case of refrigerators, refrigerator-freezers, and freezers, room air-conditioners, dishwashers, clothes washers, clothes dryers, and kitchen ranges and ovens) or five years (in the case of central air-conditioners and heat pumps, water heaters, pool heaters, direct heating equipment, and furnaces) after publication of the final rule establishing a standard.".*

*(1) CRITERIA FOR PRESCRIBING NEW OR AMENDED STANDARDS.—*
*(1) The Secretary may not prescribe any amended standard which increases the maximum allowable energy use, or decreases the minimum required energy efficiency, of a covered product.*

*(2)(A) Any new or amended energy conservation standard prescribed by the Secretary under this section for any type (or class) of covered product shall be designed to achieve the maximum improvement in energy efficiency which the Secretary determines is technologically feasible and economically justified.*

*(B)(i) In determining whether a standard is economically justified, the Secretary shall, after receiving views and comments furnished with respect to the proposed standard, determine whether the benefits of the standard exceed its burdens by, to the greatest extent practicable, considering—*

*(I) the economic impact of the standard on the manufacturers and on the consumers of the products subject to such standard;*

*(II) the savings in operating costs throughout the estimated average life of the covered product in the type (or class) compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the covered products which are likely to result from the imposition of the standard;*

*(III) the total projected amount of energy savings likely to result directly from the imposition of the standard;*

*(IV) any lessening of the utility or the performance of the covered products likely to result from the imposition of the standard;*

*(V) the impact of any lessening of competition, as determined in writing by the Attorney General, that is likely to result from the imposition of the standard;*

*(VI) the need for national energy conservation; and*

*(VII) other factors the Secretary considers relevant.*

*(ii) For purposes of clause (i)(V), the Attorney General shall make a determination of the impact, if any, of any lessening of competition likely to result from such standard and shall transmit such de-*

termination, not later than 60 days after the publication of a proposed rule prescribing or amending an energy conservation standard, in writing to the Secretary, together with an analysis of the nature and extent of such impact. Any such determination and analysis shall be published by the Secretary in the Federal Register.

(iii) If the Secretary finds that the additional cost to the consumer of purchasing a product complying with an energy conservation standard level will be less than three times the value of the energy savings during the first year that the consumer will receive as a result of the standard, as calculated under the applicable test procedure, there shall be a rebuttal presumption that such standard level is economically justified. A determination by the Secretary that such criterion is not met shall not be taken into consideration in the Secretary's determination of whether a standard is economically justified.

(3) The Secretary may not prescribe an amended or new standard under this section for a type (or class) of covered product if—

(A) for products other than dishwashers, clothes washers, clothes dryers, and kitchen ranges and ovens, a test procedure has not been prescribed pursuant to section 323 with respect to that type (or class) of product; or

(B) the Secretary determines, by rule, that the establishment of such standard will not result in significant conservation of energy or that the establishment of such standard is not technologically feasible or economicaly justified.

For purposes of section 327, a determination under subparagraph (B) with respect to any type (or class) of covered products shall have the same effect as would a standard prescribed for such type (or class).

(4) The Secretary may not prescribe an amended or new standard under this section if the Secretary finds (and publishes such finding) that interested persons have established by a preponderance of the evidence that the standard is likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States at the time of the Secretary's finding. The failure of some type (or classes) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a standard for other types (or classes).

(m) PROCEDURE FOR PRESCRIBING NEW OR AMENDED STANDARDS.—Any new or amended energy conservation standard shall be prescribed in accordance with the following procedure:

(1) The Secretary—

(A) shall publish an advance notice of proposed rulemaking which specifies the type (or class) of covered products to which the rule may apply;

(B) shall invite interested persons to submit, within 60 days after the date of publication of such advance notice, written presentations of data, views, and arguments in response to such notice; and

(C) may identify proposed or amended standards that may be prescribed.

*(2) A proposed rule which prescribes an amended or new energy conservation standard or prescribes no amendment or no new standard for a type (or class) of covered products shall be published in the Federal Register. In prescribing any such proposed rule with respect to a standard, the Secretary shall determine the maximum improvement in energy efficiency or maximum reduction in energy use that is technologically feasible for each type (or class) of covered products. If such standard is not designed to achieve such efficiency or use, the Secretary shall state in the proposed rule the reasons therefor.*

*(3) After the publication of such proposed rulemaking, the Secretary shall, in accordance with section 336, afford interested persons an opportunity, during a period of not less than 60 days, to present oral and written comments (including an opportunity to question those who make such presentations, as provided in such section) on matters relating to such proposed rule, including—*

*(A) whether the standard to be prescribed is economically justified (taking into account those factors which the Secretary must consider under subsection (1)(2)) or will result in the effects described in subsection (1)(4);*

*(B) whether the standard will achieve the maximum improvement in energy efficiency which is technologically feasible;*

*(C) if the standard will not achieve such improvement, whether the reasons for not achieving such improvement are adequate; and*

*(D) whether such rule should prescribe a level of energy use or efficiency which is higher or lower than that which would otherwise apply in the case of any group of products within the type (or class) that will be subject to such standard.*

*(4) A final rule prescribing an amended or new energy conservation standard or prescribing no amended or new standard for a type (or class) of covered products shall be published as soon as is practicable, but not less than 90 days, after publication of the proposed rule in the Federal Register.*

*(n) SPECIAL RULE FOR CERTAIN TYPES OR CLASSES OF PRODUCTS.— (1) A rule prescribing an energy conservation standard for a type (or class) of covered products shall specify a level of energy use of efficiency higher or lower than that which applies (or would apply) for such type (or class) for any group of covered products which have the same function or intended use, if the Secretary determines that covered products within such group—*

*(A) consume a different kind of energy from that consumed by other covered products within such type (or class); or*

