**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CLEAN ENERGY CHOICE COALITION, NFP<br><br>       *Plaintiff,*<br><br>  *v.*<br><br>VILLAGE OF OAK PARK, ILLINOIS,<br><br>       *Defendant.* | Case No. 1:25-cv-04353<br><br>Hon. Franklin U. Valderrama |

## DEFENDANT'S COMBINED MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ...............................................................................................................2

STANDARD OF REVIEW ...............................................................................................5

ARGUMENT ....................................................................................................................5

I.     EPCA DOES NOT PREEMPT OAK PARK'S CODE AMENDMENTS.........................6

     A.     EPCA Preempts Local Laws Concerning Appliances' Excessive Energy Use. ........................................................................................................................7

     B.     Oak Park's Code Amendments Do Not Restrict Excessive Energy Use.................9

     C.     Plaintiff's Interpretation of EPCA Contradicts its Text, Context, and History and Produces Absurd Results.................................................................10

CONCLUSION..................................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Air Conditioning & Refrigeration Institute v. Energy Res. Conservation & Dev't Comm'n,*
410 F.3d 492 (9th Cir. 2005) ............................................................................2, 3, 9

*Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York,*
2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) ..................................................... *passim*

*Cal. Rest. Ass'n v. City of Berkeley,*
89 F.4th 1094 (9th Cir. 2024) ......................................................................6, 9, 10

*CSX Transp., Inc. v. Easterwood,*
507 U.S. 658 (1993)...........................................................................................6

*FDA v Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000)...........................................................................................9

*Huron Portland Cement Co. v. City of Detroit,*
362 U.S. 440 (1960)...........................................................................................5

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996)...........................................................................................6

*Mulhern Gas Co. v. Mosley,*
2025 WL 2062194 (N.D.N.Y. July 23, 2025) ....................................................7, 10

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,*
514 U.S. 645 (1995)..........................................................................................13

*Nat. Res. Def. Council, Inc. v. Herrington,*
768 F.2d 1355 (D.C. Cir. 1985)........................................................................3, 8

*Queenside Hills Realty Co., Inc. v. Saxl,*
328 U.S. 80 (1946)............................................................................................5

*Univ. Tex. Sw. Med. Ctr. v. Nassar,*
570 U.S. 338 (2013)..........................................................................................14

*Zero Zone, Inc. v. DOE,*
832 F.3d 654 (7th Cir. 2016) ............................................................................8

**Statutes**

425 I.L.C.S. 65/8 ..................................................................................................................14

425 I.L.C.S. 65/9 ................................................................................................................ 14I

42 U.S.C. § 6291(1) ..............................................................................................................8

42 U.S.C. § 6291(4) .........................................................................................................7, 11

42 U.S.C. § 6293 ...................................................................................................................8

42 U.S.C. § 6293(b)(3) .........................................................................................................7

42 U.S.C. § 6293(c)(1)(B) ..................................................................................................11

42 U.S.C. § 6294 .............................................................................................................8, 12

42 U.S.C. § 6295 ...................................................................................................................8

42 U.S.C. § 6295(b)(1) .......................................................................................................12

42 U.S.C. § 6295(f)(1)–(3) .................................................................................................15

42 U.S.C. § 6297(c) ................................................................................................3, 7, 8, 14

42 U.S.C. § 6297(d) ..............................................................................................................3

42 U.S.C. § 6297(d)(1)(B), (C) ..........................................................................................13

42 U.S.C. § 6297(e)-(f) .........................................................................................................3

42 U.S.C. § 6297(f)(3)(A) ...................................................................................................13

42 U.S.C. § 6314 ...................................................................................................................8

42 U.S.C. § 6315 ...................................................................................................................8

Oak Park Vill. Code § 7-1-2 ..............................................................................................4, 5

Oak Park Vill. Code § 7-5-1 ................................................................................................15

Oak Park Vill. Code § 7-6-2 ..............................................................................................4, 5

Pub. L. No. 94-163, 89 Stat. 871 (1975) ............................................................................2, 3

Pub. L. No. 95-619, 92 Stat. 3206 (1978) ..............................................................................3

Pub. L. No. 100-12, 101 Stat. 103 (1987) ..............................................................................3

