UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CLEAN ENERGY CHOICE COALITION, NFP<br><br>*Plaintiff,*<br><br>v.<br><br>VILLAGE OF OAK PARK, ILLINOIS,<br><br>*Defendant.* | Case No. 1:25-cv-04353<br><br>Hon. Franklin U. Valderrama |

**DEFENDANT'S REPLY IN SUPPORT OF
CROSS MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

For all that Plaintiff insists this is a case about text, it has little to say about the Village's statutory interpretation arguments. Plaintiff acknowledges that, to be preempted by the Energy Policy and Conservation Act, a regulation must "concern[] . . . energy use." But, it says, "energy use" is not a fixed design characteristic, used to ascertain how much energy an appliance consumes under representative testing conditions—even though it operates that way throughout EPCA. Rather, Plaintiff claims, a regulation concerns "energy use" if it in any way prohibits or restricts consumers or businesses from using any appliance. In Plaintiffs' view, virtually every form of regulation—ranging from noise ordinances to fire safety—actually concerns an appliance's "energy use" so long as it affects where and when the appliance can be used.

But as Plaintiff does not dispute (or even acknowledge), EPCA's definition of "energy use" includes a clause that is wholly incompatible with its theory: EPCA specifies that energy use is "determined in accordance with test procedures," not consumer use. Nor does Plaintiff attempt to reconcile its expansive theory of EPCA preemption with the statute's framework and structure. And it does not bother to explain why Congress, in enacting EPCA, would have intended the absurd results Plaintiff's theory produces. Under Plaintiff's theory, whenever the Department of Energy promulgates an energy conservation standard for an appliance, the agency also invalidates all local health, safety, zoning, and noise restrictions that would otherwise restrict the appliance's use—even if those restrictions have nothing to do with its energy efficiency. And since DOE itself has no power over health, safety, zoning, or noise, Plaintiff's theory of EPCA would leave behind a regulatory no-mans-land where *no one* can restrict the siting or use of any covered appliance. Nothing in EPCA's text, structure, or history suggests that Congress intended that result.

Rather than seriously contest any of these points, Plaintiff hangs its hat on a strange argument. The Village, it says, asks the Court to adopt a "motive-based" exemption from EPCA

1

preemption. But the Village plainly does not do so. Its argument is that health-and-safety regulations like its building code amendments do not concern "energy use," as EPCA defines that term, and thus fall outside its preemptive scope. As confirmed time and again by EPCA's definitions, structure, and history, Congress restricted EPCA preemption to local regulations addressing energy conservation standards. That Congress did not displace laws "concerning" other topics—ranging from pollution to zoning—rests not on some "motive-based" preemption inquiry, but on a straightforward interpretation of the language and logic that Congress employed.

I.  **The Plain Text of EPCA Forecloses Plaintiff's Preemption Theory.**

Beginning with EPCA's text, Plaintiff's theory of EPCA preemption cannot be reconciled with the express definition of "energy use" the statute incorporates into its preemption provision. According to Plaintiff, when EPCA preempts state regulations "concerning . . . energy use," it preempts regulations concerning the quantity of fossil fuels or electricity consumed by covered appliances "at the place where those covered appliances are used." Dkt. 28 at 12; Dkt. 46 at 4. In this way, Plaintiff says, EPCA preemption applies whenever a regulation restricts where or how consumers may install and operate an appliance. The problem for Plaintiff is that EPCA says the opposite.

EPCA specifies how to determine appliances' "energy use," and it isn't "at the place where" they "are used" by a consumer. Dkt. 28 at 9. It's where and when they are manufactured. Per EPCA, "energy use" is "the quantity of energy directly consumed by a consumer product at point of use, *determined in accordance with test procedures* under [42 U.S.C. §] 6293. 42 U.S.C. § 6291(4) (emphasis added). Those "test procedures" do not somehow measure how an appliance actually operates each time it is installed in a home or business, but rather "measure . . . energy use . . . of a covered product during a representative average use cycle or period of use, as determined by [the DOE]." *Id.* § 6293(b)(3). As courts, agencies, and manufacturers have

2

recognized for decades, "energy use" is a standardized design characteristic, assessed in controlled conditions "simulating actual use." *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1404 (D.C. Cir. 1985). It is a fixed value determined *before* a product is put up for sale and it is calculated according to DOE testing rules that establish the degree to which a product uses electricity or fossil fuels in producing a particular result. "Energy use" under EPCA thus has nothing to do with whether an appliance is actually turned on (or not) in a home or factory. And EPCA's preemption of laws "concerning . . . energy use" likewise applies only to laws concerning appliances' energy conservation characteristics, such as laws setting local efficiency standards that are greater than DOE's. EPCA does not create an entitlement to install and "use" a product wherever and however one might wish, free from all local control.

