**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CLEAN ENERGY CHOICE
COALITION, NFP

        Plaintiff,

        v.

VILLAGE OF OAK PARK, ILLINOIS,

        Defendant.

No. 25-cv-04353
Judge Franklin U. Valderrama

**MEMORANDUM OPINION AND ORDER**

The Energy Policy and Conservation Act of 1975 (EPCA) prohibits state and local regulations "concerning the energy efficiency [or] energy use" of certain products. 42 U.S.C. § 6297(c). The Village of Oak Park (the Village), as part of its effort to reduce its greenhouse emissions, enacted an ordinance which provides that, as to all "new buildings," "[t]he source of energy for the building shall be all electric and the source of energy shall not be fossil fuels." Oak Park Vill. Code § 7-1-2 at P301.1 (the Ordinance); R. 1, Compl.[1] Plaintiff Clean Energy Choice Coalition, NFP (Clean Energy), an assortment of groups whose members seek to preserve their interests in providing natural gas services and appliances to consumers, sued the Village asserting that the Ordinance is preempted by EPCA. Before the Court are Clean Energy and the Village's cross-motions for summary judgment. R. 27, Pl.'s Mot.

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

Summ. J.; R. 34, Def.'s Cx-Mot. Summ. J. For the reasons below, the Court denies Clean Energy's motion and grants the Village's motion for summary judgment.

## Background

In deciding cross-motions for summary judgment, the Court views the facts in the light most favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). So, when the Court evaluates Clean Energy's motion for summary judgment, the Village gets the benefit of reasonable inferences; conversely, when evaluating the Village's motion, the Court gives Clean Energy the benefit of the doubt. On summary judgment, the Court assumes the truth of the facts presented by the parties, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

### I. The Ordinance

In August 2022 the Village adopted Climate Ready Oak Park (CROP), a comprehensive planning framework under which the Village plans to reduce its greenhouse gas emissions and protect its residents' health, safety, and welfare. DSOF[2] ¶ 2, 5. Changes to the Village's building code are a key step in that plan, because the Village's older building stock runs largely on fossil fuels. *Id.* ¶ 2. After a

---

[2]Citations to the Parties' Local Rule 56.1 Statements of Material Facts are identified as follows: "PSOF" for Clean Energy's Statement of Material Facts (R. 29); "Def.'s Resp. PSOF" for the Village's Response to Clean Energy's Statement of Material Facts (R. 35); "DSOF" for the Village's Statement of Material Facts (R. 34-1); and "Pl.'s Resp DSOF" for Clean Energy's Response to the Village's Statement of Material Facts. (R. 47).

series of meetings in June 2023, the Village amended its building and residential codes for new construction (the Ordinance). *Id.* ¶¶ 10–11.

Under the Ordinance, most new buildings and residences in the Village are required to use electricity as their "source of energy" and may not combust "fossil fuels" indoors. Oak Park Vill. Code § 7-1-2 at P301.1; § 7-6-2 at X301.1. The purpose of this prohibition is "to reduce production of greenhouse gases." *Id.* § 7-1-2 at P101.2; § 7-6-2 at X101.2. In addition to its general prohibition on fossil fuels, the Ordinance prescribes several requirements for appliances installed in new buildings. PSOF ¶ 7. For example, it amends the Building Code to require all cooktops to be "electric induction types," all ovens to be "electric types," and "energy for any clothes dryer shall be provided by an electric pump." Oak Park Vill. Code § 7-1-2 at P30; § 7-6-2 at X301.1(6). The Ordinance also prohibits "directly piped exterior gas fire pits and gas cooking grills whose source of energy are fossil fuels." *Id.* § 7-1-2 P301.1(10); § 7-6-2 at X301.1(8). The Ordinance went into effect on January 1, 2024. PSOF ¶ 8.