*(B) have a capacity or other performance-related feature which other products within such type (or class) do not have and such feature justifies a higher or lower standard from that which applies (or will apply) to other products within such type (or class).*

*In making a determination under this paragraph concerning whether a performance-related feature justifies the establishment of a higher or lower standard, the Secretary shall consider such factors*

*as the utility to the consumer of such a feature, and such other factors as the Secretary deems appropriate.*

*(2) Any rule prescribing a higher or lower level of energy use or efficiency under paragraph (1) shall include an explanation of the basis on which such higher or lower level was established.*

*(o) INCLUSION IN STANDARDS OF TEST PROCEDURES AND OTHER REQUIREMENTS.—Any new or amended energy conservation standard prescribed under this section shall include, where applicable, test procedures prescribed in accordance with section 323 and may include any requirement which the Secretary determines is necessary to assure that each covered product to which such standard applies meets the required minimum level of energy efficiency or maximum quantity of energy use specified in such standard.*

*(p) DETERMINATION OF COMPLIANCE WITH STANDARDS.—Compliance with, and performance under, the energy conservation standards (except for design standards authorized by this part) established in, or prescribed under, this section shall be determined using the test procedures and corresponding compliance criteria prescribed under section 323.*

*(q) SMALL MANUFACTURER EXEMPTION.—(1) Subject to paragraph (2), the Secretary may, on application of any manufacturer, exempt such manufacturer from all or part of the requirements of any energy conservation standard established in or prescribed under this section for any period not longer than the 24-month period beginning on the date such rule becomes effective, if the Secretary finds that the annual gross revenues of such manufacturer from all its operations (including the manufacture and sale of covered products) does not exceed $8,000,000 for the 12-month period preceding the date of the application. In making such finding with respect to any manufacturer, the Secretary shall take into account the annual gross revenues of any other person who controls, is controlled by, or is under common control with, such manufacturer.*

*(2) The Secretary may not exercise the authority granted under paragraph (1) with respect to any type (or class) of covered product subject to an energy conservation standard under this section unless the Secretary makes a finding, after obtaining the written views of the Attorney General, that a failure to allow an exemption under paragraph (1) would likely result in a lessening of competition.*

## REQUIREMENTS OF MANUFACTURERS

SEC. 326. [(a)] *(a) IN GENERAL.*—Each manufacturer of a covered product to which a rule under section 324 applies shall provide a label which meets, and is displayed in accordance with, the requirements of such rule. If such manufacturer or any distributor, retailer, or private labeler of such product advertises such product in a catalog from which it may be purchased, such catalog shall contain all information required to be displayed on the label, except as otherwise provided by rule of the Commission. The preceding sentence shall not require that a catalog contain information respecting a covered product if the distribution of such catalog commenced before the effective date of the labeling rule under section 324 applicable to such product.

【(b)(1)】 *(b) NOTIFICATION.—(1)* Each manufacturer of a covered product to which a rule under section 324 applies shall notify the Secretary or the Commission—

(A) not later than 60 days after the date such rule takes effect, of the models in current production (and starting serial numbers of those models) to which such rule apples; and

(B) prior to commencement of production, of all models subsequently produced (and starting serial numbers of those models) to which such rule applies.

\* \* \* \* \* \* \*

(3) When requested—

(A) by the Secretary for purposes of ascertaining whether a product subject to a standard *established in or* prescribed under section 325 is in compliance with that standard, or

\* \* \* \* \* \* \*

【(c) Each】 *(c) DEADLINE.—Each* manufacturer shall use labels reflecting the range data required to be disclosed under section 324(c)(1)(B) after the expiration of 60 days following the date of publication of any revised table of ranges unless the rule under section 324 provides for a later date. The Commission may not require labels be changed to reflect revised tables of ranges more often than annually.

【(d) For purposes of carrying out this part, the Secretary may require, under authority available to him under this part or other provisions of law administered by him, each manufacturer of covered products to submit such information or reports of any kind or nature directly to the Secretary with respect to energy efficiency of such covered products, and with respect to the economic impact of any proposed energy efficiency standard, as the Secretary determines may be necessary to establish and revise test procedures, labeling rules, and energy efficiency standards for such products and to insure compliance with the requirements of this part. The provisions of section 11(d) of the Energy Supply and Environmental Coordination Act of 1974 shall apply with respect to information obtained under this subsection to the same extent and in the same manner as it applies with respect to energy information obtained under section 11 of such Act.】

*(d) INFORMATION REQUIREMENTS.—(1) For purposes of carrying out this part, the Secretary may require, under this part or other provision of law administered by the Secretary, each manufacturer of a covered product to submit information or reports to the Secretary with respect to energy efficiency or energy use of such covered product and the economic impact of any proposed energy conservation standard, as the Secretary determines may be necessary to establish and revise test procedures, labeling rules, and energy conservation standards for such product and to insure compliance with the requirements of this part. In making any determination under this paragraph, the Secretary shall consider existing public sources of information, including nationally recognized certification programs of trade associations.*

*(2) The Secretary shall exercise authority under this section in a manner designed to minimize unnecessary burdens on manufacturers of covered products.*

*(3) The provisions of section 11(d) of the Energy Supply and Environmental Coordination Act of 1974 shall apply with respect to information obtained under this subsection to the same extent and in the same mannner as they apply with respect to energy information obtained under section 11 of such Act.*

### [EFFECT ON OTHER LAW

[SEC. 327. (a) This part supersedes any State regulation insofar as such State regulation may now or hereafter provide for—

[(1) the disclosure of information with respect to any measure of energy consumption of any covered product—

[(A) if there is any rule under section 323 applicable to such covered product, and such State regulation requires testing in any manner other than that prescribed in such rule under section 323, or

[(B) if there is a rule under section 324 applicable to such covered product and such State regulation requires disclosure of information other than information disclosed in accordance with such rule under section 324; or

[(2) any energy efficiency standard or other requirement with respect to energy efficiency or energy use of a covered product—

[(A) if there is a standard under section 325 applicable to such product, and such State regulation is not identical to such standard, or

[(B) if there is a rule under section 323 or 324 applicable to such product and such State regulation requires testing in accordance with test procedures which are not identical to the test procedures specified in such rule.