**Regulations**

10 C.F.R. § 429.12 ................................................................................................8

10 C.F.R. §§ 430–31 .............................................................................................8

16 C.F.R. § 305.17 ................................................................................................8

16 C.F.R. § 305.17(a)(9) .....................................................................................12

**Federal Register Notices**

47 Fed. Reg. 14,424 (Apr. 2, 1982) ....................................................................13

47 Fed. Reg. 57,198 (Dec. 22, 1982) ..................................................................13

72 Fed. Reg. 20,586 (Apr. 25, 2007) ....................................................................4

75 Fed. Reg. 6474 (Feb. 9, 2010) ..........................................................................4

76 Fed. Reg. 51,281 (Aug. 18, 2011) ....................................................................7

**Legislative Histories**

H.R. Rep. No. 94-340 (1975) .................................................................................2

S. Rep. No. 100-6 ...................................................................................................3

**Other Authorities**

Fed. R. Civ. P. 56(a) ..............................................................................................5

*Fire Kills 3 Children; Space Heater Blamed*, Chi. Trib. (Dec. 28, 1985) .....................14

*Space-Heater Fire Deaths Up*, Chi. Trib. (Jan. 10, 1986) .............................................14

U.S. Dep't of Energy, *Energy Intensity Indicators: Terminology and Definitions* .........................7

**INTRODUCTION**

Under our federalist system, local governments have great latitude to protect their residents' health, safety, and welfare. Burning fossil fuels in our homes and buildings harms all three. It creates indoor pollution with serious respiratory and cardiovascular consequences. And it generates greenhouse gases that fuel heat waves and superstorms. In the Village of Oak Park, these problems manifest in asthma and heart disease, as well as drought and flash floods. To combat them, the Village amended its building and residential codes to bar newly constructed buildings from burning fossil fuels for power or heating. These protections are part of the Village's effort to implement Climate Ready Oak Park, a comprehensive regulatory scheme the Village adopted to make the Village more sustainable, healthy, and resilient. And they are part of a long line of actions the Village has taken under its police powers to protect residents' health and safety, from restrictions on the burning of particular fossil fuels in boilers to rules for maintaining exhaust systems.

Plaintiff here maintains that the Village has no power to address these harms. In its view, once an appliance is subject to an energy conservation standard under the Energy Policy and Conservation Act ("EPCA"), no state or local authority can restrict its operation for any reason. Such appliances—from commercial boilers to industrial fans to walk-in freezers—must be permitted to run at any time in any location. If Plaintiff were correct, Congress's 1987 amendments to EPCA radically upended much of the local health and safety regulation that Americans depend on: Building and residential codes would no longer be able to restrict the use of kerosene heaters in nurseries, limit fuels used by boilers or furnaces, or, indeed, impose prudent restrictions on the use of most appliances.

Fortunately, Plaintiff is wrong. EPCA was enacted to reduce the energy that appliances consume through energy conservation standards. It expressly preempts local energy conservation

1

standards that compete with federal ones. But nothing in its text, structure, or history suggests that it *also* preempts local laws that restrict the use of certain appliances, in certain locations, for reasons having nothing to do with energy conservation. The Court should deny Plaintiff's motion, and grant summary judgment for the Village.

## BACKGROUND

### A.    The Energy Policy and Conservation Act

Congress enacted EPCA to reduce the country's energy consumption in the wake of the 1973 oil crisis. *Air Conditioning & Refrigeration Institute v. Energy Res. Conservation & Dev't Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005) ("*ACRI*"). Because residential energy represented some 17% of the nation's energy use, Congress took aim at new consumer appliances, hoping to "reduc[e] the[ir] energy usage . . . relative to their output." H.R. Rep. No. 94-340, at 94–95 (1975).

At first, Congress sought these energy savings through labeling. Believing that "better informed consumers" would make mandatory standards "unnecessary," it required manufacturers to label appliances with measures of their "energy use" and "energy efficiency." *ACRI*, 410 U.S. at 499. By "energy use," it meant "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with" prescribed "test procedures." Pub. L. No. 94-163, § 321(a)(5), 89 Stat. 871, 917 (1975). And it defined "energy efficiency" as "the ratio of the useful output of services from a consumer product to the energy use of such product, determined" by similar means. *Id.* § 321(a)(6). To guide these standards, Congress called for what would later become the Department of Energy ("DOE") to set "energy efficiency improvement target[s]" for the covered products. *Id.* § 325(a)(1)(A). It also preempted state laws that imposed different testing or labeling obligations or differed from any federal efficiency standards. *Id.* § 327(a)–(b).