Plaintiff does not explain how its construction of EPCA aligns with this statutory text. Instead, Plaintiff simply pretends the text does not exist, shearing off the inconvenient "determined by" language from Congress's express definition of "energy use.". *See* Dkt. 46 at 4. But "[w]hen a statute includes an explicit definition," the court "must follow" it in full, *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018)—even if Plaintiff does not like where it leads.

Plaintiff compounds its selective quotation by eschewing the accepted meaning of the text it *does* rely on. *See* Dkt. 46 at 5–6. Even without Congress's use of the "testing procedures" clause in the definition of "energy use," Plaintiff still must deal with "point of use." Plaintiff does not dispute that, in the energy sector, "point of use" is a technical term that refers to how much energy an appliance consumes directly, and does not include energy consumed as that energy is transmitted from point of generation to point of use. *See* Dkt. 35 at 7. Rather, Plaintiff says that this technical meaning cannot govern here because EPCA does not expressly adopt it. *See* Dkt. 46 at 5–6. Accordingly, Plaintiff urges the Court to define "point of use" colloquially to mean "the

3

place where" a product is "used." Dkt. 28 at 9 (quoting *Cal. Restaurant Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024)).

But as the Supreme Court has explained, "when a statute, like this one, is 'addressing a technical subject, a specialized meaning is to be expected.'" *Van Buren v. United States*, 593 U.S. 374, 388 n.7 (2021) (citation modified) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 73 (2012)). Courts' obligation to "take note of terms that carry 'technical meanings'" attaches whether or not Congress explicitly demanded they do so. *Id.* (quoting Scalia, *Reading Law* at 73). Especially so here, when the rest of the statutory text—assiduously ignored by Plaintiff—underscores that Congress did not conceive of energy use as measured at the point of installation.

Plaintiff's few remaining textual arguments cannot survive its basic misreading of "energy use." Plaintiff urges the Court to interpret the term "concerning" in the preemption provision "expansively" to capture any state regulation that "relat[es]" in any way to "energy use." Dkt. 46 at 5 (citation modified). Even if the Court accepted that invitation, a broad understanding of the term "concerning" does not "transform the meaning" of the term "energy use" as Congress expressly defined it in the statute. *Cal. Restaurant Ass'n*, 89 F.4th at 1125 (Friedland, J., dissenting from denial of rehearing). "As even Plaintiffs acknowledge, Congress' use of the word 'concerning' does not create a limitless preemption; the regulation at issue must still relate to or be about or regarding the "energy use" of a covered product for preemption to apply." *Mulhern Gas Co. v. Mosley*, No. 1:23-CV-1267, 2025 WL 2062194, at *14 (N.D.N.Y. July 23, 2025). Plaintiffs cannot make that showing, because "the challenged statute[] neither directly regulate[s] energy use of any covered equipment, nor. . . in any way concern[s] the energy use of a covered product" because it "prohibit[s] the installation of *any* fossil-fuel equipment or system in new

4

buildings, regardless of the energy use of such equipment or systems." *Id.* Plaintiff's preferred reading of the text would "take a chainsaw to these nuanced problems when Congress meant to use a scalpel." *Facebook, Inc. v. Duguid*, 592 U.S. 395, 405 (2021).

In short, Plaintiffs cannot rely on the word "concerning" to expand EPCA's preemptive reach far beyond what the statute's text, structure, and logic will support. The word "concerning" on its own is indeterminate—and, if "extend[ed] to the furthest stretch of [that] indeterminacy," is practically limitless because "relations stop nowhere." *Dubin v. United States*, 599 U.S. 110, 119 (2023) (citation modified). That is why the Supreme Court has instructed courts to "go beyond [such] unhelpful text" and look instead to "statutory context" to understand "the kind of relationship required," and its "nature and strength." *Id.* (citation modified). And as the Village has explained—and details further below, *see infra* at Part II—context is no help to Plaintiff.