## II.    EPCA

Congress enacted EPCA in 1975, "in the aftermath of the oil embargo imposed against the United States in 1973 and 1974 by certain petroleum-producing countries." *Nat. Res. Def. Council, Inc., v. Herrington*, 768 F.2d 1355, 1364 (D.C. Cir. 1985). "EPCA was designed, in part, to reduce the United States' domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n.*, 410 F.3d 492, 498–99 (9th Cir. 2005) (citation

3

omitted). EPCA sought to achieve this goal by authorizing energy efficiency standards and prescribing labeling requirements for "major home appliances and certain other consumer products," in the hope that "better informed consumers and voluntary efforts by manufacturers would make energy efficiency standards unnecessary." *Id.* at 499.

In 1978 Congress amended EPCA with the National Energy Conservation and Policy Act (NECPA), which "required the [Department of Energy] to prescribe minimum energy efficiency standards for thirteen covered products," namely kitchen ranges, ovens clothes dryers and furnaces. *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499. NECPA allowed states to "prescribe regulations more stringent than federal regulations *only if* the Secretary [of Energy] found there was a significant state or local interest to justify the state's regulation" and the regulation "would not unduly burden interstate commerce." *Id.* (emphasis in original). The Department of Energy (DOE), however, concluded in 1982 that "establishing minimum energy efficiency standards for the relevant appliances would not result in significant energy conservation and would not be economically justified," thus "the DOE determined no efficiency standards were required under NECPA." *Id.* While adopting this policy, the DOE also initiated a "general policy of granting petitions from States requesting waivers from preemption." *Id.* This resulted in a "growing patchwork of differing State regulation" that complicated the "design, production, and marketing of appliances." *Id.* at 500 (cleaned up). So, Congress passed the National Appliance Energy Conservation Act of 1987 (NAECA), which established uniform federal energy

standards for residential appliances. *Id*. at 499–500. NAECA also made changes to the preemption clause and made it more difficult for states to obtain a waiver. *Id*.

EPCA's current preemption provision for consumer products provides in relevant part:

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered [consumer] product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product[.]

42 U.S.C. § 6297(c).

"Energy" is defined as "electricity, or fossil fuels." 42 U.S.C. § 6291(3). "Energy use" means "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." *Id*. § 6291(4). "Energy efficiency" means "the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title." *Id*. § 6291(5). "Energy conservation standard" is defined as "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use . . . determined in accordance with test procedures prescribed under section 6293 of this title; or . . . a design requirement for" certain covered consumer products. *Id*. § 6291(6).

### III. Clean Energy

Clean Energy is an Illinois non-profit organization seeking to guarantee that energy consumers in the Chicagoland area and the State of Illinois have access to a

wide range of established technologies and energy alternatives, including natural gas. PSOF ¶ 1. Its members include, among others, the International Union of Operating Engineers Local 150, AFL-CIO (Local 150); National Association of Homebuilders (NAHB); and NPL Construction Co. (NPL). *Id.* ¶ 12. Both Local 150 and NAHB have thousands of members, including construction workers and homebuilders, some with specialized training on natural gas distribution and maintenance processes. *Id.* ¶¶ 13–15, 18. NPL installs and restores natural gas utilities in Oak Park and surrounding communities. *Id.* ¶ 21.

According to Clean Energy, the Ordinance has led to increased costs, which in turn deny coalition members potential new customers who would otherwise choose to use natural gas. PSOF ¶ 23. The Ordinance eliminated significant work opportunities for Local 150 members, who have specialized training in this field.[3] *Id.* ¶¶ 15–16. Since the Ordinance's enactment, demand for NPL's services has declined in the Village and directly reduced its revenue.[4] PSOF ¶ 22. Clean Energy seeks a declaratory judgment and permanent injunction prohibiting enforcement of the Ordinance as preempted by EPCA. Compl. ¶¶ 75–76. Predictably, the Village sees things differently and insists that EPCA's preemption clause, the meaning of its technical terms, and the broader statutory framework all make clear that EPCA only

---

[3]The Village disputes these allegations. The Village argues that other work opportunities exist for Local 150 members. Def's Resp. PSOF ¶ 16. The Court need not resolve this factual dispute, as it is immaterial to resolution of the parties' cross-motions.