[(b)(1) If a State regulation is prescribed which establishes an energy efficiency standard or other requirement respecting energy use or energy efficiency of a type (or class) of covered products and which is not superseded by subsection (a)(2) or (b)(2), then any person subject to such regulation may file a petition with the Secretary requesting that the Secretary prescribe a rule under this subsection which supersedes such State regulation in whole or in part. The Secretary, after consideration of the petition, the views of the affected State and the comments of any interested person, shall issue such requested rule only if the Secretary finds (and publishes such finding) that—

[(A) there is no significant State or local interest sufficient to justify such State regulation; and

[(B) such State regulation unduly burdens interstate commerce.

[(2) If a State regulation is prescribed after January 1, 1978, which establishes an energy efficiency standard or other requirement respecting energy use or energy efficiency of a type (or class) of covered products and which is not superseded by subsection (a)(2), then such State regulation is superseded. Notwithstanding the requirement of the preceding sentence, such State may file a

petition with the Secretary requesting a rule that such State regulation is not superseded pursuant to this paragraph. The Secretary, after consideration of the petition and the comments of interested persons, shall prescribe such rule only if he finds there is a significant State or local interest to justify such State regulations; except that the Secretary may not prescribe such State regulations; except that the Secretary may not prescribe such rule if he finds that such State regulation would unduly burden interstate commerce.

[(3) Notwithstanding subsection (a)(2), any State prescribing a State regulation which provides an energy efficiency standard or other requirement respecting energy use or energy efficiency for any type (or class) of covered products for which a Federal energy efficiency standard is applicable may file a petititon with the Secretary requesting a rule that such regulation not be superseded. The Secretary, after consideration of the petition and the comments of interested persons, shall prescribe such rule only if he finds (and publishes such finding) that—

[(A) there is a significant State or local interest to justify such State regulation; and

[(B) such State regulation contains a more stringent energy efficiency standard than such Federal standard;

except that the Secretary may not prescribe such rule if he finds that such State regulation would unduly burden interstate commerce.

[(4) The Secretary shall give notice of any petition filed under this subsection and afford interested persons a reasonable opportunity to make written comments thereon. The Secretary, within 6 months after the date any petition is filed, shall deny such petition or prescribe the requested rule, except that the Secretary may publish a notice in the Federal Register extending such period to a date certain. Such notice shall include the reasons for delay. In the case of any denial of a petition under this subsection, the Secretary shall publish in the Federal Register notice of such denial and the reasons for such denial.

[(5) The requirement of paragraph (2) shall not continue in effect after July 1, 1980, in the case of any type (or class) of covered products specified in paragraphs (1) through (13) of section 322(a).

[(c) Notwithstanding the provisions of subsection (a), any State regulation which sets forth procurement standards for a State (or political subdivision thereof) shall not be superseded by the provisions of this part if such State standards are more stringent than the corresponding Federal standards.

[(d) For purposes of this section, the term "State regulation" means a law or regulation of a State or political subdivision thereof.

[(e) Any disclosure with respect to energy use, energy efficiency, or estimated annual operating cost, which is required to be made under the provisions of this part, shall not create an express or implied warranty under State or Federal law that such energy efficiency will be achieved, or that such energy use or estimated annual oprating cost will not be exceeded, under conditions of actual use.]

*EFFECT ON OTHER LAW*

SEC. 327. (a) PREEMPTION OF TESTING AND LABELING REQUIRE-
MENTS.—(1) *Effective on the date of enactment of the National Ap-
pliance Energy Conservation Act of 1987, this part supersedes any
State regulation insofar as such State regulation provides at any
time for the disclosure of information with respect to any measure
of energy consumption of any covered product if—*

(A) *such State regulation requires testing or the use of any
measure of energy consumption or energy descriptor in any
manner other than that provided under section 323; or*

(B) *such State regulation requires disclosure of information
with respect to the energy use or energy efficiency of any covered
product other than information required under section 324.*

(2) *For purposes of this section, the term "State regulation" means
a law, regulation, or other requirement of a State or its political
subdivisions.*

(b) GENERAL RULE OF PREEMPTION FOR ENERGY CONSERVATION
STANDARDS BEFORE FEDERAL STANDARD BECOMES EFFECTIVE FOR A
PRODUCT.—*Effective on the date of enactment of the National Ap-
pliance Energy Conservation Act of 1987 and ending on the effective
date of an energy conservation standard established under section
325 for any covered product, no State regulation, or revision thereof,
concerning the energy efficiency or energy use of the covered product
shall be effective with respect to such covered product, unless the
State regulation or revision—*

(1) *was prescribed or enacted before January 8, 1987, and is
applicable to products before January 3, 1988;*

(2) *is a State procurement regulation described in subsection
(e);*

(3) *is a regulation described in subsection (f)(1) or is pre-
scribed or enacted in a building code for new construction de-
scribed in subsection (f)(2);*

(4) *is a regulation prohibiting the use in pool heaters of a con-
stant burning pilot;*

(5) *is a regulation described in subsection (d)(5)(B) for which a
waiver has been granted under subsection (d); or*

(6) *is a regulation effective on or after January 1, 1992, con-
cerning the energy efficiency or energy use of television sets.*

(c) GENERAL RULE OF PREEMPTION FOR ENERGY CONSERVATION
STANDARDS WHEN FEDERAL STANDARD BECOMES EFFECTIVE FOR A
PRODUCT.—*Except as provided in section 325(b)(3)(A)(ii) and effec-
tive on the effective date of an energy conservation standard estab-
lished in or prescribed under section 325 for any covered product, no
State regulation concerning the energy efficiency or energy use of
such covered product shall be effective with respect to such product
unless the regulation—*