In 1978, to move more "expeditiously," Congress jettisoned the labeling approach and required DOE to set mandatory energy use and efficiency standards. *Nat. Res. Def. Council, Inc.*

*v. Herrington*, 768 F.2d 1355, 1362 (D.C. Cir. 1985) (citation modified); *see* National Energy Conservation and Policy Act, Pub. L. No. 95-619, § 325, 92 Stat. 3206, 3259 (1978). Nonetheless, for years DOE failed to promulgate any national energy conservation standards and instead simply granted waivers to states that set their own design requirements. *See ACRI*, 410 F.3d at 499. The result was a "growing patchwork of differing State regulations" complicating the "design, production, and marketing" of appliances. *Id.* at 500 (citation modified).

Congress's efforts to fix that problem gave rise to EPCA as we know it today. *See* National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12 § 5, 101 Stat. 103. The amended statute adopted a set of uniform standards and required DOE to keep them updated. *See id.* And to counteract the problem of "separate State appliance standards," S. Rep. No. 100-6, at 4, Congress revised EPCA's preemption regime. It made modest changes to the preemption clause, which now provides that "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product." 42 U.S.C. § 6297(c).[1] But Congress made it much more difficult for states to obtain a waiver. *See id.* § 6297(d). It also created various exceptions. *See id.* § 6297(e)–(f).

## B.  The Village of Oak Park's Sustainability Goals and Related Code Amendments

In August 2022, the Village of Oak Park adopted Climate Ready Oak Park, a comprehensive planning framework under which the Village plans to reduce its greenhouse gas emissions and protect its residents' health, safety, and welfare. Changes to the Village's building code are a key step in that plan, because its older building stock runs largely on fossil fuels. Def.'s

---

[1] Before the 1987 amendments, the relevant preemption provision covered any "energy efficiency standard or other requirement respecting energy use or energy efficiency" of a covered product absent a waiver." Pub. L. No. 95-619, § 424(b)(1)–(3); *see also* Pub. L. No. 94-163, §327(a)(2) (covering "any energy efficiency standard or similar requirement with respect to energy efficiency or energy use of a covered product").

Statement of Material Facts ¶ 2 ("Def.'s SOMF"). The United States Environmental Protection Agency has determined that even short-term exposure to chemicals from gas combustion can harm respiratory and cardiovascular systems, resulting in development of and increased hospitalization for asthma, heart disease, and chronic lung function impairment. *See, e.g.*, 75 Fed. Reg. 6474, 6479-80 (Feb. 9, 2010); 72 Fed. Reg. 20,586, 20,586–87 (Apr. 25, 2007).

The Village was also increasingly concerned with its emission of greenhouse gases that fueled the heat waves, droughts, and flash floods that increasingly plagued the community. Def.'s SOMF ¶¶ 3-4. So, in June 2023, after a series of meetings informed by comments and recommendations by the Village's Chief Sustainability Officer, Environment & Energy Commission, Building Codes Advisory Commission, and members of the public, the Village Board of Trustees amended its building and residential codes for new construction. *Id.* ¶¶ 10-11. The amended codes are a key part of the Village's comprehensive and long-range plan to safeguard its residents from the damage and human health harm caused by indoor fossil fuel combustion. *Id.* ¶¶ 10 & 13.

Under the new code, most new buildings and residences in the Village must use electricity as their "source of energy" and may not combust "fossil fuels" indoors. *See* Oak Park Vill. Code § 7-1-2 at P301.1; § 7-6-2 at X301.1.1 (restricting fossil fuels and exempting backup power and commercial kitchens). They must incorporate certain technologies, such as heat pumps, *Id.* § 7-1-2 at P.301.1.2; § 7-6-2 at X301.1.2, and energy recovery ventilation systems, *Id.* § 7-1-2 at P301.1.; § 7-6-2 at X301.1. And they may not use others, including "gas cooking grills whose source of energy [is] fossil fuels." *Id.* § 7-1-2 at P.301.1.10; § 7-6-2 at X301.1.8. But though the code restricts, in some circumstances, what appliances new buildings may use, it sets no energy

conservation standards and imposes no design requirements. The result is a revised code that makes Oak Park buildings safer for those who live or work in them.