Plaintiff then attempts to draw unsupported inferences from EPCA's preemption waiver for building codes. As Plaintiff sees it, because that waiver extends to regulations that indirectly regulate energy use, EPCA preemption does too. And in doing so, Plaintiff claims, EPCA preemption reaches any regulation that "limit[s] which appliances builders can use." Dkt. 46 at 6. But this second point does not follow from the first. The Village has no quarrel with Plaintiff's first point. As the Village has explained, *see* Dkt. 35 at 12, EPCA can preempt regulations that do not *directly* specify design requirements for individual appliances but nevertheless do so indirectly—such as a code that restricts builders to installing appliances that exceed DOE energy conservation standards. But for EPCA preemption to apply, the challenged regulation still must (directly or indirectly) regulate "energy use," as EPCA defines that term. And as discussed above, the Village's ordinance does not do that.

5

Plaintiff's attempt to distinguish between regulations of "energy use" and state energy conservation standards fares no better. Plaintiff begins by arguing that, if Congress intended to focus EPCA preemption on state energy conservation standards, it would have said so. *See* Dkt. 46 at 4. But Congress *did* say so: It explicitly labeled the provision as a "[g]eneral rule of preemption for energy conservation standards before Federal standard becomes effective for product." 42 U.S.C. § 6297(c). "Section headings" such as these "supply" clear "cues as to what Congress intended"—especially when, as here, they accord with the rest of the statutory scheme. *Rudisill v. McDonough*, 601 U.S. 294, 309 (2024). Plaintiff suggests that Congress nevertheless perceived some daylight between "energy conservation standards" and "requirement[s] with respect to energy use" because it used the terms together conjunctively later in the section containing the preemption provision. Dkt. 46 at 4–5; *see* 42 U.S.C. § 6297(d)(1)(A). But that usage simply captures what all acknowledge: EPCA preempts not just state regulations that *formally* set energy conservation standards, but also state regulations that *functionally* do so—such as through building-code provisions that indirectly regulate how much energy appliances may be designed to use—for example, by requiring that all appliances installed in a building consume less than a certain amount of kilowatts per hour.

In fact, Plaintiff's argument is a better rejoinder to its own theory: If Congress had intended for an energy-conservation statute like EPCA to preempt every state health-and-safety regulation that restricts the use of a covered appliance, it would have said so. Plaintiff asserts that Congress intended a tortured syllogism that apparently occurred to no one for the first four decades of EPCA's existence—that "more than zero" is a "quantity," and so any regulation that restricts the operation of a covered appliance "concern[s]" a "quantity" of fossil fuels. Dkt. 28 at 9; *see also* Dkt. 46 at 7. It is far more plausible that if Congress indeed intended such a far-reaching result, it

6

would have just said what Plaintiff insists it meant: when DOE establishes an energy conservation standard, it preempts every state regulation restricting that appliance's use. But Congress did not do so. It explained that EPCA preempts only state regulations that concern the quantity of energy an appliance is designed to consume.[1]

## II. EPCA's Carefully Calibrated Statutory Framework Forecloses Plaintiff's Preemption Theory.

Plaintiff's interpretation of EPCA's preemptive scope is equally irreconcilable with EPCA's "statutory framework." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996). As the Village has explained, *see* Dkt. 35 at 7–9, 11–12, the definition of "energy use" as a fixed estimate of energy consumption based on a product's design is an essential component of EPCA's statutory framework. Plaintiff's contrary interpretation is at odds with that framework, makes much of the statute impossible to apply, and yields absurd results. Plaintiff leaves almost all these implications unaddressed. Apart from quibbling with a few of the Village's examples, Plaintiff spends most of its efforts on the curious argument that EPCA preemption does not turn on the "motive" behind a regulation. But the Village never argued otherwise. As described in the Village's opening brief, Plaintiff's preemption theory fails because EPCA "preempt[s] only state and local laws that address appliance energy and water conservation," Dkt. 34 at 5. Because Congress restricted only laws that concern "energy use" and "energy efficiency" as Congress defined those terms in EPCA, and the Village's code amendments concern neither, they are not preempted.

---

[1] That Plaintiff's interpretation would effectuate such an intrusion into traditional state domains warrants strong judicial skepticism, *see Biden v. Nebraska*, 600 U.S. 477, 501–02 (2023), even if—contrary to the thoughtful argument presented by the Village's *amicus*—the presumption against preemption no longer applies even to those express preemption cases where plaintiffs seek to displace historic state police powers. Even in the absence of such a presumption, courts traditionally "construe the preempted domain narrowly in deference to state sovereignty." *Fed. L. Enf't Officers Ass'n v. Attorney Gen. N.J.*, 93 F.4th 122, 134 (3d Cir. 2024).