[4]The Village objects to this allegation on the basis that Clean Energy has not provided adequate evidentiary support. Def's Resp. PSOF ¶ 22. As above, resolution of this factual dispute is unnecessary for resolution of the cross-motions.

preempts local regulations that prescribe the equivalent of a federal energy conservation standard for a covered product's characteristics as manufactured. R. 35, Def.'s Resp./Cx-Memo. at 6.

## IV. Amici Curiae

Amici Curiae (Amici) are four organizations with interests in preserving the public health and climate benefits of the Village's all-electric new construction ordinance and similar policies beyond the Village. R. 37, Amici Memo. at 1. Amici argue that Clean Energy's expansive reading of EPCA's preemptive reach would completely negate the Village's firmly established authority to reduce air pollution that harms the public health, pursuant to its valid police powers. *Id.* at 2. According to Amici, when analyzing express preemption provisions, the Seventh Circuit applies a presumption against preemption in areas of traditional state regulation. *Id.* at 12 (citing *Laborers' Pension Fund v. Miscevic*, 880 F.3d 927, 931 (7th Cir. 2018)). This presumption applies here, assert Amici, because the Ordinance is a valid exercise of the Village's traditional police power to regulate public health and safety. *Id.* at 14 (citing *Sutker v. Ill. State Dental Soc.*, 808 F.2d 632, 635-36 (7th Cir. 1986)). Amici argue that even though EPCA's plain language, statutory structure, and legislative history clearly show the Ordinance is not preempted, the Seventh Circuit's presumption against preemption creates an even higher bar —which the Village fails to clear. *Id.*

The parties' fully briefed cross motions for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure are before the Court.[5]

## Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *See Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

---

[5]The Court heard oral arguments on the respective motions.

8

## Analysis

### I.    Preemption

Given that the parties' cross-motions center on whether the Ordinance is preempted by EPCA, the Court starts with the law of preemption. The Supremacy Clause of the U.S. Constitution provides that the Constitution and laws of the United States shall be the "supreme law of the land." U.S. Const. art. VI, cl.2. The Supremacy clause "invalidates state laws that interfere with, or are contrary to, federal law." *Nelson v. Great Lakes Educ. Loan Servs. Inc.*, 928 F.3d 639, 646 (7th Cir. 2019) (quoting *Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 712–713 (1985)). There are three types of preemption: express, field, and conflict. *Id*. At issue here is express preemption, as Clean Energy argues that the Ordinance is expressly preempted by EPCA.

Express preemption exists when Congress clearly declares its intention to preempt state law. *See C.Y. Wholesale, Inc., v. Holcomb,* 965 F.3d 541, 546 (7th Cir. 2020). "In all pre-emption cases, and particularly in those in which Congress has legislated in a field in which the States have traditionally occupied, [courts] must start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (cleaned up). "Express preemption presents a question of statutory interpretation." *Nelson,* 928 F.3d at 647. The "purpose of Congress is the ultimate touchstone in every pre-emption case."

*Medtronic, Inc., v. Lohr*, 518 U.S. 470, 485 (1996) (citation omitted). Congressional intent, of course is "primarily [] discerned from the language of the pre-emption statute and the statutory framework surrounding it." *Id.* (citation omitted). Also relevant "is the structure and purpose of the statute as a whole." *Id.* (citation omitted).