(1) *is a regulation described in paragraph (2) or (4) of subsec-
tion (b);*

(2) *is a regulation which has been granted a waiver under
subsection (d); or*

(3) *is in a building code for new construction described in
subsection (f)(3).*

*(d) WAIVER OF FEDERAL PREEMPTION.—(1)(A) Any State with a State regulation which provides for any energy conservation standard or other requirement with respect to energy use or energy efficiency for any type (or class) of covered product for which there is a Federal energy conservation standard under section 325 may file a petition with the Secretary requesting a rule that such State regulation become effective with respect to such covered product.*

*(B) Subject to paragraphs (2) through (5), the Secretary shall, within the period described in paragraph (2) and after consideration of the petition and the comments of interested persons, prescribe such rule if the Secretary finds (and publishes such finding) that the State has established by a preponderance of the evidence that such State regulation is needed to meet unusual and compelling State or local energy interests.*

*(C) For purposes of this subsection, the term unusual and compelling State or local energy interests" means interests which—*

*(i) are substantially different in nature or magnitude than those prevailing in the United States generally; and*

*(ii) are such that the costs, benefits, burdens, and reliability of energy savings resulting from the State regulation make such regulation preferable or necessary when measured against the costs, benefits, burdens, and reliability of alternative approaches to energy savings or production, including reliance on reasonable predictable market-induced improvements in efficiency of all products subject to the State regulation.*

*The factors described in clause (ii) shall be evaluated within the context of the State's energy plan and forecast.*

*(2) The Secretary shall give notice of any petition filed under paragraph (1)(A) and afford interested persons a reasonable opportunity to make written comments, including rebuttal comments, thereon. The Secretary shall, within the 6-month period beginning on the date on which any such petition is filed, deny such petition or prescribe the requested rule, except that the Secretary may publish a notice in the Federal Register extending such period to a date certain but no longer than one year after the date on which the petition was filed. Such notice shall include the reasons for delay. In the case of any denial of a petition under this subsection, the Secretary shall publish in the Federal Register notice of, and the reasons for, such denial.*

*(3) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that such State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis. In determining whether to make such finding, the Secretary shall evaluate all relevant factors, including—*

*(A) the extent to which the State regulation will increase manufacturing or distribution costs of manufacturers, distributors, and others;*

*(B) the extent to which the State regulation will disadvantage smaller manufacturers, distributors, or dealers or lessen competition in the sale of the covered product in the State;*

*(C) the extent to which the State regulation would cause a burden to manufacturers to redesign and produce the covered*

product type (or class), taking into consideration the extent to
which the regulation would result in a reduction—

    (i) in the current models, or in the projected availability
of models, that could be shipped on the effective date of the
regulation to the State and within the United States; or

    (ii) in the current or projected sales volume of the covered
product type (or class) in the State and the United States;
and

    (D) the extent to which the State regulation is likely to con-
tribute significantly to a proliferation of State appliance effi-
ciency requirements and the cumulative impact such require-
ments would have.

(4) The Secretary may not prescribe a rule under this subsection if
the Secretary finds (and publishes such finding) that interested per-
sons have established, by a preponderance of the evidence, that the
State regulation is likely to result in the unavailability in the State
of any covered product type (or class) of performance characteristics
(including reliability), features, sizes, capacities, and volumes that
are substantially the same as those generally available in the State
at the time of the Secretary's finding, except that the failure of some
classes (or types) to meet this criterion shall not affect the Secre-
tary's determination of whether to prescribe a rule for other classes
(or types).

(5) No final rule prescribed by the Secretary under this subsection
may—

    (A) permit any State regulation to become effective with re-
spect to any covered product manufactured within three years
after such rule is published in the Federal Register or within
five years if the Secretary finds that such additional time is
necessary due to the substantial burdens of retooling, redesign,
or distribution needed to comply with the State regulation; or

    (B) become effective with respect to a covered product manu-
factured before the earliest possible effective date specified in
section 325 for the initial amendment of the energy conservation
standard established in such section for the covered product;
except that such rule may become effective before such date if
the Secretary finds (and publishes such finding) that, in addi-
tion to the other requirements of this subsection the State has
established, by a preponderance of the evidence, that—

        (i) an energy emergency condition exists within the State
which—

            (I) imperils the health, safety, and welfare of its resi-
dents because of the inability of the State or utilities
within the State to provide adequate quantities of gas
or electric energy to its residents at less than prohibi-
tive costs; and

            (II) cannot be substantially alleviated by the impor-
tation of energy or the use of interconnection agree-
ments; and

        (ii) the State regulation is necessary to alleviate substan-
tially such condition.

(6) In any case in which a State is issued a rule under paragraph
(1) with respect to a covered product and subsequently a Federal
energy conservation standard concerning such product is amended

*pursuant to section 325, any person subject to such State regulation may file a petition with the Secretary requesting the Secretary to withdraw the rule issued under paragraph (1) with respect to such product in such State. The Secretary shall consider such petition in accordance with the requirements of paragraphs (1), (3), and (4), except that the burden shall be on the petitioner to show by a pre- ponderance of the evidence that the rule received by the State under paragraph (1) should be withdrawn as a result of the amendment to the Federal standard. If the Secretary determines that the petitioner has shown that the rule issued by the State should be so with- drawn, the Secretary shall withdraw it.*

*(e) EXCEPTION FOR CERTAIN STATE PROCUREMENT STANDARDS.— Any State regulation which sets forth procurement standards for a State (or political subdivision thereof) shall not be superseded by the provisions of this part if such standards are more stringent than the corresponding Federal energy conservation standards.*

*(f) EXCEPTION FOR CERTAIN BUILDING CODE REQUIREMENTS.—(1) A regulation or other requirement enacted or prescribed before Janu- ary 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or pre- scribed under section 325 for such covered product.*