## C.    Procedural History

Oak Park's new building and residential code amendments took effect on January 1, 2024. Plaintiff Clean Energy Choice Coalition, an organization that professes to protect its members' interests in preserving varied "energy options," filed this action over a year later, in April 2025. Dkt. 1. It sought a declaratory judgment that EPCA preempts Oak Park's amendments and moved for summary judgment and an injunction of the entire Ordinance on August 27, 2025. Dkt. 27.

## STANDARD OF REVIEW

A party is entitled to summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When, as here, there are no genuine disputes of material fact, the only question is whether a party has shown that they are entitled to judgment as a matter of law.

## ARGUMENT

The Supreme Court has recognized time and again that health and welfare laws concerning pollution and safety are traditionally matters of local control. *See. e.g.*, *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power."); *Queenside Hills Realty Co., Inc. v. Saxl*, 328 U.S. 80, 82–83 (1946) ("Protection of the safety of persons is one of the traditional uses of the police power of the State."). EPCA, a federal law that concerns neither pollution nor safety, does not purport to regulate or displace local health and welfare authority. At every turn, its text, structure, and history convey that Congress intended to preempt only state and local laws that address appliance energy and water conservation. Because Oak Park's code amendments simply

5

bar certain appliances from certain locations, without regard to how much energy they consume or conserve, they are not preempted.

## I.      EPCA Does Not Preempt Oak Park's Code Amendments.

As with any question of statutory interpretation, the express preemption inquiry starts with EPCA's "text and structure." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (citation modified). For Congress to preempt state or local law, its intent to do so must be discernible "from the language of the preemption statute and the statutory framework surrounding it." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (citation modified). Here, the text of EPCA's preemption clause, the meaning of its technical terms, and its broader statutory framework make plain that EPCA preempts only those local regulations that prescribe the equivalent of a federal energy conservation standard for a covered product. Because Oak Park's code amendments do no such thing, operating independently of how much energy appliances consume or conserve, they are not preempted.

To advance the contrary view, Plaintiff leans on a Ninth Circuit decision adopting a sweeping interpretation of EPCA's preemption clause, under which the clause prohibits state and local authorities from restricting an appliance's use in any way once a federal energy conservation standard has been adopted for it. *See Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101–17 (9th Cir. 2024). But as eleven judges of that court observed, that interpretation departs from EPCA's text, structure, and common sense. *See id.* at 1119–26 (Friedland, J., dissenting from denial of rehearing en banc). No other court has adopted the Ninth Circuit's interpretation, while two have expressly agreed with the eleven judges who pointed out the flaws in the Ninth Circuit's decision. *See Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*, 2025 WL 843619, at *5 (S.D.N.Y. Mar. 18, 2025); *Mulhern Gas Co. v. Mosley*, 2025 WL 2062194, *14 (N.D.N.Y. July 23, 2025). This Court should join them.

A. **EPCA Preempts Local Laws Concerning Appliances' Excessive Energy Use.**

EPCA's preemption provision states that, "effective on the effective date of an energy conservation standard," "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product." 42 U.S.C. § 6297(c). Plaintiff does not suggest that Oak Park's code amendments concern "energy efficiency" or "water use," so its theory turns on what a "regulation concerning . . . energy use" is.

On that score, EPCA is clear. It provides an explicit definition of "energy use" that refers to a standardized design characteristic assessed under controlled testing conditions. 42 U.S.C. § 6291(4). Under EPCA, "energy use" is "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under [42 U.S.C. §] 6293." *Id*. Section 6293, in turn, provides for test procedures that "measure . . . energy use . . . of a covered product during a representative average use cycle or period of use, as determined by [the DOE]." *Id.* § 6293(b)(3). And "point of use" is a technical term to describe a measurement taken "without adjustment for any energy loss in the generation, transmission, and distribution of that energy." *Ass'n of Contracting Plumbers*, 2025 WL 843619, at *5 (quoting Energy Intensity Indicators: Terminology and Definitions, U.S. Dep't of Energy, http://bit.ly/3I7L8yP); *see also, e.g.*, 76 Fed. Reg. 51,281, 51,283 (Aug. 18, 2011) (term assesses how much "electricity, natural gas, propane, and/or fuel oil an appliance uses where it is operated," omitting "the energy losses associated with" steps like "transmission[] and distribution of electricity"). In sum, "energy use" is a representative measure of how much energy a product typically consumes per use cycle, or over a given period, measured under controlled conditions "simulating actual use." *Herrington*, 768 F.2d at 1404. It is a design characteristic of a product, and a function of how it is manufactured, supplying a fixed value to estimate and describe its performance.