### A. EPCA's Statutory Framework Treats "Energy Use" As a Fixed Estimate of Energy Consumption.

EPCA's definition of "energy use" explains how DOE sets energy conservation standards (by setting a fixed value of "energy use" that products may not exceed). 42 U.S.C. §§ 6291(6)(A), 6295. It tells manufacturers how to design their products (to consume no more than the specified amount of energy), and how to discern whether a product meets such a standard (by testing the product under representative, unduly burdensome conditions before it may be sold). *Id.* at §§ 6293, 6314. And it informs what manufacturers must certify to DOE before putting a product on the market (that the product meets the standard), 10 C.F.R. § 429.12, as well as how to label products for consumers at the point of sale (by specifying how much energy they may use), *see* 42 U.S.C. §§ 6294, 6315.

But if Plaintiff were correct, and "energy use" were a measure of how much appliances are actually operated by their eventual purchasers " the place where [theyare] used," many of these provisions would make no sense. *Ass'n of Contracting Plumbers v. City of New York*, No. 23-CV-11292, 2025 WL 843619, at *5 (S.D.N.Y. Mar. 18, 2025) If one can only measure "energy use" when a product is used by a consumer, how can a manufacturer conclude the product satisfies DOE's "energy use" standard *before* putting it up for sale? *Id.* How could that manufacturer fill out the product's "energy use" label, *see* 42 U.S.C. § 6294; *see also* 16 C.F.R. § 305.17(a)(9), or confirm that the product is EPCA-compliant, before putting it on the market, *see* 42 U.S.C. § 6296(d)(1)? Plaintiff does not even attempt to wrestle with these questions.

And they are only the beginning of the absurd results Plaintiff's interpretation creates. As the Village explained, *see* Dkt. 35 at 12–13, that interpretation creates an inexplicable disconnect between the scope of EPCA's waiver and preemption provisions. Under Plaintiff's theory, Congress preempted building codes that restrict where appliances may be sited to protect health

8

and safety—but authorized DOE to *waive* preemption only as to those codes that target "energy consumption" and "energy efficiency." 42 U.S.C. § 6297(f)(3)(A). That means that once DOE sets an energy conservation standard, it irreversibly precludes state and local governments from addressing through regulation any of the dangers that appliances may pose.

And because DOE lacks the authority to regulate health or safety, Plaintiff's interpretation creates a regulatory vacuum. Once an appliance is subject to a federal energy conservation standard, it is insulated from every other form of regulation. State and local governments cannot use fire codes, zoning ordinances, or noise regulations to bar the appliance from being placed in a dangerous—or even just bothersome—location because to do so would restrict their use of "more than zero" energy. For instance, according to Plaintiff's theory, by banning kerosene space heaters in multifamily housing, Chicago has issued a standard setting those heaters' maximum energy use to zero. Although there is not currently a federal energy conservation standard for kerosene heaters, DOE already specifies how to test their energy use. *See* 10 C.F.R. § 430, subpart B, app. G at 1.4.4. And as soon as DOE decides that there is greater "potential for energy savings" from standards for these appliances than it currently perceives, *see* Energy Conservation Program: Energy Conservation Standards for Direct Heating Equipment, 86 Fed. Reg. 66403, 66404 (Nov. 23, 2021), and accordingly sets an energy conservation standard, it will by Plaintiff's logic wipe Chicago's crucial fire-safety regulation—and countless others—off the books.

    **B.**     **Plaintiff's Responses to EPCA's Carefully-Reticulated Statutory Framework Fail.**

Plaintiff offers three responses, but none provides even the faintest reason to think that Congress intended the absurd results Plaintiff's interpretation would require.

*First*, Plaintiff points out that Chicago's kerosene heater restriction is preserved—for now—by DOE's forbearance in issuing an energy conservation standard for the product. But that

misses the Village's point. Congress indisputably included kerosene space heaters as covered products under EPCA, and DOE has already considered whether to issue an energy conservation standard for this appliance, pausing only because insufficient energy savings were currently available. Plaintiff's argument is that Congress therefore *required* that all fire safety laws immediately give way if DOE ever decides to issue an energy standard. That is, to put it mildly, not a result that one would impute to a rational Congress. Nor does it make any sense that Congress would require such radical results in such an oblique fashion, addressing itself to "energy conservation standards" yet choosing to preempt all local appliance regulation.