When it comes to the presumption against preemption, the Court agrees with Clean Energy that the presumption should not apply here. The Village does not dispute this principle, but Amici do. *See* R. 48, Def.'s Cx-Reply at 7 n.1; Amici Memo. at 12–14. The Supreme Court and the Seventh Circuit have held that courts should "not invoke any presumption against preemption" in express preemption cases and should "instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 594 (2011)); *see also Planned Parenthood of Indiana, Inc. v. Commr. of Indiana State Dept. Health*, 699 F.3d 962, 984 (7th Cir. 2012). The Court therefore disagrees with Amici that a presumption against preemption should apply here.

## II.    The Competing Interpretations

### a.  *Clean Energy's Position and* California Restaurant Association[6]

Clean Energy argues that under the plain text of EPCA, the Ordinance is preempted. Pl.'s Memo. Summ. J. at 8. Clean Energy points out that EPCA expressly preempts any "State regulation concerning . . . the energy use of" gas appliances. *Id.*

---

[6]*California Rest. Ass'n v. City of Berkely*, 89 F. 4th 1094 (9th Cir. 2024).

(quoting 42 U.S.C. §§ 6297(c)). The statutory definitions of key terms, according to Clean Energy, confirm it applies to natural gas bans, such as the Ordinance. *Id.* Clean Energy notes that the Ordinance prohibits any appliance that uses more than zero fossil fuels, which it maintains is "indisputably a quantity." *Id.* at 9 (citation omitted). In short, Clean Energy argues that EPCA preempts state regulations concerning energy use and energy use is defined as a quantity of energy consumed by a consumer. Therefore, the Ordinance's requirement that the "quantity" of energy made by fossil fuels be zero is preempted. In support of this interpretation, Clean Energy relies heavily on *California Rest. Ass'n v. City of Berkely*, 89 F. 4th 1094 (9th Cir. 2024).

In *California Rest. Ass'n*, the plaintiffs challenged a municipal regulation prohibiting the installation of natural gas piping within newly constructed buildings. 89 F. 4th at 1098. The Ninth Circuit held that EPCA preempted the ordinance, reasoning that because "EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations," the ordinance impermissibly regulated "energy use" by setting the quantity to be used in new construction at 'zero.'" *Id.* at 1101–02 (emphasis in original). From the majority's point of view, "a building code that prohibits consumers from using natural gas–powered appliances in newly constructed buildings necessarily regulates the quantity of energy directly consumed by the appliances at point of use," which EPCA expressly prohibits. *Id.* at 1102 (cleaned up).

In dissent, Judge Friedland accused the majority of misinterpreting EPCA's key terms "to have colloquial meanings instead of the technical meanings required

11

by established canons of statutory interpretation." *California Rest. Ass'n*, 89 F. 4th at 1120. The way Judge Friedland saw it, EPCA from its inception was designed to set "uniform appliance efficiency standards" for covered products that proceeded to market, and not to create a "consumer right to use" any covered appliance. *Id.* at 1121. According to Judge Friedland, EPCA is a "technical statute" whose words must be interpreted in accordance with "specialized meanings." *Id.* The critical terms "energy use" and "point of use" must be given their technical and industry-relevant meanings. *Id.* at 1121–23. "Energy use," for example, is a technical term meant to encompass "the typical amount of energy consumed per use cycle or in a given amount of time while the appliance is in operation." *Id.* "Energy use" is a fixed performance standard that "aims to approximate the *typical* energy use of an appliance during operation, the measure does not depend on any given consumer's *actual* use." *Id.* (emphases in original).

Similarly, "point of use," explained Judge Friedland, has a "well-established technical meaning" and does not refer to the place where an appliance is used. *California Rest. Ass'n*, 89 F. 4th at 1124–25. Rather, the technical meaning of the term refers to a way of measuring energy consumption. *Id.* "Point of use" measures "site energy," the energy that is directly consumed by the appliance from the pipe or outlet, and Congress intended for its inclusion to "give a technical instruction" to the DOE and manufacturers upstream in the supply chain. *Id.* Point of use does not expand EPCA's scope to govern the end-user's ability to *use* installed covered products at their intended final destinations. *Id.* Rather, it fits neatly into the statutory

definition of "energy use," which refers to a covered product's characteristics as manufactured.