*(2) A regulation or other requirement, or revision thereof, enacted or prescribed on or after January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation stand- ard established in or prescribed under section 325 for such covered product if the code does not require that the energy efficiency of such covered product exceed—*

*(A) the applicable minimum efficiency requirement in a na- tional voluntary consensus standard; or*

*(B) the minimum energy efficiency level in a regulation or other requirement of the State meeting the requirements of sub- section (b)(1) or (b)(5),*
*whichever is higher.*

*(3) Effective on the effective date of an energy conservation stand- ard for a covered product established in or prescribed under section 325, a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of such covered product is not superseded by this part if the code complies with all of the following requirements:*

*(A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.*

*(B) The code does not require that the covered product have an energy efficiency exceeding the applicable energy conserva- tion standard established in or prescribed under section 325, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under sub-section (d).*

*(C) The credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 325 or the efficiency level required in a State regulation referred to in subparagraph (B) is on a one-for-one equivalent energy use or equivalent cost basis.*

*(D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered product subject to an energy conservation standard established in or prescribed under section 325, the baseline building designs are based on the efficiency level for such covered product which meets but does not exceed such standard or the efficiency level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).*

*(E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds by more than 5 percent either standard of level referred to in subparagraph (D), there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard.*

*(F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).*

*(G) The estimated energy use of any covered product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 323, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 323 or other technically accurate documented procedure.*

*(4)(A) Subject to subparagraph (B), a State or local government is not required to submit a petition to the Secretary in order to enforce or apply its building code or to establish that the code meets the conditions set forth in this subsection.*

*(B) If a building code requires the installation of covered products with efficiencies exceeding both the applicable Federal standard established in or prescribed under section 325 and the applicable standard of such State, if any, that has been granted a waiver under subsection (d), such requirement of the building code shall not be applicable unless the Secretary has granted a waiver for such requirement under subsection (d).*

*(g) No Warranty.—Any disclosure with respect to energy use, energy efficiency, or estimated annual operating cost which is required to be made under the provisions of this part shall not create*

*an express or implied warranty under State or Federal law that such energy efficiency will be achieved or that such energy use or estimated annual operating cost will not be exceeded under conditions of actual use.*

### AUTHORITY TO OBTAIN INFORMATION

Sec. 329. (a) *In General.*—For purposes of carrying out this part the Commission and the Secretary may each sign and issue subpenas for the attendance and testimony of witnesses and the production of relevant books, records, papers, and other documents, and may each administer oaths. Witnesses summoned under the provisions of this section shall be paid the same fees and mileage as are paid to witnesses in the courts of the United States. In case of contumacy by, or refusal to obey a subpena served, upon any persons subject to this part, the Commission and the Secretary may each seek an order from the district court of the United States for any district in which such person is found or resides or transacts business requiring such person to appear and give testimony, or to appear and produce documents. Failure to obey any such order is punishable by such court as a contempt thereof.

(b) *Confidentiality.*—Any information submitted by any person to the Secretary or the Commission under this part shall not be considered energy information as defined by section 11(e)(1) of the Energy Supply and Environmental Coordination Act of 1974 for purposes of any verification examination authorized to be conducted by the Comptroller General under section 501 of this Act.

* * * * * * *

### PROHIBITED ACTS

Sec. 332. (a) *In General.* —It shall be unlawful—.
    (1) * * *

* * * * * * *

(5) for any manufacturer or private labeler to distribute in commerce any new covered product which is not in conformity with an applicable [energy efficiency standard prescribed under] *energy conservation standard established in or prescribed under* this part.

(b) *Definition.*—For purposes of this section, the term "new covered product" means a covered product the title of which has not passed to a purchaser who buys such product for purposes other than (1) reselling such product, or (2) leasing such product for a period in excess of one year.

### ENFORCEMENT

Sec. 333. (a) *In General.*—Except as provided in subsection (c), any person who knowingly violates any provision of section 332 shall be subject to a civil penalty of not more than $100 for each violation. Such penalties shall be assessed by the Commission, except that penalties for violations of section 332(a)(3) which relate to requirements prescribed by the Secretary, violations of section 332(a)(4) which relate to requests of the Secretary under section 326(b)(2), or violations of section 332(a)(5) shall be asserted by the

Secretary. Civil penalties assessed under this part may be compromised by the agency or officer authorized to assess the penalty, taking into account the nature and degree of the violation and the impact of the penalty upon a particular respondent. Each violation of paragraph (1), (2), or (5) of section 332(a) shall constitute a separate violation with respect to each covered product, and each day of violation of section 332(a) (3) or (4) shall constitute a separate violation.

(b) DEFINITION.—As used in subsection (a), the term "knowingly" means (1) the having of actual knowledge, or (2) the presumed having of knowledge deemed to be possessed by a reasonable man who acts in the circumstances, including knowledge obtainable upon the exercise of due care.

[(c) It] *(c) SPECIAL RULE.—It* shall be an unfair or deceptive act or practice in or affecting commerce (within the meaning of section 5(a)(1) of the Federal Trade Commission Act) for any person to violate section 323(c), except to the extent that such violation is prohibited under the provisions of section 332(a)(1), in which case such provisions shall apply.

[(d)(1)] *(d) PROCEDURES FOR ASSESSING PENALTY.—(1)* Before issuing an order assessing a civil penalty against any person under this section, the Secretary shall provide to such person notice of the proposed penalty. Such notice shall inform such person of his opportunity to elect in writing within 30 days after the date of receipt of such notice to have the procedures of paragraph (3) (in lieu of those of paragraph (2)) apply with respect to such assessment.