This concept is an essential component of EPCA's statutory framework. EPCA establishes (or requires DOE to establish) "energy conservation standards" that restrict how manufacturers may design covered products by "prescrib[ing] a minimum level of energy efficiency" or a "maximum quantity of energy [or water] use" before those products may be "distributed in commerce." 42 U.S.C. §§ 6291(1), (6), 6295. In other words, depending on the product, DOE must either restrict how much energy it may consume in absolute terms (an "energy efficiency" standard) or bar it from producing too little usable output relative to that energy consumption (a standard concerning "energy use"). Once DOE has set such a standard, manufacturers may use whatever "design path[]" they wish to "attain the performance levels required." *Zero Zone, Inc. v. DOE*, 832 F.3d 654, 666 (7th Cir. 2016) (citation modified). Whatever they choose, before they may distribute a product, manufacturers must test it under representative conditions, 42 U.S.C. §§ 6293, 6314; 10 C.F.R. §§ 430–31; certify to DOE that it meets the standard, 10 C.F.R. § 429.12; and label the product with its energy use, *see* 42 U.S.C. §§ 6294, 6315; 16 C.F.R. § 305.17.

EPCA's preemption clause fits neatly into this statutory framework. When an "energy conservation standard" has been established for a particular covered product, the preemption clause ensures that no state or local regulation that likewise "concern[s]" the "energy use" of "such covered product" may "be effective with respect to such product." 42 U.S.C. § 6297(c). And by doing this, EPCA ensures that, when manufacturers design and produce their products, they need not juggle competing state and federal energy conservation standards and are subject to a single set of rules, governed by specified test procedures. *ACRI*, 410 U.S. at 499.

Reading EPCA in this straightforward manner leads to a straightforward rule: once DOE establishes, for example, a maximum amount of energy that gas-burning boilers may use to output a particular level of heat, Oak Park cannot adopt a different efficiency standard for gas-burning

boilers installed within the Village. But the mere existence of a DOE-established design standard does not require Oak Park to allow the unrestricted "use" of any particular appliance within its boundaries. Nothing in EPCA requires Oak Park to permit large boilers to be installed and operated in every bungalow and bedroom, without limitation, regardless of local health and safety impacts.

### B. Oak Park's Code Amendments Do Not Restrict Excessive Energy Use.

EPCA's consistent technical definition of "energy use" as a design characteristic, and that definition's role in EPCA's "coherent regulatory scheme," *FDA v Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), together foreclose Plaintiff's challenge. Oak Park's code amendments do not set energy conservation standards. They do not restrict how much energy a covered appliance may be designed to consume. Indeed, they are indifferent to whether an appliance guzzles energy or requires just a small amount. Instead, they restrict most new buildings from using one particular fuel source: fossil fuels. And they do so to protect Village residents from the emissions generated by fossil fuel combustion.

Many of Oak Park's code provisions do not act on EPCA-covered products at all. But where they do, they do not require that those products be redesigned to consume less energy. They direct builders and consumers to deploy "one set of products with one set of federal efficiency standards (electric appliances)" rather than "another set of products with different federal efficiency standards (gas appliances)." *Cal. Rest. Ass'n*, 89 F.4th at 1126 (Friedland, J., dissenting). Indeed, in some instances, the code's focus on health and emissions may cause new buildings (or appliances within them) to consume more energy, not less. *See id.* (citing 10 C.F.R. § 430.32(e)(1)(ii)) (setting a more stringent standard for gas furnaces than for electric ones). The amendments—like virtually every municipal building and fire code—bar the use of certain appliances in certain locations for health and welfare reasons. But they do not require that the appliance achieve a reduction in energy use or an improvement in energy conservation, and are

9

not preempted. *See Ass'n of Contracting Plumbers*, 2025 WL 843619, at *6 (similar statute draws no "distinction between products based on their energy efficiency or energy use as manufactured," but "instead regulates, indirectly, the type of fuel that a covered product may consume in certain settings, irrespective of [its] energy efficiency or use"); *Mulhern Gas Co.*, 2025 WL 2062194, at *14 (electrification statute did not "concern" any product's "energy use" when it "prohibit[ed] the installation of *any* fossil-fuel equipment or system in new buildings").