Setting aside the insurmountable problem with Plaintiffs' response on kerosene space heaters, Plaintiff's response fails to account for the many energy conservation standards DOE *has* set. These include over 70 categories of devices ranging from furnaces to fans, industrial boilers to residential freezers—and even television sets. Under Plaintiff's theory, those standards already exempt covered appliances from large swaths of state and local regulatory authority. According to Plaintiff's rule, noise ordinances cannot restrict the siting of loud industrial fans; zoning laws and building codes cannot prohibit the use of industrial furnaces in residential neighborhoods; cities must not restrict the use of walk-in freezers (or televisions) in elementary schools; and public universities cannot prohibit students from installing EPCA-covered appliances in their dorms—because doing so sets the maximum quantity of energy they may consume at zero.

*Second*, Plaintiff faults the Village for purportedly elevating Congress's objectives in enacting EPCA, and the interpretations of the agency long tasked with enforcing it, over statutory text. But the Village relies on these indicia of statutory meaning not to contradict EPCA's text or framework, but because they confirm exactly what the text establishes: the limited scope of EPCA's preemption clause. *See United States ex. Rel. Streck v. Eli Lilly & Co.*, 152 F.4th 816, 835

(7th Cir. 2025) (rejecting interpretation that "leads . . . to a nonsensical destination inconsistent with the statute's clear purpose"). And while the interpretation of EPCA is indeed a question for this Court, DOE's 1982 interpretation of the statute is precisely the sort of longstanding, consistent, and contemporaneous agency interpretation that should command its "very great respect." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (quoting *Edwards' Lessee v. Darby*, 12 Wheat. 206, 210 (1827)). Even more so when, as here, Congress updated EPCA "against the backdrop" of that interpretation, suggesting its intent to "work in harmony with what has come before." *See Monsalvo v. Bondi*, 145 S. Ct. 1232, 1242 (2025) (citation modified).

*Finally*, Plaintiff attempts to reduce the Village's arguments to a request that the Court exempt regulations from EPCA preemption based on the "motive" a state or local government had in enacting them. *See* Dkt. 46 at 8–10. But the Village's point is not about *why* health-and-safety regulations like its building code were enacted. It is about *what* they do: regulate how much pollution new buildings may emit. In doing so, they do not regulate, directly or indirectly, how much energy the appliances within those buildings are designed to consume. Indeed, they may even cause greater overall energy consumption. *See* Dkt. 34 at 9. The Village's regulations therefore do not concern an appliance's "energy use" as that term is defined under EPCA. Under the consistent and straightforward interpretation of preemption that flows from the statute's text, framework, and purpose, EPCA does not preempt regulations like these.

## CONCLUSION

The Court should deny Plaintiff's motion for summary judgment, grant Oak Park's cross-motion, and enter judgment for the Village.

DATED: November 19, 2025

/s/ *Gregory T. Smith*
Gregory T. Smith
ELROD FRIEDMAN LLP
350 N. Clark Street, Second Floor
Chicago, Illinois 60654
(312) 528-5201
gregory.smith@elrodfriedman.com
ARDC # 6297652


/s/ *Tony Fioretti*
Tony Fioretti, Assistant Village Attorney
VILLAGE OF OAK PARK
123 Madison Street
Oak Park, IL 60302
(708) 358-5666
tony.fioretti@oak-park.us
ARDC # 6308997

Respectfully submitted,

/s/ *Gavin M. Kearney*
Gavin M. Kearney
Thomas Cmar
EARTHJUSTICE
311 South Wacker Drive, Suite 1400
Chicago, IL 60606
(773) 828-0816
gkearney@earthjustice.org
tcmar@earthjustice.org
ARDC # 6328270

/s/ *Timothy R. Oberleiton*
Timothy R. Oberleiton (*pro hac vice*)
EARTHJUSTICE
1001 G Street NW, Suite 1000
Washington, D.C. 20001
(202) 667-4500
toberleiton@earthjustice.org

/s/ *Linnet Davis-Stermitz*
Linnet Davis-Stermitz (*pro hac vice*)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle WA 98104
(206) 343-7340
ldavisstermitz@earthjustice.org

/s/ *Dror Ladin*
Dror Ladin (*pro hac vice*)
EARTHJUSTICE
48 Wall Street 15th Floor
New York, NY 10005
(212) 845-7376
dladin@earthjustice.org

*Counsel for Defendant Village of Oak Park, Illinois*