### b. *The Village's Position and* Plumbers[7]

The Village argues that EPCA preempts only those local regulations that create the equivalent of a federal energy conservation standard for a covered product. Def.'s Resp./Cx-Memo. at 6. Because the Ordinance, from the Village's perspective, does not, the Ordinance is not preempted. *Id.* Clean Energy's argument, notes the Village, is premised on "regulation concerning . . . energy use." *Id.* at 7. But "energy use" is a representative measure of how much energy a product typically consumes per use cycle, or over a given period, measured under controlled conditions simulating actual use. *Id.* The Village maintains that energy use is a design characteristic of a product, and a function of how it is manufactured, supplying a fixed value to estimate and describe its performance. *Id.* The Village contends that although the Ordinance restricts, in some circumstances, what appliances new buildings may use, it does not set energy conservation standards and imposes no design requirements. *Id.* at 4–5. In support of this interpretation, the Village relies on *Ass'n of Contracting Plumbers of the City of New York Inc v. City of New York*, 180 F.4th 434 (2d Cir. 2026)[8] (*Plumbers*).

---

[7]*Ass'n of Contracting Plumbers of the City of New York, Inc v. City of New York*, 180 F.4th 434 (2d Cir. 2026).

[8]*Plumbers* was issued after the parties concluded their briefing and oral argument. The Village cited *Plumbers* as supplemental authority (R. 58) and Clean Energy filed a response (R. 60). In its response/cross-motion, the Village relied on one of the two district court cases the Second Circuit affirmed in *Plumbers*. *See* Def.'s Resp./Cx-Memo. (citing *Ass'n of*

13

In *Plumbers*, the City of New York and New York State enacted laws that, in effect, prohibited the use of fossil fueled appliances in newly constructed residential buildings. 180 F.4th at 436. Two separate suits were filed, one against the City of New York and one against New York State. The plaintiffs, trade associations and unions, alleged that the laws were preempted by EPCA. *Id*. at 437. The district court in the case against the City granted the City's motion to dismiss; the district court in the case against the State of New York granted summary judgment in favor of the State. Both courts found that EPCA did not preempt the laws, as the laws did not concern the energy use of a covered product. In doing so, the courts declined to adopt the Ninth Circuit's definition of "energy use," and instead adopted Judge Friedland's interpretation of EPCA. *Id*. The Second Circuit affirmed.

The Second Circuit first determined the meaning of "energy use" as used in EPCA. *Plumbers*, 180 F.4th at 439-40. There, as in this case, the plaintiffs argued that the "energy use" of a covered product was "the amount of energy consumed by covered products in the hands of the consumer." *Id*. at 439. The court rejected that interpretation of "energy use." The court noted that manufacturers ascertain an appliance's energy use by using test procedures, the results of which are determinative. *Id*. And those test procedures, from the court's point of view, "are designed to *replicate* the appliance's average use, meaning the tests performed in a controlled setting, not at the appliance's ultimate destination in the hands of consumers." *Id*. (emphasis in original). The court thus found "energy use" to mean "a

*Contracting Plumbers of City of New York, Inc. v. City of New York*, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025)).

14

standardized, fixed measure assigned to a product before it reaches consumers," so "once an appliance has been sold, nothing a consumer does with the appliance changes that appliance's energy use." *Id*. Therefore, reasoned the court, "a regulation that effectively bars the use of a covered appliance by certain consumers, like the challenged laws, has little to do with that appliance's 'energy use.'" *Id*. In short, "'energy use,' as that term is used in the preemption provision, has no effect whatsoever on that appliance's coverage under the challenged laws." *Id*. at 445.