\* \* \* \* \* \* \*

## CITIZEN SUITS

SEC. 335. (a) Except as otherwise provided in subsection (b), any person may commence a civil action against—

(1) any manufacturer or private labeler who is alleged to be in violation of any provision of this part or any rule under this part; [or]

(2) any Federal agency which has a responsibility under this part where there is an alleged failure of such agency to perform any act or duty under this part which is not discretionary[.]; or

*(3) the Secretary in any case in which there is an alleged failure of the Secretary to comply with a nondiscretionary duty to issue a proposed or final rule according to the schedules set forth in section 325.*

The United States district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such provision or rule, or order such Federal agency to perform such act or duty, as the case may be. *The courts shall advance on the docket, and expedite the disposition of, all causes filed therein pursuant to paragraph (3) of this subsection. If the court finds that the Secretary has failed to comply with a deadline established in section 325, the court shall have jurisdiction to order appropriate relief, including relief that will ensure the Secretary's compliance with future deadlines for the same covered product.*

(b) *LIMITATION.*—No action may be commenced—

(1) under subsection (a)(1)—

    (A) prior to 60 days after the date on which the plaintiff has given notice of the violation (i) to the Secretary, (ii) to the Commission, and (iii) to any alleged violator of such provision or rule, or

    (B) if the Commission has commenced and is diligently prosecuting a civil action to require compliance with such provision or rule, but, in any such action, any person may intervene as a matter of right.

(2) under subsection (a)(2) prior to 60 days after the date on which the plaintiff has given notice of such action to the Secretary and Commission.

Notice under this subsection shall be given in such manner· as the Commission shall prescribe by rule.

(c) *RIGHT TO INTERVENE.*—In such action under this section, the Secretary or the Commission (or both), if not a party, may intervene as a matter of right.

(d) *AWARD OF COSTS OF LITIGATION.*—The court, in issuing any final order in any action brought pursuant to subsection (a) of this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate.

(e) *PRESERVATION OF OTHER RELIEF.*—Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of this part or any rule thereunder, or to seek any other relief (including relief against the Secretary or the Commission).

(f) *COMPLIANCE IN GOOD FAITH.*—For purposes of this section, if a manufacturer or private labeler complied in good faith with a rule under this part, then he shall not be deemed to have violated any provision of this part by reason of the alleged invalidity of such rule.

\*     \*     \*     \*     \*     \*     \*

### [ADMINISTRATIVE PROCEDURE AND JUDICIAL REVIEW

[SEC. 336. (a) Rules under sections 323, 324, 325(a), 327(b), or 328 shall be prescribed in accordance with section 553 of title 5, United States Code, except that—

    [(1) interested persons shall be afforded an opportunity to present written and oral data, views, and arguments with respect to any proposed rule, and

    [(2) in the case of a rule under section 325(a), the Secretary shall, by means of conferences or other informal procedures, afford any interested person an opportunity to question—

        [(A) other interested persons who have made oral presentations under paragraph (1), and

        [(B) employees of the United States who have made written or oral presentations,

with respect to disputed issues of material fact. Such opportunity shall be afforded to the extent the Secretary determines that questioning pursuant to such procedures is likely to result in a more timely and effective resolution of such issues.

A transcript shall be kept of any oral presentations made under this subsection.

〔(2) Subsections (c) and (d) of section 18 of the Federal Trade Commission Act shall apply to rules under section 325 (other than subsections (a)(1), (2), and (3)) to the same extent that such subsections apply to rules under section 18(a)(1)(B) of such Act.

〔(b)(1) Any person who will be adversely affected by a rule prescribed under section 323, 324, or 325 when it is effective may, at any time prior to the sixtieth day after the date of such rule is prescribed, file a petition with the United States court of appeals for the circuit wherein such person resides or has his principal place of business, for a judicial review thereof. A copy of the petition shall be forthwith transmitted by the clerk of the court to the agency which prescribed the rule. Such agency thereupon shall file in the court the written submissions to, and transcript of, the proceedings on which the rule was based as provided in section 2112 of title 28, United States Code.

〔(2) Upon the filing of the petition referred to in paragraph (1), the court shall have jurisdiction to review the rule in accordance with chapter 7 of title 5, United States Code, and to grant appropriate relief as provided in such chapter. No rule under section 323, 324, or 325 may be affirmed unless supported by substantial evidence.

〔(3) The judgment of the court affirming or setting aside, in whole or in part, any such rule shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28, United States Code.

〔(4) The remedies provided for in this subsection shall be in addition to, and not in substitution for, any other remedies provided by law.

〔(c)(1) Titles IV and V of the Department of Energy Organization Act (42 U.S.C. 7191 et seq.) shall not apply with respect to the procedures under this part.

〔(2) The procedures applicable under this part shall not—

〔(A) be considered to be modified or affected by any other provision of law unless such other provision specifically amends this part (or provisions of law cited herein), or

〔(B) be considered to be superseded by any other provision of law unless such other provision does so in specific terms, referring to this part, and declaring that such provision supersedes, in whole or in part, the procedures of this part.〕

### ADMINISTRATIVE PROCEDURE AND JUDICIAL REVIEW

*Sec. 336. (a)(1) In addition to the requirements of section 553 of title 5, United States Code, rules prescribed under sections 323, 324, 325, 327, or 328 of this part shall afford interested persons an opportunity to present written and oral data, views, and arguments with respect to any proposed rule.*

*(2) In the case of a rule prescribed under section 325, the Secretary shall, by means of conferences or other informal procedures, afford any interested person an opportunity to question—*

    *(A) other interested persons who have made oral presentations; and*

*(B) employees of the United States who have made written or oral presentations with respect to disputed issues of material fact.*

*Such opportunity shall be afforded to the extent the Secretary determines that questioning pursuant to such procedures is likely to result in a more timely and effective resolution of such issues.*

*(3) A transcript shall be kept of any oral presentations made under this subsection.*