### C. Plaintiff's Interpretation of EPCA Contradicts its Text, Context, and History and Produces Absurd Results.

Plaintiff asks this Court to hold that EPCA's preemption provision extends far beyond competing energy conservation standards. Its argument is breathtakingly expansive: According to Plaintiff, once DOE establishes a standard for an appliance, no locality can restrict the appliance's operation in any way. If a consumer wants to operate a gas stove in a fireworks factory, or a portable kerosene heater in a multifamily building, Plaintiff's theory is that local authorities are powerless to stop it: Any regulation that "prohibit[s]" an appliance from using "more than zero fossil fuels"—that is, any regulation that prohibits an appliance from operating in any location— "concern[s]" the "quantity of energy" the appliance "use[s]" and is thereby preempted. Dkt. 28 at 9–11. Plaintiff disregards EPCA's language, structure, and history, producing absurd results.

*First*, Plaintiff relies on an understanding of "energy use" that is untethered to EPCA's carefully designed statutory text. For Plaintiff, an appliance's energy use is the actual amount of fuel that it "uses" when it is operated by a consumer. *See* Dkt. 28 at 9. To connect that understanding to the statute, Plaintiff relies on EPCA's reference to the energy "directly consumed by a consumer product at point of use." *Id.* (quoting 42 U.S.C. § 6297(4)). But as explained above, "point of use" does not refer to the point where a consumer uses an object. The term instead distinguishes between the energy an appliance consumes on-site and the additional energy required

to generate, transmit, and distribute that energy. *See supra* 7. And the definition does not stop there. The sentence Plaintiff relies on continues by specifying that "point of use" is "determined in accordance with test procedures under section 6293." 42 U.S.C. § 6291(4). As explained above, those procedures apply only where a covered product is tested and are a function of its manufacture or design. That means a product's "energy use" as determined by EPCA's test procedures is a fixed value that estimates how the product will perform once installed—not a measure of how much an appliance actually runs in each workshop or home it is installed in. *Id*. Thus, under EPCA, a rule barring an appliance is not an "energy conservation standard" governing "energy use."

The rest of the statute reflects the same understanding. For instance, EPCA repeatedly imposes obligations on manufacturers based on Congress's understanding that products' "energy use" is fixed long before they are marketed or sold. *See, e.g.*, *id.* § 6293(c)(1)(B) (barring representations "with respect to" a covered product's "energy use" unless that product was tested in accordance with statutory procedures); *id.* at §§ 6296(a), 6294(I)(i) (requiring manufacturers to label products with their tested "energy use" before they can be offered for sale).

Indeed, if "energy use" had the meaning Plaintiff proposes, many of EPCA's requirements would fall apart. Take the requirement that a covered product may not be sold "if it does not meet [EPCA] standards," including "energy use" requirements. *Ass'n of Contracting Plumbers*, 2025 WL 843619, at *5. "If, as Plaintiff[] contend[s], 'energy use' refers to the amount of energy a product actually consumes in the hands of a consumer," and not an intrinsic design characteristic, "then this rule would be impossible to implement." *Id.* There would be no way to know in advance of a product's purchase, installation, and operation what its "energy use" would be. Or take EPCA's authorization of DOE to seek information from manufacturers about products' "energy use" so the agency can assess "compliance with EPCA's standards" and "facilitate DOE's

administration of the statute." *Id.* (citation modified) (citing 42 U.S.C. § 6296(d)(1)). Under Plaintiff's view, this provision would "require manufacturers to somehow monitor consumers' use of appliances after installation," an absurd proposition. *Id.* (citation modified). Finally, "energy use" and energy efficiency information are used to populate blank fields on a standardized label, *see, e.g.*, 16 C.F.R. § 305.17(a)(9) (requiring labels for water heaters to contain the text: "Estimated yearly energy use: __ [kWh or therms]"), which must be affixed to a product *before* it enters commerce, *see generally* 42 U.S.C. § 6294. In sum, none of these provisions would function if "energy use" referred to consumers' actual operation of a product.