Next, the court looked to the statutory context, meaning the "structure and purpose of the Act." *Plumbers*, 180 F.4th at 440. The court concluded that the statutory context confirmed that "energy use" "refers to a metric determined before an appliance ever reaches consumers, not the energy that appliance uses in the hands of consumers." *Id*. at 441.

The court then turned to the plaintiffs' argument—an argument also advanced by Clean Energy here—that Congress intended to preempt any regulation "concerning" energy use of a covered product under EPCA. *Plumbers*, 180 F.4th at 441-42. Not so, according to the court, which found that "phrases such as 'related to,' and 'concerning' do not endlessly stretch the scope of preemption provisions." *Id*. Based on the definition of energy use, the law neither directly regulates energy use of any covered product, nor does it *concern* the energy use of a covered product. *Id*. at 444-46.

The plaintiffs in *Plumbers* further argued that EPCA's exemptions for certain building codes confirm that preemption applies even if the state or local ordinance

15

does not regulate appliances directly. 180 F.4th at 447-48. The Second Circuit disagreed that the building code exemptions undermined its interpretation of the preemption provision as applied to the challenged laws. *Id.* For starters, observed the court, "for the exemption to make any sense, the kind of regulation it describes must be preempted in the first place; otherwise, the exception would do no work." *Id.* at 447. The building code regulations were "not the kind of performance standards that Congress was most directly concerned with," but nonetheless had "an impermissible relationship to EPCA's subject matter" because they achieved the goal of regulating the performances of appliances in buildings and also directly "implicate[d] Congress's objectives in maintaining uniform energy conservation standards." *Id.* at 447-48. Therefore, the court found that its interpretation of the preemption provision internally consistent with the building code exemption, and indeed, found that the exemption provision further supported its interpretation. *Id.*

The court also found its interpretation supported by the preemption provision's history, as "it is clear that the challenged laws would not be preempted under the prior versions of [EPCA's] preemption provision," and further amendments "illustrate[] that Congress's revisions to the preemption provision were intended to reinforce the limits of its scope, not broaden them." *Plumbers*, 180 F.4th at 448-49.

Lastly, the Second Circuit disagreed with *California Restaurant Association.* From the court's point of view, the Ninth Circuit's emphasis on "point of use" ignored the second half of the statutory definition of "energy use," which references point of use as "determined in accordance with test procedures under section 6293." *Plumbers*,

16

180 F.4th at 451. The court found it "simply incompatible" that the statutory definition of "energy use" and reliance on manufacturer test procedures to determine usage would refer to energy an appliance consumes "at its intended final destination." *Id.* (citation omitted).

While the Second Circuit is the latest court to have addressed the issue of preemption by EPCA, it is not the only court to have concluded that EPCA does not preempt state or local ordinances that prohibit the use of fossil fuels such as natural gas and heating fuel in newly constructed residential buildings. *See Nat'l Ass'n of Home Builders of the States v. District of Columbia*, 2026 WL 837674 (D.D.C. Mar. 26, 2026); *Nat'l Ass'n of Home Builders of the U.S. v. Montgomery Cnty*, 2026 WL 817322 (D. Md. Mar. 25, 2026).

## III. EPCA and the Ordinance

With these considerations in mind, the Court turns to the Ordinance and EPCA. The Court starts with the text of EPCA's preemption clause. The preemption clause provides that "for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product." 42 U.S.C. § 6297(c). Applying the tools of statutory construction, the Court finds that EPCA does not preempt the Ordinance.

"Statutory construction . . . is a holistic endeavor." *United Sav. Ass'n of Tex. v. Timers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). When interpreting a statute, courts begin with the language of the statute, "giving the words used their ordinary meaning." *Artis v. District of Columbia*, 583 U.S. 71, 83 (2018) (citation

17

omitted); *see also Schneider Nat'l Leasing, Inc. v. United States*, 11 F.4th 548, 554, 559 (7th Cir. 2021) (citations omitted). As the Supreme Court has explained, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 441 (2019) (citation omitted). In interpreting an express preemption clause, the court must "identify the domain expressly pre-empted" by the statute. *Nelson,* 928 F.3d at 647 (citation omitted).