*(b)(1) Any person who will be adversely affected by a rule prescribed under sections 323, 324, or 325 may, at any time within 60 days after the date on which such rule is prescribed, file a petition with the United States court of appeals for the circuit in which such person resides or has his principal place of business, for judicial review of such rule. A copy of the petition shall be transmitted by the clerk of the court to the agency which prescribed the rule. Such agency shall file in the court the written submissions to, and transcript of, the proceedings on which the rule was based, as provided in section 2112 of title 28, United States Code.*

*(2) Upon the filing of the petition referred to in paragraph (1), the court shall have jurisdiction to review the rule in accordance with chapter 7 of title 5, United States Code, and to grant appropriate relief as provided in such chapter. No rule under sections 323, 324, or 325 may be affirmed unless supported by substantial evidence.*

*(3) The judgment of the court affirming or setting aside, in whole or in part, any such rule shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as privided in section 1254 of title 28, United States Code.*

*(4) The remedies provided for in this subsection shall be in addition to, and not in substitution for, any other remedies provided by law.*

*(5) The procedures applicable under this part shall not—*

*(A) be considered to be modified or affected by any other provision of law unless such other provision specifically amends this part (or provisions of law cited herein); or*

*(B) be considered to be superseded by any other provision of law unless such other provision does so in specific terms by referring to this part and declaring that such provision supersedes, in whole or in part, the procedures of this part.*

*(c) Jurisdiction is vested in the Federal district courts of the United States over actions brought by—*

*(1) any adversely affected person to determine whether a State or local government is complying with the requirements of this part; and*

*(2) any person who files a petition under section 325(k) which is denied by the Secretary.*

\*     \*     \*     \*     \*     \*     \*

## ANNUAL REPORT

SEC. 338. The Secretary shall report to the Congress and the President either (1) as part of his annual report, or (2) in a separate report submitted annually, on the progress of the program undertaken pursuant to this part and on the energy savings impact of this part. Each such report shall specify the actions undertaken by

the Secretary in carrying out this part during the period covered by such report, and those actions which the Secretary was required to take under this part during such period but which were not taken, together with the reasons therefor. *Nothing in this section provides a defense or justification for a failure by the Secretary to comply with a nondiscretionary duty as provided for in this part.*

## AUTHORIZATION OF APPROPRIATIONS

SEC. 339. (a) *AUTHORIZATIONS FOR THE SECRETARY.*—There are authorized to be appropriated to the Secretary not more than the folowing amounts to carry out his responsibilities under this part—
* * *

(b) *AUTHORIZATIONS FOR THE COMMISSION.*—There are authorized to be appropriated to the Commission not more than the following amounts to carry out its responsibilities under this part—
    (1) * * *

* * * * * * *

(c) *OTHER AUTHORIZATIONS.*—There are authorized to be appropriated to the Secretary to be allocated not more than the following amounts—
    (1) * * *

* * * * * * *

# DISSENTING VIEWS

I oppose the National Appliance Energy Conservation Act of 1987. My main reason for opposing the bill is that H.R. 87 short shrifts American consumers. This bill, which has not been the subject of a single day of hearings in this Congress and had only one day of hearings in the 99th Congress, imposes $14.2 billion in higher appliance costs on American consumers. It does not serve the public interest to rush to judgment on this vital consumer legislation.

Mandatory appliance efficiency standards will deprive American consumers of the fundamental right of choice by forcing them to choose among a shrinking selection of increasingly expensive appliances. The cost of products covered by this legislation will rise by $1.4 billion per year and entire categories of appliances will be banned from the marketplace. For example, 90 percent of heat pumps, 90 percent of central air conditioners, 90 percent of refrigerators and freezers, and 70 percent of the oil and gas furnaces now on the market will not meet the efficiency standards in H.R. 87. These products will be banned from the marketplace.

The "inefficient" products banned from the marketplace will be the least expensive products. The committee has issued legislation to divert the income of the elderly and poor toward conservation programs. I support energy conservation, but conservation should not be imposed on the American people irrespective of cost. If consumers want more efficient air conditioners and refrigerators, they should be permitted to purchase them. There are products in the market today that exceed the standards in H.R. 87. Consumers have the option to purchase more efficient appliances if they want them. However, those consumers who want to save their money in the near term should be free to do so.

I am sure U.S. manufacturers will be able to meet the ambitious standards in H.R. 87. However, the cost to American consumers of meeting these standards will be burdensome. In point of fact, the estimate that the appliance costs will rise by $1.4 billion per year comes from a group that actually supported the legislation and may be understated.

Proponents of H.R. 87 have minimized the trade impact of this legislation. They have argued that trade in appliances covered under H.R. 87 is minimal, and foreign penetration of domestic markets is insignificant. However, according to the Commerce Department, there is substantial trade in these appliances and the legislation will have a serious negative impact on the American trade deficit. A recent report, "1987 U.S. Industrial Outlook," indicates imports are growing in some appliance categories. According to this report, "Increasing imports, more than weather or consumer preference for central air conditioning systems, caused 1986 domestic

shipments of room air conditioners to fall more than 15 percent from their 1985 level of 3 million units." (Outlook, pp. 22–9).

H.R. 87 promises to aggravate the looming trade deficit in appliances. I researched recent trends in appliance exports and imports and found a serious problem. Exports of six major categories of appliances has declined by 8 percent since 1984 and imports of five major categories of appliances rose 46 percent over the same period. We face a serious problem in appliance trade and H.R. 87 will only lead to a further deterioration of the American position.

In a year when Congress is grappling with solutions to our massive trade deficit, I question the propriety of encouraging more appliance imports. A 15 percent decrease in domestic market share is a serious trade problem, one that is overlooked in H.R. 87. American manufacturers export refrigeration equipment and air conditioners to 130 countries. Mandatory efficiency standards raise the costs of American appliances, and is certain to make them less competitive in foreign markets where cost is a more important consideration than energy efficiency. I regret that the first major piece of legislation considered by the committee in 1987 will aggravate our trade problems.