Plaintiff has no response to any of this except to argue (Dkt. 28 at 11–12) that, because EPCA can preempt building codes, "energy use" must refer not to design requirements but to the actual energy used in a particular building. This argument falls flat even on its own terms. The fact that EPCA can preempt building codes just shows that states cannot use building codes to indirectly set energy conservation standards—for instance, by using a code to require that any refrigerator a builder installs consumes fewer kilowatt hours per year than required under the federal standard. *See* 42 U.S.C. § 6295(b)(1) (federal standard). It does not mean they cannot use building codes to restrict where refrigerators may be installed. Plaintiff's argument (Dkt. 28 at 12) that "energy use" can refer to both electricity and fossil fuels is similarly irrelevant. A local law imposing an energy conservation design requirement on gas or electric boilers is equally preempted regardless of whether it addresses electric energy or fossil fuel energy, but a local law that restricts the use or installation of an appliance for health and safety reasons is not.

*Second*, Plaintiff's interpretation of the preemption clause creates a disconnect between the scope of EPCA's waiver and preemption provisions that cannot be reconciled with the rest of the statutory scheme. Congress authorized DOE to waive EPCA preemption only if it found that a

12

regulation is "needed to meet unusual and compelling State or local energy or water interests," such as when the "energy or water savings resulting" from an otherwise preempted law outweigh its overall costs. 42 U.S.C. § 6297(d)(1)(B), (C). And it permitted DOE to waive building code preemption only as to codes targeting "energy consumption" and "energy efficiencies"—not codes restricting certain appliances based on health and safety concerns. 42 U.S.C. § 6297(f)(3)(A). If Plaintiff is correct, then Congress made the inexplicable choice to both preempt and make categorically ineligible for waiver all local appliance regulations aimed at health and safety. The better interpretation is that Congress intended EPCA's preemption clause to match both the statute's energy and water conservation objectives and the waiver's focus on energy and water savings. *See N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 646 (1995) (courts look to statute's "objectives" as a "guide to the scope of the state law that Congress understood would survive").

*Third*, EPCA's history underscores that Congress had no intention of crafting a preemption clause as broad as Plaintiff claims. Congress incorporated a preemption clause into EPCA from the start, and by 1978 provided that any "energy efficiency standard or other requirement respecting energy use or energy efficiency" of a covered product would be preempted absent a waiver. *See see also* Pub. L. No. 95-619, § 424(b)(1)–(3); *see also* Pub. L. No. 94-163, § 327(a)(2). DOE then repeatedly interpreted the scope of that provision as restricted to local laws directly addressing energy conservation, explaining that a "rule whose purpose is other than energy efficiency[,] such as a law on fire safety, would not appear to be preempted by the Federal rule, even if it has a secondary and incidental effect of improving the efficiency of a covered product." 47 Fed. Reg. 14,424, 14,456 (Apr. 2, 1982); *see also* 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982) (while "[p]rohibition of hook-ups for appliances with less than a certain efficiency would be

13

subject to preemption," a bar on "placing oversized furnaces and air conditioners in new buildings . . . would not be"). When Congress in 1987 enacted the amendment at issue here, it gave no indication that it suddenly wanted DOE energy conservation standards to displace local health and safety laws. Instead, it maintained a "rule of preemption for energy conservation standards" that concerns only a product's "energy efficiency, energy use, or water use." 42 U.S.C. § 6297(c). Congress's re-use of the defined term "energy use" resulted in decades of stable interpretation of EPCA's preemptive reach. And that outcome aligns with common sense: when EPCA required an energy efficiency standard for furnaces, Congress could not reasonably have expected (or desired) to thereby automatically repeal all safety protections restricting furnaces in local building codes.