The Court begins with the term "energy use." "When a statute includes an explicit definition of a term, a court must follow that definition, even if it varies from a term's ordinary meaning." *Van Buren v. United States*, 593 U.S. 374, 387 (2021) (citation omitted) (cleaned up). Recall that EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." 42 U.S.C. § 6291(4). Section 6293 requires that such test procedures be "reasonably designed to produce test results which measure [the] . . . energy use . . . of a covered product during a representative average use cycle or period of use." 42 U.S.C. § 6293(b)(3). Clean Energy maintains that EPCA preempts any regulation of the quantity of energy that a gas appliance consumes. Since the Ordinance bans the use of gas appliances, Clean Energy argues it effectively sets the appliance's consumption to zero, and as such, is preempted. The Village, on the other hand, insists that EPCA preempts energy conservation standards that compete with federal standards, but does not preempt local laws that have nothing to do with energy conservation, such

18

as the Ordinance. The Court finds that the Village has the better of the argument and in doing so, joins the courts who have declined to adopt Clean Energy's interpretation of "energy use."

The reasoning in *Plumbers* is applicable and persuasive, and the Court agrees with the Second Circuit and the Village that "energy use" in EPCA refers to a predetermined value that is assigned to a product before it reaches consumers. This definition is supported by the statute's explicit direction that "energy use" be determined in accordance with test procedures under section 6293. 42 U.S.C. § 6291(4). The test procedures themselves are designed to produce test results measuring "a representative *average use cycle or period of use*." 42 U.S.C. § 6293 (emphasis added). "Energy use" as preempted in EPCA is thus unimpacted by the actual energy an appliance consumes in the hands of consumers. Whether that use is zero is irrelevant under the statute. Because the Ordinance here regulates the types of energy or fuel that covered appliances may use in certain buildings, rather than establishing or affecting the appliances' federally regulated energy-efficiency or energy-use performance standards, the Ordinance does not "concern" energy use under EPCA. The Court further finds that the Ordinance does not create the type of conflicting product standards or burdens on manufacturers that EPCA's preemption provision was intended to prevent and therefore falls outside the statute's preemptive scope.

And, like the Second Circuit in *Plumbers*, the Court finds that EPCA's building code exemption supports the Court's reading of its preemption provision. The

19

provision states that "a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of [that] covered [consumer] product" is not preempted if seven requirements are met. 42 U.S.C. § 6297(f)(3). It is important to note that the regulations covered by the exemption are different from the kind of energy conservation standards that primarily concerned Congress—the regulations covered by the building code exemption are building-wide and operate through incentives. *See Plumbers*, 180 F.4th at 447. Regardless, as other courts have noted, the "legislative history of the building code exception to preemption confirms that Congress wanted to ensure that state building codes could not frustrate national uniformity in appliance standards by requiring the installation of products whose efficiencies exceeded federal standards." *Maryland Bldg. Indus. Ass'n, Inc. v. McIlwain*, 828 F. Supp. 3d 617, 637 (D. Md. 2026). The building code exemption illustrates that Congress intended to preempt regulations that mandate installation of appliances with energy efficiency exceeding predetermined federal standards. This is in line with the Court's interpretation of EPCA's "energy use": a predetermined value that is assigned to a product before it reaches consumers. Regulations that require the use of appliances with energy efficiencies exceeding federal standards are preempted. The Ordinance is not one such regulation.

## Conclusion

For the foregoing reasons, the Court finds that the Ordinance is not preempted under EPCA. Accordingly, the Court denies Plaintiff's motion for summary judgment [R. 27] and grants Defendant's cross-motion for summary judgment [R. 34].

Dated: July 30, 2026

_____
United States District Judge
Franklin U. Valderrama