One of the underlying assumptions in H.R. 87 is the mistaken belief that conservation can only be achieved by government fiat. However, our experience over the past ten years demonstrates that we do not need government standards in order to improve the energy efficiency of appliances. In recent years, the energy efficiency of refrigerators increased 48 percent and the efficiency of central air conditioners increased 27 percent. Moreover, these substantial improvements came in the absence of mandatory appliance standards. There are excellent laws on the books that require efficiency labels, giving the consumer the information necessary to make product choices. Experience shows that mandatory efficiency labels have successfully encouraged consumers to purchase efficient products. At the same time, labels have allowed consumers the freedom of choice. I do not share the belief that we "must protect the consumer from himself."

Another impetus of H.R. 87 is a projection that the legislation will lead to $28 billion in economic benefits by the year 2000. This estimate is fundamentally flawed and should be dramatically reduced. For one thing, the report uses present day dollars. Obviously, a 1987 dollar in the year 2000 will not have the same value it has in 1987. In addition, the report assumes there will be no change in use patterns after the consumer has been forced to purchase more efficient appliances. Lower operating costs will tend to result in higher usage and distinct changes in consumer behavior. The report also is based on unreasonable discount rates to exaggerate the benefits of H.R. 87. Recognizing these factors, the projected benefits of H.R. 87 shrink to somewhere in the range between $0 and $4 billion.

The establishment of national appliance efficiency standards also ignores sharp climatic variations in different regions of the country. To insist that air conditioners in Minnesota and Indiana have the same energy-efficiency ratings as air conditioners in Mississippi and Texas ignores the fact that an air conditioner may be operated four or five times as much in warmer climates. For example, a

comparison of hours of air conditioner operation in different cities demonstrates that annual usage in Detroit is 265 hours, while usage in New Orleans is 1,370 hours. Annual heating hours in these two cities is 2,533 hours and 1,099 hours, respectively. H.R. 87 makes no allowance for variation.

This lack of allowance for climatic variations imposes costs on the consumer. While consumers in New Orleans may be able to recapture the higher cost of their air conditioner through lower operating costs over a period of years, they will not be able to recapture the cost of their expensive heat pump. At the same time, Detroit consumers will not be able to recapture the higher cost of an air conditioner designed for the climate in New Orleans.

One of the "selling points" of H.R. 87 is "energy security". Proponents argue mandatory energy efficiency standards will reduce energy consumption. However, this legislation approaches energy security from exactly the wrong perspective. Instead of ordering the American people to use less energy, we should remove the government restrictions on domestic energy production. The removal of natural gas controls, repeal of the Fuel Use Act, and opening up our public lands in the West, Alaska, and Outer Continental Shelf [OCS] will go much further towards improving our energy security than government appliance efficiency standards.

It is somewhat ironic that this is the first piece of energy legislation considered by Congress since the collapse in world oil prices in January 1986. In the past fourteen months, Congress has done nothing about the most serious energy threat confronting our nation since 1979. Over this period, the United States has lost 800,000 barrels per day of domestic production, or 9 percent of total domestic production. At the same time, oil consumption rose by over 1 million barrels per day and oil imports rose by 22 percent. Congress has done nothing about this serious problem.

At best, H.R. 87 will reduce domestic energy consumption by 1 percent to 2 percent over a ten-year period. However, the rising dependency on foreign oil imports will erase any benefit from the legislation. In the end, we know government appliance standards will not be the foundation of our energy security. Energy security is best achieved through maintenance of American energy production. At the present time, the best way to maintain U.S. oil production is through an oil import fee or tax incentives for domestic exploration and development.

On November 1, 1986, President Reagan vetoed H.R. 5465 on the grounds that the legislation intruded unduly into the marketplace, limited the freedom of choice available to consumers, unintentionally harmed consumers, especially low income and elderly consumers, abridged traditional state responsibilities and perogatives, and mandated a long series of complicated future rulemakings. Only one of these objections has been addressed, the future rulemakings. An amendment authorized by the ranking Republican member of the Energy and Power Subcommittee and adopted by the subcommittee eliminated mandatory rulemakings in favor of discretionary rulemakings after the mandatory rulemakings. While this amendment is a distinct improvement to H.R. 87, most of the objectionable provisions cited by President Reagan in his veto message were not addressed by the committee and remain in the legislation.

The committee has the opportunity to come up with national appliance conservation standards that were reasonable. Instead, we adopted legislation that embraced appliance efficiency standards that were totally unreasonable. According to the Senate report on S. 83, the companion bill to H.R. 87, "The standards in most cases are as strong as, or stronger than, any State standards currently in effect." I can appreciate the fact that litigation over the 1978 statute has established the requirement for national appliance standards. However, it is not apparent to me they must be measured by the excesses of the few states that currently have standards. Those states that do not have standards will not only be forced to accept standards, but the strictest possible standards. H.R. 87 locks in these unreasonable standards, since the bill has no provision to lower standards if they prove unrealistic or burdensome. In fact, H.R. 87 specifically forbids any lowering of appliance standards. Since prices have no place to go but up, the legislation will have an inflationary impact.

The legislation also establishes conditional cost effectiveness tests for the implementation of appliance standards. A standard is deemed "economically justified" if the additional cost to consumers of appliances that comply with the standards is less than three times the value of the energy savings during the first year of use. However, a determination that a product does not meet this test cannot be taken into consideration when the Department of Energy makes an evaluation of economic justification. It is virtually impossible to fail the determination of economic justification under this criterion.

In effect, H.R. 87 creates Corporate Average Fuel Economy [CAFE] standards for appliances instead of automobiles. These CAFE standards have proven to be unworkable for automobiles and there is no reason to expect they will work any better for refrigerators, heat pumps, or central air conditioning units.

JOE BARTON.

O