*Fourth*, Plaintiff's interpretation of EPCA yields absurd results that are radically "inconsisten[t] with the design and structure of the statute as a whole." *Univ. Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013). If EPCA's preemption clause swept as broadly as Plaintiff supposes, the law would preempt much of the authority states and localities around the country take for granted. For example, Illinois bans the use of kerosene space heaters in many structures— including nursing homes, day-care centers, and structures more than three stories tall. 425 I.L.C.S. 65/9. And it heavily restricts their use in many other circumstances. *See, e.g.*, 425 I.L.C.S. 65/8. With good reason: in the 1980s, kerosene space heaters were responsible for a terrible spate of fires around Chicago. *See Fire Kills 3 Children; Space Heater Blamed*, Chi. Trib. (Dec. 28, 1985), http://bit.ly/4nfuCfl; *Space-Heater Fire Deaths Up*, Chi. Trib. (Jan. 10, 1986), http://bit.ly/46EBYD9. Kerosene is, of course, a fossil fuel. So under Plaintiff's construction of EPCA, these commonplace safety regulations have been unlawful for decades, because they ban a covered appliance based upon its use of "more than zero" fossil fuels. Dkt. 28 at 9. *See also Ass'n of Contracting Plumbers*, 2025 WL 843619, at *6. ("[I]f EPCA preempts a regulation effectively

14

banning the use of fossil fuel powered appliances in a subset of new residential buildings, then by the same logic it might preempt a regulation that effectively prohibits the use of such appliances in close proximity to gas station pumps.").

That is to say nothing of the many other regulations that limit what sorts of fuels various EPCA-covered appliances may burn, or where they may do so. For example, Oak Park bars oil burners—components of furnaces and boilers—from using a fuel mix containing gasoline due to increased fire risk. *See* Int'l Fire Code § 605.1.3 (incorporated by Oak Park Vill. Code § 7-5-1). Those products are each subject to an EPCA energy conservation standard. *See, e.g.*, 42 U.S.C. § 6295(f)(1)–(3)). Per Plaintiff's sweeping theory, localities lack any authority to regulate "*fossil fuels* consumed by a consumer product," no matter how dangerous or ill-suited to local needs. Dkt. 28 at 12. So, "[w]ere Plaintiffs correct about the scope of EPCA, these vital safety regulations would likewise be preempted—an absurd result that the Court must avoid." *Ass'n of Contracting Plumbers*, 2025 WL 843619, at *6.

And after sweeping all these regulations aside, EPCA would leave no one to step into the breach. EPCA does not authorize DOE to regulate appliances for health and safety purposes and, as explained above, it does not authorize DOE to waive preemption in this context, either. As a court faced with a similar ordinance recently concluded: "Nothing in EPCA's text, structure, or legislative history suggests that Congress did not expect such regulations to survive preemption." *Id.* Because "regulations of that sort are peculiarly within the province of state and local legislative authorities, . . . it is hardly doubtful that [they] . . . fall[ ] outside" EPCA's "preemptive sweep." *Id.* (citation modified).

## CONCLUSION

The Court should deny Plaintiff's motion for summary judgment, grant Oak Park's cross-motion, and enter judgment for the Village.

**DATED**: September 24, 2025

/s/ Gregory T. Smith
Gregory T. Smith
ELROD FRIEDMAN LLP
350 N. Clark Street, Second Floor
Chicago, Illinois 60654
(312) 528-5201
gregory.smith@elrodfriedman.com
ARDC # 6297652


/s/ Tony Fioretti
Tony Fioretti, Assistant Village Attorney
VILLAGE OF OAK PARK
123 Madison Street
Oak Park, IL 60302
(708) 358-5666
tony.fioretti@oak-park.us
ARDC # 6308997

Respectfully submitted,

/s/ Gavin M. Kearney
Gavin M. Kearney
Thomas Cmar
EARTHJUSTICE
311 South Wacker Drive, Suite 1400
Chicago, IL 60606
(773) 828-0816
gkearney@earthjustice.org
tcmar@earthjustice.org
ARDC # 6328270

/s/ Timothy R. Oberleiton
Timothy R. Oberleiton (*pro hac vice*)
EARTHJUSTICE
1001 G Street NW, Suite 1000
Washington, D.C. 20001
(202) 667-4500
toberleiton@earthjustice.org

/s/ Linnet Davis-Stermitz
Linnet Davis-Stermitz (*pro hac vice*)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle WA 98104
(206) 343-7340
ldavisstermitz@earthjustice.org

/s/ Dror Ladin
Dror Ladin (*pro hac vice*)
EARTHJUSTICE
48 Wall Street 15th Floor
New York, NY 10005
(212) 845-7376
dladin@earthjustice.org

*Counsel for Defendant Village of Oak Park,
Illinois*

16